**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CERVECERÍA MODELO DE MÉXICO,
S. DE R.L. DE C.V.,

                          Plaintiff,

          vs.

CB BRAND STRATEGIES, LLC,
CROWN IMPORTS LLC, and
COMPAÑÍA CERVECERA DE
COAHUILA, S. DE R.L. DE C.V.,

                 Defendants.

Case No.: 1:21-cv-01317-LAK

ECF Case

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

**KIRKLAND & ELLIS LLP**
Sandra C. Goldstein, P.C.
Stefan Atkinson, P.C.
Daniel R. Cellucci
Sara S. Tatum
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
sandra.goldstein@kirkland.com
stefan.atkinson@kirkland.com
daniel.cellucci@kirkland.com
sara.tatum@kirkland.com

*Counsel for Defendants*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................. 4

    A.    The Parties ........................................................................................ 4

    B.    ABI and Modelo Compete Until ABI Decides to Acquire Modelo in 2012. ......... 5

    C.    The Department of Justice Sues to Block ABI's Acquisition of Modelo. .............. 5

    D.    Facing Litigation with the DOJ, ABI and Modelo Agree to Divest
        Modelo's Entire U.S. Business, Including Its U.S. Beer Brands, to
        Constellation. ................................................................................... 7

    E.    The Parties Execute the Sublicense Agreement, Which Grants
        Constellation a Perpetual License to Market and Sell Corona-Branded
        Beer and Related Products in the United States. ...................................... 8

    F.    Hard Seltzer Takes Off as the Newest Innovation in Beer. ................................. 10

    G.    Constellation Launches Corona Hard Seltzer, Which Becomes Immensely
        Popular, Challenging ABI's Bud Light Seltzer. .................................................. 11

    H.    ABI Commences Litigation After Corona Hard Seltzer Becomes Popular. ......... 13

STATUTORY AND REGULATORY BACKGROUND ............................................. 14

LEGAL STANDARD ........................................................................................ 17

ARGUMENT ................................................................................................... 19

I.    CONSTELLATION HAS NOT BREACHED THE LICENSE AGREEMENT. ................. 20

    A.    Corona Hard Seltzer Is a "Beer." ........................................................ 20

    B.    Corona Hard Seltzer Is, at a Minimum, a "Version" of "Beer" or a
        "Version" of a "Malt Beverage." .......................................................... 25

    C.    Other Provisions of the Sublicense Agreement Confirm That Constellation
        Has Broad Rights to Innovate and Bring to Market Corona Hard Seltzer. ......... 27

    D.    ABI's Contrary Position Is Unsupported and Inconsistent with the Purpose
        of the License Agreement. ................................................................... 28

    E.    Corona Hard Seltzer Is a "Mexican-Style Beer" Because Every Can
        Expressly States That the Product Is "IMPORTED FROM MEXICO." .............. 33

II.  CORONA HARD SELTZER HAS NOT INFRINGED ANY TRADEMARK
     RIGHTS. ....................................................................................................................... 35

CONCLUSION ......................................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)...................................................................................................17

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
  493 F.3d 87 (2d Cir. 2007)....................................................................................11, 12

*In re Bank of N.Y. Mellon Corp. Forex Transactions Litig.,*
  921 F. Supp. 2d 56 (S.D.N.Y. 2013).........................................................................19

*Beazley Ins. Co., Inc. v. ACE Am. Ins. Co.,*
  197 F. Supp. 3d 616 (S.D.N.Y. 2016), *aff'd* 880 F.3d 64 (2d Cir. 2018) .........................21, 23

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)...................................................................................................17

*In re Bernard L. Madoff Inv. Secs. LLC,*
  773 F.3d 411 (2d Cir. 2014).......................................................................................26

*Bourne v. Walt Disney Co.,*
  68 F.3d 621 (2d Cir. 1995).........................................................................................35

*Brass v. Am. Film Tech., Inc.,*
  987 F.2d 142 (2d Cir. 1993).......................................................................................18

*Chesapeake Energy Corp. v. Bank of New York Mellon Tr. Co., N.A.,*
  773 F.3d 110 (2d Cir. 2014).......................................................................................25

*Condor Cap. Corp. v. CALS Invs., LLC,*
  118 N.Y.S.3d 29 (App. Div. 2020) ............................................................................18

*Doron Precision Sys., Inc. v. FAAC, Inc.,*
  423 F. Supp. 2d 173 (S.D.N.Y. 2006).......................................................................11

*Eskimo Pie Corp. v. Whitelawn Dairies, Inc.,*
  284 F. Supp. 987 (S.D.N.Y. 1968) ............................................................................21

*Est. of Setlow v. Liberty Union Mfg. Co., Inc.,*
  2008 WL 11413406 (E.D.N.Y. Mar. 31, 2008).........................................................14

*Ganino v. Citizens Utils. Co.,*
  228 F.3d 154 (2d Cir. 2000).......................................................................................17

*Harris v. Simon & Schuster, Inc.*,
  646 F. Supp. 2d 622 (S.D.N.Y. 2009) ...................................................................35

*Helprin v. Harcourt, Inc.*,
  277 F. Supp. 2d 327 (S.D.N.Y. 2003) ..............................................................4, 12

*Hugo Boss Fashions, Inc. v. Federal Ins. Co.*,
  252 F.3d 608 (2d Cir. 2001) ...........................................14, 21, 22, 23, 24, 29

*Innophos, Inc. v. Rhodia, S.A.*,
  832 N.Y.S.2d 197 (App. Div. 2007), *aff'd*, 10 N.Y.3d 25 (2008) ........................26

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
  62 F.3d 69 (2d Cir. 1995) ......................................................................................19

*Jenkins v. XpresSpa Grp., Inc.*,
  2020 WL 7261138 (S.D.N.Y. Dec. 10, 2020) .......................................................33

*Kramer v. Time Warner Inc.*,
  937 F.2d 767 (2d Cir. 1991) ...................................................................................4

*Metro. Life Ins. Co. v. RJR Nabisco Inc.*,
  906 F.2d 884 (2d Cir. 1990) ............................................................................17, 21

*Porwal v. Ballard Power Sys., Inc.*,
  2019 WL 1510707 (S.D.N.Y. Mar. 21, 2019) .......................................................11

*Reinhardt v. Wal-Mart Stores, Inc.*,
  547 F. Supp. 2d 246 (S.D.N.Y. 2008) ...................................................................35

*Reinhardt v. Wal-Mart Stores, Inc.*,
  547 F. Supp. 2d 346 (S.D.N.Y. 2008) ...................................................................18

*RM Realty Holdings Corp. v. Moore*,
  884 N.Y.S.2d 344 (App. Div. 2009) ......................................................................29

*Robinson v. United States*,
  80 U.S. (13 Wall.) 363, 20 L.Ed. 653 (1871) .................................................14, 23

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ...................................................................................17

*Seiden Assocs., Inc. v. ANC Holdings, Inc.*,
  959 F.2d 425 (2d Cir. 1992) ...................................................................................33

*Spinelli v. Nat'l Football League*,
  903 F.3d 185 (2d Cir. 2018) ...................................................................................35

*Trs. of Upstate N.Y. Eng'rs Pension Fund. v. Ivy Asset Mgmt.*,
   131 F. Supp. 3d 103 (S.D.N.Y. 2015) .................................................................18

*TufAmerica, Inc. v. Orchard Enters., Inc.*,
   2011 WL 4946663 (S.D.N.Y. Oct. 14, 2011) ......................................................35

*United States v. Anheuser-Busch InBev & Grupo Modelo*,
   No. 1:13-cv-00127, ECF No. 1 (D.D.C. 2013) ..................................................4, 7

*Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*,
   807 N.E.2d 876 (N.Y. 2004) ...............................................................................31

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
   127 F. Supp. 3d 156 (S.D.N.Y. 2015) .................................................................11

**Statutes**

15 U.S.C. § 1117 ..........................................................................................................13

26 U.S.C. §§ 5001, et seq. ............................................................................................14

26 U.S.C. § 5052 ..........................................................................................................14

26 U.S.C. § 5052(a) ......................................................................................................22

27 U.S.C. § 211 ............................................................................................................16

Federal Food, Drug, and Cosmetic Act .......................................................................16

Lanham Act, 15 U.S.C. §§ 1051 *et seq.* .....................................................................13

N.Y. Alco. Bev. Cont. Law § 3(3) ...........................................................................16, 22

N.Y. Tax Law § 420 ..................................................................................................16, 22

**Rules**

Fed. R. Civ. P. 12(b)(6) ....................................................................................4, 17, 18, 20

Fed. R. Evid. 201(b) ......................................................................................................11

**Regulations**

27 C.F.R. §7.10 .............................................................................................................16

27 C.F.R. § 25.11 .......................................................................................................15, 22

27 C.F.R. § 25.15 .......................................................................................................15, 22

N.Y. Comp. Codes R. & Regs. tit. 9, § 84.1(f) ........................................................................17

N.Y. Comp. Codes R. & Regs. tit. 9, § 84.1(g) .......................................................................17

N.Y. Comp. Codes R. & Regs. tit. 9, § 84.1(g)(2) ...................................................................23

**Other Authorities**

https://www.ttb.gov/images/pdfs/rulings/2008-3.pdf ................................................................15

Merriam-Webster's Dictionary 1390 (11th ed. 2003) ...............................................................25

New Oxford Dictionary 2055 (1st ed. 1998) .............................................................................25

## INTRODUCTION

"Hard seltzer" is an innovative beverage alcohol concept that consumers love.  According to industry analysts, it is quite possibly the most exciting thing to hit the beer market in decades. Some products that are marketed as "hard seltzers" are created by combining distilled spirits with a carbonated base.  Other products marketed as "hard seltzers" are brewed just like traditional lagers and other beers from a malted barley base, a sugar base, or other legally recognized substitutes for malt.  Consumers have rewarded this innovation:  sales of hard seltzer exploded during the five years since these products first hit the market, exceeding $4.5 billion in 2020 alone.

More than a year ago, Constellation, a producer, marketer, and distributor of beverage alcohol headquartered in New York, launched a wildly successful sugar-based hard seltzer under the popular Corona brand:  Corona Hard Seltzer.  Corona Hard Seltzer is a brewed fermented beverage produced by Constellation in its brewery in Coahuila, Mexico.  Pursuant to its perpetual, irrevocable, and exclusive license rights in the Corona marks, Constellation invested significant resources to develop Corona Hard Seltzer and promote and sell it in the United States.  Today, Corona Hard Seltzer is the fourth most popular hard seltzer in the United States, and rising.  But not everybody is happy about Corona Hard Seltzer's success.  Anheuser-Busch InBev SA/NV ("ABI"), the world's largest alcoholic beverages company and licensor of the Corona marks to Constellation, recently launched several of its own hard seltzer products, including Bud Light Seltzer.  Corona Hard Seltzer competes with Bud Light Seltzer and other ABI hard seltzers to satisfy consumers' skyrocketing demand for hard seltzer.

ABI, through its subsidiary, now takes the position that Constellation never had any right to develop and promote Corona Hard Seltzer, and that Constellation has been breaching its contractual obligations and infringing ABI's trademark rights ever since Constellation launched

Corona Hard Seltzer last year.  ABI is incorrect.  This lawsuit is simply another page out of ABI's well-worn playbook for taking out its competition in the domestic beer market.

ABI's efforts to thwart competition date back to at least 2012, when ABI decided to acquire the remaining stake it did not already own in one of its largest competitors and the original owner of the Corona marks, Grupo Modelo.  Taking the "if you can't beat them, join them" approach, ABI decided to acquire Modelo rather than compete.  But as soon as the acquisition was announced, the Antitrust Division of the United States Department of Justice got involved and put an end to ABI's efforts to buy total market dominance.  As a prerequisite to approving the acquisition, the DOJ required ABI to divest Modelo's entire domestic business, including Modelo's right to use the Corona marks (and others) on beer imported and sold in the United States.  So Modelo sold rights in the Corona marks (and others) to Constellation.  In exchange for a lump-sum payment of $4.75 billion, the parties executed a number of agreements, including the key Sublicense Agreement at issue in this case.  The Sublicense Agreement grants Constellation an expansive license to step into the shoes of Modelo's business in the United States, including a perpetual license to use the Corona marks (and others) with respect to the promotion and marketing of "Beer," defined as "beer, ale, porter, stout, malt beverages, and any other versions . . . of the foregoing."  In addition, the Sublicense Agreement gives Constellation certain rights to innovate and bring new products to market using the Corona marks.  The result of the transaction fulfilled the purpose of the DOJ by creating overnight the third-largest brewer and distributor of beer in the U.S.—Constellation—and thus preserving competition in the beer industry.

Consistent with its rights under the Sublicense Agreement, Constellation *did* innovate and *did* launch a new product in the domestic beer market:  Corona Hard Seltzer.  Under federal and New York law, which govern the Sublicense Agreement, beer can be brewed from a sugar base

because sugar is a legally recognized substitute for malt. But ABI (through Modelo) now takes the extraordinary position that the Sublicense Agreement's reference to "beer, ale, porter, stout, malt beverages, and any other versions . . . of the foregoing" does not include a sugar-based beer at all, whether called a "hard seltzer" or otherwise. In other words, against the Sublicense Agreement's broad definition of "Beer," and applicable law, Modelo claims that because Corona Hard Seltzer is brewed from a *sugar* base (rather than a *malted barley* base) it falls outside the scope of the license—and that Constellation must shut down production of Corona Hard Seltzer and cease its competition with ABI and Modelo in this expanding beer subcategory.

That is not right. The Sublicense Agreement does not exclude sugar-based hard seltzers from its definition of "Beer" and include malt-based hard seltzers only. Simply put, Constellation has not breached the Sublicense Agreement or infringed any trademark rights by developing and selling Corona Hard Seltzer, because the Sublicense Agreement unambiguously *includes* sugar-based brewed beverages (including those called "hard seltzers") within its definition of "Beer," which comprises "beer, . . . malt beverages, and any other versions . . . of the foregoing." The Sublicense Agreement was negotiated by sophisticated parties in the well-defined and highly regulated beverage alcohol industry, so the Court need only consult traditional evidentiary sources such as the regulatory backdrop and industry terminology to conclude that the Sublicense Agreement's definition of "Beer" is unambiguous and permits Constellation to produce and market Corona Hard Seltzer. That correct interpretation of the Sublicense Agreement's definition of "Beer" also makes sense in light of other provisions giving Constellation rights to innovate and launch new products. By contrast, ABI's contrary suggestion that the Sublicense Agreement's definition of "Beer" *excludes* a sugar-based hard seltzer like Corona Hard Seltzer finds no support in the language of the Sublicense Agreement, relies on atextual exclusionary principles pulled from

the air, and frustrates the known intent of the contract: to promote consumer welfare by giving Constellation all the tools necessary to innovate and compete against ABI while, at the same time, preventing ABI from interfering in or impeding Constellation's exercise of its rights to the Corona marks. This Court should reject ABI's latest effort to squelch a major competitor, and need only construe the Sublicense Agreement as written to conclude that Constellation has every right to market and sell Corona Hard Seltzer to the legions of customers who enjoy it. Because Constellation has not breached the Sublicense Agreement, nor infringed any trademark rights, the Court should dismiss the Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6).

## FACTUAL BACKGROUND

### A.    The Parties

Plaintiff Cervecería Modelo de México, S. de R.L. de C.V. is a Mexican corporation with its principal place of business in Mexico City, Mexico. Compl. ¶ 10. It is a subsidiary of Anheuser-Busch InBev SA/NV, a corporation headquartered in Leuven, Belgium. Complaint ¶¶ 17, 23, *United States v. Anheuser-Busch InBev & Grupo Modelo*, No. 1:13-cv-00127, ECF No. 1 (D.D.C. 2013) ("DOJ Compl.").[1] ABI is the world's largest alcoholic beverages company. Compl. ¶ 20.

Defendants (together "Constellation") are CB Brand Strategies, LLC, with its principal place of business in Zug, Switzerland; Crown Imports LLC, with its principal place of business in

---

[1]    A true and correct copy of the Department of Justice's Complaint in *United States v. Anheuser-Busch InBev & Grupo Modelo*, No. 1:13-cv-00127, ECF No. 1 (D.D.C. 2013), is attached as Exhibit 1 to the Declaration of Sara S. Tatum, filed contemporaneously with this motion. This complaint may be considered at the motion to dismiss stage because it is incorporated by reference in the Complaint (¶ 21), *see, e.g.*, *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330-31 (S.D.N.Y. 2003), and because public court filings are generally subject to judicial notice, *see Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

Chicago, Illinois; and Compañía Cervecera de Coahuila, S. de R.L. de C.V., with its principal place of business in Nava, Coahuila, Mexico. *Id.* ¶¶ 11-13.

### B.    ABI and Modelo Compete Until ABI Decides to Acquire Modelo in 2012.

Before ABI decided to acquire its most disruptive challenger, Modelo, and despite ABI owning a 35.3% direct interest in the latter, the two companies engaged in "substantial head-to-head competition" in the domestic beer market. DOJ Compl. ¶ 6. The rivalry was hardly a secret, as even "ABI and Modelo executives agree[d] that there [was] vigorous competition between the ABI and Modelo brands in the United States." *Id.* ¶ 20. The degree of competition between the two entities was so substantial that it necessitated firewalls "to ensure that the ABI members of Modelo's Board d[id] not become privy to information about the pricing, marketing, or distribution of Modelo brands in the United States." *Id.* Pricing was a particular focus for ABI. While other companies, such as MillerCoors, often followed ABI's price increases, Modelo did not and usually instead "resisted ABI-led price hikes." *Id.* ¶¶ 3-4. ABI was not fond of Modelo's lone insistence on independence. In fact, "ABI internal documents acknowledge[d] that Modelo ha[d] put 'increasing pressure' on ABI by pursuing a competitive strategy *directly at odds* with ABI's well-established practice of leading prices upward." *Id.*

Against the backdrop of Modelo's unique reluctance to follow ABI's otherwise unchallenged lead on pricing in the United States, ABI announced in June 2012 that it had agreed to purchase the remaining equity interest from Modelo's owners for about $20.1 billion. *Id.* ¶¶ 19, 23.

### C.    The Department of Justice Sues to Block ABI's Acquisition of Modelo.

ABI and Modelo recognized from the beginning that their deal would raise red flags. As disclosed by the Department of Justice, "in an effective acknowledgement that the acquisition of Modelo raise[d] significant competitive concerns," ABI and Modelo announced the deal and

"simultaneously entered into another transaction in an attempt to 'remedy' the competitive harm caused by ABI's acquisition of the remainder of Modelo." *Id.* ¶ 24. Specifically, the parties proposed that Modelo divest its existing interest in Crown to Constellation. But the DOJ rejected this meager proposal, making clear that it failed to address fully the "likely anticompetitive effects of the proposed acquisition." *Id.* ¶ 11. The DOJ concluded that the "significant increase in market concentration that the proposed acquisition would produce in the relevant markets, combined with the loss of head-to-head competition between ABI and Modelo, [wa]s likely to result in unilateral price increases by ABI and to facilitate coordinated pricing between ABI and remaining market participants." *Id.* ¶ 68.

Nearly seven months after the deal was announced, the DOJ filed a civil antitrust complaint to enjoin the proposed $20.1 billion transaction. *Id.* ¶ 1. The DOJ alleged that the acquisition would constitute "a serious violation of Section 7 of the Clayton Act," which prohibits mergers and acquisitions when the effect "may be substantially to lessen competition, or to tend to create a monopoly." Compl. ¶ 21; *see also* DOJ Compl. ¶¶ 1, 86. In particular, the ABI-Modelo transaction would substantially lessen competition in the market for beer, as it would combine "the largest and third-largest brewers of beer sold in the United States." Compl. ¶ 21; DOJ Compl. ¶¶ 1, 7. After analyzing both national and regional market concentrations, the DOJ concluded that the proposed "acquisition [was] presumed to be anticompetitive." DOJ Compl. ¶ 43.

The removal of Modelo as a major competitor to ABI in the U.S. was a central concern animating the DOJ's antitrust lawsuit. As detailed in the DOJ Complaint, ABI had been focused for more than a decade on trying to control Modelo because of the threat it posed to ABI's various products. *Id.* ¶¶ 65-66. The DOJ expressed concern that the "proposed acquisition would eliminate this competition by further concentrating the beer industry, enhancing ABI's market

power, and facilitating coordinated pricing between ABI and the next largest brewer." *Id.* ¶ 2. The DOJ alleged that the proposed merger "would likely increase the ability of ABI and the remaining beer firms to coordinate by eliminating an independent Modelo – which has increasingly inhibited ABI's price leadership – from the market." *Id.* ¶ 47. The DOJ stated the obvious: more was required to alleviate the anticompetitive effects of the acquisition.

### D. Facing Litigation with the DOJ, ABI and Modelo Agree to Divest Modelo's Entire U.S. Business, Including Its U.S. Beer Brands, to Constellation.

To address its antitrust concerns about the likely effects of the potential transaction, the DOJ required the divestiture of Modelo's entire U.S. business, a plan to which ABI and Modelo ultimately, albeit reluctantly, agreed. The terms and conditions of the resolution of the DOJ's antitrust suit are detailed in the Competitive Impact Statement and Final Judgment, as approved by the United States District Court for the District of Columbia. *See* Competitive Impact Statement, *United States v. Anheuser-Busch InBev & Grupo Modelo*, No. 1:13-cv-00127, ECF No. 30 (D.D.C. 2013) ("CIS"); Final Judgment, *United States v. Anheuser-Busch InBev & Grupo Modelo*, No. 1:13-cv-00127, ECF No. 48 (D.D.C. 2013).[2]

The solution was straightforward but extensive: ABI and Modelo complied with the required divestiture of Modelo's entire U.S. business through, among other remedies, the grant of an expansive license to Constellation. Compl. ¶ 22. The DOJ's intent was to enable Constellation to become an independent competitor against ABI across all categories of beer in the domestic market in perpetuity. To that end, the DOJ made clear that it was paramount that Constellation "stand in the shoes of Modelo in the United States" and be able to innovate and bring new beverages to market and adapt with consumer demand without interference from ABI. CIS at 10,

---

[2]    True and correct copies of the Competitive Impact Statement and Final Judgment are attached as Exhibits 2-3 to the Declaration of Sara S. Tatum. The Court may take notice of such judicial records. *Supra* note 1.

12.  The Final Judgment required "ABI and Modelo to make certain divestitures to [Constellation] for the purpose of remedying the loss of competition alleged in the [DOJ's] Complaint."  Final Judgment at 2.  The DOJ clarified that ABI was required to "grant to Constellation a perpetual, assignable license to ten of the most popular Modelo Brand Beers, including Corona and Modelo Especial, for sale in the United States."  CIS at 10.

On October 21, 2013, the Final Judgment was approved by the District Court.  Final Judgment at 29.  As a result, Modelo became fully part of the world's largest beverage alcohol company, ABI.  Compl. ¶ 20.

### E.    The Parties Execute the Sublicense Agreement, Which Grants Constellation a Perpetual License to Market and Sell Corona-Branded Beer and Related Products in the United States.

To ensure that the DOJ-directed divestiture would succeed in perpetuity, Modelo had to grant Constellation a clearly articulated continuous license.  The parties set the specific terms of the mandated divestiture and resulting Modelo-Constellation sublicense in the Sublicense Agreement.  Compl. ¶ 22.[3]  Indeed, the District Court presiding over the DOJ's enforcement action referenced the Sublicense Agreement itself in the Final Judgment approving the overall divestiture transaction.  Final Judgment.  All parties, including Modelo, "agree[d] to be bound by the provisions of the Final Judgment," including the Sublicense Agreement.  *Id.* at 1.  Ultimately, in exchange for a lump-sum payment of $4.75 billion, Modelo sold and Constellation acquired virtually unfettered rights to use intellectual property in accordance with the Sublicense Agreement.  Compl. ¶ 23.

---

[3]    Modelo and CBBS are successors to the signatories to the Agreement, Marcas Modelo, S. de R.L. de C.V. and Constellation Beers Ltd., and CBBS has granted sublicenses under the Agreement to its affiliates Crown and CCC.  Compl. ¶ 24 n.2; Agreement § 2.6(a).

The Sublicense Agreement grants Constellation an expansive, perpetual, exclusive license to market and sell Corona-branded "Beer" in the United States, which cannot be terminated for any reason.  Specifically, the Sublicense Agreement grants Constellation a perpetual license to use Modelo's "Trademarks" in connection with "importing, advertising, promoting, marketing and selling Importer Products and Interim Products in [the United States and Guam]" and with "the application of the Trademarks to Importer Products in the course of manufacturing, bottling and packaging of Importer Products in [Mexico]."  *Id.* ¶¶ 3, 27; Agreement § 1.1.  The Sublicense Agreement defines "Trademarks" to include the "CORONA Marks" owned by Modelo.  Compl. ¶ 26; Agreement §§ 1.1, 2.10.  An "Importer Product" is a "Product or Brand Extension Beer produced" by Constellation, and "Product" is "Beer packaged in Containers bearing one or more of the Trademarks."  Compl. ¶ 28; Agreement § 1.1.

Importantly, the Sublicense Agreement defines "Beer" expansively to include "beer, ale, porter, stout, malt beverages, and any other versions or combinations of the foregoing, including non-alcoholic versions of any of the foregoing."  Compl. ¶ 3; Agreement § 1.1.  Moreover, the Sublicense Agreement does not limit Constellation to using the same recipes for the production of Corona-branded Beer for all eternity.  Rather, the Sublicense Agreement expressly provides Constellation with "the right to determine in its sole discretion any changes to the Beer Recipe it uses for each existing Product, which changes may be variations or derivatives of Recipes of such existing Products or entirely new Recipes."  Agreement § 2.2(b).  The Sublicense Agreement limits Constellation's rights only with respect to "distilled spirits," disabling Constellation from creating a Brand Extension Beer that incorporates distilled spirits unless Modelo does so first in Mexico or Canada.  *Id.* § 2.15(c).

Thus, the Sublicense Agreement anticipated, and allowed for, evolution and innovation in other ways, too. For example, the Sublicense Agreement gives Constellation the ability to manufacture, market, and sell any new "Brand Extension Beer," which is defined as "Beer packaged in Containers bearing a . . . Mark that is derivative of one or more of the Trademarks[.]" *Id.* § 1.1. In developing these new Brand Extension Beers, the Agreement also affords Constellation "the right to determine in its sole discretion the Beer Recipe it uses for each new Brand Extension Beer, which Beer Recipes may be variations or derivatives of Recipes of then-existing Products or entirely new Recipes." *Id.* § 2.15(a). The DOJ noted that "[t]his flexibility allows Constellation *to adapt to changing market conditions* in the United States to compete effectively in the future, and reduces ABI's ability to interfere with those adaptations." CIS at 12 (emphasis added).

Unlike ABI's original (and rejected) term-limited proposal, the Sublicense Agreement does not expire in the near term. The licenses granted by the Sublicense Agreement are "perpetual and assignable and cannot be terminated by ABI for any reason." *Id.* The Sublicense Agreement provides that Constellation's rights in the Corona brand and business "shall continue in perpetuity" and are exclusive, royalty free, and irrevocable. Additionally, ABI has "no right to terminate" the Sublicense Agreement "at any time." Agreement § 4.1. As a result, the Sublicense Agreement continues to govern the parties' rights resulting from the DOJ-mandated divestiture of Modelo's "Beer" business in the United States.

### F.    Hard Seltzer Takes Off as the Newest Innovation in Beer.

While the Sublicense Agreement's flexibility remains unchanged, the world has evolved since 2013. At the time when Modelo and Constellation entered into the Sublicense Agreement, there were no products called "hard seltzers" being sold on the market. Compl. ¶ 35. However, since 2016, hard seltzer products like Corona Hard Seltzer have taken off as crowd favorites. In

2019 alone, hard seltzer sales totaled more than $1 billion, and that number more than quadrupled in 2020 to $4.5 billion.  *Id.*  Not wanting to be left out of this increasingly crowded and competitive subsegment of the beer category, ABI now markets its own competing hard seltzer products, including Bud Light Seltzer, Bud Light Lemonade Seltzer, Michelob Ultra Organic Seltzer, and BonViv, alongside its other beers, Bud Light and Bud Light Platinum.[4]

Recognizing the opportunity for innovation and the wide popularity of the Corona mark as sublicensed in the Sublicense Agreement, Constellation first used the Corona mark to launch a flavored malt beverage called Corona Refresca.  *Id.* ¶ 37.  Constellation shared its plans to launch Corona Refresca with Modelo.  *Id.* ¶ 42.  Presumably concluding that the Sublicense Agreement indisputably conveyed a license to place the Corona mark on a malt beverage like Corona Refresca, Modelo never objected to the use of the Corona mark in connection with Corona Refresca or otherwise threatened any contract or trademark challenges.

### G.    Constellation Launches Corona Hard Seltzer, Which Becomes Immensely Popular, Challenging ABI's Bud Light Seltzer.

In late February 2020, Constellation officially launched Corona Hard Seltzer in four flavors: tropical lime, mango, cherry, and blackberry lime.  *Id.* ¶¶ 4, 43.  Seizing on this growing

---

[4]    A true and correct copy of the relevant pages from ABI's website is attached as Exhibit 4 to the Declaration of Sara S. Tatum.  The contents of a party's website that are not reasonably subject to dispute may be considered on a motion to dismiss.  *E.g.*, *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) (citing Fed. R. Evid. 201(b)); *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015) (reviewing "printouts from entities' websites" because "the case law applying Rule 201 states that, for purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination" (internal quotation marks, alterations, and citations omitted)); *Porwal v. Ballard Power Sys., Inc*., 2019 WL 1510707, at *2 n.3 (S.D.N.Y. Mar. 21, 2019) (similar); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 98 (2d Cir. 2007) (considering "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and *documents possessed by or known to the plaintiff and upon which it relied in bringing the suit*" (emphasis added)).

segment of the beer market and product popularity, Constellation spent more than $40 million on commercials, internet, and print media announcing the introduction of Corona Hard Seltzer.  *Id.* ¶ 6.  In July 2020, Constellation reported shipping "in excess of 3 million cases of [Corona Hard Seltzer]," noting that Corona Hard Seltzer had become the "Number 4" hard seltzer product in the U.S. market.  *See* Constellation Q1 FY 2021 Earnings Call, July 1, 2020.[5]  By October 2020, as Constellation announced, "Corona Hard Seltzer [had] become one of the most successful new product launches in [the] company's history."  Compl. ¶ 8.

Corona Hard Seltzer is brewed, deriving its alcohol content from a sugar base.  *Id.* ¶ 46.  On every can, Constellation clearly notes that Corona Hard Seltzer is "beer" with an express disclosure on the packaging next to health warnings.  *Id.* ¶ 47.  Every can of Corona Hard Seltzer also clearly states that it is "IMPORTED FROM MEXICO," making clear that Corona Hard Seltzer originates in Mexico.  *Id.* ¶ 49.  And Constellation describes Corona Hard Seltzer to investors and customers as a beer.  *See, e.g.*, Exhibit 5 to the Declaration of Sara S. Tatum, (describing Corona Hard Seltzer as part of Constellation's "beer portfolio"); Constellation Q3 FY 2020 Earnings Call, Jan. 8, 2020 (announcing "plans for the launch of Corona Hard Seltzer this spring, which will help further strengthen our position as the leader in the high-end of the US beer segment").[6]

---

[5]    A true and correct copy of this earnings call is attached as Exhibit 5 to the Declaration of Sara S. Tatum.  This document is incorporated by reference in the Complaint (¶¶ 6, 45, 48), and "possessed by or known to the plaintiff" and "relied [upon] in bringing the suit," so it may be considered when ruling on this motion to dismiss.  *Shaar Fund, Ltd*., 493 F.3d at 98; *Helprin*, 277 F. Supp. 2d at 330-31.

[6]    A true and correct copy of this earnings call is attached as Exhibit 6 to the Declaration of Sara S. Tatum.  This document is incorporated by reference in the Complaint (¶¶ 45, 48), so it may be considered when ruling on this motion to dismiss.  *Supra* note 5.

In early August 2020, nearly six months after Corona Hard Seltzer was launched and when it was already clear that it was a strong competitor to ABI's Bud Light Seltzer, Modelo first asserted in a letter that "Constellation and its affiliates were infringing Modelo's CORONA trademarks and in breach of the Sublicense." Compl. ¶ 51. "Modelo insisted that Constellation cease importing, advertising, promoting, marketing and selling Corona Hard Seltzer, and enter into negotiations regarding other relief to which Modelo believe[d] it [was] entitled." *Id*. Modelo then initiated nonbinding arbitration pursuant to Sections 6.2 and 9.5 of the Sublicense Agreement, with the arbitration concluding with a merits decision issued by the tribunal in November 2020. *Id*. ¶ 17.

## H.    ABI Commences Litigation After Corona Hard Seltzer Becomes Popular.

On February 15, 2021, ABI, acting through its subsidiary Modelo, commenced this lawsuit. In Count I, the Complaint alleges that Constellation's use of the Corona mark in connection with Corona Hard Seltzer constitutes "trademark infringement in violation of [the Lanham Act, 15 U.S.C. §§ 1051 *et seq*.]." *Id*. ¶¶ 53-59. ABI claims that Constellation's conduct presents "an 'exceptional case' under 15 U.S.C. § 1117," such that it is entitled to "recover up to treble the amount of Constellation's unlawful profits [disgorgement] and Modelo's damages [lost profits], and an award of attorneys' fees." *Id*. ¶¶ 62-63. In Count II, ABI alleges that Constellation has "breached Section 2.12 of the [Agreement] by using the CORONA Marks in connection with Corona Hard Seltzer." *Id*. ¶ 68. ABI claims that it "has suffered and will continue to suffer damages as a result of Constellation's breach . . . in an amount to be proved at trial." *Id*. ¶ 69. ABI requests that the Court declare that Constellation has "no authorization to manufacture, import, advertise, market, or sell Corona Hard Seltzer" and seeks to enjoin Constellation from "producing, marketing, and selling Corona Hard Seltzer." *Id*. at 19, ¶¶ 1, 5.

## STATUTORY AND REGULATORY BACKGROUND

Alcoholic beverages—including beer and malt beverages—are highly regulated in this country.  Statutory and regulatory regimes regulate, and therefore define, "beer" and "malt beverages."  Although the various statutes and regulations do not contain identical definitions for "beer" and "malt beverage," the parties negotiated the Sublicense Agreement against the backdrop of extensive federal and state regulation.  As a result, this "established body" of law is highly relevant to the proper construction of the Sublicense Agreement.  *Est. of Setlow v. Liberty Union Mfg. Co., Inc.*, 2008 WL 11413406, at *6 (E.D.N.Y. Mar. 31, 2008); *see also Hugo Boss Fashions, Inc. v. Federal Ins. Co.*, 252 F.3d 608, 617-18 (2d Cir. 2001) ("When interpreting a state law contract . . . an established definition provided by state law or industry usage will serve as a default rule, and that definition will control unless the parties explicitly indicate, on the face of their agreement, that the term is to have some other meaning."); *Robinson v. United States*, 80 U.S. (13 Wall.) 363, 366, 20 L.Ed. 653 (1871) ("Parties who contract on a subject-matter concerning which known usages prevail, by implication incorporate them into their agreements, if nothing is said to the contrary.").

*First*, the federal government regulates and taxes beverage alcohol.  For example, the Internal Revenue Service taxes three (and only three) categories of beverage alcohol: distilled spirits, wine, and beer.  *See generally* 26 U.S.C. §§ 5001, et seq.  All beverage alcohol must be slotted into one of the three categories under the tax code.  "Beer" is defined as: "beer, ale, porter, stout, and other similar fermented beverages (including saké or similar products) of any name or description containing one-half of 1 percent or more of alcohol by volume, brewed or produced from malt, wholly or in part, or from any substitute therefor."  26 U.S.C. § 5052.  The tax code thus does not distinguish between beer and malt beverages; all malt beverages are "beer" under the tax code.

14

The Alcohol and Tobacco Tax and Trade Bureau ("TTB") is the bureau of the Department of the Treasury that regulates and collects taxes on trade and imports of alcohol, tobacco, and firearms within the United States. The TTB implements the tax code and relevant regulations with respect to distilled spirits, wines, and beer—the three (and only three) categories of beverage alcohol recognized by the tax code. TTB Ruling 2008-3, (July 7, 2008) at 2, available at https://www.ttb.gov/images/pdfs/rulings/2008-3.pdf ("TTB Op."). Sensibly, the TTB's definition of "beer" is essentially identical to the tax code's definition of beer. *See* 27 C.F.R. § 25.11. However, the TTB has also promulgated a regulation establishing "[s]tandards for the production of beer," *id.*, including "Materials for the production of beer," 27 C.F.R. § 25.15. In that regulation, the TTB defines "substitute[s]" for malt: "Beer must be brewed from malt or from substitutes for malt. Only rice, grain of any kind, bran, glucose, sugar, and molasses are substitutes for malt. In addition, you may also use the following materials as adjuncts in fermenting beer: honey, fruit, fruit juice, fruit concentrate, herbs, spices, and other food materials." *Id*. Thus, an alcoholic beverage brewed "from substitutes for malt," including "sugar," is a "beer."

The Federal Alcohol Administration Act ("FAA Act") is the law that gives the Secretary of the Treasury (and therefore the TTB) broad authority to promulgate regulations concerning the labeling and advertising of wine, distilled spirits, and *malt beverages*. The FAA Act does not refer to "beer," even though all malt beverages roll up under the definition of "beer" in the tax code. The FAA Act defines a malt beverage as requiring the use of malted barley and hops:

> [A] beverage made by the alcoholic fermentation of an infusion or decoction, or combination of both, in potable brewing water, of malted barley with hops, or their parts, or their products, and with or without other malted cereals, and with or without the addition of unmalted or prepared cereals, other carbohydrates or products prepared therefrom, and with or without the addition of carbon dioxide, and with or without other wholesome products suitable for human food consumption.

27 U.S.C. § 211; *see also* 27 C.F.R. § 7.10.  Thus, under the FAA Act, a malt beverage is an alcoholic beverage containing malted barley and hops.  The FAA Act does not establish special rules for the labeling and advertising of alcoholic beverages that do not meet the definition of "malt beverage" under the Act (i.e., those that do not contain malted barley and hops), and therefore the TTB does not impose special labeling requirements on those alcoholic beverages (i.e., non-malt beverages that are not wine or distilled spirits).  Rather, the federal Food, Drug, and Cosmetic Act establishes the labeling requirements for beer that is not a malt beverage. TTB Op. at 5.

This regulatory discrepancy means that the terms "beer" and "malt beverage" are at times overlapping.  "Beer" encompasses a broader swath of beverage alcohol than "malt beverage."  For purposes of the TTB regulations and the tax code, all malt beverages are "beer" because malt beverages satisfy the definition of "beer" under those regulations.  But for purposes of labeling, a malt beverage is a distinct label applied to fewer beverages, differentiated by the requirement that a malt beverage contain malted barley and hops while a beer may be "brewed or produced from malt, wholly or in part, or from any substitute therefor."  *Id.* at 4 ("[A] fermented beverage that is brewed from a substitute for malt . . . but without any malted barley may constitute a 'beer' under the [tax code] but does not fall within the definition of a 'malt beverage' under the FAA Act.").

*Second*, the States regulate and tax beverage alcohol.  New York's general Alcoholic Beverage Control Law defines "beer" to include "any fermented beverages of any name or description manufactured from malt, wholly or in part, or from any substitute therefore."  N.Y. Alco. Bev. Cont. Law § 3(3).  The tax law similarly defines "Beers" to "mean and include all alcoholic beer, lager beer, ale, porter, and stout, and all other fermented beverages of any name or description manufactured from malt, wholly or in part, or from any substitute therefor containing one-half of one per centum, or more, of alcohol by volume."  N.Y. Tax Law § 420.  And the New

York State Liquor Authority's regulations use a nearly identical definition of beer, adding only a requirement that the beverage contain at least 0.5% of alcohol by volume. *See* N.Y. Comp. Codes R. & Regs. tit. 9, § 84.1(f). Thus, under New York regulations, "any fermented beverage of any name or description manufactured from malt, wholly or in part, or from any substitute therefor, is beer." *See* N.Y. Comp. Codes R. & Regs. tit. 9, § 84.1(g). "Beer" is contrasted with "Liquor," which refers to "distilled or rectified spirits or similar alcoholic beverages." *Id*.

In sum, the regulatory definitions of "beer" are inclusive rather than exclusive. Federal and state regulators do not define beer based on the specific product used for fermentation. Nor do regulators rely on physical properties such as look, taste, or smell. To the contrary, so long as "malt" or a "substitute" for malt is employed in the brewing process, regulators understand the beverage to be "beer" and treat it as such.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court generally "accept[s] all factual allegations in the complaint as true and draw[s] all reasonable inferences in the plaintiffs' favor" when considering a motion to dismiss. *Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000)). Fundamentally, a plaintiff's "[f]actual allegations must be enough to raise a right of relief above the speculative level." *Twombly*, 550 U.S. at 555. If a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

It is appropriate to resolve a contractual dispute at the motion to dismiss stage where the contract is unambiguous and entitles the defendant to relief as a matter of law. *See, e.g.*, *Metro. Life Ins. Co. v. RJR Nabisco Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) ("Under New York law, . . . if a contract is unambiguous on its face, its proper construction is a question of law."); *Reinhardt v. Wal-Mart Stores, Inc.*, 547 F. Supp. 2d 346, 353-55 (S.D.N.Y. 2008) (determining that a contract's "unambiguous language foreclose[d] other interpretations and the need to consider extrinsic evidence," and dismissing infringement claim "as a matter of law"); *accord Condor Cap. Corp. v. CALS Invs.*, *LLC*, 118 N.Y.S.3d 29, 30 (App. Div. 2020) ("The . . . court providently exercised its discretion by not converting defendant's motion [to dismiss] into a summary judgment motion. 'Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract[.]' Discovery is unnecessary because '[a]ny such discovery would simply be an opportunity for plaintiff to uncover parol evidence to attempt to create an ambiguity in an otherwise clear and unambiguous agreement[.]'" (internal citations omitted)). So too with trademark claims that derive from a breach of contract claim: "[D]etermining whether a defendant's activities fall within the scope of an existing license essentially involves a question of contract interpretation." *Reinhardt*, 547 F. Supp. 2d at 352.

A court deciding a Rule 12(b)(6) motion is not limited to the face of the complaint. Rather, a court's "consideration is limited to the factual allegations in plaintiff['s] . . . complaint, . . . to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of which plaintiff[] had knowledge and relied on in bringing suit." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 131 F. Supp. 3d 103, 119 (S.D.N.Y. 2015) (quoting *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)). "[W]hen a plaintiff chooses not to attach to the

complaint or incorporate by reference a document upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss."  *In re Bank of N.Y. Mellon Corp. Forex Transactions Litig.*, 921 F. Supp. 2d 56, 70 (S.D.N.Y. 2013) (Kaplan, J.) (citing *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

## ARGUMENT

In February 2020, Constellation launched a wildly popular sugar-based brewed fermented beer—a "hard seltzer" in the current marketing environment—under the Corona brand:  Corona Hard Seltzer.  A year later, now that Corona Hard Seltzer is firmly established as a major player, ABI claims that because this innovative product is *sugar*-based, it is not a "Beer" as that term is defined in the Sublicense Agreement, and therefore Constellation has breached the Sublicense Agreement and infringed ABI's trademark rights.  According to ABI, *malt*-based Corona Refresca is in, while *sugar*-based Corona Hard Seltzer is out.  Remarkably, ABI takes this position even though the Sublicense Agreement broadly defines "Beer" to include "beer, . . . malt beverages, and any other versions . . . of the foregoing," and does not contain any reference at all to specific ingredients or other physical characteristics.  Agreement § 1.1.  ABI's stingy interpretation of the scope of the Sublicense Agreement is plainly incorrect.  The Sublicense Agreement defines "Beer" broadly, and that definition unambiguously includes a sugar-based brewed fermented beverage like Corona Hard Seltzer as a "beer," as a "version" of a "beer," and as a "version" of a "malt beverage."  To see why, the Court need only consult the kinds of traditional authorities that courts often look to in resolving contractual disputes between sophisticated and highly regulated parties, including the regulatory backdrop and common industry terminology.  These sources confirm that Corona Hard Seltzer is a "Beer" under the Sublicense Agreement.  That correct interpretation of the Sublicense Agreement's definition of "Beer" is in harmony with other provisions in the

Sublicense Agreement granting Constellation broad rights to innovate and bring to market new products in order to compete with ABI and Modelo.  And it is the only interpretation of the Sublicense Agreement that is faithful to the purpose of the Sublicense Agreement, which is to fully divest Modelo's entire domestic business and create a fully capacitated competitor to ABI.

Simply put, Constellation did not breach the Sublicense Agreement by using Corona marks on Corona Hard Seltzer.  Nor did Constellation infringe any trademark rights.  ABI's trademark infringement claim under the Lanham Act depends entirely on its incorrect theory that sugar-based hard seltzer is not "Beer" (even though malt-based hard seltzer is), and therefore that Constellation exceeded the scope of the Sublicense Agreement by selling Corona Hard Seltzer.  This Court should reject ABI's attempt to remove a major competitor to ABI's own hard seltzer products, and dismiss the Complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

## I.    CONSTELLATION HAS NOT BREACHED THE LICENSE AGREEMENT.

The only question in this case is whether the Sublicense Agreement excludes Corona Hard Seltzer, a brewed fermented beverage made from cane sugar, from its broad definition of "Beer." It does not.  The Sublicense Agreement defines "Beer" as "beer, ale, porter, stout, malt beverages, and any other versions or combinations of the foregoing, including non-alcoholic versions of any of the foregoing."  Agreement § 1.1.  That language unambiguously includes a sugar-based product like Corona Hard Seltzer within its scope. Constellation did not breach the Sublicense Agreement by exercising its right to innovate and bring to market a sugar-based hard seltzer that regulators and the parties themselves refer to as "Beer."

### A.    Corona Hard Seltzer Is a "Beer."

Corona Hard Seltzer is a "Beer" as that term is defined by the Sublicense Agreement. Hard seltzer is an innovative product that is a fermented beverage brewed from a legally recognized substitute for malt (i.e., sugar).  The Sublicense Agreement's definition of "Beer" is

not ambiguous: "beer," "malt beverages," and all other "versions" of either are expressly included within the scope of the Sublicense Agreement. *Id.* Corona Hard Seltzer falls within that definition.

Where the language of a contract is unambiguous, the Court need only construe the language and enforce the contract as written. Ambiguity is a question of law. *Metro. Life Ins. Co.*, 906 F.2d at 889. Moreover, language is not made ambiguous simply because the parties "urge different interpretations in the litigation." *Id.* Rather, a court must use ordinary tools of interpretation to determine itself whether a contract is ambiguous. In doing so, courts applying New York contract law look to, among other authorities, the regulatory landscape and "customs, practices, usages and terminology as generally understood in the particular trade or business." *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F. Supp. 987, 994 (S.D.N.Y. 1968) (Mansfield, J.). The Second Circuit has made clear that courts should consult "these sources for guidance" at the outset because "a possible ambiguity may ultimately be proven to be illusory" in light of such evidence. *Hugo Boss*, 252 F.3d at 618. Courts only consider extrinsic evidence of the parties' intent if the contract remains ambiguous *even after* the Court has consulted regulatory and industry authorities to determine what a "a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business" would understand the contract term to mean. *Hugo Boss*, 252 F.3d 608 at 617; *Eskimo Pie Corp.*, 284 F. Supp. at 993-95; *see also Beazley Ins. Co., Inc. v. ACE Am. Ins. Co.*, 197 F. Supp. 3d 616, 623 (S.D.N.Y. 2016), *aff'd* 880 F.3d 64 (2d Cir. 2018).

Here, reference to the regulatory backdrop and industry terminology confirms that the plain language of the Sublicense Agreement, including the Sublicense Agreement's definition of "Beer," unambiguously includes a sugar-based fermented product such as hard seltzer like Corona Hard

Seltzer.  A "reasonably intelligent person" who is familiar with (1) the regulatory landscape and (2) industry terminology, *Hugo Boss*, 252 F.3d at 617, would understand Corona Hard Seltzer to be a "beer," and therefore within the scope of the Sublicense Agreement.

*First*, Corona Hard Seltzer is a "beer" for the simple reason that it is brewed from a legally recognized substitute for malt and therefore meets regulatory definitions of "beer."  Regulators would not exclude Corona Hard Seltzer from the definition of "beer" simply because it is brewed from a sugar base rather than a malt base.  To state the obvious:  Corona Hard Seltzer *is* regulated as a "beer."  For federal tax and regulatory purposes, Corona Hard Seltzer, like Bud Light Seltzer, falls within the TTB's (and the tax code's) definition of beer because Corona Hard Seltzer is brewed from sugar, which is a recognized "substitute for malt."  *See* 27 C.F.R. § 25.11 (defining "[b]eer" to include beverages "brewed or produced from malt, wholly or in part, or from *any substitute for malt*"); 27 C.F.R. § 25.15 (recognizing that "[o]nly rice, grain of any kind, bran, glucose, sugar, and molasses are substitutes for malt"); 26 U.S.C. § 5052(a) (defining beer, in part, to include "other similar fermented beverages . . . of any name or description . . . brewed or produced from malt, wholly or in part, or from any substitute therefor").  And state regulatory regimes, too, treat a sugar-based brewed fermented beverage like Corona Hard Seltzer as a "beer."  Like the TTB and tax code definitions, New York law defines beer as "any fermented beverage[] of any name or description manufactured from malt, wholly or in part, or from any substitute therefor."  N.Y. Alco. Bev. Cont. Law § 3(3); *see also* N.Y. Tax Law § 420 (defining "[b]eers" to include, in part, "all other fermented beverages of any name or description manufactured from malt, wholly or in part, or from any substitute therefor").  New York state labeling requirements also require that "each label affixed to any container containing fermented beverages manufactured from malt, wholly or in part, or from any substitute therefor, shall have the word *beer* prominently

displayed on the main label," subject to exceptions not at issue here.  N.Y. Comp. Codes R. & Regs. tit. 9, § 84.1(g)(2).

In highly regulated industries like the beverage alcohol industry, the parties' use of a term that has a well-established meaning under the relevant regulatory regime is presumed to mean what regulators say that it means, not something else.  *Beazley Ins. Co*., 197 F. Supp. 3d at 625.  Indeed, given the uniformity with which regulations treat sugar-based hard seltzers as "beer," there is a strong presumption that the contractual term "beer" includes Corona Hard Seltzer.  *See Robinson v. United States*, 80 U.S. (13 Wall.) 363, 366, 20 L.Ed. 653 (1871) ("Parties who contract on a subject-matter concerning which known usages prevail, by implication incorporate them into their agreements, if nothing is said to the contrary.").  To overcome that presumption, there must be clear evidence on the face of the contract that the parties *rejected* the regulatory definition.  *Hugo Boss Fashions*, 252 F.3d at 617-18 ("When interpreting a state law contract . . . an established definition provided by state law or industry usage will serve as a default rule, and that definition will control unless the parties explicitly indicate, on the face of their agreement, that the term is to have some other meaning."); *Beazley Ins. Co*., 197 F. Supp. 3d at 625 (same).

Here, there is no indication that the parties intended to reject the consistent regulatory definition of "beer" and instead adopt a different, unspecified definition of "beer" untethered from any relevant regulations.  ABI's suggestion that the parties' decision to prune a *sui generis* beverage alcohol like saké from the Sublicense Agreement's definition of "Beer," *see* Compl. ¶ 29, hardly qualifies as evidence that the parties intended "beer" to mean something other than what the regulators pronounce.  And in any event, in that very same paragraph of the Complaint, ABI conspicuously fails to propose any alternative affirmative definition of "beer."  That is because there is *no alternative definition of "beer"*—as used to define "Beer"—in the Sublicense

Agreement.  None of ABI's proposed "defining characteristics" of "beer," *see infra* p. 29, are found in the contract itself.  The absence of any other definition of "beer" in such a highly regulated industry would be a glaring oversight if the parties in fact did intend to reject the uniform regulatory definition in favor of a different (unknown and unspecified) definition.  The parties did not write such a contract; the "face of the[ ] agreement" indicates that the parties did not intend to reject the regulatory definition of "beer."  *Hugo Boss Fashions*, 252 F.3d at 617-18.

Second, in light of consistent regulatory treatment, it is unsurprising that both ABI and Constellation use the term "beer" to refer to hard seltzers like Corona Hard Seltzer.  Most obviously, Constellation and ABI clearly label their respective hard seltzers as "Beer."  Compl. ¶ 47.  But ABI and Constellation not only label their hard seltzers as "beer" on the cans themselves, they also refer to hard seltzers as "beer" on their own websites.  For example, despite arguing that Corona Hard Seltzer is not "Beer" in this lawsuit, ABI places *its own* hard seltzers, like Bud Light Seltzer and other sugar-based hard seltzers, right alongside its other beers in its online "Guide to Our Beers." *See* Exhibit 4 to the Declaration of Sara S. Tatum.  Constellation's treatment of Corona Hard Seltzer is similarly consistent with use of the term "beer" to describe hard seltzers: Constellation's website shows Corona Hard Seltzer as one of "Our Cervesas."[7]  The parties' consistent practice of using the word "beer" to refer to hard seltzers such as Corona Hard Seltzer fully aligns with the federal and state regulatory definitions of beer.

---

[7]    A true and correct copy of the relevant pages from Constellation's Corona website is attached as Exhibit 7 to the Declaration of Sara S. Tatum.  The contents of the website are not reasonably subject to dispute and thus may be considered when ruling on this motion to dismiss. *Supra* note 4.  ABI's assertion that "Constellation has never once used the word 'beer' . . . in any of its tens of millions of dollars in television commercials for Corona Hard Seltzer," Compl. ¶ 47, is therefore misleading and incomplete.

In light of (1) the regulatory treatment of sugar-based, brewed fermented beverages like Corona Hard Seltzer as "beer," and (2) the parties' own use of the industry term "beer" to describe hard seltzers, the Sublicense Agreement's definition of "Beer" is unambiguous: the only reasonable interpretation of "beer" in the definition of "Beer" is that it includes products like Corona Hard Seltzer.  Simply put, ABI can prevail only if this Court determines that the word "beer" has a more limited (and undefined) meaning in the Sublicense Agreement than regulators and the parties themselves ascribe to it.

### B.    Corona Hard Seltzer Is, at a Minimum, a "Version" of "Beer" or a "Version" of a "Malt Beverage."

As explained, Corona Hard Seltzer is a "beer," and the Court need not read any further in the Sublicense Agreement's definition of "Beer."  But to the extent there is any doubt that Corona Hard Seltzer is a "Beer," the Sublicense Agreement does not just include within its scope "beer," but also expressly includes any "version" of "beer" and any "version" of "malt beverage."  Even setting aside the regulatory and industry-based evidence that Corona Hard Seltzer is a "beer," *at an absolute minimum*, Corona Hard Seltzer is a "version" of beer or malt beverage.

The words "any other version" of "beer" and "malt beverage" must be given meaning independent from simply "beer" and "malt beverage."  It is axiomatic that courts must construe the language of a contract so as not to render terms superfluous.  *See Chesapeake Energy Corp. v. Bank of New York Mellon Tr. Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014).  Accordingly, the plain language of the Sublicense Agreement includes within the definition of "Beer" beverages that are *not* "beers" or "malt beverages," but qualify as "versions" of those beverages.  The word "version" means "a particular form of something differing in certain respects from an earlier form or other forms of the same type of thing."  New Oxford Dictionary 2055 (1st ed. 1998); *see also* Merriam-Webster's Dictionary 1390 (11th ed. 2003) ("A form or variant of a type or original").  Here, the

Sublicense Agreement defines "Beer" broadly, to mean "beer, ale, porter, stout, malt beverages, *and any other versions or combinations of the foregoing*, including non-alcoholic versions of any of the foregoing." Agreement § 1.1 (emphasis added). The emphasized language demonstrates that the parties clearly intended for "Beer" to include an expansive understanding of the words "beer, ale, porter, stout, [and] malt beverages," and to allow for innovation so that new products that "differ[] in certain respects" from "an earlier form" of "beer" or "malt beverage" are still captured in the expansive language. *See, e.g.*, *In re Bernard L. Madoff Inv. Secs. LLC*, 773 F.3d 411, 419 (2d Cir. 2014) ("Few words in the English language are as expansive as 'any.'"); *Innophos, Inc. v. Rhodia, S.A.*, 832 N.Y.S.2d 197, 199 (App. Div. 2007) (concluding that the phrase "or other similar charges of any kind whatsoever" in a purchase agreement was "all-encompassing, not limiting, and, indeed, broad enough to cover the government assessment at issue"), *aff'd*, 10 N.Y.3d 25 (2008).

In fact, given the expansiveness of the word "version," Corona Hard Seltzer qualifies as both a "version" of "beer" and a "version" of a "malt beverage." As explained, Corona Hard Seltzer is brewed from sugar, not malt. For that reason, Corona Hard Seltzer is not a "malt beverage" under the FAA Act (or the TTB's regulations implementing it), because that law requires that malt beverages contain malt. However, under the tax code, all malt beverages are beer. So there are overlapping definitions of "beer" and "malt beverage." Layer on top of that the use of the word "version" and it becomes clear that Corona Hard Seltzer fits into both descriptions. The only reason not to treat Corona Hard Seltzer as a "version" of a "malt beverage" (i.e., the FAA Act's definition of "malt beverage") does not even apply under ABI's theory that regulatory definitions must be discarded. Compl. ¶ 29. So if the regulatory definition is no longer the touchstone, then Corona Hard Seltzer is obviously a "version" of a malt beverage. Indeed, Corona

Hard Seltzer is a gluten-free "version" of a malt-based malt beverage beverage like Corona Refresca, whose production ABI did not object to under the Sublicense Agreement. Compl. ¶ 42. The only difference between "malt beverages" like Corona Refresca that indisputably fall within the scope of the Sublicense Agreement and Corona Hard Seltzer is that Corona Hard Seltzer is brewed from a sugar base rather than a malt base. And a sugar-based product that is otherwise substantially similar to those "malt beverages" is clearly a "version" of a malt beverage. Corona Hard Seltzer is an alternative, gluten-free "version" of malt beverages that have long been on the market: it is an innovative product that "differ[s] in certain respects" from malt-based malt beverages, but is clearly a "form . . . of the same type of thing."

### C.    Other Provisions of the Sublicense Agreement Confirm That Constellation Has Broad Rights to Innovate and Bring to Market Corona Hard Seltzer.

As explained, the Sublicense Agreement defines "Beer" inclusively—not exclusively—to include "beer," "malt beverages," and any "versions" of those two alcoholic beverages. An expansive definition of "Beer" is consistent with other provisions of the Sublicense Agreement that grant Constellation broad rights to innovate and bring to market new products (such as Corona Hard Seltzer) in order to compete with ABI and Modelo. By contrast, a cramped interpretation of the contractual term "Beer" is inconsistent with all of the other textual clues contained in the Sublicense Agreement that show the broad scope of the license.

To begin, the Sublicense Agreement explicitly contemplates that Constellation might produce new versions of beer (referred to as "Brand Extension Beers" in the Sublicense Agreement), and gives Constellation "the right to determine in *its sole discretion* the Beer Recipe it uses for each new Brand Extension Beer, which Beer Recipes may be variations or derivatives of Recipes of then-existing Products or entirely new Recipes." Agreement § 2.15(a). In fact, Constellation's discretion to develop new Brand Extension Beers with entirely new recipes is

limited in only three ways:  (i) any new Brand Extension Beers must meet the definition of "Mexican-Style Beer"—that is, the product's trademarks and trade dress cannot "imply . . . an origin other than Mexico"; (ii) any new recipe must "meet the Quality Standards," which do not contain any requirements with respect to specific ingredients; and (iii) Constellation "shall not use any distilled spirits as an ingredient in any Recipe for a Brand Extension Beer," unless Modelo does so first in Mexico or Canada.  *Id.* §§ 1.1, 2.15(c).

Indeed, Section 2.15(c) is particularly strong evidence that the Sublicense Agreement's definition of "Beer" includes a sugar-based hard seltzer like Corona Hard Seltzer.  That provision, called "distilled spirits," disables Constellation from developing a Brand Extension Beer containing distilled spirits unless ABI launches such a product in Mexico or Canada. Section 2.15(c) is an express reservation of rights to ABI:  absent that limitation, Constellation would be able to develop a Brand Extension Beer containing distilled spirits consistent with the Sublicense Agreement's broad definition of "Beer."

### D.    ABI's Contrary Position Is Unsupported and Inconsistent with the Purpose of the License Agreement.

ABI's position is that sugar-based Corona Hard Seltzer is out, but malt-based Corona Refresca is in.  There is no authority whatsoever for the distinction that ABI wants this Court to draw between malt-based and sugar-based beverage alcohol.  And in fact, the evidence is unambiguously to the contrary.  *See supra* p. 22 (explaining that sugar is a legally recognized substitute for malt and that no industry participant would recognize this distinction as relevant).

ABI states that Corona Hard Seltzer is not "Beer," suggesting that the parties explicitly rejected the regulatory definitions and pulling two other exclusionary principles from the air: (1) Corona Hard Seltzer contains "[n]either hops nor malt, two defining characteristics of beer and malt beverages," Compl. ¶ 43; and (2) "Corona Hard Seltzer is not made like 'beer' (or any of the

other words used to define 'Beer' in the Sublicense), does not have the same ingredients, and does not look like, taste like, pour like, or have the aroma of a Beer," *id.* ¶ 46.  None of these arguments justifies departure from the clear terms of the Sublicense Agreement, and each relies on extrinsic evidence that is not appropriate given the parties' use of unambiguous contractual terms.  *See, e.g.*, *RM Realty Holdings Corp. v. Moore*, 884 N.Y.S.2d 344, 347 (App. Div. 2009) ("Any . . . discovery would simply be an opportunity for plaintiff to uncover parol evidence to attempt to create an ambiguity in an otherwise clear and unambiguous agreement.").

        *First*, ABI points out that "the 'Beers' defined in the Sublicense and the 'beers' permitted under the [tax code] (and other regulatory and statutory definitions) are different—and they differ because the parties intended a different outcome."  Compl. ¶ 29.  As discussed, ABI essentially argues that the Court should infer that the parties intended to depart in some meaningful way from the regulatory backdrop based solely on the fact that the Sublicense Agreement's definition of "Beer" is not *exactly the same* as the federal tax code's definition of "Beer."  However, ABI nowhere explains what specific inference the Court should draw from any discrepancy, including why the discrepancy draws a limiting inference notwithstanding the parties' explicit inclusion of "any other versions."  Certainly the distinction does not "explicitly indicate, on the face of the agreement," that the parties intended to depart from the default rule that background regulatory definitions inform the meaning of commercial contracts executed by sophisticated parties in a highly regulated industry.  *Hugo Boss Fashions, Inc.*, 252 F.3d at 617-18.  And in any event, the deletion of "saké" in the definition of "Beer" contained in the Sublicense Agreement is hardly inconsistent with the regulatory definitions of "Beer" more generally given the significant fact that "saké" invokes the geography of Japan.  Moreover, under federal law, saké is regulated as *both* "beer" and "wine."  For purposes of production and tax, saké is treated as a "Beer."  But for

labeling and advertising, sake is treated as wine under the FAA Act. It is hardly surprising that the parties pruned sake from their definition of "Beer." Doing so in no way suggests that Corona Hard Seltzer is excluded from the plain meaning of the term "Beer," or that the parties intended to adopt some other, unspecified definition of "Beer." *See supra* p. 23-24.

*Second*, ABI claims that because Corona Hard Seltzer contains "[n]either hops nor malt, two defining characteristics of beer and malt beverages," Compl. ¶ 43, it is excluded from the scope of the Sublicense Agreement. But the Sublicense Agreement does not refer to those "defining characteristics" at all, and imposing such atextual limitations would contradict the Sublicense Agreement's express grant of discretion to Constellation to innovate and create new recipes that are not required to contain malt or hops (or any other specific ingredients, for that matter). Here, Constellation's use of sugar to brew Corona Hard Seltzer, a legally recognized substitute for malt, is fully consistent with the language of the Sublicense Agreement. ABI's suggestion that the Sublicense Agreement's broad and inclusive definition of "Beer" requires the use of malt and hops finds no support in the statutory regimes defining "Beer," nor is it consistent with widespread industry practice of referring to products that may or may not contain malt or hops as "Beer." In fact, ABI cites no authority whatsoever—contractual, regulatory, or practical— for this supposed limitation on the meaning of "Beer." That is because there is none.

Relatedly, ABI suggests that because Corona Hard Seltzer "does not have the same ingredients, and does not look like, taste like, pour like, or have the aroma of a Beer," *id.* ¶ 46, it must be excluded from the scope of the Sublicense Agreement. That argument could have some appeal if the Court were inclined to disregard the language of the Sublicense Agreement (which could have but does not contain any sensory limitations or requirements), the regulatory landscape, and the parties' own terminology in favor of what the average person on the street might think.

But it is a red herring.  Corona Refresca likewise does not "look like, taste like, pour like, or have the aroma of" what ABI suggests is a traditional beer, but malt beverages like Corona Refresca are indisputably within the scope of the Sublicense Agreement.  This argument reflects an attempt by ABI to graft onto the Sublicense Agreement an everyman "looks-and-tastes" test that is plainly contradicted by the inclusion of malt beverages that do not "look like" or "taste like" traditional beer either.  There is simply no requirement in the Sublicense Agreement that "Beer" be limited to what one might consider traditional beer.  To the contrary, the Sublicense Agreement expressly disclaims that limitation by including "versions" of "beer" and "malt beverages" that look and taste nothing like a traditional Corona beer but are innovative recipes that Constellation may design "in its sole discretion."  Agreement § 2.2(b).  This Court should reject ABI's effort to conjure up such a requirement, as the Agreement does not contain it.  *See Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004) (recognizing that "courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include" and, therefore, should not "add or excise terms . . . under the guise of interpreting the writing" (citations omitted)).

Stripped of rhetoric, ABI's real position is simply that because Corona Hard Seltzer is a sugar-based, not malt-based, brewed beverage, it is not a "version" of a "beer" or of a "malt beverage."  That position cannot be squared with the parties' use of the words "any other version" to expand (not constrict) the scope of the Sublicense Agreement, or with Constellation's rights to innovate and create new recipes.

ABI's restrictive gloss on the scope of the Sublicense Agreement is not only unsupported by the text, but it also stifles the very competition that the DOJ worked to maintain and the D.C. District Court approved.  As the DOJ made clear in 2013, the underlying framework of the

Sublicense Agreement sought the "complete divestiture" of Modelo's domestic business so that Constellation was "capable of replacing the competition that Modelo [brought] to the United States market." CIS at 2. More specifically, the DOJ expressly stated that the broad divestitures required by the Final Judgment, as implemented by the Sublicense Agreement, were intended to "create an independent and economically viable competitor [Constellation] that w[ould] stand in the shoes of Modelo in the United States." *Id.* at 10. It would be odd indeed if the language of the Sublicense Agreement meant that Constellation is hobbled from innovating under the Corona brand to compete in the fast-growing hard seltzer subcategory. Fortunately, the parties did not draft a Sublicense Agreement that brings about that counterintuitive result; to the contrary, the expansive scope of "Beer" under the Sublicense Agreement is faithful to the permissive construction that the District Court approved when it attached the Sublicense Agreement as an exhibit to the Final Judgment. By contrast, ABI's cramped interpretation not only departs from the unambiguous meaning of the contractual terms, including "Beer," and imposes requirements not in the contract, but it also stands completely at odds with the Sublicense Agreement's expressly intended result: to create a fully functioning competitor to ABI in the domestic market, including innovative products that fall under the definition of Beer, like hard seltzer.

Finally, it should not be ignored that the parties entered into the Sublicense Agreement to assuage the DOJ's very real and valid antitrust concerns. The Sublicense Agreement was essential to resolving the DOJ's allegations that ABI's purchase of Modelo and the entities' proposed merger arrangement would have significant anticompetitive effects on the U.S. beer market. *See supra* p. 7. As the DOJ explained, the Sublicense Agreement's purposeful "flexibility allows Constellation to adapt to changing market conditions in the United States to compete effectively in the future, and [to] reduce[ ] ABI's ability to interfere with those adaptations." CIS at 12. To

that end, only an *expansive* definition of "Beer" makes any sense at all:  ABI's attempt to narrow the definition of "Beer" would prevent Constellation from continuing to be "an independent and economically viable competitor" of ABI that can flexibly "adapt to changing market conditions in the United States to compete effectively."  *See id.* at 10, 12.  All parties, including Modelo, "agree[d] to be bound by the provisions of the Final Judgment," including the License Agreement. Final Judgment at 1.  A faithful reading of the Sublicense Agreement, not a cramped one, is required to give effect to this purpose.  *See Jenkins v. XpresSpa Grp., Inc.*, 2020 WL 7261138, at *8 (S.D.N.Y. Dec. 10, 2020) ("Under New York law, the trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use." (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc*., 959 F.2d 425, 428 (2d Cir. 1992))).

ABI's efforts to contract the Sublicense Agreement's expansive terms runs directly counter to the entire divestiture arrangement.  Indeed, the DOJ recognized the need to "allow[] for expected future growth in sales of the licensed brands."  CIS at 13.  Only a reading of "Beer" that gives meaning to its expansive definition under the Sublicense Agreement, namely one that includes products like Corona Hard Seltzer, would allow Constellation the flexibility unambiguously essential to the contract's intended scheme.

### E.    Corona Hard Seltzer Is a "Mexican-Style Beer" Because Every Can Expressly States That the Product Is "IMPORTED FROM MEXICO."

As an afterthought, ABI asserts the baseless argument that Corona Hard Seltzer is not a "Mexican-style Beer," and therefore Constellation is in breach of the Sublicense Agreement's requirement that it produce and sell only "Mexican-style Beers."  Compl. ¶¶ 49-50.  Under the Sublicense Agreement, "Mexican-style Beer" is simply defined to mean "Beer bearing the Trademarks that does not bear any trademarks, trade names or trade dress that would reasonably be interpreted to imply to consumers in the Territory an origin other than Mexico."  *Id.* ¶ 30.  But

ABI concedes, as it must, that every single can of Corona Hard Seltzer states that the product is "IMPORTED FROM MEXICO." *Id.* ¶ 49.  This is the only reference to national origin identified in the Complaint.  ABI fails to identify any information on the packaging, containers, or advertisements for Corona Hard Seltzer that would suggest "an origin other than Mexico."  ABI's claim that Corona Hard Seltzer is not a "Mexican-style Beer" is simply without merit.

ABI's only supporting allegation—that, according to ABI, "hard seltzers were created in the United States and mostly featured (so far) in the U.S. market"—is incorrect and irrelevant. *Id.* ¶ 49.  First, it is inaccurate that no hard seltzers are currently being sold in Mexico.  Second, the Complaint contains no allegations that consumers understand hard seltzers as being non-Mexican in origin.  Moreover, it is simply implausible that consumers would believe Corona Hard Seltzer has "an origin other than Mexico" because every can is clearly labeled "IMPORTED FROM MEXICO."  The region that originally developed the beverage cannot be the test for what constitutes a "Mexican-style Beer"; no Corona product would meet this extracontractual definition because beer products were not originally "created" in Mexico.

Recognizing the weakness of its argument, ABI argues that the "IMPORTED FROM MEXICO" label is "required by 'federal country of origin' regulations," and so "the only references to Mexico on the packaging and containers for Corona Hard Seltzer are required by U.S. law." *Id.* ¶¶ 49-50.  But the express reference to Corona Hard Seltzer's Mexican origin does not lose effectiveness under the Sublicense Agreement merely because the labelling is also required by federal law.  ABI's argument that Corona Hard Seltzer is not a Mexican-style Beer, as that term is defined in the Sublicense Agreement, does not give rise to a breach of contract.

## II.    CORONA HARD SELTZER HAS NOT INFRINGED ANY TRADEMARK RIGHTS.

Constellation did not breach the Sublicense Agreement, so it also did not infringe any trademark rights possessed by ABI.  "Disputes involving the scope of a license present courts with a question of contract." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 197 (2d Cir. 2018).  More specifically, "determining whether a defendant's activities fall within the scope of an existing license essentially involves a question of contract interpretation." *Reinhardt v. Wal-Mart Stores, Inc.*, 547 F. Supp. 2d 246, 352 (S.D.N.Y. 2008).  Indeed, a valid license "immunizes the licensee" from an infringement allegation, provided that the licensee's use is within the agreement with the licensor.  *Harris v. Simon & Schuster, Inc.*, 646 F. Supp. 2d 622, 630 (S.D.N.Y. 2009).

ABI itself agrees that its trademark infringement claim is derivative of its breach of contract claim by recognizing that Constellation "may innovate and bring to market any product it likes, but if it is to bear a licensed Modelo U.S. trademark, the innovation must be within the scope of the [Sublicense Agreement.]"  Compl. ¶ 30.  And ABI makes no unique substantive allegations in support of its trademark infringement claim.  *See Id.* ¶¶ 53, 64.  Accordingly, the only question presented in the Complaint is whether Constellation's use of the Corona mark "fall[s] within the scope of the existing license[]." *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995).  And because the Sublicense Agreement unambiguously conveys a license to sell Corona Hard Seltzer, Constellation's activities do not exceed the scope of the Sublicense Agreement and do not constitute trademark infringement.  *See TufAmerica, Inc. v. Orchard Enters., Inc.*, 2011 WL 4946663, at *2 (S.D.N.Y. Oct. 14, 2011) (dismissing infringement claim because plaintiff conceded the relevant license governed the question).

## CONCLUSION

The motion to dismiss should be granted in full and with prejudice.

Dated:  New York, New York         */s/ Sandra C. Goldstein*
       April 5, 2021

Sandra C. Goldstein, P.C.
Stefan Atkinson, P.C.
Daniel R. Cellucci
Sara S. Tatum
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
sandra.goldstein@kirkland.com
stefan.atkinson@kirkland.com
daniel.cellucci@kirkland.com
sara.tatum@kirkland.com

*Counsel for Defendants*