UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CERVECERÍA MODELO DE          :
MÉXICO, S. DE R.L. DE C.V.,   :
                              :
                Plaintiff,    :
                              :
        v.                    :
                              :
CB BRAND STRATEGIES, LLC,     :          No. 21-CV-01317-LAK
CROWN IMPORTS LLC, and        :
COMPAÑÍA CERVECERA DE         :
COAHUILA, S. DE R.L. DE C.V., :
                              :
                Defendants.   :
                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MODELO'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Michael H. Steinberg
(*pro hac vice*)
Alexa M. Lawson-Remer
(*pro hac vice application forthcoming*)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California  90067

Marc De Leeuw
Adam R. Rahman
Colin O. Hill
Kirandeep K. Mahal
(*pro hac vice application forthcoming*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004

*Counsel for Plaintiff Cervecería
Modelo de México, S. de R.L. de C.V.*

May 17, 2021

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

THE COMPLAINT'S ALLEGATIONS ...............................................................7

    A.    The Parties ...........................................................................7

    B.    The ABI/Modelo Merger and the DOJ's Focus on the
          U.S. "Beer" Market..........................................................8

    C.    The Sublicense Grants Constellation a Limited License to Use
          Modelo's U.S. Trademarks for "Beer" ...............................9

    D.    Constellation Is Able to Innovate Within the Scope of the Sublicense ................11

    E.    Constellation Launches Corona Hard Seltzer and Represents to the
          World that Corona Hard Seltzer Is Not a "Beer"...................11

    F.    This Action...........................................................................13

THE *INCONSISTENT* STATUTORY AND REGULATORY LANDSCAPE............................14

ARGUMENT ....................................................................................................16

I.    CORONA HARD SELTZER IS NOT A "BEER" UNDER THE
    PLAIN LANGUAGE OF THE SUBLICENSE ......................................17

    A.    New York Law Requires a Contract Be Given Its Plain Meaning ........................17

    B.    Under the Plain Meaning of the Word, Corona Hard Seltzer
          Is Not a "beer" .....................................................................18

II.    CONSTELLATION'S ATTEMPTS TO EVADE THE PLAIN
    LANGUAGE OF THE SUBLICENSE ARE UNAVAILING.........................................20

    A.    Constellation's Reliance on Self-Selected Statutory and
          Regulatory Definitions Is Mistaken..................................20

    B.    There Is No "Established Definition" of "beer" Provided by
          Statutes and Regulations....................................................27

    C.    Corona Hard Seltzer Is Not a "version" of a "beer" or
          "malt beverage" ...................................................................30

    D.    Constellation's Remaining Arguments Are Either Irrelevant or
          Do Not Support Its Position ...............................................32

E.      Corona Hard Seltzer Is Not a "Mexican-Style Beer" ............................................34

CONCLUSION.......................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Matter of Andy Floors, Inc. (Tyler Const. Corp.),*
   609 N.Y.S.2d 692 (3d Dep't 1994)................................................................22

*Arlyn Oaks Civic Ass'n* v. *Brucia,*
   654 N.Y.S.2d 1016 (Sup. Ct. Nassau Cty. 1997) ..................................23

*Ashcroft* v. *Iqbal,*
   556 U.S. 662, 129 S. Ct. 1937 (2009).........................................................16

*Authentic Bev. Co., Inc.* v. *Texas Alcoholic Bev. Comm'n,*
   835 F. Supp. 2d 227 (W.D. Tex. 2011).......................................................22

*Beazley Ins. Co., Inc.* v. *ACE Am. Ins. Co., et al.,*
   197 F. Supp. 3d 616 (S.D.N.Y. 2016).........................................................22

*Bell Atl. Corp.* v. *Twombly,*
   550 U.S. 544, 127 S. Ct. 1955 (2007).........................................................16

*Bianco* v. *Bianco,*
   830 N.Y.S.2d 21 (1st Dep't 2007) ...............................................................17

*British Int'l. Ins. Co. Ltd.* v. *Seguros La Republica, S.A.,*
   342 F.3d 78 (2d Cir. 2003)................................................................17, 30

*Burns* v. *Burns,*
   81 N.Y.S.3d 846 (4th Dep't 2018)...............................................................22

*Bush* v. *City of New York,*
   762 N.Y.S.2d 775 (Sup. Ct. Bronx Cty. 2003) .........................................22

*Chalet Liquors, Inc.* v. *Supervalu, Inc.,*
   2004 WL 885356 (Minn. Ct. App. Apr. 24, 2004) .........................2, 3, 19

*Charron* v. *Sallyport Glob. Holdings, Inc.,*
   2014 WL 7336463 (S.D.N.Y. Dec. 24, 2014) ...........................................17

*Chase Grp. All. LLC* v. *City of N.Y. Dep't of Fin.,*
   620 F.3d 146 (2d Cir. 2010)...........................................................................16

*Crowley* v. *VisionMaker, LLC,*
   512 F. Supp. 2d 144 (S.D.N.Y. 2007).........................................................26

*Deutsche Bank Nat'l Trust Co.* v. *Quicken Loans Inc.*,
    810 F.3d 861 (2d Cir. 2015)...........................................................................24

*Deverho Const. Co.* v. *State of New York*,
    407 N.Y.S.2d 399 (Ct. Cl. 1978) ...............................................................24

*Eskimo Pie Corp.* v. *Whitelawn Dairies, Inc.*,
    284 F. Supp. 987 (S.D.N.Y. 1968).............................................................22

*Est. of Setlow* v. *Liberty Union Mfg. Co., Inc.*,
    2008 WL 11413406 (E.D.N.Y. Mar. 31, 2008)...............................26, 27

*Gary Friedrich Enters.* v. *Marvel Characters, Inc.*,
    716 F.3d 302 (2d Cir. 2013)........................................................................17

*Graev* v. *Graev*,
    11 N.Y.3d 262 (2008) ..................................................................................19

*Hugo Boss Fashions, Inc.* v. *Fed. Ins. Co.*,
    252 F.3d 608 (2d Cir. 2001)............................................................. *passim*

*Kramer* v. *Time Warner, Inc.*,
    937 F.2d 767 (2d Cir. 1991).........................................................................7

*Law Debenture Tr. Co. of N.Y.* v. *Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010).................................................................21, 30

*Lockheed Martin Corp.* v. *Retail Holdings, N.V.*,
    639 F.3d 63 (2d Cir. 2011).........................................................................17

*Mazzola* v. *County of Suffolk*,
    533 N.Y.S.2d 297 (2d Dep't 1988)...........................................................17

*Miller* v. *Mercuria Energy Trading, Inc.*,
    291 F. Supp. 3d 509 (S.D.N.Y. 2018), *aff'd*, 774 F. App'x 714 (2d Cir. 2019).....................21

*Mionis* v. *Bank Julius Baer & Co., Ltd.*,
    749 N.Y.S.2d 497 (1st Dep't 2002) ...........................................................18

*Murphy* v. *Arlington Cent. Sch. Dist. Bd. of Educ.*,
    1999 WL 1140872 (S.D.N.Y. Dec. 13, 1999) .........................................23

*Nachem* v. *Prop. Mkts. Grp., Inc.*,
    918 N.Y.S.2d 490 (1st Dep't 2011) .............................................4, 17, 21

*Nat'l Leased Hous. Ass'n* v. *United States*,
    32 Fed. Cl. 762 (1999)................................................................................24

*Norman Bobrow & Co.* v. *Loft Realty Co.*,
    577 N.Y.S.2d 36 (1st Dep't 1991) .......................................................................18

*Omni Quartz, Ltd.* v. *CVS Corp.*,
    287 F.3d 61 (2d Cir. 2002)................................................................................18

*Penn Grp., LLC* v. *Slater*,
    2007 WL 2020099 (S.D.N.Y. June 13, 2007) ....................................................7

*Robinson* v. *United States*,
    80 U.S. 363 (1871)...........................................................................................30

*Ronnen* v. *Ajax Elec. Motor Corp.*,
    88 N.Y.2d 582 (1996) .....................................................................................22

*Schron* v. *Troutman Sanders LLP*,
    20 N.Y.3d 430 (2013) ................................................................................18, 26

*SR Int'l Bus. Ins. Co.* v. *World Trade Ctr. Properties, LLC*,
    467 F.3d 107 (2d Cir. 2006).............................................................................30

*Turner Const. Co.* v. *Seaboard Sur. Co.*,
    447 N.Y.S.2d 930 (1st Dep't 1982) .................................................................22

*VKK Corp.* v. *Nat'l Football League*,
    244 F.3d 114 (2d Cir. 2001).............................................................................17

*Vt. Teddy Bear Co.* v. *538 Madison Realty Co.*,
    1 N.Y.3d 470 (2004) .................................................................................18, 25

*Worcester Creameries Corp.* v. *City of N.Y.*,
    861 N.Y.S.2d 198 (3d Dep't 2008)..............................................................18, 25

**STATUTES**

26 U.S.C. § 5052 ..............................................................................................4, 10, 23

Conn. Gen. Stat. § 12-433...............................................................................6, 14, 27, 28

Conn. Gen. Stat. § 30-1...................................................................................6, 14, 27, 28

Del. Code tit. 4, § 101 ...........................................................................................27, 28

Fla. Stat. § 563.01 ................................................................................................15, 27

Haw. Rev. Stat. § 244D-1...........................................................................................28

Haw. Rev. Stat. § 281-1........................................................................................27, 28

Ind. Code § 7.1-1-3-1 ...............................................................................6, 27, 28

Ind. Code § 7.1-1-3-6 ...........................................................................6, 15, 27, 28

Kan. Stat. § 41-102 .............................................................................15, 27, 28

Mich. Comp. Laws § 436.1103 ...................................................................27, 28

Mich. Comp. Laws § 436.1105 .............................................................15, 27, 28

Minn. Stat. § 297G.01 ...............................................................................27, 28

Minn. Stat. § 340A.101 .............................................................................27, 28

Miss. Code. § 27-71-3 ...............................................................................27, 28

Miss. Code. § 67-3-3 .................................................................................27, 28

Mont. Code § 16-1-106 .............................................................................27, 29

N.Y. Al. Bev. Con. § 3 .....................................................................................23

N.Y. Tax Law § 420 .......................................................................................4, 28

Neb. Rev. Stat. § 53-103.03 .....................................................................27, 28

Or. Rev. Stat. § 471.001 .....................................................................6, 27, 28, 29

Tex. Alco. Bev. Code § 1.04 .....................................................................27, 28

Wash. Rev. Code § 66.04.010 .............................................................15, 27, 28

Wis. Stat. § 125.02 .....................................................................................27, 28

Wis. Stat. § 139.01 .....................................................................................27, 28

**REGULATIONS**

27 C.F.R. § 7.10 ....................................................................................................10

27 C.F.R. § 25.11 ...........................................................................................10, 23

19 C.F.R. § 102.0 ..................................................................................................35

19 C.F.R. § 134.0 ..................................................................................................35

27 C.F.R. Part 7 .....................................................................................................10

27 C.F.R. Part 25 ...................................................................................................10

21 C.F.R. Part 101................................................................................................10

**RULES**

Fed. R. Civ. P. 12(b)(6)................................................................................13, 16

**LEGISLATION**

H.B. 46, 151ST GEN. ASSEMB. (DEL. 2020)........................................................28

H.B. 79, 67TH LEGIS., REG. SESS. (MONT. 2021) ..............................................29

H.B. 593, 31ST LEGIS. (HAW. 2021) ...................................................................28

H.B. 1545, 86TH LEGIS. (TEX. 2019) ..................................................................28

H.B. 2264, 81ST LEGIS. ASSEMB., REG. SESS. (OR. 2021) .................................29

H.B. 7109, LEGIS. LAW SERV. (FLA. 2017) ........................................................28

S.B. 565, 31ST LEGIS. (HAW. 2021)....................................................................28

**OTHER AUTHORITIES**

5 CORBIN ON CONTRACTS § 24.26 ...........................................................21, 23, 24

AMERICAN HERITAGE DICTIONARY (5th ed. 2011) ..........................................2, 19

*Beer*, Dictionary.com, https://perma.cc/E8NU-YLGE ......................................19

*Beer*, Google Dictionary, https://perma.cc/393J-Y4T7 ...................................19

RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY (2d ed. 2001)................9

WEBSTER'S NEW COLLEGIATE DICTIONARY (9th ed. 1980)..............................2, 19

WEBSTER'S NEW COLLEGIATE DICTIONARY (10th ed. 1993)................................19

WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY (2d ed. 1979)....................19

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002)............................. *passim*

Plaintiff Cervecería Modelo de México, S. de R.L. de C.V. ("Modelo") respectfully submits this memorandum in opposition to Constellation's[1] motion to dismiss Modelo's Complaint ("Mem.").

## INTRODUCTION

Constellation is willfully infringing Modelo's U.S.-registered CORONA trademarks by marketing and selling "Corona Hard Seltzer"—a fruit-flavored, sparkling water with alcohol made from fermented cane sugar. Constellation owns *none* of Modelo's valuable CORONA marks. Constellation's purported justification for misappropriating Modelo's intellectual property is that Corona Hard Seltzer falls within its limited license to use Modelo's marks in the U.S. and Guam to market and sell "Beer," as defined in an eight-year-old trademark Sublicense. The Sublicense's defined term "Beer," however, makes no mention of "hard seltzer." Instead, the parties defined "Beer" by using well-known and commonly used words: "beer, ale, porter, stout, malt beverages, and any other versions or combinations of the foregoing, including non-alcoholic versions of any of the foregoing." Sugar-based hard seltzers, like Corona Hard Seltzer, are not within this definition. Yet Constellation tries to shoehorn Corona Hard Seltzer into the scope of the Sublicense by arguing it is a (lowercase "b") "beer."

Constellation does not, and cannot, challenge here that "beer" has a common, well-defined, and non-technical meaning: "beer" is an alcoholic beverage made with malted barley (or other grain) and flavored with hops. That definition is consistent across numerous dictionaries used by New York and federal courts, including those extant when the parties negotiated and signed the Sublicense. The 2002 version of WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, for

---

[1]    Capitalized terms not defined herein have the meaning ascribed to them in the Complaint (ECF No. 1).

example, defines "beer" as "a malted and hopped somewhat bitter alcoholic beverage."[2]  In fact, the question "what makes a beverage a beer?" has been judicially determined before, when the Minnesota Court of Appeals held that "beer" "should be construed in the sense of [its] plain, ordinary, fair, usual, and popular sense meaning" and "that hops flavoring is essential to the ordinary definition of beer."  *Chalet Liquors, Inc.* v. *Supervalu, Inc.*, 2004 WL 885356, at *5 (Minn. Ct. App. Apr. 24, 2004).

As a "spiked sparkling water" that has *no malt* and *no hops* flavoring, Corona Hard Seltzer flunks the WEBSTER'S and *Chalet Liquors* plain-meaning test.  That Corona Hard Seltzer contains no malt and is not flavored with hops (*i.e.*, is not a plain-meaning "beer") is not in dispute.  (Mem. at 1, 3, 12, 19-20, 26-27.)  Constellation admits that Corona Hard Seltzer "does not have the same ingredients" as a "beer," "does not look like, taste like, pour like, or have the aroma" of a "beer," and would not be considered a "beer" by the "average person on the street."  (Mem. at 30.)  These concessions alone are sufficient for this Court to deny Constellation's motion under a straightforward application of New York contract law.

Constellation's claim here that its product is a "beer" also is to be contrasted to what it said *before* this litigation.  Even before Corona Hard Seltzer's launch, Constellation told everyone who would listen that it is *not* a "beer."  Constellation's admissions began in two applications in late 2019 to the U.S. Patent and Trademark Office ("USPTO") in which it sought to register trademarks for Corona Hard Seltzer.  In those applications (made in *Modelo's* name, but without Modelo's permission), Constellation represented to the USPTO under penalty of perjury that Corona Hard Seltzer would *not* be a "beer," but rather a "hard seltzer."   (Compl. ¶¶ 39-40.)   Similarly,

---

[2]     WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 197 (2002).  *See also*, *e.g.*, WEBSTER'S NEW COLLEGIATE DICTIONARY 100 (9th ed. 1980) ("a malted and hopped somewhat bitter alcoholic beverage"); AMERICAN HERITAGE DICTIONARY 161 (5th ed. 2011) ("A fermented alcoholic beverage brewed from malt and flavored with hops").

Constellation has told the public and its investors that Corona Hard Seltzer is *not* a "beer." *See infra* at 11-13. In fact, Constellation has yet to use the word "beer" to describe Corona Hard Seltzer in the tens of millions of dollars' worth of television commercials for its "hard seltzer."

How does Constellation attempt to reconcile this contradiction? By claiming that Corona Hard Seltzer—a malt-free, hop-free, sugar-based product—is some non-beer "beer" even though it does not taste, look, or pour like, or have the ingredients of, a beer. Because it is not a "beer" in the eyes of consumers or under the plain meaning of that word, Constellation says that the plain, ordinary, and unambiguous language the parties used should be ignored. According to Constellation, Corona Hard Seltzer is a "beer" because it falls within some, but by no means all, regulatory definitions of "Beer." Constellation's argument is that Corona Hard Seltzer is a "beer" but only when viewed through the distorting prism of a federal excise tax provision and selected New York regulations that define "Beer" to include beverages (like saké and cider) that the Sublicense does not. So far afield is Constellation in its conception of "beer" that it concedes that an "average person" asking for a "beer" would be perplexed (and likely disappointed) when a bartender serves a Corona Hard Seltzer. (Mem. at 30.) It is no wonder Constellation's argument is wrong as a matter of law.

More precisely, Constellation's primary argument—rejected by *Chalet Liquors* and others—is that the supposed "consistent regulatory definition" of "beer" in federal and state statutes and regulations should be incorporated into the Sublicense's definition of "beer" even if they include beverages that do not meet the plain meaning of "beer" (*i.e.*, do not contain malt and is not flavored with hops). (*Id.* 23-24.) To that end, Constellation relies primarily on a single excise tax provision in the Internal Revenue Code ("IRC") and various, largely unspecified, "state regulatory regimes" that treat "Corona Hard Seltzer" as a regulatory "Beer" despite lacking malt

and hops flavoring. (*Id.* at 22.) Constellation says these select regulations are part of a regulatory backdrop that provides a "uniform" and "consistent" definition of "beer" that governs Modelo and Constellation's relationship. (*Id.* at 3, 14, 19, 21, 23-24, 29.) This theory fails at every level.

*First*, statutory and regulatory definitions are irrelevant to the construction of the Sublicense.[3] New York courts only consider extrinsic statutory definitions to construe a contract term under limited circumstances, none of which exists here. New York law does not allow statutory and regulatory definitions to be used to *create* and *resolve* an ambiguity in an unambiguous contract term—which is precisely what Constellation seeks to do. Instead, common words are given the meaning "accorded to the term in ordinary usage" and not treated as "distinct term[s] of art." *Nachem* v. *Prop. Mkts. Grp., Inc.*, 918 N.Y.S.2d 490, 490 (1st Dep't 2011).

*Second*, the self-selected statutory and regulatory provisions Constellation cites defeat its own argument. Those provisions state expressly that their definition of "Beer" applies *only* for the purposes of the particular section of the code or regulations in which they reside. New York courts consistently enforce such limitations. *See infra* Section II.A.2. And the statutory and regulatory provisions themselves demonstrate that a plain meaning of "beer" exists independent of regulations: Those provisions define "Beer" to include the undefined term "beer," demonstrating that "beer" has a plain meaning that is well known and needs no definition (regulatory or otherwise).[4]

*Third*, instead of adopting any regulatory definitions, the parties negotiated their own agreement-specific definition of "Beer." (Compl. ¶ 29.) To be sure, Modelo and Constellation

---

[3]     A copy of the Sublicense (without exhibits) ("Sublicense") is attached as Exhibit 1 to the Declaration of Marc De Leeuw, dated May 17, 2021, submitted in support of this Memorandum ("De Leeuw Decl.").

[4]     *See* 26 U.S.C. § 5052(a) ("*For the purposes of this chapter* . . . the term 'beer' means *beer*, ale, porter, stout . . .") (emphasis added); N.Y. Tax Law § 420(5) ("*As used in this article* . . . 'Beers' mean and include all alcoholic *beer*, lager beer, ale, porter, and stout . . . .) (emphasis added).

exist in a highly regulated industry, and both are well aware of this "regulatory backdrop" (Mem. at 3, 14, 23-24, 29).  Yet, the parties rejected any statutes or regulations to determine the scope of their trademark license.  To make that choice clear, the Sublicense definition of "Beer" begins with the same words as the IRC definition ("beer, ale, porter, stout"), but then expressly *departs* from the IRC definition in favor of a narrower one that excludes a variety of other beverages (like sugar-based hard seltzer) that are unlike "beer" or "malt beverages" (but are taxed as "beer" for federal excise tax purposes).  In other words, the Sublicense specifically excludes the broader IRC and New York state law definitions of "Beer," which the parties of course knew about in 2013 when they negotiated and signed the Sublicense.

*Finally*, Constellation does not even meet the standard it sets for itself.  Constellation says there is a "uniform" or "consistent regulatory definition" that the parties incorporated into the Sublicense.  (*Id.* at 23-24.)  Contrary to Constellation's incomplete account (*id.* at 14-17, 23-24), no "uniform" or "consistent regulatory definition of 'beer'" existed in 2013 for the Court to consult, and no such definition exists today—rather, the regulatory landscape remains in flux.  Corona Hard Seltzer—like other highly regulated goods imported for sale across the U.S.—is subject to an array of differing rules, regulations, and treatment.  Constellation's theory of regulatory consistency and its incomplete claim that "Corona Hard Seltzer *is* regulated as a 'beer'" (*id.* at 22) falls apart on a simple examination of Corona Hard Seltzer's present-day regulatory journey from production in Coahuila, Mexico, and across the U.S. border to consumers:

As Constellation admits, the liquid put into a Corona Hard Seltzer can in Coahuila does not taste, pour, or look like "beer," or have the aroma or ingredients of "beer."  (*Id.* at 30.)  And, when the cans are transported across the U.S.-Mexican border, U.S. Customs and Border Protection ("CBP") does not treat sugar-based hard seltzers, like Corona Hard Seltzer, as "beer"

for tariff purposes, but instead as "[o]ther fermented beverages (for example, cider, perry, mead, saké)." (*See* De Leeuw Decl., Ex. 2 (CBP ruling) at 12.)  Remarkably, at the same time it crosses the border and is not a "beer" for tariff purposes, Corona Hard Seltzer is considered a "Beer" under the IRC definition and Constellation incurs a federal excise tax on this basis.

Upon its arrival in the U.S., a can of Corona Hard Seltzer continues to receive disparate treatment depending on whichever of the 50 states it happens to be in.  While a can of Corona Hard Seltzer might be treated as a "Beer" in some states, that is not true in many others.  For example, regulators in Oregon treat sugar-based hard seltzers as a "wine."  Or. Rev. Stat. § 471.001(11). Similarly, the same can of Corona Hard Seltzer in Connecticut does not fall within the statutory definition of "beer," because it is not made from "barley, malt and hops."  Conn. Gen. Stat. §§ 12-433, 30-1(5).  Nor is it a "beer" under the statutory definition in Indiana, because Corona Hard Seltzer is not made from "barley malt or other cereal and hops."  Ind. Code §§ 7.1-1-3-1, 7.1-1-3-6.  So while Constellation attempts to paint a picture of a "uniform" and "consistent regulatory definition" of "beer" and "consistent regulatory treatment" of sugar-based hard seltzers as "beer" (Mem. at 23-24), the legal treatment of Corona Hard Seltzer is, in reality, as varied and textured as the landscape of the U.S.  These sophisticated parties—like all parties who decide to enter a contract—sought to ensure certainty.  That is why they agreed to a contract with plain, unambiguous terms.  The Court should not disregard the Sublicense's language in favor of Constellation's selected (and incomplete) set of statutory and regulatory provisions.

As a throwaway, Constellation argues that Corona Hard Seltzer is a "version" of a "beer" or "malt beverage."  This makes no sense.  After acknowledging that a "version" of something must be "a particular form" of that thing (*id*. at 25), Constellation again fails the test it advances. A tricycle is not "a particular form" of a car; a malt-free beverage is not "a particular form" of a

"malt beverage"; and a malt-free and hops-free "spiked hard seltzer" is not "a particular form" of a beer. Corona Hard Seltzer is thus not a form of a "beer" or "malt beverage," so it cannot be a version of either. And Constellation's claim that Corona Hard Seltzer is a "Mexican-style Beer" disregards the requirements of the Sublicense and the reality of how the product is perceived by consumers (which is fundamentally a question of fact).

## THE COMPLAINT'S ALLEGATIONS

### A.    The Parties

Founded in 1922 and headquartered in Mexico City, Modelo is the proud creator of beloved Mexican-style beers and the owner of iconic trademarks (in the U.S. and elsewhere) associated with its beer brands, including its flagship CORONA brand. (Compl. ¶¶ 10, 18-19.) Corona, like Modelo's other beers, highlights Modelo's rich Mexican heritage. (*Id.* ¶ 2.) When Modelo entered the U.S. market in the 1980s, it protected the value of its brands by registering its trademarks with the USPTO, including its then-existing marks for the CORONA brand—marks that Modelo had been using in commerce since 1943. (*Id.* ¶¶ 24, 26, Appendix 1; De Leeuw Decl., Ex. 3 (collecting CORONA Trademark Registrations).)[5] Modelo remains the proud owner of these marks today, and the widely recognized CORONA brand is sold in more than 160 countries. (Compl. ¶¶ 19, 24.)

Constellation is the maker of many wines, spirits, beers, and other alcoholic beverages, and a limited licensee of certain of Modelo's valuable U.S. trademarks. (Compl. ¶¶ 11-13, 24.) Years before the Sublicense, Constellation worked with Modelo to import Corona products into the U.S. (Sublicense at 2.) Constellation produces, packages, imports, and distributes Corona Hard Seltzer. (Compl. ¶¶ 11-13; De Leeuw Decl., Ex. 4 (Corona Hard Seltzer can).)

---

[5]     The Court may take judicial notice of public documents such as public filings by a party. *See Kramer* v. *Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir. 1991); *see also Penn Grp., LLC* v. *Slater*, 2007 WL 2020099, at *4 n.2 (S.D.N.Y. June 13, 2007) (collecting cases) ("Courts may take judicial notice of public filings . . . public disclosure documents, statutes, case law, and administrative decisions.").

**B.      The ABI/Modelo Merger and the DOJ's Focus on the U.S. "Beer" Market**

After Anheuser-Busch InBev SA/NV ("ABI") and Modelo announced their merger in 2013, the DOJ filed an action challenging the merger because of its alleged competitive effects on the U.S. "beer" market.  (Compl. ¶ 21; Declaration of Sara S. Tatum ("Tatum Decl."), Ex. 1 (DOJ Compl.) ¶¶ 1-2, 25-37.)  The DOJ's Complaint identified the product market the DOJ intended to protect by precisely defining "beer":  an "alcoholic beverage[] usually made from a malted cereal grain, flavored with hops, and brewed via a process of fermentation," and "substantially differentiated from other alcoholic beverages by taste, quality, alcohol content, image, and price." (*Id.* ¶ 25; Compl. ¶ 21.)  A product like Corona Hard Seltzer that is not made from malt or flavored with hops is not a "beer" under the definition in the DOJ Complaint.  (De Leeuw Decl., Ex. 5 (Corona Hard Seltzer webpage, listing ingredients); Mem. at 1, 3, 12, 19-20, 26-27, 30.)

To address the DOJ's concern about a "beer" antitrust market, Modelo divested aspects of its U.S. beer business by granting Constellation a limited license for "Beer" as set out in the Sublicense.[6]  (Compl. ¶ 22.)  Modelo continues to own the licensed U.S. marks, including the right to use them around the world and for everything other than "Beer" in the U.S. and Guam. (Compl. ¶ 3.)  ABI and the DOJ also entered a separate agreement to govern some of ABI's obligations for the DOJ action, memorialized in the Final Judgment.  (Compl. ¶ 22.)  The Final Judgment and the Sublicense are separate and distinct agreements, each directed to different issues.

Notably, the parties chose a *different* definition for "Beer" in the Final Judgment than

---

[6]      Constellation spends significant portions of its brief hoping to garner this Court's sympathy by pretending that Modelo's parent company has somehow acted anticompetitively because Modelo is enforcing the Sublicense's field of use restrictions.  (Mem. at 1-2, 4, 5-8, 10, 11-13, 20, 30-33.)  Constellation's views on Modelo's parent company are irrelevant to this action brought by Modelo to protect the intellectual property that it cultivated and owns.  Moreover, there is nothing anticompetitive about sending a letter to a licensee or pursuing litigation when the licensee fails to adhere to the license that the DOJ believed would preserve competition. Constellation also controls many other brands, like Svedka, which it used to market its first (failed) entry into the field of hard seltzers.  (Comp. ¶¶ 36-37.)  Constellation's theft of Modelo's valuable intellectual property is not "pro-competitive."

appeared in either the DOJ Complaint or the Sublicense—which also did not track the regulatory definitions upon which Constellation relies.  (Compl. ¶ 22.)  The Final Judgment defines "Beer" with reference to its ingredients:  "Any fermented alcoholic beverage that (1) is composed in part of water, a type of *starch*, yeast, and a flavoring and (2) has undergone the process of brewing." (Tatum Decl., Ex. 3 (Final Judgment) at II.E (emphasis added).)  Because sugar is not a starch, a product made from cane sugar, like Corona Hard Seltzer, does not qualify as a "Beer" under the Final Judgment.[7]

### C.    The Sublicense Grants Constellation a Limited License to Use Modelo's U.S. Trademarks for "Beer"

The Sublicense (governed by New York law) identifies multiple U.S. trademarks for Modelo's beers that are licensed to Constellation.  (Compl. ¶ 24; Sublicense §§ 1.1 at 4, 10, 2.15(b) & Exs. B, D.)  The Sublicense grants Constellation the right to import, market, and sell "Beer" in the U.S. and Guam.  (Compl. ¶ 27; Sublicense §§ 1.1 at 4, 9, 2.1.)[8]  "Beer" is defined as "beer, ale, porter, stout, malt beverages, and any other versions or combinations of the foregoing, including non-alcoholic versions of any of the foregoing."  (Compl. ¶ 28; Sublicense § 1.1 at 4.)

In defining "Beer," the parties focused on the liquid, not the container or the regulatory status or consequences of the liquid.  The Sublicense thus defines "Product" as "Beer packaged *in* Containers" bearing the licensed Trademarks and "Containers" as "the receptacle in which the

---

[7]    Starch is a complex carbohydrate comprised of a chain of molecules that can be broken down into simple sugars (like glucose).  In contrast, sugar is a simple carbohydrate, like lactose or glucose.  Thus, while starch can be broken down into sugar, sugar itself is not a starch.  *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2226, 2285 (2002) ("starch" is defined as a "complex carbohydrate ($C_6H_{10}O_5$)x that is the chief storage form of carbohydrate in plants, . . . is hydrolyzed by acids to dextrins, hydrol, and finally glucose and by carbohydrases to dextrins or glucose"; "sugar" is defined as a "substance that consists entirely or essentially of sucrose"); *see also* RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 1858, 1901 (2d ed. 2001) (also distinguishing starch from sugar).

[8]    Modelo granted Constellation an exclusive license to use the licensed Trademarks solely in connection with production, import, marketing, and sale in the U.S. and Guam of "Importer Products," which are defined as a "Product or Brand Extension Beer."  (Compl. ¶¶ 27, 28; Sublicense § 1.1 at 4, 6, 8, 9, 2.1.)

Beer is *directly placed*."  (Sublicense § 1.1 at 5, 8 (emphasis added).)  And the parties' rejection

of tax and regulatory definitions is evidenced dramatically in the differences between the

Sublicense's defined term "Beer" and the IRC's excise tax definition of "Beer."  The Sublicense's

"Beer" definition begins by mirroring the first four words of the IRC definition (26 U.S.C.

§ 5052(a)), but then rejects the rest of it in favor of language deliberately chosen by the parties and

designed to narrow the definition of "Beer":

> ***beer, ale, porter, stout,*** ~~and other similar fermented beverages (including saké or~~ ~~similar products) of any name or description containing one-half of 1 percent or~~ ~~more of alcohol by volume, brewed or produced from malt, wholly or in part, or~~ ~~from any substitute therefor~~ malt beverages, and any other versions or combinations of the foregoing, including non-alcoholic versions of any of the foregoing.

(Compl. ¶ 29; Sublicense § 1.1 at 4 (language from the IRC that was not included in the Sublicense

is struck and in red; and language in the Sublicense but not in the IRC is underlined and in blue).)

The parties of course were knowledgeable about taxes and tax consequences when negotiating the

Sublicense—these issues are expressly addressed in the recitals and Article VIII (Sublicense at 3,

33)—but did not mention them in defining "Beer."[9]

　　　　As to be expected for a multi-billion dollar contract among sophisticated parties, the parties

were deliberate in their word selection when drafting the Sublicense.  The Sublicense states that

its language "shall be deemed to be the language chosen by the parties to express their mutual

intent," and confirms the contract was "the joint drafting product of the parties . . . and each

provision has been subject to [their] negotiation and agreement."  (*Id.* § 1.2(d).)  And it contains a

---

[9]　　　　Constellation also cites to the Alcohol and Tobacco Tax and Trade Bureau ("TTB") definition of "Beer." (Mem. at 15, 22 (citing 27 C.F.R. § 25.11).)  As Constellation acknowledges, the TTB definition is "essentially identical to the tax code's definition." (*Id.* at 15.)  Corona Hard Seltzer is subject to the TTB beer regulations found under 27 C.F.R. Part 25.  But that is only half the story.  Corona Hard Seltzer is not subject to the TTB's labeling and advertising regulations under 27 C.F.R. Part 7 because those regulations apply only to "malt beverage[s]," as defined in the TTB's regulations (*see* 27 C.F.R. § 7.10; Mem. 15-16), which Constellation acknowledges Corona Hard Seltzer is not (Mem. at 26).  Instead, Corona Hard Seltzer is subject to the Food and Drug Administration's labeling regulations at 21 C.F.R. Part 101.

broad merger clause providing that the Sublicense and its ancillary documents "constitute the entire agreement among the parties . . . and supersede all prior or contemporaneous agreements and understandings, whether written or oral." (*Id.* § 9.6.)  Finally, the Sublicense contemplates the express incorporation of statutes and regulations into the Sublicense (*id.* § 1.2(c)); notably, no statutes and regulations are incorporated into the definition of "Beer."

### D.    Constellation Is Able to Innovate Within the Scope of the Sublicense

The Sublicense sets a specific path for Constellation to innovate using the licensed marks, defined in the Sublicense as "Brand Extension *Beers*."[10]  (Compl. ¶ 30 (emphasis added).)  But any such innovative product must still be "Beer," and the trade name and trade dress must confirm that it is a "Mexican-style Beer."[11]  (*See id*.)  This pathway gives Constellation ample room to innovate using Modelo's brands, and Constellation has done so, for example, by launching Corona Refresca and Corona Familiar without objection from Modelo.  (Compl. ¶ 37.)  Corona Refresca is a malt beverage, made from malt.  (Mem. at 11, 19; Compl. ¶ 37.)  In fact, Constellation worked with Modelo to launch Corona Refresca, including consulting with Modelo for nearly 18 months prior to the launch and providing Modelo with the recipe.  (Compl. ¶ 42.)

### E.    Constellation Launches Corona Hard Seltzer and Represents to the World that Corona Hard Seltzer Is Not a "Beer"

When the Sublicense was negotiated, "hard seltzers" had not yet been introduced (by beer companies or otherwise).  (Compl. ¶ 35.)  Since 2016, hard seltzer products have seen explosive growth.  (*Id.*)  Constellation first attempted to enter the hard seltzer market with Svedka Spiked

---

[10]    "Brand Extension Beers" are defined with reference to the liquid as "Beer packaged in Containers bearing a . . . Mark that is derivative of one or more of the [licensed] Trademarks for use in the marketing, . . . distribution, and sale of Mexican-style Beer."  (Sublicense § 1.1 at 4.)

[11]    "Mexican-style Beer" is defined as "Beer bearing the Trademarks that does not bear any trademarks, trade names or trade dress that would reasonably be interpreted to imply to consumers in the [U.S. and Guam] an origin other than Mexico."  (*Id.* § 1.1 at 7.)

Seltzer in June 2018, but it failed and was discontinued in August 2019, just as Constellation was preparing to launch Corona Hard Seltzer.  (*Id*. ¶¶ 36-37.)

In preparation for that Corona Hard Seltzer launch, Constellation filed two applications for CORONA HARD SELTZER trademarks in November 2019 under Modelo's name, without consulting Modelo.  (*Id*. ¶¶ 39-40, 42.)  In those applications, Constellation sought to protect the newly minted product name "Corona Hard Seltzer" and swore under penalty of perjury that it would not be a "beer," and in one application identified the product as "Alcoholic beverages, except beer; Hard seltzer; Flavored malt-based alcoholic beverages."  (*See id.* ¶¶ 39-42.)  Even after Constellation launched Corona Hard Seltzer—and it became clear the beverage was sugar-based, not "malt-based"—Constellation amended its trademark applications, reaffirming to the USPTO that Corona Hard Seltzer is *not* "beer."  (Compl. ¶¶ 41, 43; Mem. at 3, 12, 19-20, 26-27.)

Constellation's argument in its motion as to what constitutes a "beer" is flatly inconsistent with its own presentation to the market.  Both before and after Corona Hard Seltzer's launch, Constellation acknowledged and publicly represented that Corona Hard Seltzer is different from a beer.  For example, in a January 2020 earnings call, Constellation's CEO Bill Newlands explained to investors that hard seltzers—including Corona Hard Seltzer—are understood both by Constellation and consumers as a distinct category, separate and apart from beer:  "Seltzer is, in all likelihood, not going to take space from our core beer franchise.  *The consumer views it as something different.  The retailer is viewing it as something different* . . . and we believe that will continue."  (Compl. ¶¶ 6, 48.)  Three months later, in an April 3, 2020 investor call, Newlands reaffirmed that "[s]eltzer . . . is one of the fastest-growing sub-segments within the alcohol beverage business" and that "[Corona Hard Seltzer] . . . goes into a *different space*" than beer.  (*Id*.)  And in July 2020, Newlands told investors that the "introduction of Corona Hard Seltzer

[was] a great example of leveraging a tremendously strong brand *into a new category*," and that it was "important to not simply lump seltzer in with beer" because "[seltzer] is not necessarily a direct trade-off with beer." (*Id*. ¶ 48.)

Constellation's statements are consistent with the product's packaging, which prominently identifies Corona Hard Seltzer as a "hard seltzer" and "spiked sparkling water." (*Id.* ¶ 47.) The only reference to "beer" on Corona Hard Seltzer packaging is a two-millimeter font "beer" imprint on the back of each can, which Constellation acknowledges is a regulatory requirement that all manufacturers must comply with, regardless of how their private contracts may define "Beer." (*Id.*; Mem. at 22-23.) But, after meeting its minimum regulatory obligations, Constellation never uses the word "beer" in its multi-million dollar television commercials to promote Corona Hard Seltzer. (Compl. ¶¶ 6, 47.) Similarly, Constellation's webpage for Corona Hard Seltzer does not mention the word "beer." (*See* De Leeuw Decl., Ex. 5.)

### F. This Action

Modelo brings this action for trademark infringement and breach of contract pursuant to its rights as the successor-in-interest to the Sublicense to prevent Constellation from misusing and misappropriating Modelo's valuable CORONA trademark for Corona Hard Seltzer, which is not a "Beer," let alone a "Mexican-style Beer." (*See* Compl. ¶¶ 53-63, 64-71.)[12]

In response, Constellation asks the Court to dismiss Modelo's lawsuit for failing to state a claim under Rule 12(b)(6). Constellation first argues Corona Hard Seltzer is a "Beer" because it falls within the definition of "Beer" in selected statutes and regulations the parties chose not to expressly adopt in the Sublicense. (Mem. at 20-25.) Constellation then argues Corona Hard Seltzer is a "version" of a "beer" and a "malt beverage," even though it contains no malt or hops

---

[12]    Modelo and CBBS are the successors to the signatories to the Sublicense. (Compl. ¶ 24 n.2.)

(defining characteristics of those beverages).  (*Id.* at 25-27.)  Finally, Constellation argues Corona Hard Seltzer is a "Mexican-style Beer" because each can states, in tiny font and as required by federal law, that the product is "IMPORTED FROM MEXICO."  (*Id.* at 33-34.)

### THE *INCONSISTENT* STATUTORY AND REGULATORY LANDSCAPE

Constellation's motion hinges on its representation that there is a "uniform" or "consistent regulatory definition" for "beer."  (Mem. at 14-16, 22-24.)  To be sure, the beverage alcohol industry is highly regulated at the state, federal, and international level.  Constellation acknowledges in its motion that the "relevant regulatory regime" encompasses federal regulation *generally* and state regulation writ large (referring to state_s_, plural).  (Mem. at 14, 16, 17, 22 ("the States regulate and tax beverage alcohol"; referring to "[f]ederal and state regulators", "federal tax and regulatory purposes," and "state regulatory regimes").)  Despite this acknowledgement, in describing this regulatory landscape, Constellation only cites selected IRC, TTB, and New York state regulations that contain definitions of "Beer."  In doing so, Constellation focuses only on the tip of the regulatory iceberg:  All fifty states to which Corona Hard Seltzer is shipped and sold have adopted definitions of "Beer" and/or "Malt beverage" for tax and general regulatory purposes.  At the time the parties negotiated the Sublicense in 2013, many states' definitions differed from, and were substantially narrower than, the definitions on which Constellation relies.  (*See* De Leeuw Decl., Ex. 6 (collecting statutory and regulatory definitions).)  In fact, many states defined, and continue to define, "Beer" to *exclude* sugar-based hard seltzers like Corona Hard Seltzer.  (*See id*.)

For example, now and in 2013, a host of state law definitions reject any notion that a sugar-based liquid is a "Beer" for the purposes of taxation, sales, permitting, licensing, and labeling, among other things.  Connecticut defines "[B]eer" as "any beverage obtained by the alcoholic fermentation of . . . barley, malt and hops."  Conn. Gen. Stat. §§ 12-433, 30-1(5); *see also*, *e.g.*,

Mich. Comp. Laws § 436.1105(8) ("'Beer' means any beverage obtained by alcoholic fermentation of . . . barley, malt, hops, or other cereal."). Corona Hard Seltzer has none of those ingredients. (Mem. at 12, 19, 20, 30; Compl. ¶¶ 41, 43.) Other states like Indiana, Kansas, and Washington define "Beer" more broadly to include beverages made from "barley malt or other cereal [or grains] and hops," but make no mention of using non-cereals/grains (such as cane sugar). Ind. Code § 7.1-1-3-6; Kan. Stat. § 41-102; Wash. Rev. Code § 66.04.010. In 2013, Florida defined both "Beer" and "Malt beverage" simply as "all brewed beverages containing malt," Fla. Stat. § 563.01 (2013),[13] which is (again) absent from Corona Hard Seltzer.

At the federal level, alcoholic beverages are subject to additional regulation beyond the IRC and TTB excise taxation regulations on which Constellation relies. *First*, Constellation's regulatory "overview" omits the TTB's alternate definition of beer as a "[m]alt beverage . . . possessing the characteristics generally attributed to and conforming to the trade understanding of 'beer.'" (De Leeuw Decl., Ex. 7 (TTB Beverage Alcohol Manual, Vol. 3, Ch. 4) at 3.) There is no dispute that Corona Hard Seltzer does not satisfy this definition. (*See* Mem. at 15-16, 26.)

*Second*, CBP has concluded the IRC excise tax definition is not determinative of whether a product is a "beer" for tariff classification purposes. *See infra* at 29. CBP asks "whether a beverage is a beer" based on "its manufacturing process, organoleptic properties [*i.e.*, sensory properties], and commercial identity." (De Leeuw Decl., Ex. 2 at 10.) Applying this test, CBP determined that sugar-based hard seltzer products are *not* "beer" under their regulations. *See infra* at 29. The CBP's conclusion is consistent with the definitions of "Beer" in the DOJ Complaint and Final Judgment, neither of which includes Corona Hard Seltzer. (*See* Tatum Decl., Ex. 1 (DOJ Compl.) ¶ 25; Tatum Decl., Ex. 3 (Final Judgment) at 4.)

---

[13]    That definition remained in force until June 30, 2017. *See* H.B. 7109, LEGIS. LAW SERV. (FLA. 2017) (eff. July 1, 2017).

Contrary to Constellation's contention, many regulators *do* in fact "define beer based on the specific product used for fermentation" (Mem. at 17) and/or its sensory properties. While some states follow the IRC excise tax definition in whole or in part, the landscape of regulatory definitions is far from "consistent" or "uniform." The regulatory treatment of sugar-based hard seltzers is also far from "consistent" or "uniform." Rather, it is currently in flux.[14] In the context of this inconsistent landscape, and given the parties were under no obligation to adopt specific regulatory definitions into their private contract, Modelo and Constellation adopted a bespoke definition for "Beer." While regulations may vary, the Sublicense definition is constant. That is the definition that governs the parties and this dispute.

## ARGUMENT

To dismiss a claim under Rule 12(b)(6), Constellation must demonstrate that the Complaint does not "state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009). On a Rule 12(b)(6) motion, the Court must construe the Complaint liberally, accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor. *Chase Grp. All. LLC* v. *City of N.Y. Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010).

Modelo has more than plausibly alleged that Constellation breached the Sublicense and infringed Modelo's trademarks. The parties agree the Sublicense definition of "Beer" is unambiguous and should be interpreted and applied as written (Mem. at 25), but Constellation

---

[14]    With the increased popularity of hard seltzers, several states have considered, or are in the process of considering, regulatory amendments to address hard seltzer specifically, further underscoring that there is no "consistent regulatory definition" of "beer" or "uniform regulatory treatment" of hard seltzer. *See infra* Section II.B.

pivots away from the plain meaning of that definition because it excludes Corona Hard Seltzer. Constellation's construction is inconsistent with the parties' agreement, depends on extraneous materials outside the actual contract, and runs headlong into binding New York law.

## I.     CORONA HARD SELTZER IS NOT A "BEER" UNDER THE PLAIN LANGUAGE OF THE SUBLICENSE.

### A.     New York Law Requires a Contract Be Given Its Plain Meaning.

 "Under New York law 'the initial interpretation of a contract is a matter of law for the court to decide.'" *VKK Corp.* v. *Nat'l Football League*, 244 F.3d 114, 129 (2d Cir. 2001). When interpreting a written contract, the Court seeks "to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *British Int'l. Ins. Co. Ltd.* v. *Seguros La Republica, S.A*., 342 F.3d 78, 82 (2d Cir. 2003); *Gary Friedrich Enters.* v. *Marvel Characters, Inc*., 716 F.3d 302, 313 (2d Cir. 2013) ("When interpreting a contract, the intention of the parties should control, and the best evidence of intent is the contract itself.").

Step one in interpreting a contract is to determine whether an ambiguity exists. *Lockheed Martin Corp*. v. *Retail Holdings, N.V*., 639 F.3d 63, 69 (2d Cir. 2011). "Ambiguity must be determined on the face of the contract; extrinsic evidence may not be introduced in an attempt to create ambiguity." *Charron* v. *Sallyport Glob. Holdings, Inc*., 2014 WL 7336463, at *16 (S.D.N.Y. Dec. 24, 2014). In making this assessment, common words must not be read to mean "anything other than that accorded to the term in ordinary usage," or treated as "distinct term[s] of art rendering the document ambiguous." *Nachem*, 918 N.Y.S.2d at 490. Thus, a contract's words "must be given their plain meaning, and it is common practice for courts to refer to the dictionary in determining plain meaning." *Bianco* v. *Bianco*, 830 N.Y.S.2d 21, 23 (1st Dep't 2007); *see also Mazzola* v. *County of Suffolk*, 533 N.Y.S.2d 297, 297 (2d Dep't 1988) ("[I]t is common practice for the courts of this State to refer to the dictionary to determine the plain and

ordinary meaning of words to a contract").

Where, as here, "the agreement was negotiated between sophisticated and well-counseled parties" negotiating at arm's length," courts are "extremely reluctant to interpret [the] agreement as impliedly stating something which the parties have neglected to specifically include" or to "add or excise terms, [or] distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Worcester Creameries Corp.* v. *City of N.Y.*, 861 N.Y.S.2d 198, 201 (3d Dep't 2008) (quoting *Vt. Teddy Bear Co.* v. *538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004)); *see also Mionis* v. *Bank Julius Baer & Co., Ltd.*, 749 N.Y.S.2d 497, 502 (1st Dep't 2002) ("[T]he court violated a fundamental principle of contract interpretation by failing to give effect to a defined term in the authorization agreement.").

As Constellation acknowledges (Mem. at 18, 29), extrinsic (parol) evidence is inadmissible to interpret an unambiguous contract, *Omni Quartz, Ltd.* v. *CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002), and "evidence outside the four corners of the document" may only be considered if the court first determines an ambiguity exists in the contract, *Schron* v. *Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013). "[W]here a contract contains a merger clause, a court is obliged 'to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing.'" *Id.* A merger clause like the one in the Sublicense is given virtually conclusive effect under New York law. *See Norman Bobrow & Co.* v. *Loft Realty Co.*, 577 N.Y.S.2d 36, 36 (1st Dep't 1991).

### B. Under the Plain Meaning of the Word, Corona Hard Seltzer Is Not a "beer."

Constellation agrees dictionary definitions can and should be used to define the common understandings of ordinary words in the Sublicense. (*See* Mem. at 25 (relying on dictionary definitions of the word "version").) Yet Constellation ditches the dictionary when it comes to "beer." That is no surprise, because dictionaries, including those regularly consulted by New York

-18-

and federal courts, define beer as the well-known beverage brewed with malted barley (or some other grain) and the hops that give beer its distinctive bitter taste.  For example, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (widely available at the time the Sublicense was negotiated and signed) defines "beer" as "a malted and hopped somewhat bitter alcoholic beverage."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 197 (2002).[15]  A host of other sources confirm this definition.[16]  There has been no change to that common understanding, as other sources (including more recent dictionary entries) are to the same effect.[17]

To Modelo's knowledge, the only court to have construed the word "beer" also referenced dictionary definitions, holding that the ordinary, common meaning of "beer" applied:

> Terms or words should be construed in the sense of their plain, ordinary, fair, usual, and popular sense meaning rather than philosophical, literal, or technical sense. The district court determined that the plain, ordinary, fair, usual, and popular sense of "beer" means a "hops-based alcoholic beverage."  We agree that hops flavoring is essential to the ordinary definition of beer.

*Chalet Liquors*, 2004 WL 885356 at *5.  The court rejected the same argument that Constellation makes here—that "the unambiguous definition of beer should include the offending products

---

[15]     *See, e.g.*, *Graev* v. *Graev*, 11 N.Y.3d 262, 272 (2008) (consulting Webster's Third New International Dictionary, among others).

[16]     *See, e.g.*, WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY 187 (2d ed. 1979) ("an alcoholic beverage made by brewing and fermentation from cereals, usually malted barley, and flavored with hops and the like for a slightly bitter taste"); WEBSTER'S NEW COLLEGIATE DICTIONARY 100 (9th ed. 1980) ("a malted and hopped somewhat bitter alcoholic beverage"); WEBSTER'S NEW COLLEGIATE DICTIONARY 102 (10th ed. 1993) ("an alcoholic beverage usu[ally] made from malted cereal grain (as barley), flavored with hops, and brewed by slow fermentation").  Alternative definitions in these dictionaries include "a carbonated nonalcoholic or a fermented slightly alcoholic beverage with flavoring derived from roots and other plant parts"—*e.g.*, "birch beer, ginger beer, spruce beer" (or substantively similar language).  This definition is not implicated here.  *See Chalet Liquors*, 2004 WL 885356, at *5 (noting the irrelevance of the second definition when referring to alcoholic beverages).

[17]     *E.g.*, AMERICAN HERITAGE DICTIONARY 161 (5th ed. 2011) ("A fermented alcoholic beverage brewed from malt and flavored with hops"); *Beer*, Dictionary.com, https://perma.cc/E8NU-YLGE (last accessed May 16, 2021) ("an alcoholic beverage made by brewing and fermentation from cereals, usually malted barley, and flavored with hops and the like for a slightly bitter taste"); *Beer*, Google Dictionary, https://perma.cc/393J-Y4T7 (last accessed May 16, 2021) ("An alcoholic drink made from yeast-fermented malt flavored with hops.").

because they are included in the regulatory definition of beer." *Id*.

Constellation admits that, in ordinary parlance, the liquid in its Corona Hard Seltzer cans is not a "beer." (Mem. at 30.) It contains no malted barley (or other grain) and it is not flavored with hops, the defining characteristics of "beer." (Compl. ¶ 43; Mem. at 12, 20; De Leeuw Decl., Ex. 5.) These defining characteristics are not "atextual limitations [that] contradict the Sublicense" (Mem. at 30), but are instead included within the plain meaning of the terms the parties chose. Constellation recognizes as much, conceding Corona Hard Seltzer does not possess the defining characteristics of "beer" as ordinarily understood by "the average person on the street." (*Id*. at 30.) Constellation admitted this to the USPTO, which requires that proposed trademark goods be described by their "generally understood" and "common meaning";[18] when Constellation applied for a trademark on Corona Hard Seltzer, it stated that the product was *not* "beer." (Compl. ¶¶ 39-40.) Constellation's concessions about plain meaning are fatal to its Motion, and to its defense.

## II.    CONSTELLATION'S ATTEMPTS TO EVADE THE PLAIN LANGUAGE OF THE SUBLICENSE ARE UNAVAILING.

### A.    Constellation's Reliance on Self-Selected Statutory and Regulatory Definitions Is Mistaken.

Constellation seeks to evade the Sublicense's plain language by invoking a supposed "consistent regulatory definition" for the common word "beer." (Mem. at 23; *see id*. at 20-25.) To do so, Constellation does not make an exhaustive inquiry, but instead argues that the IRC and a few other statutory and regulatory definitions (although they differ from each other) should

---

[18]    The USPTO Trademark Manual states that "[t]he identification [of goods] should set forth common names, using terminology that is generally understood. . . . The language used to describe goods and/or services should be understandable to the average person and should not require an in-depth knowledge of the relevant field." (De Leeuw Decl., Ex. 8 (USPTO, Trademark Manual of Examining Procedure (Oct. 31, 2018)) § 1402.01.) "The common understanding of words or phrases used in an identification determines the scope and nature of the goods or services. A basic and widely available dictionary should be consulted to determine the definition or understanding of a commonly used word." (*Id*. § 1402.03(4) (citations omitted); *see also id*. § 1402.07(a) (explaining the USPTO's "Ordinary-Meaning Test").)

replace the language in the Sublicense. This "incorporation by silence" of cherry-picked regulatory definitions that the parties rejected has no support in the Sublicense or the law.[19] But Constellation has no choice but to make this argument because, without these regulations, no one would ever consider Corona Hard Seltzer to be a "beer."

### 1. Constellation's Self-Selected Regulatory Definitions Cannot Displace the Plain, Ordinary Meaning of "beer."

Constellation offers no authority for its assertion that self-servingly selected regulatory definitions governing matters such as taxation and labeling may be invoked to rewrite the unambiguous terms of a Sublicense governing trademarks—on a motion to dismiss or otherwise. Constellation's legal theory fails because there is no ambiguity that would permit the Court to look beyond the Sublicense. *See Miller* v. *Mercuria Energy Trading, Inc.*, 291 F. Supp. 3d 509, 520 n.2 (S.D.N.Y. 2018) (extrinsic evidence, like evidence of regulatory practice, "is immaterial where the plain language of the contract controls"), *aff'd*, 774 F. App'x 714 (2d Cir. 2019).

Under New York law, it is inappropriate to resort to statutory or regulatory definitions to create or resolve an ambiguity where there is none. Rather, common words like "beer" may not be treated as "distinct term[s] of art," *Nachem*, 918 N.Y.S.2d at 490, and courts instead look to dictionary definitions to determine the plain, ordinary meaning of common words like "beer." *Accord Law Debenture Tr. Co. of N.Y.* v. *Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (evidence of custom and usage may only be considered where "parties have used contract terms

---

[19]    Constellation ignores the important distinction between interpretation and construction, and the implications of that distinction: The "incorporation of existing statutes into contracts is a rule of construction rather than interpretation." 5 CORBIN ON CONTRACTS § 24.26. "Interpretation is the discernment of the parties intended meaning, while construction is the legal effect that the court gives to this meaning after having identified it." *Id*. Thus, incorporation cannot vary the meaning of contract terms. The extrinsic definitions in Constellation's motion are all different than the defined term in the Sublicense and the plain meaning of "beer," and thus necessarily would vary the terms of the Sublicense if applied.

which are 'in common use in a business or art' and have 'a definite meaning understood by those who use them,' but which 'convey no meaning to [t]hose who are not initiated into the mysteries of the craft'" (alteration in original)).[20]

Constellation cites *Hugo Boss* to support its reliance on statutory and regulatory definitions (Mem. at 21-24), but that decision underscores the errors in Constellation's theory.  In *Hugo Boss*, the court was confronted with an *undefined* insurance contract term—"trademark slogan"—in a dispute over insurance coverage for a trademark litigation.   Explaining that the term was "potentially ambiguous," the court understandably looked to "well-established" federal trademark law defining that term.  *Hugo Boss Fashions, Inc.* v. *Fed. Ins. Co.*, 252 F.3d 608, 616-20 (2d Cir. 2001).[21]  Here, the contract term ("Beer") is defined in the Sublicense, no party argues it is ambiguous or potentially ambiguous, and there is no dispute that "beer" has a common, ordinary meaning.  *See Authentic Bev. Co., Inc.* v. *Texas Alcoholic Bev. Comm'n*, 835 F. Supp. 2d 227, 241

---

[20]    There are limited situations where an extrinsic statute or regulation can inform the construction of a contract term under New York law, but none is present here.  This is not a situation where (i) the disputed term implicates a specific legal procedure or term of art (*e.g.*, *Matter of Andy Floors, Inc. (Tyler Const. Corp.)*, 609 N.Y.S.2d 692, 693 (3d Dep't 1994) (concluding that the term "filed" in an arbitration clause should not be construed "to impose a method of service more restrictive than . . . already provided for by [New York law]"); (ii)  the agreement is "authorized"—*i.e.*, given force and effect—by a particular statutory scheme (*e.g.*, *Burns* v. *Burns*, 81 N.Y.S.3d 846, 849-50 (4th Dep't 2018) (looking to a defined term in "[t]he statutory scheme corresponding to the [divorce settlement] agreement in th[e] case . . . , which authorizes divorce settlement agreements")); (iii) the agreement incorporates a statutory requirement governing the contract's subject (*e.g.*, *Turner Const. Co.* v. *Seaboard Sur. Co.*, 447 N.Y.S.2d 930, 935 (1st Dep't 1982)); or (iv) a competing construction of a disputed term would violate applicable law or render the provision meaningless (*e.g.*, *Bush* v. *City of New York*, 762 N.Y.S.2d 775, 780-81 (Sup. Ct. Bronx Cty. 2003)).  To the contrary, the "law" Constellation cites is hardly "applicable" to a trademark license.  Moreover, interpreting "beer" according to its plain, ordinary meaning would not "render [the Sublicense] meaningless or without force or effect."  *Ronnen* v. *Ajax Elec. Motor Corp.*, 88 N.Y.2d 582, 589 (1996).

[21]    *See also Eskimo Pie Corp.* v. *Whitelawn Dairies, Inc.*, 284 F. Supp. 987, 991 (S.D.N.Y. 1968) (looking to the "established legal meaning" of the word "non-exclusive" in a trademark licensing context to resolve contention "that parol evidence should be admitted on the ground that the term 'non-exclusive' is ambiguous"); *Beazley Ins. Co., Inc.* v. *ACE Am. Ins. Co., et al.*, 197 F. Supp. 3d 616, 623 (S.D.N.Y. 2016) (considering "usage in the context of federal securities case law" to determine whether investors in an exchange-listed company were "customer[s] or clients" of the exchange).

(W.D. Tex. 2011) ("[t]he terms 'beer,' 'ale,' and 'malt liquor' are common terms used in everyday conversation," and not "legal concept[s]" or "legal term[s] of art").[22]  Constellation is effectively trying to use statutory and regulatory definitions to both manufacture an ambiguity where none exists and then resolve that ambiguity in its favor.  That is impermissible, and the Court should reject Constellation's attempts to rewrite the Sublicense.

### 2.    The IRC and New York Law Definitions of "beer" Have No Bearing on the Meaning of the Sublicense.

The statutes Constellation cites also cannot be imported into the Sublicense because they expressly state that their definitions of "beer" are limited to the sections in which they appear.  For example, the IRC definition of "beer" is solely "for purposes of" Chapter 51 of the IRC, 26 U.S.C. 5052(a), which sets forth excise and related tax provisions applicable to beer, wine, and spirits. *See also* 27 C.F.R. § 25.11 (TTB "Beer" definition) (limited to "[w]hen used in this part . . . ."). And the N.Y. ABC "beer" definition is likewise prefaced by a disclaimer limiting its definitions to "[w]henever used in this chapter."  N.Y. Al. Bev. Con. § 3.  Courts interpreting New York law have consistently emphasized that such limiting provisions must be respected.  *E.g.*, *Murphy* v. *Arlington Cent. Sch. Dist. Bd. of Educ.*, 1999 WL 1140872, at *2 & n.4 (S.D.N.Y. Dec. 13, 1999) (where "[t]he plain wording of [a] statute restricts the use of the[] definitions to 'this Part,'" the definitions apply only for the purpose of that part and have no "broader application"); *Arlyn Oaks Civic Ass'n* v. *Brucia*, 654 N.Y.S.2d 1016, 1020 (Sup. Ct. Nassau Cty. 1997) (explaining that "[a]s used in this part" preceding definitions in a statute constitutes "limiting language"); *see also* 5 CORBIN ON CONTRACTS § 24.26 ("Statutory glossaries, which give definitions of words and

---

[22]    Like other decisions, *Hugo Boss* also notes that statutes are irrelevant where "the parties explicitly indicate, on the face of their agreement, that the term is to have some other meaning."  252 F.3d at 617-18.  As noted below, the parties specifically rejected broader statutory definitions, which in any event are inapplicable on their face to this trademark license dispute.  *See infra* Section II.A.3.

phrases, are intended to be used to interpret the particular statutes and not to interpret contracts made by individuals.  Such definitions are therefore not incorporated in a contract unless the parties themselves incorporate them.").

Worse, Constellation does not come to grips with the fact that both the IRC and New York state law definitions to which it refers include "beer" (lowercase "b") in their definition of "Beer." Thus, the very same statutes that Constellation invokes recognize that "beer" (lowercase "b") has a plain and ordinary meaning, different from the regulatory definitions.  *See Deutsche Bank Nat'l Trust Co.* v. *Quicken Loans Inc.*, 810 F.3d 861, 868 (2d Cir. 2015) ("[S]tatutory interpretation must begin with the plain language, giving all undefined terms their ordinary meaning . . . .").

Constellation would have the Court disregard the limiting and self-containing language of these chapters and choose to follow them *instead* of the plain language of the definition within the Sublicense.  These efforts fail.  *See Deverho Const. Co.* v. *State of New York*, 407 N.Y.S.2d 399, 404 (Ct. Cl. 1978) (explaining "[t]he law . . . is not a silent factor in every contract . . . in the sense that the statutory definitions govern the interpretation of every ambiguous phrase in a private agreement"); 5 CORBIN ON CONTRACTS § 24.26 ("Judicial statements that existing statutes are incorporated in contracts refer only, of course, to relevant statutes.  Their language could otherwise be viewed as being too broad.").[23]

### 3.    The Parties Affirmatively Chose Not to Use the IRC and New York Statutory Definitions That Constellation Advances.

Constellation's attempt to incorporate extrinsic definitions into the Sublicense is

---

[23]    Under Constellation's argument, contracting parties would have to consider every usage in state and federal law, whether or not related to the purpose of—and intended to govern—the contract, and reject those usages explicitly to be sure their agreement would be enforced as written.  *See Nat'l Leased Hous. Ass'n* v. *United States*, 32 Fed. Cl. 762, 766 (1999) ("[P]laintiffs contend that regulations not referenced in the contract may be 'applicable regulations.'  This proposed interpretation, however, would seem necessarily to produce considerable indefiniteness as to the parties' respective obligations under the contract.  There are literally thousands of HUD [Housing and Urban Development] regulations not mentioned in the contract . . . .  This type of inquiry could raise a Pandora's box of potential problems and disagreements.").

particularly improper given the parties' choice *not* to use them.  According to Constellation's theory, the parties to the Sublicense—two sophisticated industry participants, each represented at the time by experienced legal counsel—negotiated a transformative multibillion-dollar trademark license with a defined term that means something entirely different from what it says.  And the "real" meaning of that term incorporates (in complete silence) aspects of a definition from the IRC (and New York law) of which *both parties no doubt were aware*.  (Mem. at 14.)  If the sophisticated parties wanted to incorporate a regulatory definition into the Sublicense, they would have done so. *See Worcester Creameries*, 861 N.Y.S.2d at 201 (quoting *Vt. Teddy Bear,* 1 N.Y.3d at 475).

Constellation's "incorporation by silence" theory is also inconsistent with Section 1.2(c) of the Sublicense provision that envisions *explicit* incorporation of statutes and regulations.  (*See* Sublicense § 1.2(c).)  The definition of "Beer" in the Sublicense does not reference any federal or New York rules, regulations, or statutes.  By contrast, in other sections of the Sublicense where the parties *did* want to incorporate statutes and regulations, they did so expressly.  (*E.g.*, Sublicense § 2.14 (citing 15 U.S.C. § 1127); *id*. § 9.11 (citing 11 U.S.C. §§ 101 *et seq.*).)

Most tellingly, the "Beer" definition the parties chose for the Sublicense begins by mirroring the IRC definition, but then explicitly *departs* from the broader portion of the IRC definition that Constellation now tries to incorporate by silence.  The "Beer" defined in the Sublicense and the "Beer" defined under the IRC (and other statutory and regulatory definitions) are different—and they differ because the parties intended a different outcome.  The parties rejected the broader language of the IRC definition by removing broad portions of the IRC definition on which Constellation is now compelled to rely upon. *See supra* at 10.

Having elected *not* to refer to any statutory or regulatory definitions in the Sublicense, Constellation cannot now introduce them as extrinsic evidence or otherwise to contradict the

unambiguous terms of the Sublicense. The parties' choice *not* to incorporate part of the IRC definition must be respected. *See Crowley* v. *VisionMaker, LLC,* 512 F. Supp. 2d 144, 152 (S.D.N.Y. 2007) ("In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use, and thus, the court ordinarily looks only at the wording used by the drafters who presumably understood what they intended."); *Schron*, 20 N.Y.3d at 436 ("Where a contract contains a merger clause, a court is obliged to . . . bar the introduction of extrinsic evidence to vary or contradict the terms of the writing.").

Constellation tries to downplay the scope of the Sublicense definition's departure from the IRC definition, casting it as "the parties' decision to prune a *sui generis* beverage alcohol like saké from the Sublicense Agreement's definition of 'Beer'" (Mem. at 23), but that rhetoric makes no sense. Under Constellation's own incorporation theory, the purportedly "pruned" saké is still a "beer" within the Sublicense because it "meets regulatory definitions of 'beer'" (*id*. at 22). In fact, the same IRC language includes saké and beverages like sugar-based hard seltzer; hence, if the parties "prune[d]" saké, they did the same for hard seltzer.

For these reasons, Constellation's claim that there is "no indication that the parties intended to reject the *consistent* regulatory definition of 'beer' and instead adopt a different, unspecified definition of 'beer' untethered from any relevant regulations" (*id*. at 23-24) is just wrong. *See Hugo Boss*, 252 F.3d at 618; *Est. of Setlow* v. *Liberty Union Mfg. Co., Inc.*, 2008 WL 11413406, at *5 (E.D.N.Y. Mar. 31, 2008).[24]    Constellation's contrary conclusion would, in effect,

---

[24]    The cases on which Constellation relies make clear that where, as here, the parties have defined a term in a manner that is different from the regulatory definition, the parties "explicitly indicate[d], on the face of their agreement, that the term is to have some other meaning" than the regulatory definition. *Hugo Boss*, 252 F.3d at 618.    For example, in *Hugo Boss*, the court only looked to state law after first determining that the phrase "trademarked slogan" was not defined in the parties' contract. *Hugo Boss*, 252 F.3d at 617. Similarly, in *Setlow*,

reincorporate via lowercase "beer" the very same aspects of the IRC definition that the parties rejected. That cannot be right.

### B.    There Is No "Established Definition" of "beer" Provided by Statutes and Regulations.

Even if it were appropriate to consult the regulatory backdrop, there is no "established" regulatory definition that the Court may presume was adopted by the parties. Constellation recognizes that private parties are only presumed to adopt an "established" regulatory definition when a "uniform" and "consistent regulatory definition" actually exists in the first place, but then incorrectly asserts that is the case here. (*See* Mem. at 23-24.) While Constellation repeatedly expounds the "highly regulated" beverage alcohol industry includes federal and state regulation across the U.S. (*id*. at 3, 14, 19, 22-24, 29), it actually cites to very few: the federal IRC and TTB definitions, and select New York state law definitions (*id*. at 22-23). Constellation ignores 49 other states, as well as relevant federal definitions and administrative guidance from CBP and other agencies. There is no "established," "uniform," or "consistent regulatory definition" of "beer" in the U.S. now, nor in 2013 when the Sublicense was negotiated, let alone one that includes sugar-based hard seltzers.

*First*, by 2013, at least 15 states' laws differed from the IRC definition and *did not* use the language on which Constellation's position depends.[25] Thirteen of these states have the same

---

the court explained that the parties could have avoided the incorporation of an established definition under state law "by provid[ing] a definition of net asset value that differ[ed] from the legally recognized default meaning." 2008 WL 11413406, at *5.

[25]    Conn. Gen. Stat. §§ 12-433, 30-1(5) (2013); Del. Code tit. 4, § 101(5) (2013); Fla. Stat. § 563.01 (2013); Haw. Rev. Stat. § 281-1 (2013); Ind. Code §§ 7.1-1-3-1, 7.1-1-3-6 (2013); Kan. Stat. Ann. § 41-102 (2013); Mich. Comp. Laws §§ 436.1103, 436.1105(8) (2013); Minn. Stat. §§ 297G.01(8), 340A.101(16); Miss. Code. §§ 27-71-3, 67-3-3 (2013); Mont. Code §§ 16-1-106(5)(a), (16) (2013); Neb. Rev. Stat. § 53-103.03 (2013); Or. Rev. Stat. § 471.001(6) (2013); Tex. Alco. Bev. Code § 1.04(15) (2013); Wash. Rev. Code § 66.04.010 (2013); Wis. Stat. §§ 125.02(6), 139.01(4) (2013).

definition today.[26]  (*See* De Leeuw Decl., Ex. 6.)  Oregon's alcohol regulator, in fact, considers sugar-based hard seltzer to be a "wine" because of its sugar base.  *See* Or. Rev. Stat. § 471.001. Even the treatment of sugar-based hard seltzer under New York law was not "established" in 2013. On its face, the statutory definition of "Wine" under New York's tax law (nowhere cited by Constellation) could include alcoholic beverages like Corona Hard Seltzer that are "produced by the fermentation of the natural sugar contents of . . . agricultural products containing sugar," N.Y. Tax § 420, and thus regulatory guidance (which came well *after* the execution of the Sublicense and launch of Corona Hard Seltzer) was needed to determine how to categorize those beverages.

*Second*, even today, in at least 13 states, sugar-based hard seltzer does *not* fall within the statutory definition of a beer or a malt beverage, and the regulatory treatment is inextricably connected to the fact that "it is brewed from a sugar base rather than a malt base"—a fact Constellation wrongly implies is irrelevant to Corona Hard Seltzer's regulatory treatment. (*Compare* De Leeuw Decl., Ex. 6 *with* Mem. at 22-23.)

*Third*, recent state legislative initiatives addressing the regulatory treatment of hard seltzer contradict Constellation's suggestion that there is "uniformity" in regulatory treatment across the U.S., much less that any such uniformity existed in 2013 when the Sublicense was negotiated and hard seltzer had not yet been sold.[27]  Instead, these changes demonstrate that the regulatory

---

[26]        Conn. Gen. Stat. §§12-433, 30-1(5); Del. Code tit. 4, § 101(5); Haw. Rev. Stat. § 281-1; Ind. Code §§ 7.1-1-3-1, 7.1-1-3-6; Kan. Stat. Ann. § 41-102; Mich. Comp. Laws §§ 436.1103, 436.1105(8); Minn. Stat. §§ 297G.01(8), 340A.101(16); Miss. Code. §§ 27-71-3, 67-3-3; Neb. Rev. Stat. § 53-103.03; Or. Rev. Stat. § 471.001(6); Tex. Alco. Bev. Code § 1.04(15) (effective until September 1, 2021 (*see* H.B. 1545, 86th Legis. (Tex. 2019)); Wash. Rev. Code § 66.04.010; Wis. Stat. §§ 125.02(6), 139.01(4).

[27]        *See* H.B. 46, 151st Gen. Assemb. (Del. 2020) (passed February 1, 2021) (amending Del. Code tit. 4, § 101 to add a new term "Fermented beverage," defined as "any product similar to beer, including . . . seltzer . . . brewed from substitutes for malt, including rice, grain, bran, glucose, sugar and molasses" while leaving intact the definition of "Beer"); S.B. 565, 31st Legis. (Haw. 2021) and H.B. 593, 31st Legis. (Haw. 2021) (proposing amendments to the state law definition of "Beer" in Haw. Rev. Stat. §§ 244D-1 and 281-1 to include malt substitutes and the definition of "Beer" in Haw. Rev. Stat. § 244D-1 to include "alcoholic seltzer beverages");

landscape remains fluid, and continues to shift by the day as the parties litigate this case.

This lack of uniformity extends to the federal level. *See* s*upra* at 15-16. Notably, CBP—which oversees a regulatory regime directly applicable to Corona Hard Seltzer—has concluded that hard seltzer is *not* a "beer." CBP recently ruled that a leading sugar-based hard seltzer, White Claw, does not fit in the Harmonized Tariff Schedule of the U.S. ("HTSUS") category 2203 "Beer made from malt," but instead belongs in category 2206 "Other fermented beverages (for example, cider, perry, mead, saké)." (*See* De Leeuw Decl., Ex. 2 at 9, 12.) CBP rejected White Claw's argument that the federal excise tax classification is "determinative," and held that White Claw "is entirely distinct from beer because it does not have the taste, aroma, character or appearance of beer" and "is not sold or marketed as beer." (*Id.* at 10, 11.) Corona Hard Seltzer shares the same sensory properties as White Claw, and is affirmatively *not* a "beer" when it crosses the border into the U.S. (*Compare* Compl. ¶¶ 43, 46-48 *with* De Leeuw Decl., Ex. 2 at 11-12.)

Constellation's contention that Corona Hard Seltzer is a "beer" because it "meets regulatory definitions of 'beer'" (Mem. at 22-24) therefore also fails because Constellation cannot meet its own standard—there is not now, nor was there in 2013, a "uniform" or "consistent regulatory definition" of "beer," and there is no "consistent regulatory treatment" of sugar-based hard seltzers like Corona Hard Seltzer.[28]

And, despite invoking the terms "custom," "usage," and "industry terminology"

---

H.B. 2264, 81st Legis. Assemb., Reg. Sess. (Or. 2021) (as amended March 31, 2021) (proposing an amendment to the definition of "Malt beverage" in Or. Rev. Stat. § 471.001(6) to include fermented beverages brewed or produced from "rice, grain, bran, glucose, sugar or molasses as a substitute for malt"); *see also* H.B. 79, 67th Legis., Reg. Sess. (Mont. 2021) (in force as of February 23, 2021) (amending the definition of "Malt beverage" in Mont. Code Ann. § 16-1-106 to include "an alcoholic beverage made by the fermentation of malt substitutes including rice, grain of any kind, glucose, sugar, or molasses").

[28]    By contrast, the court in *Hugo Boss* interpreted the meaning of the "potentially ambiguous" term "trademarked slogan" by reference to "established" law so well understood and uniform "that it has been taken as a given by the vast majority of federal courts." *Hugo Boss*, 252 F.3d at 618-19.

throughout its motion (*see*, *e.g.*, *id*. at 21, 23, 25), Constellation does not actually present *any* argument that there is a trade usage for "beer."  Presumably, this is because Constellation could not meet the heavy burden imposed by New York law on a party invoking a purported uniform trade usage. *See British Int'l*, 342 F.3d at 83-84.  Reliance on trade usage requires (i) that the term at issue be a "specialized" term with a "definite meaning" in the industry, but that "convey[s] no meaning to those who are not initiated into the mysteries of the craft" (which "beer" is not), and (ii) that the party invoking trade usage establish, as a matter of fact, that the term has a "fixed, invariable" and "uniform" definition in the industry (which the patchwork of regulatory definitions highlighted above demonstrate is not the case). *Law Debenture*, 595 F.3d at 466-67.  The burden is a high one. *SR Int'l Bus. Ins. Co.* v. *World Trade Ctr. Properties, LLC*, 467 F.3d 107, 136 (2d Cir. 2006) (explaining that a "general understanding" or definition that is "often used" is insufficient to meet this burden).[29]

## C.    Corona Hard Seltzer Is Not a "version" of a "beer" or "malt beverage."

Constellation's final argument, that Corona Hard Seltzer is a "version" of a "beer" or "malt beverage," ignores the plain language of the Sublicense.  As the dictionary definitions relied upon by Constellation confirm, a version of something must still be "a particular form" of the original, and it may only "differ[] in certain respects from an earlier form or other forms of the same type of thing." (Mem. at 25.)  Constellation's "version" argument, however, is divorced from the terms actually used in the Sublicense, and neglects the distinction between a "substitute" and "version,"

---

[29]    In support of its argument that the parties must be presumed to adopt the purported "uniform" and "consistent" regulatory definition of "beer," Constellation cites to *Robinson* v. *United States*, 80 U.S. 363 (1871). (Mem. at 14, 23.)  *Robinson* is an early case setting out the role of trade usage in interpreting a contract term. *Robinson* articulates the same principles that the Second Circuit outlined in *Law Debenture*—that evidence of trade usage may not be used as extrinsic evidence to vary the terms of a contract, but may be "properly received to ascertain and explain the meaning and intention of the parties to a contract."  80 U.S. at 365.  This, *Robinson* emphasizes, is only the case where "known usages prevail" and "nothing is said to the contrary" in the contract. *Id* at 366.  *Hugo Boss* cites *Robinson* for the proposition that "widespread custom or usage [may] serve[] to determine the meaning of a potentially vague term."  *Hugo Boss*, 252 F.3d at 617.

the word actually chosen by the parties in the Sublicense's definition of "Beer."  Constellation's efforts to turn a malt-free, hop-free, sugar-based hard seltzer into a "version" of a "beer" or "malt beverage" offers no limiting principle whatsoever and does violence to the definition of "version."

*First*, Constellation argues (apparently as a matter of law) that "the Sublicense Agreement includes within the definition of 'Beer' beverages that are *not* 'beers' or 'malt beverages,' but qualify as 'versions' of those beverages."  (*Id*. at 25 (emphasis in original).)  It defies logic that "beverages that are not 'beers' or 'malt beverages'" could be "a particular form" of a "beer" or "malt beverage," as required to be a "version" under Constellation's own definition of the term.

*Second*, further showing how divorced Constellation's position is from the actual words of the Sublicense, Constellation claims a sugar-based product like Corona Hard Seltzer that has no malt can nevertheless be a version of a "malt beverage" if it is "substantially similar" to a malt-based product.  (*Id*. at 27.)  Nowhere, however, does Constellation explain how "substantially similar" is the appropriate standard, particularly when the parties' chosen definition of "Beer" omits the portion of the IRC definition of "Beer" that includes "*similar* fermented beverages" (*see supra* at 10 (emphasis added), Section II.A.3).  "Similar" and "version" are not synonyms, and while a version may be "similar" to the original, many things that are "similar" are not "versions" of each other.  Constellation's argument also flatly contradicts its representations to the USPTO that Corona Hard Seltzer was *not* "beer."  (*See supra* at 11-12.)

Using Constellation's definition, "version" means "a particular form" *of the original*.  At a minimum, a version must share defining characteristics with the original such that it remains, fundamentally, a "form" of the original.  Malt (or some other grain) and/or hops are the defining characteristics of "beer" and "malt beverages" under their plain meanings.  (*See supra* Section I.B.) Constellation has no logical explanation for how a beverage that does not contain malt or hops can

be "a particular form" of a "beer" or "malt beverage."

At best, Constellation has identified that Corona Hard Seltzer may be made from a *substitute* for malt, *i.e.*, cane sugar, but that does not make it a "Beer" because "substitute" and "version" are also not synonyms. (Mem. at 3, 12, 19-20, 22.)[30] Although tea may be a "substitute" for coffee, no one could credibly say that tea is a "version" of coffee. Constellation's argument that a beverage made from "a substitute for malt" is necessarily a "version" of a "beer" or "malt beverage" under the Sublicense is a roundabout way of repeating its "incorporation by silence" arguments, and fails for the reasons outlined above. *See supra* at Section II.A.

*Finally*, an interpretation of "versions" that is consistent with the plain meaning of "beer" and "malt beverage" does not render the language superfluous as Constellation suggests (Mem. at 25). The use of "versions" ensures that the Sublicense's definition of "Beer" captures versions of beer such as light beer, pale ales, seasonal beer, flavored beer, and other types of beer not expressly listed. It also captures innovative beverages that differ in certain respects from traditional "beer" and "malt beverages," but nonetheless retain the defining features of "beer" and "malt beverage," such as flavored malt beverages. Such innovative products may be "versions" of a "beer" or "malt beverage" under the Sublicense; Corona Hard Seltzer is not.

### D.   Constellation's Remaining Arguments Are Either Irrelevant or Do Not Support Its Position.

#### 1.   Constellation Has Not Identified a "Consistent Practice" of Referring to Corona Hard Seltzer as "Beer."

Constellation's assertion of a purported "consistent practice of using the word 'beer' to refer to hard seltzers such as Corona Hard Seltzer" (Mem. at 24) overlooks Constellation's repeated representations to the USPTO, consumers, and investors that Corona Hard Seltzer is *not*

---

[30]   "Substitute" means "something that is put in place of something else or is available for use instead of something else." *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2280 (2002)

a "beer" (Compl. ¶¶ 6, 39-41, 47-48; *supra* at 12-13).  *First*, Constellation's description of the regulatorily mandated two millimeter font "beer" imprint on the back of each can of Corona Hard Seltzer as "clearly not[ing]" that Corona Hard Seltzer is a "beer" is wrong.  (Mem. at 12; Compl. ¶ 47, fig. 2.)  Compliance with this regulatory requirement does not magically transform the liquid sold as Corona Hard Seltzer into "Beer" under the Sublicense.  Nor does it constitute a consistent practice that evidences an acceptance of tax definitions as governing the Sublicense definition of "Beer."  The Sublicense is concerned with the properties of the liquid *inside* the container, not the labels on the container (required by some tax or labelling laws).

*Second*, Constellation's selective reliance on one aspect of the www.coronausa.com website homepage disregards that the webpage dedicated to Corona Hard Seltzer itself makes no mention of the word "beer."  (*See* De Leeuw Decl., Ex. 5.)  Moreover, while Constellation points to Modelo's parent company's description of its hard seltzer products on its website[31] or its use of the same small, regulatory imprint of "beer" on product containers as evidence of "consistent regulatory treatment" of hard seltzer as beer (Mem. at 24), Modelo's parent company is entirely irrelevant to whether Corona Hard Seltzer is a "Beer" under the Sublicense.

### 2. Constellation's Right to Innovate Under the Sublicense Is Expressly Limited to "Beer" as Defined Under the Sublicense.

Constellation argues that the Sublicense gives it the broad right to innovate and, therefore, the right to bring Corona Hard Seltzer to market.[32]  (Mem. at 27-28.)  In addition to innovating

---

[31]    Constellation ignores entirely that ABI's "beer" webpage also lists a cider and a wine beverage made of honey, among other drinks, underscoring that the placement of a hard seltzer on a webpage is merely a reflection of an organizational choice that is not necessarily connected to the product's true identity.  (*See* Tatum Decl., Ex. 4 at 3-4 (listing B Blueberry and B Classic "wine naturally created from honey"), 40 (listing ciders).)

[32]    "Brand Extension Beer," through which the Sublicense grants limited expansion rights to Constellation, is defined as "*Beer* packaged in Containers bearing a . . . Mark that is a derivative of one or more of the Trademarks for use in the marketing, merchandising, promotion, advertisement (including sponsorship activities in connection with the foregoing), licensing, distribution and sale of *Mexican-style Beer*."  (Sublicense § 1.1. at 4 (emphasis added); Compl. ¶¶ 30-31.)

with its other brands, Modelo agrees Constellation may innovate under the Sublicense, but that innovation right under the Sublicense is expressly limited to "Beer" and "Mexican-style Beer," which Corona Hard Seltzer is not.  (Compl. ¶¶ 30-32.)

Constellation's reliance on Section 2.15(c) as "strong evidence" that the Sublicense "includes sugar-based hard seltzer" (Mem. at 28) thus misses the mark.  Section 2.15(c) prevents Constellation from developing a Brand Extension Beer containing distilled spirits unless certain conditions are met.  Even without the limitation of Section 2.15(c), Constellation would still only be permitted to develop a Brand Extension Beer containing distilled spirits if it were also a "Beer" under the Sublicense, *i.e.*, a "beer, ale, porter, stout, [or] malt beverage[]," or a "version" or "combination" thereof (such as a beer or malt beverage combined with spirits).

Modelo's position is consistent with the terms of the Sublicense as a whole and holds Constellation to the plain language of the Sublicense, which never granted Constellation an unlimited right to use Modelo's valuable CORONA Marks to launch products untethered to the definition of "Beer."  (Compl. ¶¶ 30-32); *see supra* at 9-11.  Contrary to Constellation's assertion, the distinction between malt-based and sugar-based beverages was not divined by Modelo—it is an inherent consequence of the plain meaning of the words chosen by two sophisticated parties. (Compl. ¶ 29); *supra* Section I.B.

### E.    Corona Hard Seltzer Is Not a "Mexican-Style Beer."

Corona Hard Seltzer also fails the Sublicense's "Mexican-Style Beer" requirement, because Constellation may only adopt and use trademarks that are derivative of the CORONA Marks in connection with "Mexican-style Beer."  (Sublicense §§ 1.1 at 4, 7; 2.15; Compl. ¶¶ 30-32.)  "Mexican-style Beer" is defined in the Sublicense as "Beer bearing the Trademarks that does not bear *any* trademarks, trade names or trade dress that would reasonably be interpreted to imply to consumers in the [U.S.] an origin other than Mexico."  (Sublicense § 1.1 at 7 (emphasis added).)

As its name makes clear, Corona Hard Seltzer is a hard seltzer, and spiked/hard seltzers were created in the U.S., and feature heavily in the U.S. market.  (Compl. ¶ 49.)  Corona Hard Seltzer's trade name and trade dress thus imply a U.S. origin, whether or not the ultimate product is "imported," and therefore it is not permitted under the Sublicense.  (*Id.* ¶¶ 30, 49-50.)

Constellation's only rebuttal is that each Corona Hard Seltzer can has printed, in tiny font, the words "IMPORTED FROM MEXICO," in accordance with federal "country of origin" regulations.  (Mem. ¶¶ 33-34; Compl. ¶ 49; *see* 19 C.F.R. § 102.0; 19 C.F.R. § 134.0.)  However, the Sublicense prohibits the use of *any* trademarks, trade names, or trade dress that imply a non-Mexican origin.[33]  That Corona Hard Seltzer simultaneously says it is imported from Mexico *and also* bears trade names and trade dress that imply an U.S.-conceived product is precisely the type of confusion this Sublicense provision sought to avoid.[34]  (Compl. ¶¶ 49-50.)

In any event, whether the packaging, name, and flavors of Corona Hard Seltzer may reasonably be interpreted by consumers to imply a non-Mexican origin—the Sublicense standard Constellation seeks to evade—involves questions of fact, and cannot be determined on a motion to dismiss.

## CONCLUSION

The Court should deny Constellation's motion to dismiss and allow Modelo's case to proceed.

---

[33]    Many products that originated in the U.S. are now manufactured in Mexico.  This shift, accelerated by free trade agreements, does not transform the heritage and quality of the product.

[34]    Constellation cannot simply affix the valuable CORONA marks to any product and point to the "IMPORTED FROM MEXICO" label to overcome the "Mexican-style Beer" requirement in the Sublicense.

Dated:    May 17, 2021                    Respectfully submitted,
          New York, New York

_____
Michael H. Steinberg
(*pro hac vice*)
Alexa M. Lawson-Remer
(*pro hac vice application forthcoming*)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California  90067

Telephone:  (310) 712-6670
Facsimile:  (310) 712-8870
steinbergm@sullcrom.com

Marc De Leeuw
Adam R. Rahman
Colin O. Hill
Kirandeep K. Mahal
(*pro hac vice application forthcoming*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004

Telephone:  (212) 558-4000
Facsimile:  (212) 291-9113
deleeuwm@sullcrom.com

*Counsel for Plaintiff Cervecería
Modelo de México, S. de R.L. de C.V.*