# EXHIBIT 2

# U.S. Customs and Border Protection

◆

**PROPOSED REVOCATION OF TWO RULING LETTERS
AND PROPOSED REVOCATION OF TREATMENT
RELATING TO THE TARIFF CLASSIFICATION OF HARD
SELTZER**

**AGENCY:** U.S. Customs and Border Protection, Department of Homeland Security.

**ACTION:** Notice of proposed revocation of two ruling letters, and proposed revocation of treatment relating to the tariff classification of hard seltzer.

**SUMMARY:** Pursuant to section 625(c), Tariff Act of 1930 (19 U.S.C. § 1625(c)), as amended by section 623 of title VI (Customs Modernization) of the North American Free Trade Agreement Implementation Act (Pub. L. 103–182, 107 Stat. 2057), this notice advises interested parties that U.S. Customs and Border Protection (CBP) intends to revoke two ruling letters concerning tariff classification of hard seltzer under the Harmonized Tariff Schedule of the United States (HTSUS). Similarly, CBP intends to revoke any treatment previously accorded by CBP to substantially identical transactions. Comments on the correctness of the proposed actions are invited.

**DATE:** Comments must be received on or before April 23, 2021.

**ADDRESS:** Written comments are to be addressed to U.S. Customs and Border Protection, Office of Trade, Regulations and Rulings, Attention: Erin Frey, Commercial and Trade Facilitation Division, 90 K St., NE, 10th Floor, Washington, DC 20229–1177. Due to the COVID-19 pandemic, CBP is also allowing commenters to submit electronic comments to the following email address: 1625Comments@cbp.dhs.gov. All comments should reference the title of the proposed notice at issue and the *Customs Bulletin* volume, number and date of publication. Due to the relevant COVID-19-related restrictions, CBP has limited its on-site public inspection of public comments to 1625 notices. Arrangements to inspect submitted comments should be made in advance by calling Ms. Erin Frey at (202) 325–1757.

1

**FOR FURTHER INFORMATION CONTACT:** Tanya Secor, Food, Textiles and Marking Branch, Regulations and Rulings, Office of Trade, at (202) 325–0062.

**SUPPLEMENTARY INFORMATION:**

## BACKGROUND

Current customs law includes two key concepts: informed compliance and shared responsibility. Accordingly, the law imposes an obligation on CBP to provide the public with information concerning the trade community's responsibilities and rights under the customs and related laws. In addition, both the public and CBP share responsibility in carrying out import requirements. For example, under section 484 of the Tariff Act of 1930, as amended (19 U.S.C. § 1484), the importer of record is responsible for using reasonable care to enter, classify and value imported merchandise, and to provide any other information necessary to enable CBP to properly assess duties, collect accurate statistics, and determine whether any other applicable legal requirement is met.

Pursuant to 19 U.S.C. § 1625(c)(1), this notice advises interested parties that CBP is proposing to revoke two ruling letters pertaining to the tariff classification of hard seltzer. Although in this notice, CBP is specifically referring to New York Ruling Letter ("NY") N315004, dated October 13, 2020 (Attachment A) and NY N313678, dated August 28, 2020 (Attachment B), this notice also covers any rulings on this merchandise which may exist, but have not been specifically identified. CBP has undertaken reasonable efforts to search existing databases for rulings in addition to the two identified. No further rulings have been found. Any party who has received an interpretive ruling or decision (i.e., a ruling letter, internal advice memorandum or decision, or protest review decision) on the merchandise subject to this notice should advise CBP during the comment period.

Similarly, pursuant to 19 U.S.C. § 1625(c)(2), CBP is proposing to revoke any treatment previously accorded by CBP to substantially identical transactions. Any person involved in substantially identical transactions should advise CBP during this comment period. An importer's failure to advise CBP of substantially identical transactions or of a specific ruling not identified in this notice may raise issues of reasonable care on the part of the importer or its agents for importations of merchandise subsequent to the effective date of the final decision on this notice.

In NY N315004 and NY N313678, CBP classified hard seltzer in heading 2203, HTSUS, specifically in subheading 2203.00.00, HTSUS, which provides for "Beer made from malt." CBP has reviewed

NY N315004 and NY N313678 and has determined the ruling letters to be in error. It is now CBP's position that hard seltzer is properly classified, in heading 2206, HTSUS, specifically in subheading 2206.00.90, HTSUS, which provides for "Other fermented beverages (for example, cider, perry, mead, sakè); mixtures of fermented beverages and mixtures of fermented beverages and non-alcoholic beverages, not elsewhere specified or included: Other: Other."

Pursuant to 19 U.S.C. § 1625(c)(1), CBP is proposing to revoke NY N315004 and NY N313678 and to revoke or modify any other ruling not specifically identified to reflect the analysis contained in the proposed Headquarters Ruling Letter ("HQ") H314978, set forth as Attachment C to this notice. Additionally, pursuant to 19 U.S.C. § 1625(c)(2), CBP is proposing to revoke any treatment previously accorded by CBP to substantially identical transactions.

Before taking this action, consideration will be given to any written comments timely received.

CRAIG T. CLARK,
*Director*
*Commercial and Trade Facilitation Division*

Attachments

N315004

October 13, 2020
CLA-2–22:OT:RR:NC:N2:232
CATEGORY: Classification
TARIFF NO.: 2203.00.0060

MR. ARTHUR DECELLE
LEHRMAN BEVERAGE LAW
*2911 HUNTER MILL ROAD*
*OAKTON, VA 22124*

RE: The tariff classification of Hard Seltzer from the Netherlands. Correction to Ruling Number N313678.

DEAR MR. DECELLE:

This ruling modifies Ruling Number N313678, dated August 28, 2020, which contained a clerical error. The tariff classification for Hard Seltzer was inadvertently indicated as 2203.90.0060. The correct tariff classification is 2203.00.0060. A complete corrected ruling follows.

This is in response to your letter dated August 3, 2020, requesting a classification ruling on behalf of your client, Mark Anthony Brewing. You submitted flow charts depicting the various stages of operation and pictorial representations of the products.

The subject merchandise is described as five different flavors (Lime, Raspberry, Ruby Grapefruit, Black Cherry and Mango) of Hard Seltzer with the brand name "White Claw Hard Seltzer." The products consist of Beer Base (15%-17%), Natural Flavors (2%-3%), Water (81%-82%) and trace amounts of Juice Concentrate, Cane Sugar, Citric Acid and Sodium Citrate. The beer base is composed of Sugar (51%), Yeast & Nutrients (less than 4%), Water and trace amounts of Malted Gluten-Free Grains. Malted gluten free grains are mixed with sugar and warm water. The mixture is then pitched with yeast, enzymes and yeast nutrients to aid the fermentation. The fermented mixture is then clarified and filtered to produce the beer base. The beer base is then mixed with the other ingredients, including cane sugar, juice concentrate, juice flavor and water to produce the bulk product with an alcohol by volume content of 5 percent. Each flavor of the bulk finished product is packaged in 12-ounce and 19.2-ounce aluminum beverage cans ready for export to the United States.

The applicable subheading for the Hard Seltzer will be 2203.00.0060, Harmonized Tariff Schedule of the United States (HTSUS), which provides for Beer made from malt: In containers each holding not over 4 liters:: Other The duty rate will be Free.

Imports under this subheading may be subject to Federal Excise Tax (26 U.S.C. 5001, 26 U.S.C. 5041 or 26 U.S.C. 5051). Additional requirements may be imposed on this product by the Alcohol and Tobacco Tax and Trade Bureau (TTB). You may contact the TTB at the following number: (1–866–927–2533), Email-ttbinternetquestions@ttb.gov. Written requests may be addressed to: Alcohol and Tobacco Tax and Trade Bureau, Advertising, Labeling and Formulation Division, 1310 G Street NW, Box 12, Washington, DC 20005.

This merchandise is subject to The Public Health Security and Bioterrorism Preparedness and Response Act of 2002 (The Bioterrorism Act), which is regulated by the Food and Drug Administration (FDA). Information on the

Bioterrorism Act can be obtained by calling the FDA at 301–575–0156, or at the Web site www.fda.gov/oc/bioterrorism/bioact.html.

This ruling is being issued under the provisions of Part 177 of the Customs Regulations (19 C.F.R. 177).

A copy of the ruling or the control number indicated above should be provided with the entry documents filed at the time this merchandise is imported. If you have any questions regarding the ruling, contact National Import Specialist Frank Troise at frank.l.troise@cbp.dhs.gov.

*Sincerely,*

STEVEN A. MACK
*Director*
*National Commodity Specialist Division*

N313678

August 28, 2020
CLA-2–22:OT:RR:NC:N2:232
CATEGORY: Classification
TARIFF NO.: 2203.90.0060

MR. ARTHUR DECELLE
LEHRMAN BEVERAGE LAW
*2911 HUNTER MILL ROAD*
*OAKTON, VA 22124*

RE: The tariff classification of Hard Seltzer from the Netherlands

DEAR MR. DECELLE:

This is in response to your letter dated August 3, 2020, requesting a classification ruling on behalf of your client, Mark Anthony Brewing. You submitted flow charts depicting the various stages of operation and pictorial representations of the products.

The subject merchandise is described as five different flavors (Lime, Raspberry, Ruby Grapefruit, Black Cherry and Mango) of Hard Seltzer with the brand name "White Claw Hard Seltzer." The products consist of Beer Base (15%-17%), Natural Flavors (2%-3%), Water (81%-82%) and trace amounts of Juice Concentrate, Cane Sugar, Citric Acid and Sodium Citrate. The beer base is composed of Sugar (51%), Yeast & Nutrients (less than 4%), Water and trace amounts of Malted Gluten-Free Grains. Malted gluten-free grains are mixed with sugar and warm water. The mixture is then pitched with yeast, enzymes and yeast nutrients to aid the fermentation. The fermented mixture is then clarified and filtered to produce the beer base. The beer base is then mixed with the other ingredients, including cane sugar, juice concentrate, juice flavor and water to produce the bulk product with an alcohol by volume content of 5 percent. Each flavor of the bulk finished product is packaged in 12-ounce and 19.2-ounce aluminum beverage cans ready for export to the United States.

The applicable subheading for the Hard Seltzer will be 2203.90.0060, Harmonized Tariff Schedule of the United States (HTSUS), which provides for Beer made from malt: In containers each holding not over 4 liters:: Other The duty rate will be Free.

Imports under this subheading may be subject to Federal Excise Tax (26 U.S.C. 5001, 26 U.S.C. 5041 or 26 U.S.C. 5051). Additional requirements may be imposed on this product by the Alcohol and Tobacco Tax and Trade Bureau (TTB). You may contact the TTB at the following number: (1–866–927–2533), Email-ttbinternetquestions@ttb.gov. Written requests may be addressed to: Alcohol and Tobacco Tax and Trade Bureau, Advertising, Labeling and Formulation Division, 1310 G Street NW, Box 12, Washington, DC 20005.

This merchandise is subject to The Public Health Security and Bioterrorism Preparedness and Response Act of 2002 (The Bioterrorism Act), which is regulated by the Food and Drug Administration (FDA). Information on the Bioterrorism Act can be obtained by calling the FDA at 301–575–0156, or at the Web site www.fda.gov/oc/bioterrorism/bioact.html.

This ruling is being issued under the provisions of Part 177 of the Customs Regulations (19 C.F.R. 177).

A copy of the ruling or the control number indicated above should be provided with the entry documents filed at the time this merchandise is

7    CUSTOMS BULLETIN AND DECISIONS, VOL. 55, No. 11, MARCH 24, 2021

imported. If you have any questions regarding the ruling, contact National
Import Specialist Frank Troise at frank.l.troise@cbp.dhs.gov.

*Sincerely,*

STEVEN A. MACK
*Director*
*National Commodity Specialist Division*

HQ H314978

OT:RR:CTF:FTM H314978 TJS

CATEGORY: Classification

TARIFF NO.: 2206.00.90

MR. ARTHUR DECELLE
LEHRMAN BEVERAGE LAW
*2911 HUNTER MILL ROAD*
*SUITE 303*
*OAKTON, VA 22124*

RE: Revocation of NY N315004 and NY N313678; Tariff Classification of White Claw Hard Seltzer

DEAR MR. DECELLE:

This is in reference to New York Ruling Letter ("NY") NY N315004, dated October 13, 2020, concerning the tariff classification of certain hard seltzer under the Harmonized Tariff Schedule of the United States ("HTSUS"). In that ruling, U.S. Customs and Border Protection ("CBP") classified the hard seltzer at issue under subheading 2203.00.00, HTSUS, which provides for, "Beer made from malt: In containers each holding not over 4 liters." NY N315004 modified NY N313678, dated August 28, 2020, which contained a clerical error and classified the hard seltzer under subheading 2203.90.00, HTSUS. Upon additional review, we have found the classification of this product under heading 2203, HTSUS, to be incorrect. For the reasons set forth below, we hereby revoke NY N315004 and NY N313678.

You have asked for confidential treatment of the details of the production and packaging process in your submission. Inasmuch as your request conforms to the requirements of 19 C.F.R. § 177.2(b)(7), your request for confidentiality is approved. The details of the production and packaging process in your letter and the attachments to your request for a binding ruling will not be released to the public.

**FACTS:**

In NY N315004, the hard seltzer at issue was described as follows:

The subject merchandise is described as five different flavors (Lime, Raspberry, Ruby Grapefruit, Black Cherry and Mango) of Hard Seltzer with the brand name "White Claw Hard Seltzer." The products consist of Beer Base (15%-17%), Natural Flavors (2%-3%), Water (81%-82%) and trace amounts of Juice Concentrate, Cane Sugar, Citric Acid and Sodium Citrate. The beer base is composed of Sugar (51%), Yeast & Nutrients (less than 4%), Water and trace amounts of Malted Gluten-Free Grains. Malted gluten free grains are mixed with sugar and warm water. The mixture is then pitched with yeast, enzymes and yeast nutrients to aid the fermentation. The fermented mixture is then clarified and filtered to produce the beer base. The beer base is then mixed with the other ingredients, including cane sugar, juice concentrate, juice flavor and water to produce the bulk product with an alcohol by volume content of 5 percent. Each flavor of the bulk finished product is packaged in 12-ounce and 19.2-ounce aluminum beverage cans ready for export to the United States.

In your request for a binding ruling, dated August 3, 2020, you described the White Claw Hard Seltzer as "a relatively new, gluten-free, low-calorie

brand that has grown to become a significant subcategory of the U.S. beer market." You further state that the hard seltzer is sold alongside beer. The White Claw website provides the following description of the finished beverages: "Crafted with quality ingredients, White Claw® Hard Seltzer is made from a blend of seltzer water, our gluten-free alcohol base, and a hint of fruit flavor."[1] The cans are labeled "Spiked Sparkling Water with a hint of [flavor]."

**ISSUE:**

What is the tariff classification of White Claw Hard Seltzer under the HTSUS?

**LAW AND ANALYSIS:**

Classification under the HTSUS is made in accordance with the General Rules of Interpretation (GRI). GRI 1 provides that the classification of goods shall be determined according to the terms of the headings of the tariff schedule and any relative section or chapter notes. In the event that the goods cannot be classified solely on the basis of GRI 1, and if the headings and legal notes do not otherwise require, the remaining GRI 2 through 6 may then be applied in order.

The HTSUS headings under consideration are as follows:

2203    Beer made from malt

2206    Other fermented beverages (for example, cider, perry, mead, sakè); mixtures of fermented beverages and mixtures of fermented beverages and non-alcoholic beverages, not elsewhere specified or included:

\* \* \*

The Harmonized Commodity Description and Coding System Explanatory Notes (ENs) constitute the official interpretation of the Harmonized System at the international level. While not legally binding, and therefore not dispositive, the ENs provide a commentary on the scope of each heading of the Harmonized System and are thus useful in ascertaining the classification of merchandise under the System. *See* T.D. 89–80, 54 Fed. Reg. 35127 (Aug. 23, 1989).

The EN to heading 2203, HTSUS, provides in pertinent part as follows:

Beer is an alcoholic beverage obtained by fermenting a liquor (wort) prepared from malted cereals (most commonly barley or wheat), water and (usually) hops. Certain quantities of non-malted cereals (e.g., maize (corn) or rice) may also be used for the preparation of the liquor (wort). The addition of hops imparts a bitter and aromatic flavour and improves the keeping qualities. Cherries or other flavouring substances are sometimes added during fermentation.

Sugar (particularly glucose), colouring matter, carbon dioxide and other substances may also be added.

According to the fermenting process employed, the products may be bottom fermentation beer, obtained at a low temperature with bottom yeasts, or top fermentation beer, obtained at a higher temperature with top yeasts.

---

[1] White Claw, https://www.whiteclaw.com/ (last visited Feb. 17, 2021).

Beer may be pale or dark, sweet or bitter, mild or strong. It may be put up in barrels, bottles or in airtight tins and may be marketed as ale, stout, etc.

The EN to heading 2206, HTSUS, provides in relevant part as follows:

This heading covers all fermented beverages other than those in headings 22.03 to 22.05.

. . .

All these beverages may be either naturally sparkling or artificially charged with carbon dioxide. They remain classified in the heading when fortified with added alcohol or when the alcohol content has been increased by further fermentation, provided that they retain the character of products falling in the heading.

\* \* \*

You assert that the White Claw Hard Seltzer is properly classified in heading 2203, HTSUS, as beer. In particular, you claim that the hard seltzer meets the definitions of "beer" in the Internal Revenue Code ("IRC") and the Alcohol and Tobacco Tax and Trade Bureau ("TTB") regulations. *See* 26 U.S.C. § 5052(a); 27 C.F.R. §§ 25.11, 25.15, 27.11. You state that although the excise tax is a separate function from tariff classification, the functions are substantially related. The TTB regulations you cite pertain to the collection of federal excise taxes on alcoholic products and are not intended as guidance for classification of imported merchandise under the HTSUS. Statutes, regulations and administrative interpretations relating to 'other than tariff purposes' are not determinative of CBP classification disputes. *See Amersham Corp. v. United States*, 5 C.I.T. 49, 56, 564 F. Supp. 813, 817 (1983). However, to the extent that regulations or definitions of other federal agencies may be instructive in a tariff classification decision, we note that TTB regulations refer to both "beer" and "malt beverages" separately; regardless of their tax treatment, TTB clearly acknowledges that not all beverages made from malt are "beer." We also note that the IRC and TTB definitions of "beer" may encompass products not classified as beer under the HTSUS, such as sakè, which is explicitly classified in heading 2206, HTSUS. Thus, the IRC and TTB regulations are not binding on CBP for tariff classification purposes.

The present issue is whether the White Claw Hard Seltzer is a beer of heading 2203, HTSUS, or other fermented beverage of heading 2206, HTSUS. Heading 2203, HTSUS, is an *eo nomine* provision for beer. To determine whether a beverage is a beer, CBP examines its manufacturing process, organoleptic properties, and commercial identity. *See* Headquarters Ruling Letter ("HQ") H243087 (Jan. 13, 2015); and HQ 084708 (July 21, 1989). CBP has consistently classified flavored malt beverages produced from a filtered fermented malt base to which flavoring is added in heading 2206, HTSUS, rather than heading 2203, HTSUS. HQ H243087 concerned the classification of four different malt beverages: "Green Apple Sparkletini Italian Spumante"; "Raspberry Sparkletini Italian Spumante"; "Peach Sparkletini Italian Spumante; and "Verdi Spumante." The beverages were manufactured by adding different flavoring to a "beer base" that was produced from a mash of malted barley. The base was filtered after fermentation to remove the color and aroma from the malt beverage in order to create a clear, odorless base.

CBP held that the beverages were precluded from classification in heading 2203, HTSUS, because they were entirely distinct from beer and were not marketed, sold, or advertised as beer.

Similarly, in HQ 084708, CBP classified fermented malt beverages described as "French Sparkler" in flavors "Wildberry" and "Raspberry." The manufacture of the French Sparklers began with fermenting degenerated malt cereals and hops and adding sugar. The product underwent "ultrafiltration" and then flavoring, colorant, and preservatives were added. CBP noted that the beverages were produced using degenerated (old) malt cereals and hops, which are not normally used in manufacturing beer. CBP also noted that the beverages were bottled and labeled as "French Sparkler," in an effort to compete in the wine cooler market. CBP concluded that the "French Sparkler" was distinct from beer because it did not have the taste, aroma, character or appearance of beer, nor was it commercially or commonly known as beer.

Like the beverages in HQ H243087 and HQ 084708, we find that the White Claw Hard Seltzer is entirely distinct from beer because it does not have the taste, aroma, character or appearance of beer. With regard to appearance of beer, the EN to heading 2203 provides that beer may be pale or dark whereas the White Claw Hard Seltzer has the appearance and consistency of clear sparkling water. The hard seltzer is manufactured in a manner similar to the beverages in HQ H243087 and HQ 084708, which involved filtering a fermented malt base and then adding flavoring. Although the production of White Claw Hard Seltzer begins with a traditional brewing and fermentation process, the finished beverage, which contains no hops, is altered during the manufacturing process to fundamentally change the character of the "beer base." The "beer base" is filtered to remove the color and aroma—and consequently, any trace of "beer" characteristics or flavor—from the final product. After filtration, seltzer water and flavoring are added to the neutral base to further distinguish the final product from beer.

Furthermore, White Claw Hard Seltzer is not named beer, and importantly, is not sold or marketed as beer. Beer is a commonly recognized product while White Claw Hard Seltzer is sold in a growing category of alcoholic beverages known as "hard seltzers" or "spiked seltzers."[2] You note that White Claw Hard Seltzer is sold alongside beer, but the appearance of the product alongside beer at a store does not make it a beer for tariff purposes. Other beverages that are sold alongside beer are classified in heading 2206, HTSUS, such as cider and wine coolers. Finally, the hard seltzers are not labeled or presented as beer but as "spiked sparkling water." Notably, the White Claw website makes no reference to beer and identifies the "beer base" as "glutenfree alcohol base." The finished products are not what is commonly or commercially known as beer within the scope of heading 2203, HTSUS. The differences in manufacturing, organoleptic properties, and the product's unique commercial identity distinguish the subject hard seltzer from beer and make classification in heading 2206, HTSUS, appropriate.

---

[2] For example, grocery chains in the United States categorize and sell White Claw as "hard seltzer" or "spiked seltzer." *See* Albertsons, https://www.albertsons.com/shop/aisles/wine-beer-spirits/beer/spiked-seltzers.177.html (last visited Feb. 17, 2021); Safeway, https://www.safeway.com/shop/aisles/wine-beer-spirits/beer/spiked-seltzers.3132.html (last visited Feb. 17, 2021); Total Wine & More, https://www.totalwine.com/beer/specialty-styles/hard-spiked-seltzers/c/9191919 (last visited Feb. 17, 2021).

In view of the foregoing, we find that heading 2206, HTSUS, encompasses the subject White Claw hard seltzer. Specifically, the hard seltzer is classified under subheading 2206.00.90, HTSUS, which provides for, "Other fermented beverages (for example, cider, perry, mead, sakè); mixtures of fermented beverages and mixtures of fermented beverages and non-alcoholic beverages, not elsewhere specified or included: Other: Other."

**HOLDING:**

By application of GRI 1, we find that the hard seltzer at issue is classified under heading 2206, HTSUS, and specifically in subheading 2206.00.90, HTSUS, which provides for, "Other fermented beverages (for example, cider, perry, mead, sakè); mixtures of fermented beverages and mixtures of fermented beverages and non-alcoholic beverages, not elsewhere specified or included: Other: Other." The 2020 column one, general rate of duty is 4.2 cents per liter.

**EFFECT ON OTHER RULINGS:**

NY N315004, dated October 13, 2020, and NY N313678, dated August 28, 2020, are hereby REVOKED.

In accordance with 19 U.S.C. § 1625(c), this ruling will become effective 60 days after its publication in the *Customs Bulletin*.

*Sincerely,*

Craig T. Clark,
*Director*
*Commercial and Trade Facilitation Division*

### NOTICE OF ISSUANCE OF FINAL DETERMINATION CONCERNING CERTAIN FIXED AND PORTABLE CEILING LIFTS

**AGENCY:** U.S. Customs and Border Protection, Department of Homeland Security.

**ACTION:** Notice of final determination.

**SUMMARY:** This document provides notice that U.S. Customs and Border Protection (CBP) has issued a final determination concerning the country of origin of certain fixed and portable ceiling lifts for healthcare purposes. Based upon the facts presented, CBP has concluded in the final determination that the ceiling lifts would not to be products of a foreign country or instrumentality designated pursuant to 19 U.S.C. 2511(b) for purposes of U.S. Government procurement.

**DATES:** The final determination was issued on March 1, 2021. A copy of the final determination is attached. Any party-at-interest, as defined in 19 CFR 177.22(d), may seek judicial review of this final determination no later than April 5, 2021.

**FOR FURTHER INFORMATION CONTACT:** Albena Peters, Valuation and Special Programs Branch, Regulations and Rulings, Office of Trade, at (202) 325–0321.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that on March 1, 2021, CBP issued a final determination concerning the country of origin of fixed and portable ceiling lifts for purposes of Title III of the Trade Agreements Act of 1979. This final determination, HQ H311763, was issued at the request of the party-at-interest, under procedures set forth at 19 CFR part 177, subpart B, which implements Title III of the Trade Agreements Act of 1979, as amended (19 U.S.C. 2511–18). In the final determination, CBP has concluded that, based upon the facts presented, the fixed and portable ceiling lifts would not be products of a foreign country or instrumentality designated pursuant to 19 U.S.C. 2511(b) for purposes of U.S. Government procurement. Section 177.29, CBP Regulations (19 CFR 177.29), provides that a notice of final determination shall be published in the **Federal Register** within 60 days of the date the final determination is issued. Section 177.30, CBP Regulations (19 CFR 177.30), provides that any party-at-interest, as defined in 19 CFR 177.22(d), may seek judicial review of a final determination within 30 days of publication of such determination in the **Federal Register**.

14    CUSTOMS BULLETIN AND DECISIONS, VOL. 55, No. 11, MARCH 24, 2021

Dated:  March 1, 2021.

JOANNE R. STUMP,
*Acting Executive Director,*
*Regulations and Rulings, Office of Trade.*

HQ H311763

March 1, 2021
OT:RR:CTF:VS H311763 AP
CATEGORY: Origin

F. Scott Galt, Partner
Armstrong Teasdale LLP
*CIPP/E*
*7700 Forsyth Blvd., Suite 1800*
*St. Louis, MO*

RE: U.S. Government Procurement; Title III, Trade Agreements Act of 1979 (19 U.S.C. 2511); Subpart B, Part 177, CBP Regulations; Country of Origin of Fixed and Portable Ceiling Lifts

Dear Mr. Galt:

This is in response to your request of June 12, 2020, on behalf of Span America, Inc. ("SA"), for a final determination concerning the country of origin of certain fixed and portable ceiling lifts for healthcare purposes. This request is being sought because your client wants to confirm eligibility of the merchandise for U.S. government procurement purposes under Title III of the Trade Agreements Act of 1979 ("TAA"), as amended (19 U.S.C. 2511 *et seq.*). SA is a party-at-interest within the meaning of 19 CFR 177.22(d)(1) and 177.23(a).

**FACTS:**

SA is a U.S.-based manufacturer of equipment and accessories for use in medical facilities. Its corporate headquarters and principal manufacturing facility is located in Greenville, South Carolina. SA manufactures fixed and portable ceiling lifts used in clinical or home settings to safely lift and/or transport immobilized individuals. SA produces two types of ceiling lifts: The Savaria FL Fixed Lift ("fixed lift") and the Savaria PL Portable Lift ("portable lift"). The fixed and portable lifts are powered with rechargeable lithium ion batteries. Users can operate the lifts through the push buttons located on the spreader bars or a remote control. The fixed lift includes buttons that control vertical and lateral movement, while the portable lift only contains buttons to raise and lower the lift.

The fixed lift attaches to ceiling-mounted track systems. Each fixed lift consists of: (1) A motor unit base which connects to the ceiling track system; (2) a spreader bar that is a horizontal bar with hooks on each end to which slings are attached used to support a person's weight; and (3) a retractable belt which extends down from the motor unit to the spreader bar and connects these two components. The lift's base unit contains a motor that controls the retractable belt and allows the base unit to move laterally along the ceiling tracks. The base unit also has a display that shows the lift's battery life. Depending on the model, the fixed lift can lift 286, 440, or 600 pounds.

Each fixed lift is comprised of 124 specifically designed component parts and 245 total component parts sourced from Canada, China, the United States, Italy, and Taiwan, as reflected in the bill of materials. Most of the parts are from Canada and China. Some of the significant components of the fixed lift from Canada and China are: The lithium ion charger from China, the main printed circuit board assembly ("PCBA") from China, the handset from China, the charging station assembly from Canada, the battery from China, and the carry bar assembly from Canada. In addition, the fixed lift is

composed of subassemblies that contain the moving parts for the lifts which are manufactured in Greenville, South Carolina: The "mega motor" subassembly, comprised of two specifically designed parts and two total parts; the "high limit" subassembly, comprised of eight specifically designed parts and 18 total parts; the "motorized trolley" subassembly, comprised of 16 specifically designed parts and 25 total parts; the "manual trolley" subassembly, comprised of six specifically designed parts and nine total parts; and the "drum" subassembly, comprised of 11 specifically designed parts and 23 total parts. Specifically, for example, the "motorized trolley" subassembly consists of: A gear motor trolley from China, a bloc trolley from China, a shaft retaining ring from China, a motorized trolley wheel from China, a spacer idler from China, a gear wheel from China, a trolley idler gear from China, and a trolley motor gear from China. These components are assembled together in South Carolina to create the motorized trolley. The final assembly of the fixed lift in South Carolina then involves the combination of all subassemblies and component parts not already incorporated into a subassembly.

The portable lift is not permanently mounted to overhead tracks. Rather, it clips to and detaches from overhead locations of the user's choice. The motor unit of the portable lift is located inside the spreader bar, and the belt is located inside the motor assembly. Depending on the model, the portable lift can lift 286 or 440 pounds. Each portable lift is comprised of 80 specifically designed component parts and 175 total component parts sourced from Canada, China, the United States, Italy, and Taiwan, as reflected in the bill of materials. Most of the parts are manufactured in Canada and China. The most significant components of the portable lift are: The portable handset from China, the bearing block from China, the portable battery from China, the main PCBA from China, the portable carry bar from China, and the worm gear from Canada.

Similar to the fixed lift, the portable lift has subassemblies that contain the moving parts for the lifts, which are manufactured in Greenville, South Carolina: The "spool" subassembly comprised of 12 specifically designed parts and 23 total parts; the "high limit" subassembly, comprised of nine specifically designed parts and 18 total parts; the "cabin port" subassembly comprised of seven specifically designed parts and seven total parts; and the "motor" subassembly containing two specifically designed parts and two total parts. Specifically, for example, the "spool" subassembly consists of: A strap from China, a pivot from China, a brake from China, a small disk from China, a spool from China, and a helical gear from Canada. As with the fixed lift, the final assembly of the portable lift involves the combination of all subassemblies and component parts not already incorporated into a subassembly.

**ISSUE:**

What is the country of origin of the subject and portable lifts for purposes of U.S. Government procurement?

**LAW AND ANALYSIS:**

CBP issues country of origin advisory rulings and final determinations as to whether an article is or would be a product of a designated country or instrumentality for the purposes of granting waivers of certain "Buy American" restrictions in U.S. law or practice for products offered for sale to the

U.S. Government, pursuant to subpart B of Part 177, 19 CFR 177.21–177.31, which implements Title III of the TAA, as amended (19 U.S.C. 2511–2518).

CBP's authority to issue advisory rulings and final determinations is set forth in 19 U.S.C. 2515(b)(1), which states:

For the purposes of this subchapter, the Secretary of the Treasury shall provide for the prompt issuance of advisory rulings and final determinations on whether, under section 2518(4)(B) of this title, an article is or would be a product of a foreign country or instrumentality designated pursuant to section 2511(b) of this title.

The rule of origin set forth under 19 U.S.C. 2518(4)(B) states:

An article is a product of a country or instrumentality only if (i) it is wholly the growth, product, or manufacture of that country or instrumentality, or (ii) in the case of an article which consists in whole or in part of materials from another country or instrumentality, it has been substantially transformed into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was so transformed.

In rendering advisory rulings and final determinations for purposes of U.S. Government procurement, CBP applies the provisions of subpart B of Part 177 consistent with the Federal Procurement Regulations. *See* 19 CFR 177.21. In this regard, CBP recognizes that the Federal Acquisition Regulations restrict the U.S. Government's purchase of products to U.S.-made or designated country end products for acquisitions subject to the TAA. *See* 48 CFR 25.403(c)(1).

The Federal Acquisition Regulations, 48 CFR 25.003, define "U.S.-made end product" as:

. . . an article that is mined, produced, or manufactured in the United States or that is substantially transformed in the United States into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was transformed.

Section 25.003 defines "designated country end product" as: a WTO GPA [World Trade Organization Government Procurement Agreement] country end product, an FTA [Free Trade Agreement] country end product, a least developed country end product, or a Caribbean Basin country end product.

Section 25.003 defines "WTO GPA country end product" as an article that:

(1) Is wholly the growth, product, or manufacture of a WTO GPA country; or

(2) In the case of an article that consists in whole or in part of materials from another country, has been substantially transformed in a WTO GPA country into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was transformed. The term refers to a product offered for purchase under a supply contract, but for purposes of calculating the value of the end product includes services (except transportation services) incidental to the article, provided that the value of those incidental services does not exceed that of the article itself.

Canada, Italy, and Taiwan are WTO GPA countries. China is not.

Most of the individual components of the fixed lift are manufactured in Canada while most of the components of the portable lift are manufactured in China. In addition, the parts of the "high limit," "motorized trolley," and "manual trolley" subassemblies of the fixed lift are predominantly of Chinese origin. The "mega motor" subassembly parts of the fixed lift are of Italian and Taiwanese origin and the "drum" subassembly parts of the fixed lift are

**18**   CUSTOMS BULLETIN AND DECISIONS, VOL. 55, No. 11, MARCH 24, 2021

predominantly of Canadian origin. The parts of the "high limit" and "cabin port" subassemblies of the portable lift are predominantly of Chinese origin, while the parts of the "motor" subassembly of the portable lift are entirely of Italian and Taiwanese origin, and the parts of the "spool" subassembly of the portable lift are predominantly of U.S. and Canadian origin. The subassemblies are assembled in the U.S. The final assembly in the U.S. fully integrates the subassemblies and the component parts not already incorporated into a subassembly. The final assembly performed in the U.S. as described is substantial and meaningful, and requires a good deal of skill, precision, and technical expertise as well as sophisticated testing and inspection of the products. The lift subassemblies and component parts are substantially transformed as a result of the assembly operations performed in the U.S. to produce the fully functional and operational fixed and portable lifts.

Therefore, the instant fixed and portable lifts would not be considered to be the products of a foreign country or instrumentality designated pursuant to 19 U.S.C. 2511(b)(1). As to whether the fixed and portable lifts assembled in the United States qualify as "U.S.-made end product," we encourage you to review the recent court decision in *Acetris Health, LLC* v. *United States,* 949 F.3d 719 (Fed. Cir. 2020), and to consult with the relevant government procuring agency.

**HOLDING:**

The subject fixed and portable lifts would not be products of a foreign country or instrumentality designated pursuant to 19 U.S.C. 2511(b)(1).

You should consult with the relevant government procuring agency to determine whether the lifts qualify as "U.S.-made end product" for purposes of the Federal Acquisition Regulations implementing the TAA.

Notice of this final determination will be given in the **Federal Register**, as required by 19 CFR 177.29. Any party-at-interest other than the party which requested this final determination may request pursuant to 19 CFR 177.31 that CBP reexamine the matter anew and issue a new final determination. Pursuant to 19 CFR 177.30, any party-at-interest may, within 30 days of publication of the **Federal Register** Notice referenced above, seek judicial review of this final determination before the Court of International Trade.

*Sincerely,*

JOANNE R. STUMP,
*Acting Executive Director,*
*Regulations and Rulings, Office of Trade.*

[Published in the Federal Register, March 5, 2021 (85 FR 12963)]

## APPLICATION FOR WAIVER OF PASSPORT AND/OR VISA
## (DHS FORM I–193)

**AGENCY:** U.S. Customs and Border Protection (CBP), Department of Homeland Security.

**ACTION:** 30-Day Notice and request for comments; extension of an existing collection of information.

**SUMMARY:** The Department of Homeland Security, U.S. Customs and Border Protection will submit the following information collection request to the Office of Management and Budget (OMB) for review and approval in accordance with the Paperwork Reduction Act of 1995 (PRA). The information collection is published in the **Federal Register** to obtain comments from the public and affected agencies.

**DATES:** Comments are encouraged and must be submitted (no later than April 12, 2021) to be assured of consideration.

**ADDRESSES:** Written comments and/or suggestions regarding the item(s) contained in this notice should be sent within 30 days of publication of this notice to *www.reginfo.gov/public/do/PRAMain*. Find this particular information collection by selecting "Currently under 30-day Review—Open for Public Comments" or by using the search function.

**FOR FURTHER INFORMATION CONTACT:** Requests for additional PRA information should be directed to Seth Renkema, Chief, Economic Impact Analysis Branch, U.S. Customs and Border Protection, Office of Trade, Regulations and Rulings, 90 K Street NE, 10th Floor, Washington, DC 20229–1177, Telephone number 202–325–0056 or via email *CBP_PRA@cbp.dhs.gov*. Please note that the contact information provided here is solely for questions regarding this notice. Individuals seeking information about other CBP programs should contact the CBP National Customer Service Center at 877–227–5511, (TTY) 1–800–877–8339, or CBP website at *https://www.cbp.gov/*.

**SUPPLEMENTARY INFORMATION:** CBP invites the general public and other Federal agencies to comment on the proposed and/or continuing information collections pursuant to the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*). This proposed information collection was previously published in the **Federal Register** (Volume 85 FR Page 76594) on November 30, 2020, allowing for a 60-day comment period. This notice allows for an additional 30 days for public comments. This process is conducted in accordance with 5 CFR 1320.8. Written comments and suggestions from the public and affected agencies should address

one or more of the following four points: (1) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; (2) the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used; (3) suggestions to enhance the quality, utility, and clarity of the information to be collected; and (4) suggestions to minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses. The comments that are submitted will be summarized and included in the request for approval. All comments will become a matter of public record.

### Overview of This Information Collection

**Title:** Application for Waiver of Passport and/or Visa (DHS Form I–193).

**OMB Number:** 1651–0107.

**Form Number:** DHS Form I–193.

**Current Actions:** This submission is being made to extend the expiration date with no change to the burden hours or to the information collected on Form I–193.

**Type of Review:** Extension (without change).

**Affected Public:** Individuals.

**Abstract:** The data collected on DHS Form I–193, Application for Waiver of Passport and/or Visa, allows CBP to determine an applicant's identity, alienage, claim to legal status in the United States, and eligibility to enter the United States under 8 CFR 211.1(b)(3) and 212.1(g). DHS Form I–193 is an application submitted by a nonimmigrant alien seeking admission to the United States requesting a waiver of passport and/or visa requirements due to an unforeseen emergency. It is also an application submitted by an immigration alien returning to an un-relinquished lawful permanent residence in the United States after a temporary absence aboard requesting a waiver of documentary requirements for good cause. The waiver of the documentary requirements and the information collected on DHS Form I–193 is authorized by Sections 212(a)(7), 212(d)(4), and 212(k) of the Immigration and Nationality Act, as amended, and 8 CFR 211.1(b)(3) and 212.1(g). This form is accessible at *https://www.uscis.gov/i-193.*

**Type of Information Collection:** DHS Form I–193.

**Estimated Number of Respondents:** 25,000.

**Estimated Number of Annual Responses per Respondent:** 1.

**Estimated Number of Total Annual Responses:** 25,000.

**Estimated Time per Response:** 10 minutes.

**Estimated Total Annual Burden Hours:** 4,150.

Dated: March 8, 2021.

SETH D. RENKEMA,
*Branch Chief,*
*Economic Impact Analysis Branch,*
*U.S. Customs and Border Protection.*

[Published in the Federal Register, March 11, 2021 (85 FR 13909)]

# U.S. Court of International Trade

◆

Slip Op. 21–28

American Pacific Plywood, Inc., et al., Plaintiffs, v. United States, Defendant, and Coalition For Fair Trade In Hardwood Plywood, Defendant-Intervenor.

Consol. Court No. 20–03914

[Denying plaintiffs' motions for reassignment of their respective actions, now consolidated, to a three-judge panel]

Dated: March 5, 2021

*Gregory S. Menegaz*, deKieffer & Horgan, PLLC, of Washington, D.C., for plaintiffs American Pacific Plywood, Inc., U.S. Global Forest, Inc., Interglobal Forest, LLC, and plaintiff-intervenors LB Wood Cambodia Co., Ltd. and Cambodian Happy Home Wood Products Co., Ltd. With him on the brief were *Alexandra H. Salzman* and *James K. Horgan*.

*Timothy C. Brightbill*, Wiley Rein, LLP, of Washington, D.C., for defendant-intervenor. With him on the brief were *Elizabeth S. Lee*, *John Allen Riggins*, *Stephanie M. Bell*, *Tessa V. Capeloto*, and *Maureen E. Thorson*.

*Brian M. Boynton*, Acting Assistant Attorney General, Civil Division, U.S. Department of Justice, Commercial Litigation Branch, New York, New York, for defendant. With him on the brief were *Jeanne E. Davidson*, Director, *Justin R. Miller*, Attorney-in-Charge, *Claudia Burke*, Assistant Director, and *Hardeep K. Josan*, Trial Attorney.

## OPINION AND ORDER

**Stanceu, Chief Judge:**

Three plaintiffs in this consolidated action—American Pacific Plywood, Inc., U.S. Global Forest, Inc., and Interglobal Forest, LLC—have filed motions under 28 U.S.C. §§ 253(c) and 255(a) that seek reassignment of each of their respective actions to a three-judge panel. Pl.'s Mot. for a Three-Judge Panel (Ct. No. 20–03914) (Feb. 3, 2021), ECF No. 21 ("Pl.'s Mot."); Pl.'s Mot. for a Three-Judge Panel (Ct. No. 20–03915) (Feb. 3, 2021), ECF No. 22; Pl.'s Mot. for a Three-Judge Panel (Ct. No. 20–03916) (Feb. 3, 2021), ECF No. 21.[1] For the reasons discussed below, the court denies plaintiffs' motions.

---

[1] Citations herein are to the amended complaint, motion for reassignment, and defendant's response in *American Pacific Plywood, Inc. v. United States*, as the filings do not vary materially across the three cases with respect to the issues raised by the motions for reassignment. Prior to consolidation, the three individual actions were assigned to Judge M. Miller Baker. Now consolidated under Consolidated Court No. 20–03914 are *American Pacific Plywood, Inc. v. United States*, Court No. 20–03914, *U.S. Global Forest v. United States*, Court No. 20–03915, and *InterGlobal Forest LLC v. United States*, Court No. 20–03916. Order (Feb. 25, 2021), ECF No. 29.

## I. BACKGROUND

These actions arose following investigations U.S. Customs and Border Protection ("Customs" or "CBP") conducted under the Enforce and Protect Act, 19 U.S.C. § 1517 ("EAPA"), into claims that certain imports of hardwood plywood occurred due to evasion of antidumping and countervailing duty orders on hardwood plywood from the People's Republic of China. Pl.'s Mot. 2; *see Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less than Fair Value, and Antidumping Duty Order*, 83 Fed. Reg. 504 (Dep't of Commerce Jan. 4, 2018) ("AD order"), *Certain Hardwood Plywood Products from the People's Republic of China: Countervailing Duty Order*, 83 Fed. Reg. 513 (Dep't of Commerce Jan. 4, 2018) ("CVD order"). Plaintiffs challenge CBP's initiation of the EAPA investigations, its institution of "interim measures" during the investigations, the final determinations by Customs that evasion of the AD and CVD orders occurred, and the affirming of those determinations by Customs upon administrative appeal. Am. Compl. ¶ 9 (Jan. 7, 2021), ECF No. 7.

Defendant takes no position on plaintiffs' motions for reassignment to a three-judge panel. Def.'s Resp. to Pl.'s Mot. for a Three-Judge Panel 3 (Feb. 24, 2021), ECF No. 27.

## II. DISCUSSION

Plaintiffs seek reassignment to a three-judge panel on two independent grounds. First, they argue that each of the consolidated actions "raises an issue of the constitutionality of an act of Congress," Pl.'s Mot. 1 (quoting 28 U.S.C. § 255(a)(1)). Second, plaintiffs argue that each "has broad or significant implications in the administration or interpretation of the customs laws." *Id.* (quoting 28 U.S.C. § 255(a)(2)). Rejecting plaintiffs' arguments on both grounds, the court declines to reassign this action from a single judge to a three-judge panel. In so doing, the court expresses no view on the merits of the claims in this litigation.

Plaintiffs' amended complaints contain eleven to twelve counts, only one of which, designated as Count IX in each complaint, contains a reference to a constitutional challenge to an act of Congress. The claim in Count IX is stated as follows: "Insofar as the EAPA statute, and in particular 19 U.S.C. § 1517(e) (Interim measures) cannot be properly interpreted to afford importers due process under the Fifth Amendment of the U.S. Constitution and CBP is permitted to impose punitive interim measures on Plaintiff without giving Plaintiff the opportunity to defend and rebut the factual and legal basis for such measures, the EAPA statute is incompatible with the Fifth Amend-

ment of the U.S. Constitution." Am. Compl. ¶ 95. The broad reference in this claim to "the EAPA statute" is too vague to support a convincing motion for assignment to a three-judge panel on the ground of a constitutional due process challenge to the entire EAPA statute. The scope of the only EAPA provision the complaint specifically addresses, the "interim measures" provision of 19 U.S.C. § 1517(e), is confined to the temporary suspension or extension of liquidation and the ordering of additional security for the payment of duties, in the form of increased bonding or the posting of cash deposits, that may be found to be owed, as measures to protect the federal revenue.[2] But even as to that provision, the claim in Count IX is stated only conditionally: the qualifying introduction, "Insofar as . . . ," reveals the conditional nature of this claim. The vague and conditional nature of the constitutional claim is sufficient reason for the court to decline to order reassignment to a three-judge panel under 28 U.S.C. § 255(a)(1).

Plaintiffs argue that "this Court cannot avoid a decision on the constitutionality of the EAPA law and regulations," Pl.'s Mot. 4, citing the decision of this Court in *Royal Brush Mfg. v. United States*, Slip Op. 20–171, 2020 Ct. Intl. Trade LEXIS 179 (Dec. 1, 2020). Plaintiffs' reliance on *Royal Brush* to support their reassignment motion on the ground stated in 28 U.S.C. § 255(a)(1) is misplaced. Because the holding in that case arose from due process issues arising out of administrative actions by Customs, *see Royal Brush*, 2020 Ct. Intl. Trade LEXIS 179 at *13–15, not a constitutional challenge to the EAPA, the court disagrees with the conclusion that plaintiffs draw from it.

Plaintiffs' argument under 28 U.S.C. § 255(a)(2) ("broad or significant implications in the administration or interpretation of the customs laws") is also unconvincing. It essentially parrots their argument under § 255(a)(1), with the addition of arguments grounded in international trade agreements and CPB's implementing regulations.

---

[2] The "interim measures" provision reads as follows:

Not later than 90 calendar days after initiating an investigation under subsection (b) with respect to covered merchandise, the Commissioner [of Customs] shall decide based on the investigation if there is a reasonable suspicion that such covered merchandise was entered into the customs territory of the United States through evasion and, if the Commissioner decides there is such a reasonable suspicion, the Commissioner shall— (1) suspend the liquidation of each unliquidated entry of such covered merchandise that entered on or after the date of the initiation of the investigation; (2) pursuant to the Commissioner's authority under section 1504(b) of this title, extend the period for liquidating each unliquidated entry of such covered merchandise that entered before the date of the initiation of the investigation; and (3) pursuant to the Commissioner's authority under section 1623 of this title, take such additional measures as the Commissioner determines necessary to protect the revenue of the United States, including requiring a single transaction bond or additional security or the posting of a cash deposit with respect to such covered merchandise.

19 U.S.C. § 1517(e).

According to plaintiffs, "in an EAPA investigation, an investigation of unfair trade can proceed without the due process protections to the foreign exporter and U.S. importer provided in the AD & CVD law" and "includes elements of punitive proceedings and allows CBP to conduct its investigations in secret for 90 days, with no notice to the targeted parties." Pl.'s Mot. 6 (citing 19 U.S.C. § 1517(e)). They add that "[a]t the 90-day juncture, without any opportunity for the targeted parties to participate in the investigation, CBP is authorized to impose punitive interim measures against the imports of the targeted parties and to maintain these interim measures for an indefinite amount of time." *Id.* They argue, further that "the EAPA law is a punitive law" and that "[t]he unfair trade laws, in contrast, are not punitive, but are remedial in nature." *Id.* at 7. They assert that the EAPA's provisional measures authority violates international obligations of the United States that arise under the World Trade Organization Uruguay Round Agreement and the Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994. *Id.* at 7–9. According to plaintiffs, "[t]hus, an important question for the court to consider in this instant case is the EAPA law's integration into the overall construct of the AD & CVD law and the extent to which due process protections under the AD & CVD law are circumvented by CBP's EAPA investigations." *Id.* at 9. Plaintiffs add that "the cases brought before the CIT challenging CBP's decisions in EAPA investigations are also beginning to multiply." *Id.* (citations omitted). Plaintiffs maintain that each of the EAPA investigations at issue in those cases "was conducted under the same EAPA statute and regulations that curtail the due process rights of the participants." *Id.* at 10. They identify, specifically, "the right to notice and the right to defend before CBP imposes punitive interim measures; the inability of participants to adequately defend against allegations, evidence, and conclusions that are based on confidential information to which the targeted parties or their legal counsel have no access; and the preclusion of targeted foreign producers and exporters from meaningful participation in their own defense." *Id.* They offer the view that "[t]he CIT's appointment of a three-judge panel will further a uniform resolution to all of the issues arising from CBP's administration and interpretation of the [ ] EAPA statute, including a finding by the Court that certain provisions of the EAPA statute and regulations cannot be reconciled with the U.S. Constitution." *Id.* at 11 (citing *Fundicao Tupy, S.A. v. United States*, 11 CIT 23, 652 F. Supp. 1538 (1987) (appointing a three-judge panel to hear challenge to an affirmative final determination of injury by the U.S. International Trade

Commission and noting an issue of first impression concerning the interpretation of the "cumulation" provisions of the antidumping duty laws).

As discussed above, plaintiffs' claim that the EAPA violates plaintiff's constitutional due process rights is stated only vaguely and conditionally. (In Count X of their complaints, plaintiffs assert a similar due process claim against CBP's implementing regulations. *See* Am. Compl. ¶¶ 97–98). Their showing under 28 U.S.C. § 255(a)(2) rests in part on some of the same arguments they advanced under § 255(a)(1). Plaintiffs' allegation that the EAPA statute violates U.S. obligations under international agreements is not itself sufficient to justify reassignment to a three-judge panel. The fact that a number of EAPA cases have been filed is also insufficient, by itself, to justify a three-judge panel according to 28 U.S.C. § 255(a)(2), as it is not uncommon for the same or similar issues to arise in multiple cases in this Court. Nor is the court persuaded by plaintiffs' arguments pertaining to CBP's regulations implementing the EAPA. Plaintiffs fail to show that adjudication of this action by a single judge will be inadequate or inappropriate with respect to any of the claims in plaintiffs' complaints.

Finally, plaintiffs argue that "[t]he benefits and advantages of a decision by a three-judge panel in this dispute would far outweigh any benefits derived from a single judge presiding over the action." Pl.'s Mot. 12. The court disagrees. Having pled a constitutional challenge to the EAPA only vaguely and conditionally, and having invoked the criterion of 28 U.S.C. § 255(a)(2) based on issues that are not inappropriate for adjudication by a single judge, plaintiffs have not presented a compelling reason why the court, in its discretion, should take the unusual step of reassignment from a single judge to a three-judge panel, which would entail the commitment of significant additional judicial resources.

### III. CONCLUSION AND ORDER

For the reasons stated above, the court, in its discretion, declines to reassign this consolidated action to a three-judge panel. Therefore, upon consideration of the motions of plaintiffs American Pacific Plywood, Inc., U.S. Global Forest, Inc., and Interglobal Forest, LLC for reassignment of this action to a three-judge panel, all papers filed herein, and upon due deliberation, it is hereby

**ORDERED** that the motions for reassignment to a three-judge panel be, and hereby are, denied.

Dated:  March 5, 2021
        New York, New York

                                    /s/ *Timothy C. Stanceu*
                                TIMOTHY C. STANCEU, CHIEF JUDGE

Slip Op. 21–29

THYSSENKRUPP MATERIALS NA INC., THYSSENKRUPP MATERIALS NA INC. –
COPPER & BRASS SALES DIVISION, THYSSENKRUPP MATERIALS NA INC. –
MATERIALS TRADING DIVISION, THYSSENKRUPP MATERIALS NA INC. –
KEN-MAC METALS DIVISION, THYSSENKRUPP PRESTA DANVILLE LLC,
Plaintiffs, v. UNITED STATES, JOSEPH R. BIDEN, in his official
capacity as President of the UNITED STATES, WYNN COGGINS, in her
official capacity as Acting Secretary of Commerce, UNITED STATES
DEPARTMENT OF COMMERCE, TROY MILLER, in his official capacity as
Senior Official Performing the Duties of the Commissioner,
UNITED STATES CUSTOMS AND BORDER PROTECTION, Defendants.

Before: Claire R. Kelly, Gary S. Katzmann, and Jane A. Restani, Judges
Court No. 20–00093

[Granting Defendants' motion to dismiss Plaintiffs' Complaint as it pertains to all
claims therein.]

Dated: March 10, 2021

*Lawrence M. Friedman*, Barnes, Richardson & Colburn, LLP, of Chicago, IL, argued
for Plaintiffs Thyssenkrupp Materials NA Inc., Thyssenkrupp Materials NA Inc. –
Copper & Brass Sales Division, Thyssenkrupp Materials NA Inc. – Materials Trading
Division, Thyssenkrupp Materials NA Inc. – Ken-Mac Metals Division and Thyssen-
krupp Presta Danville LLC. With him on the brief were *David G. Forgue*, and *Lois
Elizabeth J. Wetzel*.

*Joshua E. Kurland*, Trial Attorney, Civil Division, Commercial Litigation Branch,
U.S. Department of Justice, of Washington D.C., argued for Defendants United States,
Joseph R. Biden, in his official capacity as President of the United States, Wynn
Coggins, in her official capacity as Acting Secretary of Commerce, United States
Department of Commerce, Troy Miller, in his official capacity as Senior Official Per-
forming the Duties of the Commissioner, United States Customs and Border Protec-
tion. With him on the briefs were *Jeffrey Bossert Clark*, Acting Assistant Attorney
General, *Ethan P. Davis*, Former Acting Assistant Attorney General, *Jeanne E. David-
son*, Director, *Tara K. Hogan*, Assistant Director and *Ann C. Motto*, Trial Attorney.

## OPINION

**Restani, Judge:**

The question before us is whether the process created in *Interim
Final Rule: Requirements for Submissions Requesting Exclusions
From the Remedies Instituted in Presidential Proclamations Adjust-
ing Imports of Steel Into the United States and Adjusting Imports of
Aluminum Into the United States; and the Filing of Objections to
Submitted Exclusion Requests for Steel and Aluminum*, 83 Fed. Reg.
12,106 (Dep't Commerce Mar. 19, 2018) ("*Interim Final Rule*")[1] for

---

[1] The *Interim Final Rule* has been amended since its enactment, but the exclusion process
has remained substantively the same, with Commerce granting exclusions to "directly
affected individuals or organizations located in the United States . . . . [who use steel or

importers to request exclusions from tariffs imposed on aluminum, *Proclamation No. 9704 of March 8, 2018: Adjusting Imports of Aluminum into the United States*, 83 Fed. Reg. 11,619 (Mar. 15, 2018) ("*Proclamation 9704*"), and steel, *Proclamation No. 9705 of March 8, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11,625 (Mar. 15, 2018) ("*Proclamation 9705*"), under the Trade Expansion Act of 1962, Pub. L. No. 87–794, Title II, § 232, 76 Stat. 872 (1962) (codified as amended 19 U.S.C. § 1862) ("Section 232"), violates the Uniformity Clause of the Constitution or is arbitrary, capricious or otherwise not in accordance with law.

Plaintiffs Thyssenkrupp Materials NA Inc., Thyssenkrupp Materials NA Inc. – Copper & Brass Sales Division, Thyssenkrupp Materials NA Inc. – Materials Trading Division, Thyssenkrupp Materials NA Inc. – Ken-Mac Metals Division, and Thyssenkrupp Presta Danville LLC, (collectively, "Thyssenkrupp") are importers of steel and aluminum. Thyssenkrupp argues that the exclusion process, which grants exclusions on an application basis to specific requestors and not automatically to all importers of a particular article, creates a non-uniform tax across the United States in violation of the Uniformity Clause of the Constitution, and is an impermissible construction of *Proclamation 9704*, *Proclamation 9705*, and Section 232. Defendants, the United States, Joseph R. Biden, in his official capacity as President of the United States, Wynn Coggins, in her official capacity as Acting Secretary of Commerce, the United States Department of Commerce, Troy Miller, in his official capacity as Senior Official Performing the Duties of the Commissioner, and the United States Customs and Border Protection, (collectively, "the Government"), move the court to dismiss the Complaint for failure to state a claim, under U.S. Court of International Trade ("USCIT") Rule 12(b)(6).[2]

## BACKGROUND

### A. Statutory Framework

Congress authorized the President under Section 232 to adjust imports that pose a threat to the national security of the United

aluminum] in business activities" and retaining "the discretion to make exclusions available to all importers if [it] find[s] the circumstances so warrant[.]" *Submissions of Exclusion Requests and Objections to Submitted Requests for Steel and Aluminum*, 83 Fed. Reg. 46,026, 46,057, 46,032 (Dep't Commerce Sept. 11, 2018) ("*Interim Final Rule II*"); *see also Interim Final Rule*, 83 Fed. Reg. 12,111–12; *see also Implementation of New Commerce Section 232 Exclusions Portal*, 84 Fed. Reg. 26,751 (Dep't Commerce June 10, 2019); *Section 232 Steel and Aluminum Tariff Exclusions Process*, 85 Fed. Reg. 81,060 (Dep't Commerce Dec. 14, 2020) ("*Interim Final Rule Dec. 2020*"); Defs.' Notice of Revised Regulation, ECF No. 21 (Dec. 15, 2020).

[2] Pursuant to USCIT Rule 25(d), the names of public officials sued in their official capacity are automatically substituted when there is a change in administration.

States. In furtherance of Section 232, President Trump imposed 10 percent ad valorem duties on imports into the United States of certain aluminum products, *see Proclamation 9704*, 83 Fed. Reg. at 11,620, and imposed 25 percent ad valorem duties on imports into the United States of certain steel products, *see Proclamation 9705*, 83 Fed. Reg. at 11,626, (collectively, "*Proclamations*"). In the *Proclamations*, the President authorized Commerce to exclude aluminum and steel articles from the imposition of these tariffs if the article is "determined not to be produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality and [Commerce] is also authorized to provide such relief based upon specific national security considerations." *Proclamation 9704*, 83 Fed. Reg. at 11,621, cl. 3 (aluminum); *Proclamation 9705*, 83 Fed. Reg. at 11,627, cl. 3 (steel). The President explicitly instructed that such relief shall be provided for an aluminum or steel article "only after a request for exclusion is made by a directly affected party located in the United States." *Id.*

**B. Section 232 Exclusion Process for Steel and Aluminum**

In March 2018, Commerce established a process for "[o]nly individuals or organizations using [steel or aluminum] . . . in business activities . . . in the United States [to] submit exclusion requests[.]" *Interim Final Rule*, 83 Fed. Reg. at 12,107. The rule establishes that "[a]n exclusion will only be granted if an article is not produced in the United States in a sufficient and reasonably available amount, is not produced in the United States in a satisfactory quality, or for a specific national security consideration." *Interim Final Rule*, 83 Fed. Reg. at 12,110 (steel), 12,112 (aluminum). Commerce determined that it would approve exclusions "on a product basis" and limit exclusions "to the individual[s] or organization[s] that submitted the specific exclusion request, unless [it] approves a broader application of the . . . exclusion . . . to additional importers." *Id.* at 12,107.[3]

**C. Challenges to Commerce's Actions**

Thyssenkrupp describes its Complaint as a facial challenge of Commerce's regulations implementing the *Proclamations*. *See* Pls.' Letter of Clarification, ECF No. 23 (Jan. 6, 2021). Thyssenkrupp has made no allegation in its Complaint that it requested an exclusion and that

---

[3] The exclusion process also provides that "individuals or organizations" may submit an exclusion request for "a steel or aluminum product that has already been the subject of an approved exclusion[,]" without reference to the previously approved, denied or invalid exclusion request. *Id.* at 12,107, 12,110 (steel), 12,112 (aluminum). Commerce established that it may consider a previous exclusion request when reviewing a subsequent request. *Id.*

Commerce improperly denied it. The Complaint does not challenge how the regulation was applied to a specific exclusion request from Thyssenkrupp, but rather that the regulations require Thyssenkrupp to apply for an exclusion in the first place. This court regularly hears cases regarding specific exclusion denials. *See, e.g.*, *JSW Steel (USA) Inc. v. United States*, 44 CIT __, 466 F. Supp. 3d. 1320 (2020). Should Thyssenkrupp request such an exclusion and be denied, it may seek this remedy.

Thyssenkrupp raises two challenges to Commerce's actions.[4] First, in Counts I and III, Thyssenkrupp asserts that Commerce's exclusion process for Section 232 duties on aluminum and steel articles results in a dis-uniform tax whereby individual importers pay different duty rates on the same merchandise, in violation of the Uniformity Clause of the Constitution. Compl. ¶¶ 38, 42; *see also* 5 U.S.C. § 706(2)(B). In support of this claim, Thyssenkrupp alleges that it paid Section 232 duties on merchandise that falls within the same Harmonized Tariff Schedule of the United States ("HTSUS") classification as merchandise imported by other importers that received an exclusion. Compl. ¶¶ 21–22. Thyssenkrupp further alleges that the exclusion process results in geographic discrimination because Commerce grants exclusions to importers that import goods through one state, thereby discriminating against importers that import the same goods through other states. *See* Pls.' Resp. at 17–20. As a result, Thyssenkrupp avers that the exclusion process violates the Uniformity Clause and is "unlawful" under 5 U.S.C. § 706(2)(B). The Government counters that because both the Section 232 tariffs imposed by the President and Commerce's regulations implementing these tariffs are defined in non-geographical terms and operate with the same force and effect nationwide, the exclusion process set out in the *Interim Final Rule* does not violate the Uniformity Clause. Defs.' Mot. to Dismiss at 16–17, ECF No. 11 (Jul. 22, 2020) ("Gov. Mot. to Dismiss").

---

[4] Thyssenkrupp also alleged in the Complaint that "Section 232 is an unconstitutional delegation of authority from Congress to the Executive Branch" because it lacks "an intelligible principle by which the Executive is to act, [thus] violating the delegation doctrine." Compl. ¶ 44, ECF No. 2 (Apr. 21, 2020). The Supreme Court previously decided this issue in *Fed. Energy Admin. v. Algonquin SNG, Inc.*, holding that "the standards that [Section 232] provides the President in its implementation are clearly sufficient to meet any delegation doctrine attack." 426 U.S. 548, 559 (1976); *see also Am. Inst. for Int'l Steel, Inc. v. United States*, 806 Fed. App'x 982, 989 (Fed. Cir. 2020) ("The Court's rejection of the nondelegation-doctrine challenge to section 232 was a necessary step in the Court's rationale for ultimately construing the statute as it did, and the constitutional ruling is therefore binding precedent."), *cert. denied*, 141 S. Ct. 133 (2020). Recognizing this, Thyssenkrupp chose not to pursue this challenge. *See* Pls.' Resp. to Defs.' Mot. to Dismiss at 7, ECF No. 12 (Aug. 25, 2020) ("Pls.' Resp."). Accordingly, Count IV of the Complaint is dismissed.

In Count II, Thyssenkrupp challenges Commerce's *Interim Final Rule*, which establishes a process for granting Section 232 duty exclusions to specific importers rather than to specific articles, as contrary to the *Proclamations* and as arbitrary, capricious, an abuse of discretion or not in accordance with law, under the Administrative Procedure Act ("APA"). Compl. ¶¶ 24, 40; *see* 5 U.S.C. § 706(2)(A). Thyssenkrupp argues that Commerce's "decision to grant exclusions to individual requestors rather than for products based on HT{SUS} classification is contrary to" the *Proclamations*. *Id.* Thyssenkrupp puts particular emphasis on the language in the *Proclamations* directing Commerce to provide such relief "for any aluminum *article*," *Proclamation 9704*, 83 Fed. Reg. 11,621, cl. 3 (emphasis added), or "for any steel *article*" *Proclamation 9705*, 83 Fed. Reg. 11,627, cl. 3 (emphasis added), rather than for individual importers. Pls.' Resp. at 21–23. The Government counters that this claim should be dismissed because the *Interim Final Rule* is consistent with the *Proclamations* and the President expressly authorized Commerce to provide such relief only after an affected party requests it. Gov. Mot. to Dismiss at 27–38. The Government further asserts that Commerce's interpretation of the *Proclamations* in creating the exclusion process is entitled to deference because the *Interim Final Rule* is consistent with the text of the *Proclamations*, the overall purpose of Section 232 tariffs, and the Congressional delegation of authority in Section 232 to the President in enacting Section 232, as further delegated to Commerce with respect to the exclusion process. *Id.*

Thyssenkrupp requests two forms of relief: a refund for all the duties paid, including interest, on the importation of goods imported under HTSUS classifications for which other parties have been granted exclusions, and an injunction preventing Customs and Border Protection from collecting duties under Section 232 on products for which any requestor has received an exclusion. Compl. at 13–14. The Government argues that even if Thyssenkrupp's claims were viable, the injunctive relief that Thyssenkrupp seeks is not appropriate because it can be made whole by receiving a refund of duties paid. Gov. Mot. to Dismiss at 44.

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1581(i)(2), (4) (2018). Thyssenkrupp's claims are against the United States, its agencies, or its officers and arise out of and relate to the "administration and enforcement" of a law of the United States providing for "tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue[.]" *Id.*

The jurisdiction of the federal courts is also constrained to those cases which involve actual "cases or controversies." *See* U.S. Const. art. III, § 2, cl. 1; *see also Royal Thai Gov't v. United States*, 38 CIT __, __, 978 F. Supp. 2d 1330, 1332–33 (2014). Pursuant to Article III, a plaintiff must establish constitutional standing, by demonstrating "(1) . . . an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). To establish an injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (citing *Lujan*, 504 U.S. at 560). A plaintiff cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.* at 1549.

The Government contends that Thyssenkrupp is not injured because it has made no claim for an exclusion that has been denied, *see* Gov. Mot. to Dismiss at 26, or that it has imported merchandise identical to the merchandise imported by others that has been excluded from Section 232 duties. *See id.* at 26–27; Defs.' Reply in Supp. of Their Mot. to Dismiss at 15–16, ECF No. 18 (Oct. 15, 2020) ("Gov. Reply"). Even though the Government has challenged jurisdiction on this basis only in passing, *see* Gov. Reply at 16, the court must assure itself that there is constitutionally minimal standing.

While Thyssenkrupp's Complaint is not completely clear, the facts it alleges imply that it is injured in fact by the requirement of participation in an administrative exclusion process with no certainty of success where its competitor has received such an exclusion. Compl. ¶¶ 23, 25. Thyssenkrupp alleges more than just "a bare procedural violation" in its Complaint. *Spokeo*, 136 S. Ct. at 1549. Thyssenkrupp alleges that it is "at a competitive disadvantage as compared to importers and other organizations who have received an exclusion" because these importers can now charge lower prices for the excluded goods than Thyssenkrupp since they do not have to pay Section 232 duties on these products. Compl. ¶ 25. The court concludes that such economic injury is sufficiently concrete and nonspeculative to satisfy the minimal burden set forth by *Lujan* and *Spokeo*. *See Lujan*, 504 U.S. at 560; *Spokeo*, 136 S. Ct. at 1548; *see also Invenergy Renewables LLC v. United States*, 43 CIT __, __, 422 F. Supp. 3d 1255, 1271–74 (2019). This economic injury is also fairly traceable to the actions challenged by Thyssenkrupp, i.e. Commerce's actions in implementing the exclusion process and granting exclusions to specific import-

ers and not to articles. Finally, this injury is redressable should the court come to a favorable decision for Thyssenkrupp, either through a refund of duties paid, or through the injunctive relief sought by Thyssenkrupp, requiring Commerce to grant exclusions on a product by product basis.[5]

## DISCUSSION

The Government asserts that the Complaint fails the basic test of plausibility. Gov. Mot. to Dismiss at 14; Gov. Reply at 15–17.[6] The essence of the present motion is not based on factual insufficiency, however, but on the lack of a cognizable legal claim.[7] Thus, we turn to the constitutional provision at issue and the challenged regulations.

### A. The Interim Final Rule does not violate the Uniformity Clause

The Uniformity Clause requires that "all Duties, Imposts and Excises shall be uniform throughout the United States." U.S. Const. art I. § 8, cl. 1. The purpose of this clause is to prevent the federal government from discriminating between states when levying taxes and duties. *See Knowlton v. Moore*, 178 U.S. 41, 89 (1900). In the *Head Money Cases*, the Supreme Court wrote that a "tax is uniform when it operates with the same force and effect in every place where the subject of it is found." *Edye v. Robertson*, 112 U.S. 580, 594 (1884)

---

[5] Prudential or statutory standing, while not thought of as a jurisdictional issue, *see Gilda Industries, Inc. v. United States*, 446 F.3d 1271, 1280 (Fed. Cir. 2006) (citation omitted), and not explicitly raised by the parties, is not at issue in this case. The test is whether "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Ass'n. of Data Processing Serv. Org. Inc. v. Camp*, 397 U.S. 150, 153 (1970); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014). In this case, as an importer of steel and aluminum merchandise, Compl. ¶¶ 20–22, Thyssenkrupp is within the zone of interest of the relevant statute, Proclamations, and Constitutional provision.

[6] In deciding a motion to dismiss, "the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff." *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009). In order to survive a motion to dismiss, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). A complaint must "state a claim to relief that is plausible on its face[,]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570), but "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility[.]" *Id.* at 678 (internal quotation marks and citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

[7] Given the disposition of the action there is no reason to delve into whether Thyssenkrupp should be permitted to amend the Complaint to assert facts with more particularity. Such action would be futile. Further, Thyssenkrupp's assertion that the court needs to await an administrative record, *see* Pls.' Resp. at 11, 24, is not well-taken given the disposition of the legal grounds that does not require review of particular agency actions.

("*Head Money Cases*"). In *Knowlton*, after an extensive analysis of the clause's legislative history, the Court determined that the Uniformity Clause "simply requires that whatever plan or method Congress adopts for laying the tax in question, [it is the] same plan and the same method . . . made operative throughout the United States[.]" 178 U.S. at 84. The Court in *United States v. Ptasynski*, 462 U.S. 74, 84 (1983), created a simple test for reviewing a law under the Uniformity Clause.

Under *Ptasynski,* "[w]here Congress defines the subject of a tax in nongeographic terms, the Uniformity Clause is satisfied." 462 U.S. at 84. Only if Congress has defined the subject of a tax in geographic terms does the court conduct a close review to determine whether there is "actual geographic discrimination" on the part of Congress. *Id.* at 85. Even this close review is deferential. *See id.* at 85–86 (upholding tax exemption for Alaskan oil because no evidence "that Congress intended to grant Alaska an undue preference at the expense of other oil-producing States"); *Thomson Multimedia Inc. v. U.S.*, 26 CIT 958, 961–65, 219 F. Supp. 2d 1322, 1325–30 (2002) (upholding the Harbor Maintenance Tax that provided exemptions for certain ports because plaintiff "failed to show the actual geographic discrimination or favoritism prohibited by the Uniformity Clause"), *aff'd on other grounds*, 340 F.3d 1355 (Fed. Cir. 2003); *Amoco Oil Co. v. United States*, 23 CIT 613, 619–20, 63 F. Supp. 2d 1332, 1339–41 (1999) (holding the same), *aff'd on other grounds*, 234 F.3d 1374 (Fed. Cir. 2000). As the court has previously noted, "[t]he Supreme Court has never relied upon the Uniformity Clause to invalidate a statute." *Thomson*, 26 CIT at 961.

Thyssenkrupp contends that the exclusion process created by Commerce violates the Uniformity Clause. In particular, Thyssenkrupp argues that by failing to grant exclusions from Section 232 duties "to all importers of the same merchandise," the duties "do not have the same force and effect in every place where the subject of the tariff is found" thereby violating "the Uniformity Clause." Compl. ¶¶ 15, 38, 42. Thyssenkrupp essentially alleges that it finds itself in the following situation: Thyssenkrupp imports a steel or aluminum product, Product A. Another importer, Company X, which also produces Product A, applies for an exclusion from the Section 232 duties and Commerce grants it. Only Company X's product is excluded from the tariff. For Thyssenkrupp to receive an exclusion from the Section 232 duty for the same merchandise, Product A, they would have to apply for the exclusion separately. Thyssenkrupp and Company X operate in different states. Therefore, Thyssenkrupp argues that Commerce's exclusion process creates a geographically dis-uniform duty on the

same subject, violating the Uniformity Clause. *See id.* ¶¶ 11–15; Pls.' Resp. 17–20.[8]

In the Complaint, Thyssenkrupp appears to claim that all articles in an eight-digit HTSUS category are to be excluded if any article in such a category is excluded. *See* Compl. ¶¶ 21–23, 25, Table A, Table B.[9] Thyssenkrupp disavows this construction of the Complaint, *see* Pls.' Resp. at 7–8, but has not specified the exact basis for defining the class of allegedly discriminated against product. However the exact discrimination is defined, applying the *Ptasynski* test, Thyssenkrupp has failed to state a claim that the exclusion process is unconstitutional under the Uniformity Clause. 5 U.S.C. § 706(2)(B).

The *Proclamations* are defined in non-geographic terms, allowing any "directly affected party located in the United States" to apply for an exclusion from the Section 232 duty, and granting exclusions for products "determined not to be produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality" or also "based upon specific national security considerations." *Proclamation 9704*, 83 Fed. Reg. at 11,621, cl. 3 (aluminum); *Proclamation 9705*, 83 Fed. Reg. at 11,627, cl. 3 (steel). The implementation regulations further elaborate on these non-geographic terms defining directly affected parties that may apply for an exclusion as only "individuals or organizations using steel [and aluminum] articles . . . in business activities . . . in the United States," *Interim Final Rule*, 83 Fed. Reg. at 12,107, and using the same non-geographic criteria outlined in the *Proclamations* to grant exclusions, *compare id.* at 12,110 (steel), 12,112 (aluminum) ("[a]n exclusion will only be granted if an article is not produced in the United States in a sufficient and

---

[8] At its core, Thyssenkrupp's argument can be best characterized as a slight variation of the intrinsic uniformity theory, which says that the Uniformity Clause requires equality in taxation across states, individuals and property. *See Knowlton*, 178 U.S. at 84, 104–106. While the *Head Money Cases* seemed to open the door to the intrinsic theory, *see* 112 U.S at 594, that door was firmly shut by subsequent cases. In *Knowlton*, the Supreme Court determined that "the words 'uniform throughout the United States' do not signify an intrinsic but simply a geographical uniformity." 178 U.S. at 106. Later cases upheld this interpretation. *Fernandez v. Wiener*, 326 U.S. 340, 359 (1945) (citing *Knowlton*, 178 U.S. at 83–109) (noting that "the uniformity in excise taxes exacted by the Constitution is geographical uniformity, not uniformity of intrinsic equality and operation."). The *Ptasynski* test operationalizes this narrow understanding of the Clause. *See* 462 U.S at 84. Thyssenkrupp's allegation that Commerce's granting of an exclusion to a company that imports goods solely through Maryland is evidence of geographic discrimination, *see* Pls.' Resp. at 17–18, but failure to allege that Commerce is explicitly doing so based on geography, relies on the rejected intrinsic theory of the Uniformity Clause.

[9] The court notes the breadth of various HTSUS provisions. For example, one of the HTSUS classifications at issue here, 7219.35.00, *see* Compl. ¶ 21, Table B, covers: Flat-rolled products of stainless steel, of a width of 600 mm or more, not further worked than cold-rolled (cold-reduced), of a thickness of less than 0.5 mm; another, 7606.12.30, *see* Compl. ¶ 21, Table A, covers: Aluminum plates, sheets and strip, of a thickness exceeding 0.2 mm, rectangular (including square), of aluminum alloys, not clad. *See* HTSUS subheading 7219.35.00, 7606.12.30 (2021).

reasonably available amount, is not produced in the United States in a satisfactory quality, or for a specific national security consideration."), *with Proclamation 9704*, 83 Fed. Reg. at 11,621, cl. 3 (aluminum) *and Proclamation 9705*, 83 Fed. Reg. at 11,627, cl. 3 (steel). While it is true that importers applying for an exclusion must provide some geographic information, including addresses for the requesting organization and the importer of record, as well as the port of entry through which the merchandise will be transported, *see* Pls.' Resp. at Exhibit 1, the subject of the tax and the exclusion are both defined in nongeographic terms. Thus, "the Uniformity Clause is satisfied." *Ptasynski*, 462 U.S. at 84. This alone is dispositive.

Even if Thyssenkrupp could overcome this hurdle, the Complaint reveals that Thyssenkrupp has failed to plead facts that show "actual geographic discrimination" or "any indication that Congress sought to benefit [one state over another] for reasons that would offend the purpose of the Clause." *Ptasynski*, 462 U.S. at 84–86. Thyssenkrupp does not, for example, allege that Commerce is making exclusion decisions based upon the geographic information that they receive from requestors. Instead, Thyssenkrupp argues that because Commerce is granting exclusions on an importer-by-importer basis rather than a product-by-product basis, Commerce's exclusion process necessarily results in dis-uniform taxes across states for the same *subject*. This argument fails, however, because Thyssenkrupp, like any other directly affected party in the United States, could still apply for the exclusion. Thyssenkrupp also does not allege that it was, or will be, denied an exclusion, based upon its geographic location within the United States.

As a result, Thyssenkrupp has made no specific allegation of harm from geographic discrimination based on Commerce's implementation of the exclusion process. The exclusion process "operates with the same force and effect in every place where the subject of it is found," *Head Money Cases*, 112 U.S. at 594. Accordingly, Counts I and III of the Complaint are dismissed. *See* Compl. ¶¶ 37–38, 41–42.

## B. The Interim Final Rule is consistent with the Presidential Proclamations

The remaining question is whether the *Interim Final Rule* impermissibly exceeds the bounds of Section 232 and *Proclamation 9704* and *Proclamation 9705*. Thyssenkrupp suggests that Proclamations 9710 and 9711,[10] which amend Proclamations 9704 and 9705 respec-

---

[10] *Proclamation No. 9710 of March 22, 2018 Adjusting Imports of Aluminum Into the United States*, 83 Fed. Reg. 13,355, 13,358, cl. 6–7 (Mar. 28, 2018) ("*Proclamation 9710*") and *Proclamation No. 9711 of March 22, 2018 Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 13,361, 13,364, cl. 6–7 (Mar. 28, 2018) ("*Proclamation 9711*"), collectively,

tively, adding detail to the exclusion process essentially reflecting Commerce's approach, should be disregarded as impermissible modifications because the *Amended Proclamations* were issued beyond the period permitted for Presidential action under Section 232. Pls.' Resp. at 20–22; *see Transpacific Steel LLC v. United States*, 44 CIT __, __, 466 F. Supp. 3d 1246, 1252–53 (2020). Because the Interim Final Rule is a permissible interpretation of the *Proclamations*, and the *Amended Proclamations* do not alter the process in a material way, the court need not address whether the *Amended Proclamations* were untimely.

On March 19, 2018, Commerce issued the *Interim Final Rule*, which established "the process for how parties in the United States may submit requests for exclusions from actions taken by the President ("exclusion requests") to protect national security from threats resulting from imports of specified articles." 83 Fed. Reg. at 12,106; *see also* Compl. ¶ 10. Following notice and comment, Commerce issued revisions. *See supra* note 1; *Interim Final Rule II*, 83 Fed. Reg. at 46,026. Thyssenkrupp contends that the exclusion process established by Commerce in the *Interim Final Rule* is arbitrary, capricious, contrary to Presidential instruction and not in accordance with law because the process fails to provide automatic product-based exclusions once an exclusion has been granted to an importer for a particular product category. *See* 5 U.S.C. § 706(2)(A); Pls.' Resp. at 1–2, 20–23; Compl. ¶¶ 8–11, 24, 40.

The parties dispute what limits the *Proclamations* impose on Commerce with respect to the exclusion process. Specifically, the court must decide if Commerce's interpretation of clauses three and four of the *Proclamations* authorizing Commerce "to provide relief from the additional duties set forth in clause 2 of this proclamation for *any* [aluminum or steel] *article*," is permissible. *Proclamation 9704*, 83 Fed. Reg. at 11,621, cl. 3 (aluminum) (emphasis added); *Proclamation 9705*, 83 Fed. Reg. at 11,627, cl. 3 (steel) (emphasis added). Thyssen-

---

"*Amended Proclamations*", amended clause three of *Proclamation 9704* and *Proclamation 9705* respectively as follows:

(6) Clause 3 of Proclamation [9704 and 9705] is amended by inserting a new third sentence reading as follows: "Such relief may be provided to directly affected parties on a party-by-party basis taking into account the regional availability of particular articles, the ability to transport articles within the United States, *and any other factors as the Secretary deems appropriate*.".

(7) Clause 3 of Proclamation [9704 and 9705], as amended by clause 6 of this proclamation, is further amended by inserting a new fifth sentence as follows: "For merchandise entered on or after the date the directly affected party submitted a request for exclusion, such relief shall be retroactive to the date the request for exclusion was posted for public comment.".

*Proclamation 9710*, 83 Fed. Reg. at 13,358 (emphasis added); *Proclamation 9711*, 83 Fed. Reg. at 13,364 (emphasis added).

krupp argues that the use of the term "article" throughout the *Proclamations* requires Commerce to grant exclusions to *articles* and not to specific importers that have made exclusion requests. *See* Compl. ¶ 11; Pls.' Resp. at 20–23. Thyssenkrupp contends that the *Proclamations* require Commerce to automatically grant exclusions to all importers of equivalent articles, without requiring those importers to submit a request. *See id.*

The Government counters that the term "article" in the *Proclamations* must be read in context and notes that the *Proclamations* specifically require that "[s]uch relief shall be provided for a[n] [aluminum or steel] article only after a request for exclusion is made by a directly affected party located in the United States." *Proclamation 9704*, 83 Fed. Reg. at 11,621, cl. 3 (aluminum); *Proclamation 9705*, 83 Fed. Reg. at 11,627, cl. 3 (steel); *see* Gov. Mot. to Dismiss at 28, 35–38. The Government argues that Commerce's decision to grant exclusions based on an analysis of specific products only after a request for an exclusion is made by an importer is a permissible implementation of the exclusion process, and is consistent with the purpose and plain meaning of the *Proclamations*. *See* Gov. Mot. to Dismiss at 38–43.

The threshold issue is whether Commerce's interpretation is entitled to any deference. Because the parties dispute the meaning of the language of the *Proclamations*, *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), provides a useful analytical framework even though at issue are words of Presidential proclamations rather than statutes. Under *Chevron*, deference to an agency interpretation is required "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001); *see also Chevron*, 467 U.S. at 842–43. "Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent." *Mead Corp.*, 533 U.S. at 227. Deference extends to an agency's interpretation of Presidential action through promulgated regulations. *See Udall v. Tallman*, 380 U.S. 1, 16–17, 23 (1965) (showing "great deference" to the Secretary of Interior's reasonable interpretation of Presidential orders); *Wagner v. Office of Pers. Mgmt.*, 783 F.2d 1042, 1045 (Fed. Cir. 1986) (upholding OPM's interpretation of a Presidential directive as reasonable and entitled to "great deference") (citation omitted); *Yanko v. United States*, 869 F. 3d 1328, 1334–35 (Fed. Cir. 2017) (citing *Udall* and *Wagner* in holding that OPM's interpretation of a statute and a Presidential directive

was entitled to "broad deference"). The *Interim Final Rule*, promulgated in the exercise of the authority granted by the *Proclamations*, went through such notice and comment rulemaking. *See, e.g.*, *Interim Final Rule II*, 83 Fed. Reg. 46,026. Accordingly, the *Interim Final Rule* carries the requisite force of law that may qualify it for the type of deference given in *Chevron* and *Udall*. *See Mead Corp.*, 533 U.S. at 226–27.

As with a *Chevron* analysis, if the *Proclamations* had plainly spelled out the exclusion process the inquiry would end. 467 U.S. at 842–43. If, however, the statute is silent and the implementing Presidential directive is ambiguous, as in a *Chevron* situation, the court will uphold Commerce's interpretation so long as the interpretation is reasonable. *See id.* at 843; *DuPont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005).

Thyssenkrupp's assertion that the plain meaning of "[aluminum or steel] article" in the *Proclamations* commands an automatic product-based exclusion for all importers ignores the surrounding text of the *Proclamations*. *See* Compl. ¶¶ 8–9, 11; Pls.' Resp. at 21–23. The *Proclamations* further state that "relief shall be provided for a[n] [aluminum or steel] article *only after a request for exclusion is made* by a directly affected party" and that Commerce shall issue such procedures for requesting relief. *Proclamation 9704*, 83 Fed. Reg. at 11,621, cl. 3–4 (aluminum) (emphasis added); *Proclamation 9705*, 83 Fed. Reg. at 11,627, cl. 3–4 (steel) (emphasis added). Whether Commerce may provide an exclusion to only the requestor, or a broader exclusion to all importers of a particular article, is left open. *Id.*; *see also Interim Final Rule II*, 83 Fed. Reg. at 46,040.

Because Section 232 is silent as to limits on any exclusion process, and the *Proclamations* issued under the statute are ambiguous as to the particular procedures required for granting exclusions of Section 232 duties, the court must determine whether Commerce's *Interim Final Rule* establishing the exclusion process for aluminum and steel products is based on a permissible construction of the *Proclamations* and Section 232. The inquiry is narrow and determines only whether Commerce's promulgation of the exclusions process under the authority of the *Proclamations*, set out in the *Interim Final Rule*, is "arbitrary and capricious or otherwise legally erroneous." *Wagner*, 783 F.2d at 1045; *see also* 5 U.S.C. § 706(2)(A). An agency is entitled to great deference when interpreting executive action through the promulgation of regulations, particularly when an administrative process is at issue and the agency in question was charged with

implementing that process. *Udall*, 380 U.S. at 16–17. Where a statutory or executive action leaves ambiguity in its authorization to the agency, it serves as an implicit delegation for an agency to fill in the statutory gaps. *See Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000) (*Chevron* deference is "premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps.") (internal citation omitted). The agency has broad discretion to fill in these gaps. *Id.*; *see also Udall*, 380 U.S. at 16–17.

Here, the *Proclamations*, pursuant to Congressional delegation, direct and provide Commerce with discretion to fill in the statutory gap regarding the details of an exclusion process for Section 232 duties. Section 232 provides that the President may "take action to adjust imports of an *article* and its derivatives" for the purposes of national security. 19 U.S.C. § 1862(c)(1)(B) (emphasis added). The statute is silent as to what is meant by *article* and provides a non-exhaustive list of considerations the Secretary of Commerce and the President shall consider in examining national security. *Id.* at § 1862(d).[11] The *Proclamations* direct Commerce to establish "procedures for the requests for exclusion" of the imposed Section 232 tariffs. *Proclamation 9704*, 83 Fed. Reg. at 11,621, cl. 3–4 (aluminum); *Proclamation 9705*, 83 Fed. Reg. at 11,627, cl. 3–4 (steel). Clause three of the *Proclamations* states:

> (3) The Secretary . . . is hereby authorized to provide relief from the additional duties set forth in clause 2 of this proclamation for *any* [aluminum or steel] *article determined not to be produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality and is also authorized to provide such relief based upon specific national security considerations. Such relief shall be provided for a[n] [aluminum or steel] article only after a request for exclusion is made by a directly affected party located in the United States.* If the Secretary determines that a *particular [aluminum or steel] article should be excluded*, the Secretary shall, upon publishing a notice of such determination in the Federal Register, notify Customs and Border Protection (CBP) of the Department of Homeland Security *concerning such article* so that it will be excluded from the duties described in clause 2 of this proclamation. The Secretary shall consult with CBP to determine whether the HTSUS

---

[11] These considerations include "domestic production needed for projected national defense requirements, the capacity of domestic industries to meet such requirements, existing and anticipated availabilities of the human resources, products, raw materials, and other supplies and services essential to the national defense, . . ." among others. *Id.* at § 1862(d).

provisions created by the Annex to this proclamation should be
modified in order to ensure the proper administration of such
exclusion, and, if so, shall make such modification to the HTSUS
through a notice in the *Federal Register*.

*Proclamation 9704*, 83 Fed. Reg. at 11,621, cl. 3 (aluminum) (empha-
sis added); *Proclamation 9705*, 83 Fed. Reg. at 11,627, cl. 3 (steel)
(emphasis added). It is clear that the *Proclamations* require an indi-
vidualized exclusion request procedure, but clauses three and four
leave open the exact process required. *Id.* Contrary to Thyssenkrupp's
argument, the text of the *Proclamations* does not require that Com-
merce extend a product-based exclusion automatically to all import-
ers of a particular product when it has granted an exclusion to any
importer of that product. *See* Pls.' Resp. at 21–23. The *Proclamations*
neither require nor prohibit the extension of exclusions to parties
other than the requestor.[12] The *Proclamations* leave a gap for Com-
merce to fill in the details, and Commerce has broad discretion to do
so. *See Food and Drug Admin.*, 529 U.S. at 158; *Udall*, 380 U.S. at
16–17.

Under the authorization of these *Proclamations*, Commerce imple-
mented the exclusion process in the *Interim Final Rule*. These pro-
cedures for granting exclusions are not only consistent with the text
of the *Proclamations*, but are based on the exact criteria laid out in
the *Proclamations*. *Compare Proclamation 9704*, 83 Fed. Reg. at
11,621, cl. 3 (aluminum); *Proclamation 9705*, 83 Fed. Reg. at 11,627,
cl. 3 (steel), *with Interim Final Rule*, 83 Fed. Reg. at 12,110 (steel),
12,112 (aluminum) ("[a]n exclusion will only be granted if an article is
not produced in the United States in a sufficient and reasonably
available amount, is not produced in the United States in a satisfac-
tory quality, or for a specific national security consideration."). Com-
merce's decision to limit exclusions to individual requestors unless, in
its discretion, it approves a broader application is a reasonable con-
struction of the *Proclamations*' text as well as Section 232. *Compare
Interim Final Rule* at 12,107, 12,110 (steel), 12,112 (aluminum), *with
Proclamation 9704*, 83 Fed. Reg. at 11,621, cl. 3 (aluminum); *Procla-
mation 9705*, 83 Fed. Reg. at 11,627, cl. 3 (steel) ("Such relief shall be
provided for a[n] [aluminum or steel] article only after a request for
exclusion is made by a directly affected party located in the United

---

[12] In fact, when it has deemed it appropriate to do so, Commerce has made the exclusion on
a more general basis. In December of 2020, Commerce granted General Approved Exclu-
sions ("GAEs") to 15 aluminum articles, and 108 steel articles. *See Interim Final Rule Dec.
2020*, 85 Fed. Reg. at 81,071, 81,079–84. The products covered by the GAEs are described
at the 10-digit HTSUS category level or are more narrowly defined at the product level. *See
id.* at 81,079–84. Thyssenkrupp has not pointed to any language in the *Proclamations*
imposing limitations on Commerce's discretion to determine the details of this process.

States."); *see also Interim Final Rule II*, 83 Fed. Reg. at 46,040 (Commerce stating its reasoning for applying individual exclusions initially to ensure any "broad based product exclusions [are] done in a measured and deliberative way so as not to undermine the Proclamations and their objective of protecting critical U.S. national security interests."). It is rational for Commerce to place the burden on those desiring an exclusion to define the product at issue, so that the exclusion can be assessed in relation to the statutory factors reflected in the *Proclamations*. A requestor would not necessarily know what the breadth of a purely product-based exclusion should be. That is something about which Commerce may be able to draw some conclusions after experience with various requests. Placing the burden on parties to explain what exclusions it desires for its own products, and why, is not unreasonable. Furthermore, it certainly reflects Commerce's view of its own needs as to the efficient administration of the exclusion process.

Commerce has broad discretion in implementing such procedure. Where an agency action is reasonable, and not "plainly erroneous or inconsistent" with Congressionally delegated authority through Presidential action or statute, we owe the agency "great deference." *Wagner*, 783 F.2d at 1045; *see also Chevron*, 467 U.S. at 843; *Udall*, 380 U.S. at 16–17. There is no indication that Congress in Section 232 or the President in the *Proclamations* required broader product-based exclusions or that not doing so would be inconsistent with the purpose of Section 232 duties in advancing national security. *See* 19 U.S.C. § 1862; *Proclamation 9704*; *Proclamation 9705*. In these circumstances, the court may not substitute its judgment for that of the agency. *Udall*, 380 U.S. at 16. Accordingly, we conclude that Commerce's interpretation of the *Proclamations* in the *Interim Final Rule* is lawful and dismiss Count II of the Complaint. Compl. ¶ 40; *see* 5 U.S.C. § 706(2)(A).

## CONCLUSION

Because the exclusion process promulgated by Commerce does not violate the Uniformity Clause of the Constitution and does not reflect an improper construction of the President's *Proclamations*, the Government's motion to dismiss is granted.

Dated:  March 10, 2021
        New York, New York

                    */s/ Jane A. Restani*
                    JANE A. RESTANI, JUDGE

47    CUSTOMS BULLETIN AND DECISIONS, VOL. 55, No. 11, MARCH 24, 2021

*/s/ Claire R. Kelly*
CLAIRE R. KELLY, JUDGE

*/s/ Gary S. Katzmann*
GARY S. KATZMANN, JUDGE

# Index

*Customs Bulletin and Decisions*
*Vol. 55, No. 11, March 24, 2021*

## *U.S. Customs and Border Protection*

## *General Notices*

*Page*

Proposed Revocation of Two Ruling Letters and Proposed Revocation of
Treatment Relating to the Tariff Classification of Hard Seltzer  . . . . . .    1

Notice of Issuance of Final Determination Concerning Certain Fixed and
Portable Ceiling Lifts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    13

Application for Waiver of Passport and/or Visa (DHS Form I–193) . . . . . .    19

## *U.S. Court of International Trade*
### Slip Opinions

| | Slip Op. No. | Page |
|---|---|---|
| American Pacific Plywood, Inc., et al., Plaintiffs, v. United States, Defendant, and Coalition For Fair Trade In Hardwood Plywood, Defendant-Intervenor. . . . . . . . . . . . | 21–28 | 25 |
| Thyssenkrupp Materials NA Inc., Thyssenkrupp Materials NA Inc. – Copper & Brass Sales Division, Thyssenkrupp Materials NA Inc. – Materials Trading Division, Thyssenkrupp Materials NA Inc. – Ken-Mac Metals Division, Thyssenkrupp Presta Danville LLC, Plaintiffs, v. United States, Joseph R. Biden, in his official capacity as President of the United States, Wynn Coggins, in her official capacity as Acting Secretary of Commerce, United States Department Of Commerce, Troy Miller, in his official capacity as Senior Official Performing the Duties of the Commissioner, United States Customs And Border Protection, Defendants. . . . . . . | 21–29 | 31 |