L6G8CERA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CERVECERIA MODELO DE MEXICO,
S. de R.L. de C.V.,

                    Plaintiff,

            v.                              21 Cv. 1317 (LAK)

CB BRAND STRATEGIES, LLC,
et al.,

                    Defendants.

------------------------------x

                                          New York, N.Y.
                                          June 16, 2021
                                          2:15 p.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                          District Judge

                          APPEARANCES

SULLIVAN & CROMWELL, LLP
        Attorneys for Plaintiff
BY:  MICHAEL H. STEINBERG
        MARC DE LEEUW
        COLIN O'ROURKE HILL

KIRKLAND & ELLIS LLP
        Attorneys for Defendants
BY:  STEFAN H. ATKINSON
        SANDRA C. GOLDSTEIN
        SARA S. TATUM
        DANIEL R. CELLUCCI

L6G8CERA

1           (Case called)

2           THE DEPUTY CLERK:  Counsel for movant, are you ready?

3           MR. ATKINSON:  Yes, your Honor.

4           THE DEPUTY CLERK:  Please put your appearance on the

5    record.

6           MR. ATKINSON:  Stefan Atkinson of Kirkland & Ellis,

7    and I represent the defendants in this case.  With me at the

8    table are Sandra Goldstein and Sara Tatum, also of Kirkland.

9           THE COURT:  Good afternoon.

10          THE DEPUTY CLERK:  Counsel for respondent, are you

11   ready?

12          MR. STEINBERG:  Yes.  My name is Michael Steinberg,

13   counsel for Cerveceria Modelo de Mexico.  With me is my partner

14   Mark De Leeuw and Colin Hill.  Also on the phone, your Honor,

15   for us is Raul Escalante Martinez for Modelo, and present in

16   the courtroom is Pedro Romero, also from Modelo.

17          THE COURT:  Good afternoon.

18          All right.  Then I will hear from Mr. Atkinson first.

19          MR. ATKINSON:  Thank you, your Honor.

20          Just to note as well for the record, Kristen Klanow,

21   associate general counsel from Constellation Brands, is in the

22   courtroom as well.

23          THE COURT:  OK.

24          MR. ATKINSON:  In their license agreement, your Honor,

25   the parties defined capital B Beer to include beer or malt

L6G8CERA

1    beverages, as well as any version of either.  And yet, despite

2    this expansive and varied definition, ABI has built its case

3    around the claim that Corona Hard Seltzer qualifies as a big B

4    beer only if the guy in the pub thinks it tastes like

5    traditional beer.  But big B beer includes explicitly malt

6    beverages, which don't taste like traditional beer at all.

7    Take Mike's Hard Lemonade, Smirnoff Ice, and Zima.  These are

8    sweet, carbonated drinks that don't taste like traditional

9    beer.  They do taste like Corona Hard Seltzer, by the way.

10             ABI's principal claim here, therefore, that the Court

11   should apply "a guy in the pub" test is dead on arrival under

12   the plain language of the contract because big B beer includes

13   malt beverages.

14             The federal government, at least 35 different states,

15   and the parties themselves, all use the terms beer or malt

16   beverage to include sugar-based hard seltzers.  In light of

17   this, it is not plausible that when these highly sophisticated

18   parties expressly defined capital B Beer to include beer, malt

19   beverages, and any versions of either, they excluded Corona

20   Hard Seltzer.

21             The overwhelming industry practice is to treat Corona

22   Hard Seltzer as a beer or a malt beverage.  And a version of a

23   beer or a malt beverage --

24             THE COURT:  Could you moderate your speed, please.

25             MR. ATKINSON:  Sorry, your Honor.

L6G8CERA

1          A version of a beer or a malt beverage clearly

2    includes a beverage that the regulatory authorities treat as

3    beer or malt beverage, that are labeled as beer right there on

4    the can, and that industry participants themselves call beer.

5          To rule for Anheuser-Busch in this case, the Court

6    would have to conclude that, in drafting a broad and expansive

7    definition of capital B Beer, that includes not just beer and

8    malt beverages, but even any versions of beer and malt

9    beverages, the parties silently departed from the overwhelming

10   regulatory and industry terminology and practice.

11          THE COURT:  Overwhelming but not unanimous, right?

12          MR. ATKINSON:  That is correct, your Honor.

13          THE COURT:  What you really ought to focus on is why

14   the interpretation placed on the contract by your adversary is

15   so unreasonable that I should dismiss the case at this point.

16          MR. ATKINSON:  Sure, your Honor.  I am happy to.

17          I will start with the regulatory backdrop.

18          ABI does not dispute that Corona Hard Seltzer is

19   regulated as a beer under federal law.  ABI also does not

20   dispute that Corona Hard Seltzer is a beer under New York's

21   regulatory regime.  And ABI doesn't dispute that at the time

22   the agreement was signed, at least 35 states would have

23   considered Corona Hard Seltzer as beer.

24          As the Supreme Court held in *Robinson* long ago,

25   "Parties who contract on a subject matter concerning which

L6G8CERA

1  known usages prevail, by implication incorporate them into

2  their agreements, if nothing is said to the contrary."  And to

3  overcome that conclusion, your Honor, there must be clear

4  evidence on the face of the contract that the parties rejected

5  the generally understood industry definition.

6          Contracts among sophisticated participants in a

7  regulated industry have to be assessed from that perspective

8  under settled Second Circuit law.

9          Your Honor, given this backdrop, it is unreasonable

10  for ABI to be arguing that Corona Hard Seltzer is not a beer or

11  a malt beverage.  When you add the "any versions" language,

12  which the parties did expressly in their agreement --

13          THE COURT:  When you add what?

14          MR. ATKINSON:  The "any versions" language, the

15  expansive catch-all beyond.

16          THE COURT:  What is a version of a beer?

17          MR. ATKINSON:  So we have included in our briefing a

18  definition of version that I think the parties have agreed on,

19  which is "a particular form --

20          THE COURT:  Something tells me I wouldn't put money on

21  that.

22          MR. ATKINSON:  It's one of the few areas of agreement,

23  actually.

24          And then, of course, Mr. Steinberg can tell me if I am

25  not right about that.

L6G8CERA

1          "A particular form of something differing in certain

2    respects from an earlier form or other forms of the same type

3    of thing."

4          THE COURT:  So on that basis, presumably, chardonnay

5    is the same.  It's beer, right?

6          It differs in some respects.  It's liquid.  It has

7    that in common.  It has alcohol in it.  You can sort of see

8    through it most of the time.

9          MR. ATKINSON:  That's correct, your Honor.

10         THE COURT:  And it differs in other versions, in other

11   respects.

12         MR. ATKINSON:  The parties in negotiating this

13   contract, of course, they were sophisticated industry players.

14   In this industry, there are three categories of alcoholic

15   beverages:  Beer, wine, and distilled spirits.  I don't think

16   anybody sitting at the negotiating table was concerned that

17   wine would be captured in the definition of beer.

18         THE COURT:  Counsel, I don't know who was sitting at

19   the negotiating table.  I don't know how sophisticated they

20   were.

21         MR. ATKINSON:  Understood, your Honor.

22         THE COURT:  I don't know, for that matter, whether

23   what happened with this definition, is what has happened in any

24   number of deals that I have seen as a judge, as a lawyer, is

25   not that the negotiators came to a hard point, and they fudged

L6G8CERA

1    hoping it would never be an issue.  And that's why their

2    litigation partners do very nicely, thank you.

3            MR. ATKINSON:  But, your Honor, at the time, there was

4    no Corona Hard Seltzer.  So we are talking about a world in

5    which the parties decided that -- the parties decided after

6    being prodded, of course, by the Department of Justice -- that

7    Corona's marks had to be divested in order for the ABI/Modelo

8    merger to be.

9            THE COURT:  It wasn't divested.

10           MR. ATKINSON:  It was licensed.

11           THE COURT:  It's a limited license.

12           MR. ATKINSON:  It is, your Honor.  But it is perpetual

13   and Modelo may not terminate it.

14           THE COURT:  So?

15           MR. ATKINSON:  The marks are still owned by

16   Anheuser-Busch, but they are licensed on a perpetual basis to

17   Constellation.  And the parties, in coming to their agreement

18   as to the scope of that, did not mention a single ingredient of

19   beer, and, of course, gave the parties rights not just to a

20   license --

21           THE COURT:  I don't know if they mentioned ingredients

22   in the course of negotiating.

23           MR. ATKINSON:  The contract certainly has no reference

24   to any ingredients.

25           THE COURT:  Agreed.

L6G8CERA

1          MR. ATKINSON:  But the contract also talks about

2   innovating entirely new recipes, and includes the expansive any

3   versions of beer or malt beverage.  Under Anheuser-Busch's

4   argument, it has to already be a beer or malt beverage in order

5   for it to qualify as a version of a beer or malt beverage.

6          THE COURT:  And beer is defined as beer in your

7   contract.

8          MR. ATKINSON:  Capital B Beer is not defined as beer

9   in our contract.  It includes malt beverages, which are not

10  beer.  They don't look like beers --

11         THE COURT:  Beer is defining beer.

12         MR. ATKINSON:  I think -- Mr. Steinberg can tell us --

13  Corona Refresca doesn't look and taste and smell like a beer,

14  but it is undeniably permitted under the contract.  This is the

15  malt beverage that Corona makes.

16         Corona Hard Seltzer, remember, your Honor, is labeled

17  as beer, as in Bud Light Seltzer.  There is an industry

18  understanding here.  But, your Honor, even if we set aside the

19  industry understanding, which we, of course, do not concede,

20  *Hugo Boss* is clear that we can consider the customs and

21  usages --

22         THE COURT:  You have to have evidence of customs and

23  understandings.

24         MR. ATKINSON:  So there is evidence of the custom and

25  understanding, I think, here.  A few pieces of evidence.

L6G8CERA

1          For one, this was a divestiture remedy in the form of

2     a license, and it was a U.S.-based license.  Federal law

3     defines this term "beer" broadly to include Corona Hard

4     Seltzer.  I think that's not disputed.  The parties selected

5     New York law to govern the contract.  New York regulatory law

6     likewise defines beer to include Corona Hard Seltzer.

7          34, let's call it, other states, at the time of

8     contracting, considered beer -- had a definition of beer that

9     captured Corona Hard Seltzer.

10          THE COURT:  What about the other 15 states?

11          MR. ATKINSON:  Sure.  The other 15 states are a little

12    bit all over the place.  Many of them have now moved to a place

13    where their definitions cover Corona Hard Seltzer as well.

14    But, your Honor, if the agreement permits Constellation to make

15    versions of beer, and versions of malt beverage, clearly, it's

16    enough that 35 states in the federal government consider it

17    beer.

18          THE COURT:  Why?

19          MR. ATKINSON:  If there were one or two that

20    considered it beer, we would have a good argument that these

21    are versions of beer.  But it is beer under, for example,

22    Minnesota law, or Connecticut law, or New York law.  This is a

23    version of beer.

24          Of course, we aren't in that world.  We are in a world

25    where the overwhelming majority of regulators treat this

L6G8CERA

1    product as beer.  But we don't need 35 in order to show that

2    this meets the definition of a version of beer.  In many states

3    this is beer.

4            So when the parties against that backdrop negotiate a

5    license that includes references to beer, malt beverages, and

6    any version of beer --

7            THE COURT:  Let me put a hypothetical to you, a

8    not-so-hypothetical hypothetical.

9            You think you know what forgery is?

10           MR. ATKINSON:  I think so.

11           THE COURT:  OK.  Is a check, a corporate check, signed

12   by an officer, authorized to sign corporate checks, for the

13   purpose of stealing the money forged, within the meaning of an

14   insurance policy that insures against loss through forgery?

15           MR. ATKINSON:  Is forgery defined in the insurance

16   contract?

17           THE COURT:  No.

18           MR. ATKINSON:  I guess I would have to understand, the

19   general understanding of the term "forgery," does that include

20   passing yourself off as someone else only, or does it include

21   passing your off as the right person but for nefarious

22   purposes?  I guess I don't know enough about forgery.

23           THE COURT:  You're focused on part of the right issue,

24   but states are all over the place.  Most would say, I guess,

25   that you have got to imitate a signature, but others don't.

L6G8CERA

1    And the Second Circuit says that's ambiguous in terms of

2    forgery.

3            MR. ATKINSON:  How about if the contract said, any

4    version of forgery, any type of forgery?  I think in that case,

5    if you could point to a bunch of state law provisions that made

6    forgery applicable in these circumstances, it's hard to see how

7    the version of forgery in that hypo is ambiguous.  Forgery may

8    be.

9            And, by the way, your Honor may conclude that beer is

10   ambiguous, or that malt beverage is ambiguous.  Given the

11   industry practice here, the concept that a version of beer, or

12   a version of malt beverage, would be ambiguous, when 35 states

13   treat this as beer, when the federal government treats this as

14   beer, when ABI has a website that says "a guide to our beers"

15   that includes ABI Bud Seltzer, that we have our Cervecerias and

16   it includes Corona Hard Seltzer, that on the side of the can

17   that my friend here bought today it literally says the word

18   "beer."

19           THE COURT:  And when officers of your company said

20   Corona Hard Seltzer is not beer.

21           MR. ATKINSON:  I don't know that that's a direct

22   quote.  But I will say --

23           THE COURT:  It's close enough.

24           MR. ATKINSON:  It is true that Anheuser-Busch has

25   found a few contemporaneous statements that perhaps didn't put

L6G8CERA

1    it as directly as possible.  But I would contest, when you read

2    the earnings calls that they have cited and that we have

3    attached, I think it's clear that Constellation considers

4    seltzer as a subcategory of beer.  They talked regularly,

5    including quotes in the complaint, about seltzer not pulling

6    customers away from their core beer franchise.  Of course, if

7    there is a core beer franchise, there must be some beer

8    franchise that is not core.

9         THE COURT:  Maybe it's a core beer franchise in the

10   sense of the core of their business being the traditional

11   Budweiser labels and so on that we all know.  I don't mean

12   Budweiser, but you know what I mean.

13        MR. ATKINSON:  The point is these are additive.  We

14   have the federal government's definition.  We have 35-plus

15   states, including the state the parties chose to govern the

16   contract.  We have their website.  We have our website.  At the

17   very least, this is a version of beer.  But, by the way, your

18   Honor, we don't even need just beer.  We can be a version of

19   malt beverage and still qualify.

20        So, your Honor -- and I will slow down -- malt

21   beverages include Mike's Hard Lemonade, Smirnoff Ice, ABI has a

22   very sweet drink called Bud Light Lime-a-Rita, and

23   Constellation, of course, has Corona Refresca, which

24   Anheuser-Busch concedes, in its brief at page 11, citing to its

25   complaint at page 37, is permitted under the license agreement.

L6G8CERA

1          The only difference between malt beverages like Corona

2     Refresca, that indisputably fall within the agreement, and

3     Corona Hard Seltzer is that Corona Hard Seltzer is brewed from

4     a sugar base rather than a malt base.  In fact, Corona Hard

5     Seltzer is a gluten-free version of a malt beverage.  It is a

6     malt-free malt beverage.  Just like gluten-free pizza is a

7     version of pizza, gluten-free cookies are a version of cookies,

8     gluten-free bread is a version of bread.

9          ABI claims that malt is the key ingredient in malt

10    beverage.  Even if that's true, your Honor -- and, by the way,

11    the agreement certainly does not say that -- aren't yeast and

12    wheat key ingredients in bread?  But, of course, gluten-free

13    bread is a version of bread.  Turkey burgers, veggie burgers,

14    salmon burgers, these are all versions of hamburgers even

15    though they have no beef.

16         So Corona Hard Seltzer is an innovative product that,

17    going back to the definition your Honor asked for, differs in

18    certain respects from malt-based malt beverages, but is clearly

19    a form of the same type of thing.

20         THE COURT:  Everything differs in some respects from

21    everything else.

22         MR. ATKINSON:  Understood, your Honor.  But the idea

23    that there is some reasonable interpretation of a version of

24    malt beverage that does not capture Corona Hard Seltzer is hard

25    to fathom.  We can come up with hypos, of course, and the fact

L6G8CERA

1  that your Honor asks about chardonnay and Cabernet Sauvignon

2  and says, is that captured, is just a testament to how broadly

3  the parties wrote this definition of beer.  Capital B Beer,

4  they could have called it bananas.  It's the term, but it

5  includes more than just lowercase beer, what you would consider

6  in a Heineken or a Bud Light.  It includes malt beverages.

7  Then it goes on to include any versions of malt beverages.

8          And, by the way, elsewhere in the agreement, it says

9  that Constellation has more or less free rein, as long as they

10  are within that definition, to create entirely new recipes,

11  with no reference to malt or hops or barley.  There is a

12  provision in this agreement, I think it's 215(g), that says

13  that Constellation cannot pour liquor into capital B Beer

14  unless ABI does so first.  That's, of course, a reservation of

15  rights for ABI.  Without that, of course, the parties were

16  concerned that someone might be able to pour rum, or vodka, or

17  tequila, or whiskey into, quote unquote, beer, so malt

18  beverage, traditional beer, etc., and still be covered by the

19  license.

20          This is an extremely expansive definition.  And given,

21  your Honor, that the parties, sophisticated, clearly --

22  Anheuser-Busch is the biggest beer maker in the world -- came

23  together, used lowercase B beer, used lowercase MB malt

24  beverage, included versions as well, and now come to court and

25  claim that they weren't including beverages, that are regulated

L6G8CERA

1    and treated by the government and by the parties as exactly

2    those things, is a departure that, we would submit, is

3    unreasonable in light of the language of the contract.

4             THE COURT:  I think I have your point.

5             MR. ATKINSON:  OK.

6             THE COURT:  Mr. Steinberg.

7             Thank you, Mr. Atkinson.

8             MR. STEINBERG:  Your Honor, I have a couple of slides

9    that I have prepared, if that's acceptable, your Honor.

10            THE COURT:  Yes.

11            MR. STEINBERG:  Your Honor, we are here today on a

12   motion to dismiss at the very commencement of an action.  And

13   the question that the Court is going to have to grapple with on

14   today's motion is whether or not Modelo has plausibly alleged

15   that a sugar-based Corona Hard Seltzer is not included in the

16   sublicense definition of beer.  And I think on a motion to

17   dismiss, particularly, I don't think there is much doubt that

18   the motion has to be denied.

19            I am going to talk about four things today.

20            THE COURT:  There is one thing you can all agree on,

21   and that is that you're both certain of your positions.

22            MR. STEINBERG:  Your Honor, I am sure everybody feels

23   about it as passionately as we do, but we think we have the law

24   on our side on this motion.

25            I would like to first talk about the parties' choices,

L6G8CERA

because the parties had choices.  I also want to talk about the

plain meaning of beer, lowercase B and lowercase version.  And

then talk about Constellation's efforts to avoid that, which we

believe are flawed.  And, finally, a point that Mr. Atkinson

didn't raise is, the question is whether or not this can, and

the trade uses and the trade names, qualifies as a

Mexican-style beer.  A point that requires consumer testing to

actually understand because that's the phraseology of the

agreement.

So, in my perspective, the parties had a number of

choices that had to be made when evaluating what to do under

this contract.  And they had a lot of choices.

So, of course, they had the possibility of a bespoke

definition, the plain language, and not using any regulatory

world.

They, of course, had the choice, too, of using a

regulatory definition, like the Internal Revenue Code, or the

New York alcohol and beverage code.  They had those choices,

and they were certainly available to them.

Similarly, they had the choice of the DOJ complaint,

which defined beer to include flavored with hops and coming

from malted cereal.  Similarly, they had the DOJ final judgment

that also had an alternative definition.  And under both of

those definitions, by the way, Corona Hard Seltzer would not be

determined to be a beer.

L6G8CERA

1          Finally, there is the TTB, which has its own

2    definitions of malt beverage.  And under that definition, it

3    would not be a malt beverage either.

4          So I think there are a series of choices that the

5    parties had, and the parties did make a choice, but they

6    rejected and did not adopt any of these other alternatives.

7          So what did the parties do instead?  The parties

8    actually set forth how this sublicense was going to be

9    construed.  And the parties had a section in the sublicense,

10   following the definitions, talking about the construction of

11   that agreement and said, unless the context otherwise requires,

12   references to statutes shall include all regulations

13   promulgated thereunder, and except to the extent specifically

14   provided below, references to statutes or regulations shall be

15   construed as including all statutory and regulatory provisions

16   consolidating, amending, or replacing a statute or regulation.

17         If the parties wanted to invoke a regulatory regime,

18   they knew exactly how to do it, and the contract told them how

19   to do it.  And that's what they did for several examples.  We

20   have just highlighted three here.

21         First, in a trademark license agreement, of course you

22   are going to talk about what is confusingly similar.  And

23   there, the parties referred to the federal trademark law.  And

24   they were quite specific about it, as determined by in federal

25   courts in the state of New York.  So the Ninth Circuit's law on

L6G8CERA

1      that is going to be immaterial.  They were being precise.

2              Similarly, abandonment.  If someone abandons the mark,

3      they are going to use the federal test for abandonment.

4              And similarly, if there is a bankruptcy, they are, as

5      well, going to use the bankruptcy code.

6              So the parties had a method, the parties had a tool,

7      had they wanted to do that.

8              And the parties, when we agreed with Mr. Atkinson, of

9      course, these are very sophisticated parties; they were

10     creating the third largest beer company in the United States

11     through this very transaction.  And the parties used -- I can't

12     emphasize this enough -- they used the first four words of the

13     Internal Revenue Code and struck the rest.  The parties did not

14     adopt the parts of the Internal Revenue Code which

15     Constellation finds to be critical, the ability to substitute.

16     That aspect was removed.

17             And, of course, the contract was both broader than the

18     Internal Revenue Code definition, because this allowed the

19     parties to also have nonalcoholic versions.  So a nonalcoholic

20     version of a Corona Extra or a Corona Light.  But it also, too,

21     was narrower because we removed substitutes from that

22     definition.

23             So here, again, the parties were certainly

24     knowledgeable about this definition and made clear that they

25     departed from it.  And just because there is a regulatory

L6G8CERA

1    scheme out there, that doesn't mean that the parties *ipso facto*

2    always adopt it no matter what, no matter how.  The parties

3    always have choices, and the parties could exercise their

4    choices, which is what they did here.

5            Let's go to the next.

6            One other brief thing.  There has to be meaning to

7    this at some point.  They want to argue that a malt beverage,

8    they say now -- in their papers, principally, this was a beer

9    lowercase B.  But now it has evolved into a malt beverage.  But

10   there is no malt in what they want to have as a malt beverage.

11   They have, I guess, a non-malt version of a malt beverage,

12   which seems to violate any norm of what is the thing we are

13   talking about in the first instance.  And again, that's not

14   what the parties negotiated for, it's not what the parties

15   adopted, and it shows the rejection of that type of logic, that

16   type of position.

17           Now, how do we interpret this contract?  And why

18   shouldn't we use the plain and ordinary language?  Everyone

19   knows what a beer is.  Beer has hops, it has cereal, and it is

20   flavored.  It is malted and flavored with hops.  That's what

21   the Webster's Third New International Dictionary says.

22   Webster's New Twentieth Century defines it as an alcoholic

23   beverage made by brewing and fermentation from cereals, usually

24   malted barley, and flavored with hops and the like for a

25   slightly bitter taste.  The American Heritage Dictionary says

L6G8CERA

1    it's a fermented alcoholic beverage brewed from malt and

2    flavored with hops.  Those are what beers are.

3            Now, the Minnesota Court of Appeals looked at this

4    very question, asked the question, Well, what is a beer?  And

5    they specifically rejected the notion that the Internal Revenue

6    Code should control.

7            Now, we are not citing this case as controlling

8    authority because it's not.  It's the Court of Appeals of

9    Minnesota, and we don't think it is controlling.  But we think

10   it is helpful and instructive that a court, looking at this

11   question, would go back to the plain meaning and would not look

12   at the tax code to supply an answer that no one else is

13   supplying.

14           But what I think is most critical to today's

15   conversation, your Honor, is that the very two statutes that

16   they want to adopt -- the Internal Revenue Code or the New York

17   Tax Law -- themselves use lowercase B beer.  And, of course,

18   statutes, and we cited in our brief the *Deutsche National Bank*

19   case just because it's such an obvious point, but statutory

20   interpretation must begin with the plain language, giving all

21   undefined terms their ordinary meaning.

22           Beer is beer.  We know what it is.  We know what it

23   tastes like.  And we know what comes in this can, the liquid

24   inside here, does not look, does not taste, does not pour, does

25   not have any of the sensory attributes attributable to a beer.

L6G8CERA

```
1          I am fine that the person walking into the pub, they
2    would be disappointed if they asked for a beer and got a hard
3    seltzer.  Similarly, a person asking for a hard seltzer would
4    also be disappointed if they got a beer.  The two are distinct
5    items.
6          I would remind the Court, although it's clearly in the
7    mind of the Court, when they applied and they used Modelo's
8    name to apply to United States PTO, they said a couple of
9    things about it.  First of all, they said that it excludes
10   beer.  They said that their product was going to be a hard
11   seltzer that excludes beer.  And then they called it a malt
12   beverage, too.  But it has no malt, it excludes beer, and
13   Corona Hard Seltzer is not a defined term, it's not part of the
14   agreement.  There is nothing in there that identifies that a
15   sugar-based version of a beverage would qualify here.
16        THE COURT:  Why did it take your client so long to
17   make the claim?
18        MR. STEINBERG:  First of all, it's well within the
19   statute of limitations period.
20        THE COURT:  No one is talking about the statute of
21   limitations.
22        MR. STEINBERG:  A couple of things.  When they
23   originally filed, and this is beyond the motion, of course, but
24   when they filed, they told us in those filings that it was a
25   malt beverage, and we had to look.  We have agreed in the past,
```

L6G8CERA

1   if it is malt beverage, that's what the contract says, that's

2   what we will allow.

3         There is actually a long history about flavored malt

4   beverages under the alcohol laws, which I won't bore you with.

5   But we were fine.  Malt beverage.  OK, they can do.  And we

6   worked with them to produce it.  So the notion that we are

7   squashing innovations is not borne out by the facts, remotely.

8         So we worked with them and allowed it to come to

9   market.

10        THE COURT:  It's only the successful innovation that

11   you're upset about.

12        MR. STEINBERG:  No.  We are upset about the innovation

13   that belongs to us.  This is our product.  This is Modelo's.

14   This is outside of that agreement.  And it is up to Modelo, not

15   Constellation, to bring a product like this to market, should

16   it decide to do so.  But it is Modelo's.  And it is not

17   Mexican-style.

18        So what took so long?  We did have a little bit of a

19   pandemic, which required us to re-innovate our entire business

20   structure for Modelo and Anheuser-Busch.  Bars went away.

21   Sporting events went away.  We had to change an enormous amount

22   of circumstances.  So those issues, involving the health, the

23   safety, and the welfare of the business, those took priority at

24   a time when those priorities were important.

25        There is a procedure under the agreement.  There is an

L6G8CERA

1    ADR.  That took time.  So it's not like we just sat around and

2    did nothing.  We had a full-on ADR, which was confidential, and

3    we met that as a prerequisite to bringing suit.

4            All of those, we suggest, it's hardly unreasonable

5    delay.  We were working fast.  We had to establish priorities.

6    And we are here today.  We are prepared to go forward.  But I

7    don't believe that there is any type of laches that would apply

8    here, and they are certainly not raising it, nor could they, of

9    course, at this particular point in time.

10           So, again, in their presentation to the USPTO, they

11   called it a malt beverage.  So we had to make sure.  And when

12   did we learn that it didn't?  When we finally got ahold of a

13   can, and it doesn't use the word malt anywhere in this can.  In

14   fact, it says alcohol from sugar.

15           Now, it does say beer.  Beer right there.  It's

16   about -- I need my glasses to read it.  It's good lighting in

17   here so I can definitely read it.  And, by the way, that beer

18   is required so that they can get the lowest tax rate that the

19   United States allows on alcohol.

20           So it was in their economic interest to choose to call

21   it a beer.  And under the Internal Revenue Code, we don't

22   dispute that it would be a beer.  We dispute, however, that the

23   Internal Revenue Code is the body of law you would turn to to

24   evaluate anything related to this particular dispute.

25           So Constellation seems to avoid the parties'

L6G8CERA

1   deliberate choice not to adopt the Internal Revenue Code.   And

2   so, instead, there is supposedly this -- on their opening

3   brief -- consistent regulatory definition.   Well, that was a

4   promise that they couldn't meet.   There was no consistency to

5   that regulatory definition.   And they continue to use words

6   like industry participants, industry terminology.   And yet they

7   don't use the word trade usage, which I find instructive.

8   Because if they used the word trade usage, that would require

9   fixed and invariable terminology.   Not the case here.   It's not

10  the case.   And that's the *Law Debenture* case that we cited to

11  your Honor.

12          One more word to that:   Uniform.   Fixed, invariable

13  and uniform.   They can't possibly meet that standard.   35

14  states, 14 states, whatever they want to say.   And, by the way,

15  the law today is influx.   We cited to your Honor that Oregon

16  started out, this was a wine.   Now, they made it a beer.   OK.

17  But whatever that is, that definition is not uniform.   And it's

18  not surprising either.   Of course, states want to make laws

19  easy.   So if they are going to adopt the United States Code on

20  taxation, it makes it easy.   It makes it easy for

21  manufacturers.   But not all states do it.   And that was the

22  point.

23          So it can't be trade usage.   So instead of being trade

24  usage, they have the *Hugo Boss* argument.   Let me get to *Hugo*

25  *Boss* first because it's the Second Circuit.   But in *Hugo Boss*,

L6G8CERA

there were a couple of really important points.

First of all, in *Hugo Boss*, the meaning -- this was an insurance case determining a trademark slogan, what a trademark slogan meant under an exclusion in an insurance contract. And with that potentially ambiguous phrase, the trial court had considered slogan alone as the definition, and the Second Circuit said, no, it's potentially ambiguous because of this trademark slogan. Trademark slogan refers to federal law. And, by the way, the vast majority of the courts of appeal had determined already what the meaning of trademark slogan was, so you're going to be saddled with that definition.

That has nothing to do with this case. And *Hugo Boss* only established, by the way, a presumption of that, that that's what the parties selected as a presumption. That's not the case here. First of all, it's not ambiguous. No one is claiming the word beer has any ambiguity in this context. Nor are they claiming malt beverage has any ambiguity. Malt beverage requires malt. It's as simple as that.

Now, instead, when you are looking at the *Hugo Boss* case, *Hugo Boss* says, OK, we are going to presume that the parties meant to rely upon the federal trademark law. Of course, they were interpreting an insurance contract that was dealing with incidents and events that would trigger trademark liability. So, of course, it was a very close connection between the body of federal law that they were going to look

L6G8CERA

1   at.  Not so here.  I am still puzzling myself over what is the

2   connection between United States tax laws and a sublicense of

3   trademarks?  I don't get it.  There is a tax provision in the

4   sublicense agreement.  It makes no mention of this.

5          In fact, we are back to the question that I started

6   out with, which is, did the parties reject that, as they are

7   free to do under the *Boss* case.  We actually cited a case

8   called *Setlow*, your Honor.  And in *Setlow*, after looking at

9   *Hugo Boss*, the *Setlow* court said, hey, if you use a defined

10  term, and define it differently, we are not going to impose the

11  *Hugo Boss* presumption upon you.  And that's exactly what

12  happened here, your Honor.  We had the construction, Section

13  1.2.  Section 1.2 says, if you are going to incorporate a

14  statute, go ahead and do it.  And then we had a defined term

15  for what is beer.  That defined term does not reference, does

16  not do anything with respect to the tax code.  And, again,

17  that's assuming that you would look at the tax code.  It seems

18  quite puzzling.

19         So for that reason, we reject the notion that the

20  parties have somehow incorporated, but it's more than that.

21         Let's go to reason number 2, Colin.

22         Also, the statutory schemes themselves do not import a

23  great expansiveness.  Each of these provisions say, For

24  purposes of this chapter.  Not, For purposes of all contracts

25  made in the state of New York.  No.  For purposes of this

L6G8CERA

1   chapter.  And where a plain meaning of a statute restricts the

2   use in the definitions, well, then, they are going to honor

3   that.

4          Now, admittedly, in the *Murphy* context, a case we

5   cited, that was two competing statutory schemes.  But there is

6   really effectively no difference.  Why would you say, if it's

7   for purposes of this part, that you could use it more broadly?

8   And we have cited, to that end, your Honor, we have cited

9   Corbin on Contracts.  And Corbin says that statutory

10  glossaries, which give definitions of words and phrases, are

11  intended to be used to interpret the particular statutes and

12  not to interpret contracts made by individuals.  In other

13  words, you can't import those into a private contract.

14         THE COURT:  Well, it can be some evidence, can't it?

15         MR. STEINBERG:  It could certainly be evidence, your

16  Honor.  It could be.  But you have to look at the contract as a

17  whole and determine whether or not they have rejected those

18  statutory glossaries, as I think the record here is fairly

19  clear.  Again, the parties used the first four words of the

20  federal tax code and then got rid of the rest.

21         So I think on that ground alone, we have sort of moved

22  past the incorporation by reference, or, as I like to say,

23  incorporation-by-silence argument that Constellation is making.

24         So let me -- and I have already discussed this, that

25  they are sort of flirting with the trade usage, which we think

L6G8CERA

1    can't be done because they don't meet the standard.  And that's

2    why their brief started out saying that there is a constant and

3    uniform treatment for this, which is simply not true.

4              So that brings us --

5              THE COURT:  New York, in fact, has something called

6    the general construction law that by statute defines any number

7    of different terms, doesn't it?

8              MR. STEINBERG:  It does, although I will confess my

9    lack of familiarity with it.

10             THE COURT:  Well, it doesn't have beer listed, but it

11   defines things like property, person, day, month, men.  I

12   imagine it defines women.  Yes, it does.  Village, gender, day.

13   Kind of an interesting fact, isn't it?

14             MR. STEINBERG:  It certainly is, your Honor.

15             And if the parties wish to depart from that, I presume

16   they have to be quite express to say that they are not adopting

17   those.

18             THE COURT:  Well, it underscores your point about not

19   using terms defined in, for example, the New York Tax Law in

20   other contexts as being definitive where the tax law says for

21   purposes of this act, or words to that effect.  That's the

22   reason I raised the issue.

23             MR. STEINBERG:  We are in 100 percent agreement.  We

24   think that "for purposes of this chapter" is a big red warning

25   light to anybody that you can't expect that your contract

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L6G8CERA

1    between private parties is going to impart that definition

2    unless you are express about it.  If you want to be express

3    about it, there is no law that says you can't come up with

4    whatever definition you want.  And the parties here, we agree,

5    are sophisticated parties who had choices available to

6    themselves.

7         So we now then turn to the sort of limitless effort by

8    Constellation to use the word version to mean something that is

9    beyond a beer.  I will say one thing.  There is one thing upon

10   which we agree.  There is the provision, which is

11   2.13(c) -- let me see if I wrote it down -- which allows the

12   parties, if Modelo decides to come out and produce in certain

13   countries a beverage that combines distilled liquor and a beer,

14   we would allow that and that would be permissible under the

15   agreement.  But that point is made expressly in the definition

16   of beer when it says combinations.

17        So if I want to have a beer and tequila combination, I

18   can have it, provided that the other terms of the contract are

19   all adhered to.  But combinations are allowed.  But again,

20   combination is the most obvious reinforcement that it has to be

21   a beer.  But version, too, version as well is also a

22   reinforcement.  The example I like is, I like the chardonnay

23   one, too, but I also like a tricycle is not a car.  They are

24   similar.  They are points of transportation.  There is an

25   engine in one.  There's three wheels.  There's four wheels.

L6G8CERA

1    One is made for a child.  One is made for an adult.  You don't

2    need a license for one.  They are both versions of

3    transportation.

4              THE COURT:  It's funny you mention that example

5    because only last weekend I was present when a big burly guy,

6    with a bandanna around his head and a Harley Davidson shirt,

7    took nearly violent exception to somebody's reference to a

8    three-wheeled vehicle with a sidecar on it as a motorcycle.

9              MR. STEINBERG:  Your Honor, we all have our passions

10   and interests, I would say.

11             THE COURT:  Well, that's not one of mine, but I

12   thought it was apt.

13             MR. STEINBERG:  I would say words have to be given, at

14   the end of the day, their ordinary usage.  I would say, too, if

15   you look at their opening brief, version meant a particular

16   form of something.  By the time of their reply brief, now

17   version is, if just one person calls it a beer, then it's a

18   version of a beer.  But, of course, that violates the rule that

19   says you have to have a reasonable interpretation of agreement.

20   The fact that someone might be confused does not make a Corona

21   Hard Seltzer a version.

22             I will conclude with one last point, which is that

23   this is not a Mexican-style beer.  How do we know that?  Well,

24   the contract itself, the sublicense says, what is a

25   Mexican-style beer?  It's a Beer, capital B, which includes

L6G8CERA

1    lowercase B, bearing the trademarks, i.e., there is the

2    trademark right here, Corona, the Corona crown.  Corona, by the

3    way, in Spanish means crown.  That does not bear any

4    trademarks, trade names, or trade dress that would reasonably

5    be interpreted to imply to consumers in the territory, in the

6    United States, an origin other than Mexico.  So it worked.  I

7    don't have to pay attention to the "imported from Mexico" at

8    the bottom.  I have to pay attention to the trade name and

9    trademarks and the trade dress.

10           So do people seeing cherries with the word sparkling

11   water, does that resonate with them Mexico?  Does the phrase

12   hard seltzer resonate to them Mexico?  I would submit not.  I

13   would submit that clearly consumers would not -- hard seltzers

14   were developed in the United States long after this sublicense

15   was executed, your Honor.  And it is a distinctly American

16   phenomenon.  So we will have that question, but that is not a

17   question that can be resolved on this motion at this time.

18           So absent further questions, your Honor, I will sit

19   down.

20           THE COURT:  Thank you very much.

21           Mr. Atkinson, briefly, please.

22           MR. ATKINSON:  Thank you, your Honor.

23           Mr. Hill, would you mind just putting up slide 2

24   again.

25           So, your Honor, counsel mentioned that the parties had

L6G8CERA

1    rejected these other definitions.  There is, of course, no

2    evidence of that in the record.  But setting that aside --

3              THE COURT:  Other than the fact that they didn't use

4    them.

5              MR. ATKINSON:  They didn't, your Honor.  But they did

6    include a catch-all of "any other versions" in their

7    definition.  That is broader, I believe, than any, if there are

8    any, catch-all provisions in any of these other agreements.

9              Clearly, these other definitions are versions of beer,

10   right?  I mean, these are regulatory definitions of beer that

11   counsel concedes the parties must have had in mind when they

12   were negotiating this contract.  So the parties picked the

13   first four or so words.  They add malt beverages and they say,

14   "and any other versions or combinations of the foregoing."

15             I mean, that is about as broad as it gets.  And

16   counsel has stood up and talked for 30 or so minutes and still

17   has not told us what "versions" means.  If it's not beer, and

18   if it's not malt beverage, then it's not a version of either.

19             Counsel says that a tricycle is not a version of a

20   car.  But that a tricycle and a car are both versions of

21   transportation.  OK.  So Corona Hard Seltzer is a gluten-free

22   version of malt beverage.  They are both also versions of

23   alcoholic beverages.  Corona Hard Seltzer is a version of a

24   beer.  It's regulated as such.  It's referred to as such by

25   industry participants.  The definition, all I am saying, your

L6G8CERA

Honor, is extremely broad, and the use of the word "versions," of course, captures all of these that counsel has indicated expressly the parties rejected in negotiating their agreement.

The red line -- of course, I think your Honor knows this -- that counsel has included in their presentation and in their brief, that's made for litigation. There is no marked-up document in which the parties struck the language from the tax code. I will again say, though, your Honor, that the language we added, the parties here added, at arm's length, after beer, ail, porter, stout included malt beverages and any versions of any of the foregoing. That's broader than any of the definitions we have here.

There was a lot of discussion, your Honor, from counsel about beer. It's capital B Beer. This is the shorthand, I guess, folks are using in this case. But let's not lose sight of malt beverage. Malt beverage is not a term that is used in *Chalet Liquors*. Malt beverage is not a term that counsel has turned today to the dictionary to define. Version is not a term used in *Chalet Liquors*. Versions is not a term that counsel disputes our definition of. If this is a version of a malt beverage, and there is no plausible argument to the contrary, we would submit, just like a gluten-free bread is a version of bread, a gluten-free malt beverage is a version of malt beverage, then these efforts to make this case all about that yellow liquid that comes in the dark glass bottle,

L6G8CERA

1    and that smells and tastes like beer, sort of fall away.  It's

2    more than beer.  In this definition, it's versions of beer,

3    it's malt beverages, and it's versions of malt beverage.

4              So when counsel talks about someone saddling up to the

5    bar and asking for the beer and they get a malt beverage

6    instead, would they be disappointed?  I don't know.  They might

7    not think it's traditional beer.  If they saddled up to the

8    beer and asked for a Corona Refresca and got a Corona Hard

9    Seltzer, I don't think they would notice the difference.  These

10   are versions of malt beverage.

11             The PTO argument likewise.  We made submissions to the

12   PTO.  Counsel focuses on beer.  We didn't classify it as the

13   beer classification.  News flash.  We classified it as the malt

14   beverage classification.  And malt beverage expressly included

15   in the parties' definition.

16             Counsel made an argument that I think is not accurate

17   under the agreement.  Counsel said that, because of the

18   combinations language that you can see here on the screen -- I

19   may have touched it -- because of the combinations language

20   that you see here on the screen, even without Section 215,

21   Corona was permitted to pour distilled liquor into its beer.

22   That's not right.  The definition says, Beer, ail, porter,

23   stout, malt beverages, and any other versions or combinations

24   of the foregoing.  I don't believe counsel is arguing that

25   tequila fits within beer, ail, porter, stout, malt beverages.

L6G8CERA

1    Of course, if he is, all the better for our case. But I don't

2    think he is. I think clearly what is going on in 215, when you

3    read it in conjunction, as you must, with this definition, is

4    that there was a concern that this was broad enough to capture

5    all kinds of different things and they had to dial it back.

6    That's a minor point.

7            On Mexican beer, your Honor, the can, as counsel

8    pointed out, says imported from Mexico. In order to meet the

9    standard under the contract, they must point to something that

10   would reasonably be interpreted to imply to consumers an origin

11   other than Mexico. I mean, it says right there that it's from

12   Mexico. In fact, it is from Mexico. It's produced there.

13   Counsel says that hard seltzer is a uniquely American drink. I

14   don't think beer was developed initially in Mexico. Beer was

15   developed in Germany. So the argument that a hard seltzer is

16   not Mexican is sort of hard to fathom. And, of course, I

17   should add, Corona Refresca has been on the market for a while

18   now. It has never been challenged by ABI. Every argument they

19   have made about this being not a Mexican-style beer would apply

20   to Corona Refresca. They have not made the argument before.

21   It doesn't work and it doesn't work here.

22           Unless your Honor has further questions, I will sit

23   down.

24           THE COURT:  Thank you.

25           I have to say I thank all the lawyers on this case. I

L6G8CERA

1  don't really remember a better developed interpretation

2  argument of a statute or a contract that I have ever seen, and

3  you both did spectacular jobs, and I appreciate it, and I

4  admire it, I will tell you frankly.  And I never said anything

5  like that before.  Just ask the people I used to practice law

6  with.

7          You have both proven the accuracy of Justice

8  Frankfurter's famous statement that words can be empty vessels

9  into which one can pour anything you will.  And you have both

10 not only poured an awful lot into these words, but you have

11 raised quite a head on the glass.

12         I started reading the papers, which are enormously

13 persuasive on both sides, and initially thought that this was a

14 very complicated case.  And I practiced years back with a

15 lawyer who said, when things seem to be that complicated, if

16 they are going to be solved, there is a simple answer and your

17 job is to find it.  And the short answer is that there are

18 enormously well stated and strong arguments on both sides, but

19 they are arguments about how the word and the clause in the

20 contract should be construed.  And it is not, in my judgment, a

21 question of law; it is almost certainly a question of fact.

22 And I am denying the motion to dismiss because there is a

23 perfectly reasonable and plausible argument for the plaintiff.

24 It may or may not prevail in this case because there are

25 perfectly reasonably and strong arguments for the defendant.

L6G8CERA

1          So that's where I am coming out.  I don't know if we

2     will ever get to a summary judgment stage in this case.  And I

3     won't prejudge that because I could imagine records that would

4     be very strong one way or the other.  But I think it's time to

5     talk about a schedule and conceivably a trial date.  So let me

6     hear what you think about how long it will take you to get to

7     that point.

8          Mr. Steinberg.

9          MR. STEINBERG:  I would think that we could be at a

10    summary judgment point by June of next year, a year from today.

11         THE COURT:  Mr. Atkinson.

12         MR. ATKINSON:  Your Honor, I don't expect it would

13    take that long.

14         THE COURT:  Neither do I.

15         MR. ATKINSON:  But we are prepared to confer with

16    plaintiff.  Our expectation is we can do it in less time than

17    that, let's call it half that time.

18         THE COURT:  Mr. Steinberg, explain to me, what is

19    going to take a year?

20         MR. STEINBERG:  Your Honor, I am sort of of the school

21    that things actually are always slower, that lawyers are really

22    bad at estimating.

23         THE COURT:  Not in this courtroom.

24         MR. STEINBERG:  I usually take my initial estimation

25    and multiply it by two because I always make it too short.

L6G8CERA

1    Look, I'm the plaintiff.  If you gave me a trial date three

2    weeks from now, I would go to trial three weeks from now.  So I

3    am happy with a much earlier date.  I have one other

4    significant series of trials that come in that sort of March,

5    April, May period that are in Texas, but other than that, I am

6    at the Court's discretion to take on this case and move it

7    forward.

8            THE COURT:  How much discovery does there need to be?

9            MR. STEINBERG:  We think as to the interpretation

10   issues, not so great.  There is going to be some discussion and

11   there will be, of course -- I don't think it should be that

12   much.  Then the question about remedy and damages and all of

13   that, that will be more significant.  That will take a while to

14   develop because I don't know if they are going to have a button

15   that I can push and they will tell me every cent that they have

16   made and every cost.  My experience is that that type of

17   information is hard to pry out of a corporation's records and

18   that it's not the easiest thing in the world, especially in

19   these types of cases.

20           THE COURT:  Suppose damages were severed?

21           MR. STEINBERG:  That actually was an idea that we had

22   floated with the plaintiff.  We thought it would be best,

23   especially given the overhang of their competitive view that we

24   are somehow bullies here.  But I don't need to see their

25   financials until we are past summary judgment.  I would be

L6G8CERA

1    happy to have a much shorter period to get to summary judgment,

2    let's say by January, and proceed in that way.  Then, assuming

3    we pass that, then we will deal with where we are on damages

4    and other remedies.

5                 THE COURT:  Mr. Atkinson.

6                 MR. ATKINSON:  Your Honor, might I suggest that the

7    parties confer?  What I am hearing from counsel is that there

8    may be common ground here.  We may be able to reach an

9    agreement on the appropriate way to proceed.  I would like to

10   confer with my client, for example, on the question of whether

11   to bifurcate the analysis, the liability versus damages.  Our

12   expectation is that we could move to summary judgment with some

13   haste, that this will not take a year in discovery, but I would

14   ask the Court's permission to confer with my adversary and get

15   back to you promptly with a proposal.

16               THE COURT:  Well, it's not unreasonable.  Today is

17   Wednesday.  Can you get back to me by, say, Tuesday?

18               MR. ATKINSON:  Yes, your Honor.

19               MR. STEINBERG:  Yes, your Honor.

20               THE COURT:  I would like a joint letter, and we will

21   take it from there.

22               I meant all the nice things I said.

23               MR. STEINBERG:  Thank you, your Honor.

24               MR. ATKINSON:  Thank you.

25               (Adjourned)