**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CERVECERÍA MODELO DE MÉXICO, S. DE R.L. DE C.V. and TRADEMARKS GRUPO MODELO, S. DE R.L. DE C.V., <br><br> Plaintiffs, <br><br> v. <br><br> CB BRAND STRATEGIES, LLC, CROWN IMPORTS LLC, and COMPAÑÍA CERVECERA DE COAHUILA, S. DE R.L. DE C.V., <br><br> Defendants. | Case No. 1:21-cv-01317-LAK |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**KIRKLAND & ELLIS LLP**
Sandra C. Goldstein, P.C.
Stefan Atkinson, P.C.
Daniel R. Cellucci
Amal El Bakhar
Jenny Lee
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
sandra.goldstein@kirkland.com
stefan.atkinson@kirkland.com
dan.cellucci@kirkland.com
amal.elbakhar@kirkland.com
jenny.lee@kirkland.com

*Counsel for Defendants*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

FACTUAL BACKGROUND ................................................................................... 5

    A.    The Parties. ............................................................................................ 5

    B.    The Sublicense Gives Constellation Expansive Innovation Rights. ....................... 6

    C.    Constellation Releases Brand Extension Beers Under The Sublicense. ................. 7

LEGAL STANDARD............................................................................................. 11

ARGUMENT ......................................................................................................... 12

I.    EVEN ACCEPTING ABI'S UNDULY NARROW DEFINITION OF "BEER," THE CBI PRODUCTS UNAMBIGUOUSLY FALL WITHIN THE SCOPE OF THE SUBLICENSE.................................................................................... 13

    A.    Constellation Is Entitled To Summary Judgment Even Accepting ABI's Proposed Definition Of Lowercase "b" Beer And "Malt Beverage." ................. 14

    B.    ABI's Proposed "Beer Emulation" Standard Confirms The CBI Products Are Permitted Under The Sublicense. ................. 20

    C.    ABI's Supposed "Industry Custom" Opinions On The Meaning Of "Version" Do Not Create A Triable Issue of Fact. ................. 22

II.    SUMMARY JUDGMENT IS WARRANTED BECAUSE THE PREVAILING REGULATORY DEFINITION OF "BEER" INCLUDES THE CBI PRODUCTS........ 25

    A.    The Sublicense Must Be Read By Reference To The Prevailing Federal Definition of "Beer," Which Includes The CBI Products.................................... 26

    B.    State Regulatory Alcohol Beverage Definitions Further Confirm The CBI Products Are, At Least, A Version of "Beer" or "Malt Beverage." .................... 29

    C.    The Sublicense Does Not Reject Prevailing Regulatory Definitions of "Beer." ................................................................................................ 31

III.    SUMMARY JUDGMENT IS WARRANTED BECAUSE ABI HAS NOT RAISED A TRIABLE ISSUE OF FACT AS TO WHETHER THE CBI PRODUCTS MEET THE DEFINITION OF "MEXICAN-STYLE BEER." ................. 33

CONCLUSION...........................................................................................................................35

**Page(s)**

**Cases**

*Alt. Energy Inc. v. St. Paul Fire & Marine Ins. Co.*,
    311 F.3d 450 (1st Cir. 2002) ................................................. 15

*Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*,
    2021 WL 6060710 (2d Cir. Dec. 20, 2021). .......................... 12

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................ 11

*Banco de La Republica de Colombia v. Bank of New York Mellon*,
    2013 WL 3871419 (S.D.N.Y. July 26, 2013) ................. *passim*

*Beazley Ins. Co., Inc. v. ACE Am. Ins. Co., et al.*,
    197 F. Supp. 3d 616 (S.D.N.Y. 2016) ........................... *passim*

*Beazley Ins. Co., Inc. v. ACE Am. Ins. Co., et al.*,
    880 F.3d 64 (2d Cir. 2018) ............................................ 12, 25

*In re Bernard L. Madoff Inv. Secs. LLC*,
    773 F.3d 411 (2d Cir. 2014) ................................................ 15

*Canon Inc. v. Tesseron Ltd.*,
    146 F. Supp. 3d 568 (S.D.N.Y. 2015) ................................. 17

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
    539 U.S. 23 (2003) ............................................................. 34

*DBT Gmbh v. J.L. Min. Co.*,
    544 F. Supp. 2d 364 (S.D.N.Y. 2008) ................................ 23

*Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*,
    284 F. Supp. 987 (S.D.N.Y. 1968) ..................................... 26

*Fleischmann Distilling Corp. v. Maier Brewing Co.*,
    314 F.2d 149 (9th Cir. 1963) .............................................. 20

*Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*,
    716 F.3d 302 (2d Cir. 2013) .......................................... 16, 24

*Greenwich Capital Fin. Prod., Inc. v. Negrin*,
    903 N.Y.S.2d 346 (N.Y. App. Div. 2010) ........................... 19

*Harris v. Simon & Schuster, Inc.*,
    646 F. Supp. 2d 622 (S.D.N.Y. 2009) .................................................................13

*Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*,
    252 F.3d 608 (2d Cir. 2001) ............................................................ *passim*

*Idaho Potato Comm'n v. M&M Produce Farms & Sales*,
    2010 WL 11712586 (S.D.N.Y. Feb. 17, 2010) .....................................................34

*Innophos, Inc. v. Rhodia, S.A.*,
    832 N.Y.S.2d 197 (N.Y. App. Div. 2007) ...........................................................16

*Kelly v. Honeywell Int'l*,
    933 F.3d 173 (2d Cir. 2019) .......................................................................14, 24

*NYU v. Galderma Labs., Inc.*,
    689 Fed. App'x 15 (2d Cir. 2017) ......................................................................12

*In re Omega SA*,
    494 F.3d 1362 (Fed. Cir. 2007) ..........................................................................31

*Phil. Indem. Ins. Co. v. Streb, Inc.*,
    487 F. Supp. 3d 174 (S.D.N.Y. 2020) ................................................................23

*Quattlander v. Ray*,
    2021 WL 5043004 (S.D.N.Y. Oct. 29, 2021) .....................................................11

*Reinhardt v. Wal-Mart Stores, Inc.*,
    547 F. Supp. 2d 246 (S.D.N.Y. 2008) ................................................................12

*Rivera v. Amica Mut. Ins. Co.*,
    91 A.D.3d 562 (N.Y. Sup. 2012) .......................................................................24

*Robinson v. U.S.*,
    80 U.S. 363 (1871) .............................................................................................25

*Spinelli v. Nat'l Football League*,
    903 F.3d 185 (2d Cir. 2018) .......................................................................12, 16

*Saint Laurie Ltd. v. Yves Saint Laurent Am., Inc.*,
    2015 WL 12991205 (S.D.N.Y. Mar. 27, 2015) ..................................................17

*Terwilliger v. Terwilliger*,
    206 F.3d 240 (2d Cir. 2000) ...............................................................................17

*Thompson v. Mun. Credit Union*,
    2022 WL 2717303 (S.D.N.Y. July 13, 2022) .....................................................15

*Towl v. Est. of Block*,
    546 N.Y.S.2d 924 (N.Y. Sup. Ct. 1989) ......................................................19

*U.S. v. Gonzalez*,
    520 U.S. 1 (1997) ......................................................................................16

*Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*,
    807 N.E.2d 876 (N.Y. 2004) ......................................................................19

**Statutes, Rules, & Other Authorities**

Fed. R. Civ. P. 56 ..............................................................................................11

26 U.S.C. § 5052 ..........................................................................................29, 32

21 C.F.R. § 101.3 ..............................................................................................29

27 C.F.R. § 25.11 ........................................................................................27, 32

27 C.F.R. § 25.15 .........................................................................................*passim*

27 U.S.C. § 211(a)(7) ........................................................................................28

27 C.F.R. § 7.10 ................................................................................................28

27 C.F.R. § 7.6 ..................................................................................................29

27 C.F.R. § 25.142(a) ...................................................................................29, 33

Ark. Admin. Code § 006.02.1-1.4 ....................................................................32

Cal. Bus. & Prof. Code § 23006 ......................................................................32

Ky. Rev. Stat. Ann. § 241.010(38) ...................................................................32

Me. Stat. tit. 28-A § 2(18) (2021) ...................................................................32

N.Y. Alco. Bev. Cont. § 3(3) ......................................................................30, 32

N.Y. Tax Law § 420(5) ...............................................................................30, 32

N.Y. Comp. Codes R. & Regs. tit. 9 § 84.1(f) ................................................30

*Version*, Oxford Languages, https://www.lexico.com/en/definition/version ..........................15

*Version*, Concise Oxford English Dictionary (11th Ed. 2008) ............................15

*Version*, New Oxford Dictionary (1st ed. 1998) ................................................15

## TABLE OF DEFINED TERMS

| Abbreviation | Meaning |
|---|---|
| ABI | Anheuser-Busch InBev and its affiliates |
| CBBS | Defendant CB Brand Strategies, LLC |
| CBI Products | Corona Hard Seltzer (including Variety Pack #1, Variety Pack #2, Limonada, and Seltzerita) and Modelo Ranch Water |
| CBP | U.S. Customs and Border Protection |
| Cervecería Modelo | Plaintiff Cervecería Modelo de México, S. de R.L. de C.V. |
| CCC | Defendant Compañía Cervecera de Coahuila, S. de R.L. de C.V. |
| Constellation | Constellation Brands, Inc. and its affiliates |
| Crown | Defendant Crown Imports LLC |
| Defendants | Crown Imports LLC, CB Brand Strategies, LLC, and Compañía Cervecera de Coahuila, S. de R.L. de C.V. |
| FAA | Federal Alcohol Administration Act |
| HTSUS | Harmonized Tariff Schedule of the U.S. |
| IRC | Internal Revenue Code |
| Plaintiffs | Cervecería Modelo de México, S. de R.L. de C.V. and Trademarks Grupo Modelo, S. de R.L. de C.V. |
| TAC | Third Amended Complaint and Demand for Jury Trial, Dkt. 104 |
| Trademarks Grupo Modelo | Plaintiff Trademarks Grupo Modelo, S. de R.L. de C.V. |
| TTB | Alcohol and Tobacco Tax and Trade Bureau |
| USPTO | U.S. Patent and Trademark Office |

Defendants respectfully submit this memorandum of law in support of their motion for summary judgment on each of Plaintiffs' claims.

## INTRODUCTION

The question presented in this case is whether the expansive and perpetual rights granted to Constellation under the Sublicense to innovate new "Beer" bearing Corona- and Modelo-derived trademarks cover the CBI Products. No reasonable juror could conclude that they do not.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████ The only point of disagreement, in fact, is whether the definition of "Beer" in the Sublicense contains an implied requirement that malted grain be included as an ingredient in Constellation's new Brand Extension Beers. Critically, that supposed requirement — on which ABI builds its entire case — appears nowhere in the Sublicense. ABI could have negotiated for such a malt requirement, just like ABI negotiated rules concerning distilled spirits, but it did not. In fact, the Sublicense says the opposite: Constellation has the "sole discretion" to determine the ingredients and recipes for its new Brand Extension Beers. (Sublicense §§ 1.1, 2.15(a).)[1]

The parties urge different interpretations of the word "Beer" in the Sublicense. "Beer" is defined broadly to include not only "beer, ale, porter, stout, [and] malt beverages," but also "any other versions or combinations of the foregoing." (*Id.* § 1.1.) The CBI Products are made from

---

[1] A true and correct copy of the Amended and Restated Sublicense ("Sublicense") that is at issue in this case is attached as Exhibit 6 to the Declaration of Amal El Bakhar filed contemporaneously with this motion ("AEB Decl."). Defendants have also included the most relevant Sublicense provisions in the Rule 56.1 Statement of Material Facts In Support of Defendants' Motion for Summary Judgment ("SOF"), also filed contemporaneously with this motion. Those provisions are found at Paragraphs 14-32 of the SOF.

fermented cane sugar, which TTB — the primary U.S. regulator with nationwide jurisdiction over beer production, formulation, importation, and wholesale — has determined means the products are "beer." (SOF ¶¶ 72-73, 109.) ABI claims that the use of cane sugar is a problem under the Sublicense because, according to ABI, the ordinary meaning of lowercase "b" "beer" is a product made with malted grain and flavored with hops and the ordinary meaning of "malt beverage" is a product made with malted grain (whether or not made or "flavored with hops"), while "version" apparently is a technical, industry term of art that includes only subcategories of specific "beer styles" such as a New England IPA. Constellation disagrees with ABI's proposed interpretation, which would give a supposed "ordinary" meaning to regulatory terms ("beer, ale, porter, stout" and "malt beverages") and supposed technical meaning to a lay term ("version"). Importantly for the purposes of this motion for summary judgment, however, the CBI Products unambiguously qualify as "Beer" under either party's proposed interpretation.

First, even if the Court accepts ABI's definitions of "beer" and "malt beverage," the CBI Products still fall squarely within the definition of "Beer." Under settled rules of contract interpretation, the expansive clause "any other versions or combinations" cannot mean the same thing as lower-case "b" "beer" or "malt beverage." Instead, the language "any other versions or combinations" must have meaning. Those words unambiguously expand the scope of permissible products to include products that differ in some respects from what ABI thinks the terms lowercase "b" "beer" and "malt beverage" mean. Any other interpretation reads the phrase "any other versions or combinations" out of the contract. "Any other version" of ABI's view on "beer," reasonably construed, covers products regulated as "beer" by TTB, all of which have been deemed sufficiently similar to merit equal treatment under a host of regulations applying to, for example, permissible ingredients, formulation, brewing processes, brewery operations, and equipment.

That is not to say that the phrase "any other versions or combinations" is limitless. To the contrary, the parties negotiated express limits on permissible "Brand Extension Beers." Constellation cannot make a Brand Extension Beer with distilled spirits unless Modelo does so first in Mexico or Canada. (Sublicense § 2.15(c).) Constellation's "entirely new Recipes" for its Brand Extension Beers must be made with "yeast cultures." (*Id.* § 1.1, 2.15(a).) Constellation must assign its Brand Extension Beers brand guidelines and quality standards to ensure that they meet "any applicable regulatory standards" and are merchantable, consistently produced and marketed, and free from defects. (*See id.* §§ 1.1, 2.15(a), 3.4.) And Constellation cannot use trademarks, trade names, or trade dress that would be reasonably interpreted to imply an origin other than Mexico. (*Id.* §§ 1.1, 2.15(a).) These express limitations on Constellation's otherwise "sole discretion" to develop "entirely new Recipes" — which do not include *any* reference to malt (or hops) — confirm that the parties intentionally omitted any such requirement.

During discovery, ABI has been forced to concede that Constellation is correct: there is no malt or hops requirement in the Sublicense. Indeed, ███████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████ Applying this "emulation" standard to the full definition of "Beer," however, the CBI Products are permitted under the Sublicense. ████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

██████████████████████████ In sum, even adopting ABI's construction of "Beer," the Sublicense unambiguously permits the CBI Products and summary judgment in favor of Constellation is warranted. The CBI Products are either "version" of "beer" or, applying ABI's proposed "emulation" rule, a gluten-free "version" of "malt beverage."

*Second*, while no further analysis is needed to rule in Defendants' favor, Constellation's interpretation of "Beer" properly takes into account prevailing, nationwide regulatory definitions, which make that clear the CBI Products are permitted. The prevailing federal regulatory definition of "beer" — which applies across the U.S. beer industry to production, formulation, importation, and excise taxation — includes all products fermented from malted barley or any recognized substitute, including sugar. (SOF ¶ 70-75.) Indeed, the primary alcohol beverage regulator in the United States, TTB, mandates that anyone making a beverage like the CBI Products in the United States *must* obtain a "brewer's notice" to brew such "beer" at a "brewery." (SOF ¶ 78.) Because this prevailing definition of beer is so longstanding and uniformly applied, the States largely track this understanding. (SOF ¶ 66.) It is undisputed that the CBI Products meet the prevailing federal definition of "beer." (SOF ¶ 109.) There also is no genuine dispute that the CBI Products are regulated like any other beer in the *vast* majority of the States. (SOF ¶¶ 122-179.) Highly-sophisticated beer makers like ABI and Constellation would not silently reject that well-understood meaning of "beer" in favor of some restrictive, supposed man-in-the-pub understanding of "beer." Provided that a product meets the prevailing regulatory definitions of "beer" or "malt beverage" and does not violate express limits on Constellation's otherwise "sole discretion" to innovate "entirely new Recipes," that product meets the parties' definition of "Beer."

*Finally*, ABI's claim that Constellation breached the Sublicense because the CBI Products are not "Mexican-style Beer" is meritless. Under the Sublicense, Constellation cannot use

trademarks, trade names, or trade dress on a Brand Extension Beer that can "reasonably be interpreted to imply to consumers . . . an origin *other than* Mexico." (Sublicense §§ 1.1, 2.15(a)).) The record shows that the CBI Products' packaging cannot reasonably be interpreted to imply to consumers an origin *other than* Mexico, not least because the products expressly state that they are "IMPORTED FROM MEXICO." (SOF ¶ 259.) While ABI takes the view that this Court can determine whether the CBI Products are "Mexican-style Beer" only by reference to consumer surveys, the surveys of both parties' experts in fact confirm that summary judgment in favor of Constellation is appropriate. (SOF ¶¶ 262-66.)

Constellation's motion for summary judgment should be granted in full.

## FACTUAL BACKGROUND

### A.     The Parties.

Plaintiff Cervecería Modelo is a Mexican corporation and producer of certain alcoholic beverages, including the Corona, Modelo, Pacifico, and Victoria brands for sale outside the Territory. (SOF ¶ 1.) Plaintiff Trademarks Grupo Modelo is a Mexican corporation and the holder of certain intellectual property rights, including those licensed in the Sublicense. (SOF ¶ 3.) Both Plaintiffs are subsidiaries of ABI, Constellation's counterparty to a Stock Purchase Agreement, which agreement obligated ABI to cause Modelo to execute the Sublicense. (SOF ¶¶ 33-36.)

Defendants are each subsidiaries of Constellation. (SOF ¶ 11.) CBBS is a manufacturer of alcohol beverages and is the successor by assignment to Constellation Beers Ltd., a signatory to the Sublicense. (SOF ¶ 6.) Crown imports Modelo- and Corona-brand beers for sale within the United States, including Corona Hard Seltzer and Modelo Ranch Water. (SOF ¶ 7.) CCC brews and packages Modelo- and Corona-brand beers for export to the U.S. market, including Corona Hard Seltzer and Modelo Ranch Water. (SOF ¶ 9.)

## B.    The Sublicense Gives Constellation Expansive Innovation Rights.

Among other rights, the Sublicense affords Constellation perpetual and exclusive rights to innovate new products bearing Corona- and Modelo-derived trademarks, subject only to narrow, express restrictions.  Specifically, Section 2.15(a) allows Constellation to manufacture, import, market, and sell any new "Brand Extension Beer," which was defined as "Beer packaged in Containers bearing a . . . Mark that is derivative of one or more of the Trademarks."  "Beer" is defined to mean "beer, ale, porter, stout, malt beverages, and any other versions or combinations of the foregoing, including non-alcoholic versions of any of the foregoing."  Section 2.15(a) provides Constellation "the right to determine *in its sole discretion* the Beer Recipe it uses for each new Brand Extension Beer, which Beer Recipes may be variations or derivatives of Recipes of then existing Products or *entirely new Recipes*."  In turn, "Recipe" is defined to mean "the description and measure of ingredients, raw materials, yeast cultures, formulas, brewing processes, equipment, and other information that is reasonably necessary for a brewmaster to produce a particular Beer."  (Sublicense § 1.1.)  ABI did not negotiate to include a "malt" or "hops" requirement in this definition, even though ABI's case rests on a claim that malt is required in Constellation's "entirely new Recipe[s]" for its Brand Extension Beers.  (*Id*.)  Reading the definition of "Recipe" together with Section 2.15(a), Constellation is entitled to use "entirely new . . . ingredients, raw materials, yeast cultures, formulas, [and] brewing processes" for its Brand Extension Beers, so long as the resultant product "meets any applicable regulatory standards."  Once a Recipe is established — whether for an existing Modelo brand like Corona Extra or a new, Brand Extension Beer, like Corona Refresca — Constellation can "use functional substitutes or replacements" for Recipes that "specif[y] any particular ingredients" as long as the substitute ingredients "do not change the finished product."  (Sublicense § 3.3.)  This flexibility further underscores that Constellation, not ABI, has the right to determine which ingredients and recipes

it uses. These provisions are unambiguously broad, and allow Constellation to innovate and participate fully in the beer category.

The Sublicense also contains express limitations on Constellation's right to innovate new products, but none of these mandate the use of malt or hops. In addition to having a "Recipe" (a defined term that refers to "yeast cultures" as the only specified ingredient), Section 2.15(c) prohibits Constellation from "us[ing] any type of distilled spirits as an ingredient in any Recipe for a Brand Extension Beer" unless Modelo does so first with products in Canada or Mexico. Constellation's Brand Extension Beers also must qualify as "Mexican-style Beer." In the Sublicense, "Mexican-Style Beer" is defined to mean "Beer bearing the Trademarks that does not bear any trademarks, trade names or trade dress that would reasonably be interpreted to imply to consumers in the Territory an origin *other than* Mexico." (Sublicense § 1.1.) Finally, Constellation must create brand guidelines and quality standards for new Brand Extension Beers to ensure that the products are marketed with reasonable consistency, merchantable, consistently produced, compliant with regulations, and not defective. (*Id.* § 3.4.)

### C. Constellation Releases Brand Extension Beers Under The Sublicense.

███████████████████████████████████████████████████████████

██████  Corona Refresca is what the alcohol beverage industry refers to as a "flavored malt beverage." (SOF ¶ 216.) Flavored malt beverages have been part of the beer category for decades, and include products like Mark Anthony's Mike's Hard Lemonade, Coors' Zima Clearmalt, and ABI's Bud Light Lime-A-Rita. (SOF ¶ 119.) As ABI's proposed experts have explained, ██████

███████████████████████████████████████████████████████████

████████████████████  ████████████████████████████████████

██████████████████████████████████  ████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ Corona Refresca comes in slim cans and is labelled as a "Premium Spiked Refresher."  (SOF ¶ 220.) ██

███████████████████████████████████████████████████████████████

█████████████████████

In October 2019, Constellation announced plans to release Corona Hard Seltzer.  (SOF ¶¶ 224-225.) █████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████

Corona Hard Seltzer was released to the market in February 2020.  (SOF ¶ 236.)  Between the initial launch of Corona Hard Seltzer and the present, Constellation has released additional varieties and a substantially similar product under the Modelo brand:  Modelo Ranch Water.  (SOF

¶ 48.) ████████████████████████████████████████████████████

███████████████████████████ The CBI Products' fermentable sugar base is cane sugar. (*Id.*)

Because the CBI Products are produced from a fermentation of sugar, these products meet the

definition of "beer" used by TTB, the primary alcohol beverage regulator in the United States.

(SOF ¶ 71-75, 94.)[2] ████████████████████████████████████████████

████████████████████████████████████████████████ Every can of the

CBI Products states that these products are "BEER" and are "IMPORTED FROM MEXICO."

(SOF ¶¶ 42-43, 49-50.)

      **D.** ████████████████████████████████████████████
████████████████████████████████████████

Like Constellation and every other major beer brewer in the United States, ABI has

released multiple products marketed as hard seltzers. ██████████████████████████████



████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████ ███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ ███████ █

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

───────────────────

[2] ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████

[3]     Others correctly point out that products marketed as "hard seltzers" are not really new — for example, Coors released Zima Clearmalt in 1993, which is a substantially similar product. (SOF ¶ 204.)



██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

## **LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[4] "There is no requirement that the moving party negate the non-moving party's claim. . . . In moving for summary judgment against a party who will bear the ultimate burden of proof at trial," like ABI in this case, Constellation's "burden will be satisfied if [Defendants] can point to an absence of evidence to support an essential element of [ABI]'s claim[s]." *Quattlander v. Ray*, 2021 WL 5043004, at *4 (S.D.N.Y. Oct. 29, 2021). "[A] party opposing a properly supported motion for summary judgment . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "Factual disputes that are irrelevant or unnecessary" cannot defeat a motion for summary judgment. *Id.* at 248.

ABI asserts two claims: breach of contract and trademark infringement under the Lanham Act.[5] Under New York law, which governs the Sublicense (§ 6.1), "the threshold question on a motion for summary judgment with respect to a contract claim is whether the contract is unambiguous with respect to the question disputed by the parties." *Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, 2021 WL 6060710 (2d Cir. Dec. 20, 2021). Whether a contract is

---

[4] Unless otherwise indicated, internal citations, quotations, and subsequent history are omitted and emphasis is added.

[5] TAC ¶¶ 61-71 (Lanham Act trademark infringement), ¶¶ 72-79 (breach of contract).

ambiguous is a question of law that courts may decide at summary judgment. *NYU v. Galderma Labs., Inc.*, 689 Fed. App'x 15, 16 (2d Cir. 2017). "Whether a contract term is ambiguous is assessed from the perspective of a reasonably intelligent person who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Beazley Ins. Co., Inc. v. ACE Am. Ins. Co., et al.*, 197 F. Supp. 3d 616, 623 (S.D.N.Y. 2016), *aff'd*, 880 F.3d 64 (2d Cir. 2018). If "contracting parties use terms and concepts that are firmly rooted in federal law, and where there are no explicit signals to the contrary, [the Court] can presume that the prevailing federal definition controls." *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 618 (2d Cir. 2001); *see also Banco de La Republica de Colombia v. Bank of New York Mellon*, 2013 WL 3871419, at *7 (S.D.N.Y. 2013) (interpreting term by reference to federal and New York statutes where the agreement was "written with state and federal statutes in mind").

ABI's trademark infringement claim rests entirely on its breach of contract claim. Indeed, "[d]isputes involving the scope of a license present courts with a question of contract." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 197 (2d Cir. 2018). That is, "determining whether a defendant's activities fall within the scope of an existing license involves a question of contract interpretation." *Reinhardt v. Wal-Mart Stores, Inc.*, 547 F. Supp. 2d 246, 352 (S.D.N.Y. 2008). A valid license "immunizes the licensee" from an infringement allegation, provided that the licensee's use is within the agreement with the licensor. *Harris v. Simon & Schuster, Inc.*, 646 F. Supp. 2d 622, 630 (S.D.N.Y. 2009).

## ARGUMENT

Constellation is entitled to summary judgment on each of ABI's claims because ABI fails to raise a genuine issue of material fact that the CBI Products exceed the scope of the Sublicense. First, even accepting ABI's unduly narrow interpretation of "Beer," Constellation is entitled to summary judgment because the CBI Products are, at the very least, a "version or combination" of

a "beer" or "malt beverage" and unambiguously fall within Constellation's broad innovation rights.  (Argument § I.)   Second, under Constellation's construction of "Beer" — which appropriately consults prevailing regulatory definitions — the CBI Products are "beer" or a "version" or "combination" of "beer" or "malt beverage." (Argument § II.)  Third, the "Mexican-style Beer" claim fails because the CBI Products expressly state an origin of Mexico, ABI has failed to identify trademarks, trade dress, or trade names that could reasonably be interpreted to imply otherwise, and both parties' expert surveys confirm that the products in practice do not imply an origin other than Mexico.  (Argument § III.)

## I.   EVEN ACCEPTING ABI'S UNDULY NARROW DEFINITION OF "BEER," THE CBI PRODUCTS UNAMBIGUOUSLY FALL WITHIN THE SCOPE OF THE SUBLICENSE.

Whether or not this Court accepts Defendants' proposed interpretation of "Beer" — which aligns with the prevailing federal definitions that presumptively apply here under New York contract law — Defendants are entitled to summary judgment.  According to ABI, lower case "b" "beer" is a product made with malted barley (or some other malted grain) that is "flavored with hops" (TAC ¶¶ 46-47), ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████  Even if the Court were to adopt ABI's flawed interpretation of the Sublicense, however, the CBI Products still unambiguously fall within the scope of the broadly defined term "Beer," which includes "any other versions or combinations" of either a "beer" or a "malt beverage."   Any other construction of the Sublicense violates basic canons of contract construction, ignores Constellation's expansive innovation rights that define exactly what Constellation is and is not permitted to do when making a new Brand Extension Beer, and yields

commercially unreasonable results. (Argument § I.A-B.) ABI's attempt to explain away the word "version" with nonsensical "expert" testimony fails. (Argument § I.C.)

A. **Constellation Is Entitled To Summary Judgment Even Accepting ABI's Proposed Definition Of Lowercase "b" Beer And "Malt Beverage."**

While ABI's limited construction of "Beer" is wrong in light of the prevailing federal definition of "beer" (*infra* Argument § II.A), Constellation's right to innovate new products bearing trademarks derivative of the Corona and Modelo marks is not limited to lowercase "b" "beer" and "malt beverages." Instead, Constellation can innovate new products, using "entirely new Recipes," as long as the products qualify as capital "B" "Beer" and do not violate any of the express limitations on Constellation's innovation rights, such as the requirement that it meet "applicable regulatory standards" or the restriction on using distilled spirits as an ingredient. The parties defined capital "B" "Beer" to include not only "beer" and "malt beverages," but also "any other versions or combinations" of "beer" or "malt beverage." That definition of "Beer," read in the context of the Sublicense as a whole, unambiguously includes the CBI Products.

The defined term "Beer" must be interpreted to include beverages that do not meet ABI's interpretation of lowercase "b" "beer" or "malt beverage." Indeed, New York contract law mandates a "reasonable interpretation of a contract that gives independent meaning to each term." *Kelly v. Honeywell Int'l*, 933 F.3d 173, 183 (2d Cir. 2019). Here, if lowercase "b" "beer" means an alcoholic beverage made from malted grains and flavored with hops and "malt beverage" means an alcoholic beverage made with malted grain (as ABI claims), then this Court still must give independent meaning to the remaining twenty words that the parties included in the defined term "Beer" — "ale, porter, stout, . . . and any other versions or combinations of the foregoing, including non-alcoholic versions of any of the foregoing." For the sake of this argument only, assume the CBI Products do not qualify as "beer," "ale," "porter," "stout," "malt beverage," or "non-alcoholic

versions of any of the foregoing." The question then becomes: what did the parties intend by the phrase "any other versions or combinations of the foregoing"? It cannot be that this phrase also is limited to alcoholic beverages also made from malt and "flavored with hops," or the phrase "any other versions or combinations of the foregoing" would be duplicative of ABI's proposed definition of lowercase "b" "beer." Nor can the phrase mean any beverage made from malted grain, or the language would be duplicative of ABI's proposed interpretation of "malt beverage."

The phrase "any other versions or combinations of the foregoing" unambiguously expands the scope of products that fall within the definition of "Beer" to include products that differ in some way from ABI's read of "beer" and "malt beverage." ABI's preferred source for contract interpretation in a commercial agreement, the dictionary, defines "version" broadly to mean "a particular form of something differing in certain respects from an earlier form or other forms of the same type of thing."[6] Inclusion of the word "other" confirms that "versions or combinations" includes products that are *not* "beer" or "malt beverage," since "other" means "distinct from . . . those first mentioned." *Thompson v. Mun. Credit Union*, 2022 WL 2717303, at *5 (S.D.N.Y. July 13, 2022); *see also Alt. Energy Inc. v. St. Paul Fire & Marine Ins. Co.*, 311 F.3d 450 (1st Cir. 2002) (similar). And the word "any" further broadens the appropriate reading of "other versions and combinations" to include *all possible* variations and combinations of "beer" and "malt beverage," without limitation. *E.g.*, *U.S. v. Gonzalez*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"); *In re Bernard L. Madoff Inv. Secs. LLC*, 773 F.3d 411, 419 (2d Cir. 2014) ("Few words in the English language are as expansive as 'any.'"); *Innophos, Inc. v. Rhodia, S.A.*, 832 N.Y.S.2d 197, 199 (N.Y. App. Div. 2007) (similar). Taken together, "any other version or

---

[6] *E.g.*, *Version*, Oxford Languages, https://www.lexico.com/en/definition/version; *see also Version*, Concise Oxford English Dictionary (11th Ed. 2008) (same); *Version*, New Oxford Dictionary (1st ed. 1998) (same).

combination" includes products similar to "beer" or "malt beverage," but different in some regards from ABI's reading of "beer" or "malt beverage."

With that straightforward reading of the Sublicense, the language "any other version" of "beer" unambiguously encompasses the CBI Products. The CBI Products differ from ABI's cramped interpretation of lowercase "b" "beer" and "malt beverage" since they are brewed from a legally-recognized substitute for malt. 27 C.F.R. § 25.15. But the CBI Products are, at the very least, one possible form of "beer," being regulated as such by TTB, the IRC, and a vast majority the States. (*Infra* Argument § II.) Indeed, these regulatory agencies have already done the work required to adjudicate this case by determining that the CBI Products and ABI's ideal "beer" (a product made with malt and flavored with hops) are sufficiently similar to warrant identical treatment for a plethora or nationally applicable regulatory purposes. (*E.g.*, SOF ¶¶ 65-70, 78-87.)

This reading of the Sublicense is reinforced by reference to the agreement as a whole, in which the parties agreed to specific rules as to the outer bounds of what types of new "Beer" Constellation can manufacture bearing Corona- and Modelo-derived marks. Courts applying New York law "do not consider particular phrases in isolation, but rather interpret them in light of the parties' intent as manifested by the contract as a whole." *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013); *see also Spinelli*, 903 F.3d at 200 (citing *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000)). Furthermore, where parties expressly set forth limitations to a licensee's rights in a New York contract, the absence of another restriction on the same subject "demonstrates that . . . sophisticated parties chose not to include one." *Canon Inc. v. Tesseron Ltd.*, 146 F. Supp. 3d 568, 578 (S.D.N.Y. 2015) (agreement limited licensee's rights to sublicense in "two specific ways," but did not "prohibit[] retroactive sublicensing[,] demonstrat[ing] that these sophisticated parties chose not to include" such

restriction); *Saint Laurie Ltd. v. Yves Saint Laurent Am., Inc.*, 2015 WL 12991205, at *9 (S.D.N.Y. Mar. 27, 2015) (agreements prohibited licensees from using the trademark "Saint Laurent" in isolation for certain types of clothing and specifying required accompanying language, but did not specify any words licensees were required to use in connection with "Saint Laurent" for other types of clothing; as such, there was no other restriction).

Here, the parties agreed to specific rules concerning the ingredients Constellation must (and must not) use in its Brand Extension Beers. But they omitted any malt (or hops) requirement.

- *First*, the parties agreed that Constellation would "have the right to determine *in its sole discretion* the Beer Recipe it uses for each new Brand Extension Beer, which Beer Recipes may be . . . *entirely new Recipes*." (Sublicense § 2.15(a).) "Recipe" is defined, in relevant part, to mean the "ingredients, raw materials, yeast cultures, formulas, brewing processes, equipment, and other information that is reasonably necessary for a brewmaster to produce a particular Beer." (*Id.* § 1.1.) So the CBI Products must incorporate "yeast cultures,"[7] but Constellation is otherwise entitled to use "entirely new" "ingredients, raw materials . . . formulas, brewing processes [and] equipment" in the CBI Products.

- *Second*, Constellation's Brand Extension Beers must "meet the Quality Standards." (Sublicense § 1.1, 2.15(a).) The Quality Standards do not require the use of malt, hops, or any other specific ingredients,[8] but do require compliance with "regulatory standards."

- *Third*, the parties agreed to a limited prohibition on the use of distilled spirits. Specifically, Section 2.15(c) provides that Constellation "shall not use any distilled spirits as an ingredient in any Recipe for a Brand Extension Beer," unless Modelo uses "any type of distilled spirit or any distilled spirit flavor as an ingredient" in Products "marketed in Mexico or Canada."

Having elected to set forth rules governing certain ingredients (like yeast and distilled spirits), but omitting any mention of malt or hops in the entire Sublicense, the parties intended such omissions.

---

[7] Even the reference to "yeast cultures" confirms the breadth of Constellation's discretion to innovate "entirely new Recipes." ████████████████████████████████████████████████████████████ Elsewhere in the Sublicense, there are specific provisions governing the sharing of Modelo's "'mother' Yeast" between Modelo and Constellation (Sublicense § 2.21), but there is no requirement that Constellation use any specific yeast strains in the manufacture of new Brand Extension Beers. To the contrary, just like Constellation can innovate recipes with "entirely new . . . ingredients," Constellation also can use "entirely new . . . yeast cultures." (Sublicense §§ 1.1, 2.15(a).) ██

[8] In fact, Section 3.4 of the Sublicense directs Constellation to create new "applicable quality standards" for Brand Extension Beers. Pursuant to Section 3.4, Constellation also must create applicable brand guidelines, which ensure reasonably consistent marketing, and do not require the use of malt, hops, or any other specific ingredients.

Other provisions of the Sublicense confirm that there is no malt or hops requirement. Most notably, Section 3.3 permits Constellation to "use functional substitutes" in the event that a particular Recipe "specifies any particular ingredients, raw materials, yeast cultures, formulas, brewing processes or equipment or other items," provided that the substitute "do[es] not change the finished product." This means that if Constellation had made Corona Hard Seltzer with some malted grain — ██████████████████████████████████ ████████████████████████████ — Constellation then could rely on Section 3.3 to substitute sugar for malt and import, market, and sell the same product that is on the market today. Indeed, just like "grain of any kind" other than barley, sugar is a federally recognized "substitute" for malted barley. 27 C.F.R. § 25.15 ("Beer must be brewed from malt or from substitutes for malt. Only rice, grain of any kind, bran, glucose, sugar, and molasses are substitutes for malt."). ████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ███████████████████

ABI asks this Court to imply an unspoken malt requirement in the definition of "Beer" where none is found on the face of the Sublicense. However, it is well-settled that "courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include" and, therefore, should not "add or excise terms . . . under the guise of interpreting the writing." *Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004). This is especially true where the proposed interpretation confers

rights not expressly included in the deal.  *Id*.  To be clear, ABI could have tried to limit the definition of "Beer" to "products made with malt" (or malted barley, or even malted grain); ABI could have included a malt (or grain) requirement in the definition of "Recipe"; ABI could have stated that, while other "functional substitutes" are permitted, for the avoidance of doubt, there can be no substitute for malt; or ABI could have negotiated for approval rights over Constellation's "entirely new Recipes."  ABI did none of those things.  Instead, ABI agreed that Constellation would have the right to develop "entirely new Recipes" for Brand Extension Beers at Constellation's "sole discretion" and to substitute ingredients, all without ABI's interference.

Rewriting the Sublicense to graft a malt requirement that does not exist also would produce commercially unreasonable results.  Under New York law, "a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties."  *Greenwich Capital Fin. Prod., Inc. v. Negrin*, 903 N.Y.S.2d 346, 348 (N.Y. App. Div. 2010); *see also Towl v. Est. of Block*, 546 N.Y.S.2d 924, 925 (N.Y. Sup. Ct. 1989) (same).  ABI's proposed interpretation would condone at least two results that are unreasonable.

[redacted]

In sum, even if lowercase "b" "beer" means a product made from malted grain and flavored with hops and "malt beverage" means any product made from malted grain as ABI claims, the appropriate construction of "any other versions or combinations" of "beer" or "malt beverage" includes the CBI Products because there is no prohibition on the use of sugar in place of malted grains, and other provisions in the Sublicense expressly permit substitute ingredients.

**B.    ABI's Proposed "Beer Emulation" Standard Confirms The CBI Products Are Permitted Under The Sublicense.**

Importantly, ABI *agrees* that there are exceptions to its proposed interpretation that all lowercase "b" "beer" must be made with malt and flavored with hops. But this concession only confirms that the defined term "Beer" includes the CBI Products. [redacted]

[redacted]

---

[9] [redacted]

██████████████████████████████████████████████████████

███████████  ████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████  None of the foregoing is mentioned

in the Sublicense and creates and unworkable standard;[10] the parties did not limit Constellation's

innovation rights to products that meet ABI's checklist of supposed beer attributes.

Even adopting ABI's "emulation" standard, however, the undisputed record confirms that

the CBI Products are a gluten-free emulation of "malt beverage." ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

[10] ████████████████████████████████████████████████

██████████████████████████████████████████████uch an

amorphous standard is found nowhere in the Sublicense and is commercially unreasonable.



Even accepting ABI's construction of "Beer," Constellation is entitled to summary judgment. No reasonable trier of fact could conclude that, on the one hand, the Sublicense permits the manufacture of a Corona-branded, malt-free, hops-free beverage intended to emulate what ABI thinks is a "beer," but, on the other hand, prohibits the manufacture of a Corona-branded, malt-free, hops-free beverage intended to emulate what ABI thinks is a "malt beverage."

**C.    ABI's Supposed "Industry Custom" Opinions On The Meaning Of "Version" Do Not Create A Triable Issue of Fact.**

As explained above, even adopting ABI's myopic reading of "Beer," ABI's claims still fail because the CBI Products are at the very least a "version[] or combination[]" of "beer" or "malt beverage." ABI is well aware of this critical defect in its case. In an effort to create a triable issue of fact where there is none, ABI's putative beer experts Ray Daniels and Mike Mitaro opine that, while "beer" and "malt beverage" have ordinary meanings, "version" has a technical meaning in the beer industry and refers only to products that meet the overall parameters of a particular beer "style, but which var[y] from other interpretations of the style." (AEB Decl. Ex. 130 (Daniels

22

(¶ 61).)  ABI pulls this understanding from "style guidelines" promulgated by a few private organizations in the craft beer community for the purpose of judging beer competitions, which guidelines bear no relation to the Sublicense since they exclude beverages the parties agree fall within the definition of "Beer" (including flavored malt beverages like Corona Refresca).  (AEB Decl., Ex. 172.)  These opinions are inadmissible and should not be considered for purposes of summary judgment because, among other reasons, parties "cannot inject ambiguity into a contractual provision whose meaning is clear on its face."  *DBT Gmbh v. J.L. Min. Co.*, 544 F. Supp. 2d 364, 381 (S.D.N.Y. 2008); *Phil. Indem. Ins. Co. v. Streb, Inc.*, 487 F. Supp. 3d 174, 189 (S.D.N.Y. 2020) (criticizing expert's "contorted reading" of the contract).[11]  But ABI's argument that "version" only refers to specific subsets of craft-community approved "beer styles" fails even if the Court does not exclude Daniels' and Mitaro's opinions at this stage.

ABI's experts' proposed interpretation of "version" ignores the context in which the word is used in the Sublicense.  Again, New York contracts are interpreted to give unique meaning to each term.  *Honeywell Int'l*, 933 F.3d at 183.  And when interpreting a contract, New York courts "consider the entire writing and [do] not view particular words in isolation."  *Rivera v. Amica Mut. Ins. Co.*, 91 A.D.3d 562, 563 (N.Y. Sup. 2012); *Marvel Characters, Inc.*, 716 F.3d at 313.  The word "version," as used in the Sublicense, modifies the terms "beer" and "malt beverage," not just specific, craft-community-approved styles of "beer" such as an IPA or Weizenstock.  Moreover, "version" is not used in isolation, but is instead accompanied by "any" and "other."  In that context, a "version" of a "beer" or "malt beverage" must refer to products that differ in certain respects

---

[11]     Contemporaneous with this motion for summary judgment, Defendants have filed a motion to exclude the proposed expert testimony of Daniels and Mitaro concerning the supposed industry meaning of "version."  Defendants intend to move to exclude additional proposed expert testimony prior to the deadline for motions in limine in this matter (*see* Dkt. 157), and have endeavored to move to exclude only proposed expert testimony that was untimely and/or should be excluded prior to the resolution of this motion for summary judgment.

from the broader terms "beer" and "malt beverage." (*Supra* Argument I.A.) So if "beer" means, as ABI claims, a product made from malted grain and flavored with hops, "other versions" of "beer" encompasses similar products that have qualities distinct from "beer."

ABI's proposed industry interpretation of "version" makes even less sense when applied to "malt beverages."[12] Similar to "any other versions" of "beer," in the context of the Sublicense, a "version" of "malt beverage" must differ in certain respects from ABI's prototypical "malt beverage." ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

Even accepting ABI's narrow definition of "Beer," there is no triable issue of fact: the CBI Products meet the definition of "Beer" because they qualify (at least) as some "version or combination" of "beer" or "malt beverage," and do not violate the express limits on Constellation's innovation rights.

---

[12]     Daniels, ABI's affirmative "beer styles" expert specifically disclaimed offering any opinion on the meaning of "malt beverage." (AEB Decl., Ex. 142 (Daniels ¶ 68 n.72).) With no support for his impermissible contract interpretation, Mitaro claims for the first time in a rebuttal report that a "version" of "malt beverage" means the same thing as "malt beverage." (AEB Decl., Ex. 155 (Mitaro Report ¶ 85 ("██████████████████████████████████████ ██████████████████████████████████ The very definition of a 'malt beverage' must certainly include malt, which sugar-based hard seltzers do not.").) This proposed expert testimony is untimely and inadmissible. More to the point, if the parties wanted to limit the definition of "Beer" to exclude products differing in certain respects from ABI's view of "malt beverage," they would have written only "malt beverage" (and defined "Recipe" to include reference to malt). The parties did not do that, instead agreeing to include broadening, plain English terms like "any," "other," "version," and "combination."

## II. SUMMARY JUDGMENT IS WARRANTED BECAUSE THE PREVAILING REGULATORY DEFINITION OF "BEER" INCLUDES THE CBI PRODUCTS.

While summary judgment in Defendants' favor is warranted even accepting ABI's unduly narrow reading of "Beer," Constellation's construction of "Beer" and the Sublicense as a whole is the only reasonable interpretation. The definition of "Beer" in the Sublicense captures at least those products that meet prevailing regulatory definitions of "beer" and "malt beverage," while excluding wines and distilled spirits.

Prevailing regulatory definitions supply unambiguous meaning to the definition of "Beer" in the Sublicense. In highly-regulated industries like beverage alcohol, "where contracting parties use terms and concepts that are firmly rooted in federal law, and where there are no explicit signals to the contrary, we can presume that the prevailing federal definition controls." *Hugo Boss*, 252 F.3d at 617-18; *see also Robinson v. U.S.*, 80 U.S. 363, 366 (1871) ("Parties who contract on a subject-matter concerning which known usages prevail, by implication incorporate them into their agreements, if nothing is said to the contrary."); *Banco de La Republica*, 2013 WL 3871419, at *7 (similar); *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F. Supp. 987, 994 (S.D.N.Y. 1968). Such evidence is properly considered prior to the evaluation of extrinsic evidence. *Beazley Ins. Co., Inc.*, 197 F. Supp. 3d at 623; *see also Hugo Boss*, 252 F.3d at 617-18. Importantly, when determining whether there is a "prevailing" federal definition, "complete unanimity" is not required. *Beazley Ins. Co., Inc. v. ACE Am. Ins. Co., et al.*, 880 F.3d 64, 70 (2d Cir. 2018) ("In assessing whether there is such a 'prevailing federal definition,' we consider not whether there is complete unanimity among the courts that have addressed the question, but rather whether there is an 'overwhelming current of judicial opinion,' that is, a meaning used by 'the vast majority of federal courts.'").

Here, the Sublicense definition of "Beer" must be interpreted in light of prevailing

regulatory definitions in the U.S. alcohol beverage industry.  Far from "expressly indicat[ing]" that, for a contract governing alcohol beverage products marketed and sold nationwide, the prevailing federal regulatory definitions of such products should *not* apply, the parties made clear they were relying on "federal terms and concepts." *Hugo Boss*, 252 F.3d at 617-18.  Indeed, by pairing well-known regulatory terminology used to describe beer products in federal regulations (*i.e.*, "beer, ale, porter, stout" and "malt beverages") with language that unambiguously *expands* the scope of products covered (*i.e.*, "any other versions or combinations of the foregoing"), the parties unambiguously sought to include what is regulated as "beer" (as opposed to wine or distilled spirits).  Simply put, if a product is a "beer" or "malt beverage" under prevailing federal regulatory definitions, the product is (at least) a "version[]" of "beer" or "malt beverage."  Constellation can then use Corona- or Modelo-derived marks on such a product, provided that Constellation abides by the express limitations on its otherwise "sole discretion" to develop "entirely new Recipes" for its Brand Extension Beers.

### A.    The Sublicense Must Be Read By Reference To The Prevailing Federal Definition of "Beer," Which Includes The CBI Products.

The U.S. alcohol beverage industry is highly regulated and provides important context for this dispute.[13]  TTB is the primary alcohol beverage regulator in the United States, and has nationwide jurisdiction over beer production,

---

[13] ██████████████████████████████████████████████████████  While the CBI Products are produced in Mexico, the Sublicense is governed by New York law, the parties that negotiated the Sublicense are major players in the U.S. alcohol beverage industry, and the CBI Products can only be marketed and sold in the United States (or Guam).

brewery operations and equipment, formula approval, taxation, and many other aspects of the beer industry. (SOF ¶¶ 65, 67-70, 78-92.) TTB's nationally-applicable definition of "beer" is as follows:

> Beer, ale, porter, stout, and other similar fermented beverages (including saké and similar products) of any name or description containing one-half of one percent or more of alcohol by volume, brewed or produced from malt, wholly or in part, or from any substitute for malt. 27 C.F.R. § 25.11.

TTB also regulates the ingredients that can (and cannot) be used in the production of "beer," explicitly providing that malt is not required. For example, TTB mandates that:

> Beer must be brewed from malt or from substitutes for malt. Only rice, grain of any kind, bran, glucose, sugar, and molasses are substitutes for malt. In addition, you may also use the following materials as adjuncts in fermenting beer: honey, fruit, fruit juice, fruit concentrate, herbs, spices, and other food materials. 27 C.F.R. § 25.15.

These TTB definitions are pervasive throughout the alcohol beverage industry. For example, it is unlawful, anywhere in the United States, to manufacture a product that meets TTB's definition of "beer" without first obtaining a "brewer's notice" from TTB to brew "beer" at a "brewery."[14] (SOF ¶ 78.) ██████████████████████████████████████████████████████ ████████████████████████████████████

Notably, ABI's "exceptions" to its proposed definition of "beer" (*supra* Argument I.B) are each expressly accounted for and permitted by TTB's regulations. For example, ABI's position that beers can be made from malted or unmalted grains other than barley is expressly permitted by TTB. 27 C.F.R. § 25.15 ("beer" can be made from "grain of any kind"). Similarly, the use of herbs other than hops in the production of beer also is permitted by TTB. 27 C.F.R. § 25.15

---

[14] ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████

(permitting the use of "herbs," "spices," and "other food materials" in the production of "beer"; no hops requirement).  But ABI would have this Court ignore that well defined federal regulation in favor of its bizarre line drawing exercise, where some TTB-approved substitutes for malted barley are prohibited (sugar), but others are permitted (malted and unmalted "grain of any kind") as long as they satisfy ABI's subjective "beer" emulation test.  That cannot be right.

In addition to "beer," TTB and the FAA also define "malt beverages," which separate term is relevant to whether a beer product is subject to TTB's Part 7 labelling jurisdiction.  TTB and the FAA define "malt beverages" as products with "malted barley with hops."  27 U.S.C. § 211(a)(7); 27 C.F.R. § 7.10.  "Malt beverages," as defined by TTB and the FAA, also may contain "other malted cereals," "unmalted or prepared cereals," "other carbohydrates," added "carbon dioxide," or "other wholesome products suitable for human food consumption."  27 U.S.C. § 211(a)(7); 27 C.F.R. § 7.10.  Some products that meet TTB's definition of "beer" do not meet TTB's definition of "malt beverage," just as beers without either malted barley or hops do not meet TTB's definition of "beer."  (SOF ¶ 91.)  The distinction between TTB "beers" and "malt beverages" is relevant to whether the product is subject to TTB's Part 7 labelling jurisdiction or FDA labelling jurisdiction. In Part 7, TTB describes products like the CBI Products — which are referred to as "beer products" that meet the TTB definition of "beer" but not TTB's definition of "malt beverage" — as "*[o]ther beers not made with both malted barley and hops*."  27 C.F.R. § 7.6(b).[15]

Moreover, while ABI attempts to downplay the IRC, tax is critical to alcohol beverage

---

[15]     In addition to TTB's requirement that "[e]ach bottle of beer" — including the CBI Products — "show by label or otherwise . . . *the nature of the product* such as beer, ale, porter, stout, etc.," 27 C.F.R. § 25.142(a), the CBI Products are subject to FDA labeling jurisdiction, 27 C.F.R. § 7.6(b).  FDA has no definition of "beer."  (SOF ¶¶ 97-99.)  FDA requires all food subject to its labeling jurisdiction bear a "statement of identity."  21 C.F.R. § 101.3.  FDA's regulation does not supply any prevailing alcohol beverage definitions relevant here — Corona Hard Seltzer's can states "Hard Seltzer," Modelo Ranch Water's can states "Brewed Spiked Sparkling Water," ███████████████████████████████████████████████████████████████
FDA's statement of identity regulation does not indicate that products marketed as hard seltzer are not beer.

companies.  TTB's definition of "beer" is substantially the same as the definition of "beer" in the IRC, [26 U.S.C. § 5052](#), which creates excise tax obligations that are of great importance. ███

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████

TTB's and the IRC's regulatory definitions are well known, and closely adhered to, in the U.S. alcohol beverage industry.  (SOF ¶ 52-121.)  Under New York contract law, "the parties are presumed to have incorporated" these prevailing federal definitions "unless the parties expressly indicate otherwise."  *Beazley*, 197 F. Supp. 3d at 625.  It is undisputed that the CBI Products meet this nationally-applicable federal definition of "beer" set forth by TTB and IRC.  (SOF ¶ 109.)  Both definitions were in place at the time the parties executed the Sublicense and remain in place today.  (SOF ¶¶ 63, 72-74.)  There is no reasonable interpretation of "Beer" — which clearly refers to TTB's two regulatory definitions covering beer and then includes "any other version or combination of the foregoing" — that excludes the CBI Products.  *Hugo Boss*, 252 F.3d at 617-18.

B.     **State Regulatory Alcohol Beverage Definitions Further Confirm The CBI Products Are, At Least, A Version of "Beer" or "Malt Beverage."**

The States also have laws defining alcohol beverages, which are generally organized into three categories of alcohol beverage:  beer, wine, and spirits.  (SOF ¶ 122.)  The law of the State chosen by the parties to govern their contract is most relevant for these purposes.  *Banco de La Republica*, 2013 WL 3871419, at *6 & n.4 (consulting federal and New York law to determine meaning of "issuer"; referring to New York law after determining that law applied to the contract);

*see also Hugo Boss*, 252 F.3d at 618 (consulting New York law for a New York contact). Here, the parties elected New York law for the Sublicense. (Sublicense § 6.1.) Like the prevailing federal laws, New York defines "beer" to include "any fermented beverages of any name or description manufactured from malt, wholly or in part, or from any substitute therefore." N.Y. Alco. Bev. Cont. Law § 3(3); *see also* N.Y. Comp. Codes R. & Regs. tit. 9 § 84.1(f) (same, adding a 0.5% alcohol by volume requirement); N.Y. Tax Law § 420(5) (same). New York regulates the CBI Products as "beer." (SOF ¶¶ 127-30.)

While the prevailing nature of the federal definition of "beer," on its own, raises the presumption that it was incorporated into the Sublicense definition of "Beer," the remaining State regulations strongly support Constellation's interpretation as well. And again, "complete unanimity" of the law is not required; instead, a "vast majority" of States is sufficient. *Beazley Ins. Co., Inc.* 880 F.3d at 70. As a general matter, the States often defer to TTB on matters of alcohol beverage classification. (SOF ¶ 66.) In addition to the regulatory term "beer," the remaining States sometimes use phrases like "malt beverage," or similar terms, to refer to beer products. (SOF ¶ 122.) There is no genuine dispute that the *vast* majority of the States and the District of Columbia regulate the CBI Products in the same fashion as any other beer product. (SOF ¶¶ 125-82.)[16] Again, there is no reasonable construction of "Beer" in the Sublicense — which does not just include "beer" and "malt beverages," but also "*any other versions or combinations*" of the same — that would exclude products that are regulated by TTB and 44 of the States and the District of Columbia in the same way as any other beer product.

Importantly, differing definitions of alcohol beverage products in specific jurisdictions or

---

[16]     In 2013 when the Sublicense was executed, 37 of the States regulated sugar-brewed hard seltzers the same way as any other beer. (SOF ¶ 180-81.) Since 2013, nine additional States have modified certain statutory definitions to regulate sugar-brewed hard seltzers the same way as any other beer. (SOF ¶¶ 180-81.) No State has modified their laws or regulations to exclude sugar-based hard seltzers from the beer category. (SOF ¶ 182.)

discrete circumstances do not negate the prevailing federal definition of "beer" or render the Sublicense ambiguous. Regardless of the State in which an alcohol beverage company operates, TTB's regulations concerning, for example, the production of "beer," formula approvals for "beer," importation rules for "beer," and operations of a "brewery," will apply uniformly. (SOF ¶¶ 65-89.) It is TTB — not the dictionary, not the States, nor any other regulatory agency — that drives the prevailing regulatory definition of beer in the United States.[17]

## C. The Sublicense Does Not Reject Prevailing Regulatory Definitions of "Beer."

There is nothing on the face of the Sublicense indicating the parties intended to *reject* the long-established regulatory definition of "beer" in favor of a colloquial understanding of that term. As explained above, under New York law, "where contracting parties use terms and concepts that are firmly rooted in federal law, and where there are no explicit signals to the contrary, . . . the prevailing federal definition controls." *Hugo Boss*, 252 F.3d at 617-18; *see also Banco de La Republica*, 2013 WL 3871419, at *6.[18] In the Sublicense, the parties did not reject the prevailing

---

[17]    For this reason, that Constellation filed trademark applications for Corona Hard Seltzer in Class 33 (*see* Dkt. 23 at 20 (ABI arguing trademark filings indicate that Corona Hard Seltzer is not "beer")), does not negate the prevailing regulatory understanding of "beer" and "malt beverage." At the outset, the USPTO "classification system is merely a search tool and does not determine the trademark owner's rights." *In re Omega SA*, 494 F.3d 1362, 1363 (Fed. Cir. 2007). ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████

        Similarly, ABI has previously cited a CBP ruling (Dkt. 23 at 29) finding that White Claw — "a leading sugar-based hard seltzer" — does not fit the HTSUS definition for category 2203 "Beer made from malt." The fact that HTSUS category 2203 refers to "beer *made from malt*" makes clear some beer is not made from malt. Unlike the prevailing TTB definition of "beer," there also is no basis to conclude that HTSUS classification provides a prevailing understanding of the term "beer" in the alcohol beverage industry. Finally, HTSUS category 2203 excludes products █████████████████████████ like flavored malt beverages. (AEB Decl., Ex. 173; SOF ¶¶ 216, 221.)

[18]    This principle of New York law applies when the parties do not "expressly" incorporate the relevant legal authority or custom by copying-and-pasting the exact definition or referring to a specific statutory provision (*e.g.*, specifically stating "26 U.S.C. § 5052 applies here"). *Beazley Ins. Co.*, 197 F. Supp. 3d at 625 (Plaintiff's "argument that there is no indication that the parties intended to incorporate the usage of federal law misses the point. Where "contracting parties operate against the backdrop of federal law, . . . the parties are presumed to have incorporated the established meanings and definitions forged [therein]. This presumption governs the interpretation of the contract unless the parties expressly indicate otherwise.").

regulatory definitions of "beer." To the contrary, the parties unambiguously relied on terms and concepts from the prevailing regulatory understanding of "beer." For example, as explained above, the parties chose to pair "beer" with "ale, porter, [and] stout" (Sublicense § 1.1), which aligns with the nationwide federal definition of "Beer," *e.g.*, 26 U.S.C. § 5052 ("'beer' means beer, ale, porter, stout. . . ."), 27 C.F.R. § 25.11 (similar).[19] The parties also included "malt beverages," which is the other TTB definition covering products in the beer category. The parties also chose to permit "functional substitutes" (Sublicense § 3.3), another concept drawn from alcohol beverage regulation, *e.g.*, 27 C.F.R. § 25.15 (defining "substitutes" for malt in "beer" production).[20] Importantly, the parties also included expansive language covering "any other versions or combinations" in the definition of "Beer," making clear that the regulatory meanings of "beer" and "malt beverage" must be construed broadly.

ABI has argued that the use of the terms "beer, ale, porter, stout" in the Sublicense, followed by a change from the precise wording of the TTB definition of "beer," indicates an omission of some (but not all) beers meeting the prevailing federal definition. (*See, e.g.*, TAC ¶ 32.) This argument requires the Court to conclude that the phrase "any other versions or combinations of the foregoing" (the expanding language in the Sublicense) is *narrower* in some unspecified manner than the phrase "other similar fermented beverages" (the expanding language in TTB's definition of "beer"). If anything, however, the use of the word "any" in the Sublicense makes that clause *broader* than TTB's "other similar fermented beverages" language. Moreover, elsewhere in TTB's regulations, "beer" and "beer, ale, porter, stout, etc." — without any express

---

[19]     Despite ABI's witnesses opining that there are over "100 different beer styles" (AEB Decl. Ex. 130 (Daniels Report ¶ 3)), "ale, porter, [and] stout" is repeated in regulations of the States defining "beer" as well. *E.g.*, N.Y. Tax Law § 420 (listing "alcoholic beer, lager beer, ale, porter, and stout" in the definition of "beer"); CAL. BUS. & PROF. CODE § 23006 (listing "ale, porter, [and] stout" in the definition of "beer").

[20]     Again, the concept of "substitute" ingredients appears in State regulations too. *E.g.*, N.Y. ALCO. BEV. CONT. § 3(3) (defining "beer" to include fermented products made from "substitutes" for malt), ARK. ADMIN. CODE § 006.02.1-1.4 (same), KY. REV. STAT. ANN. § 241.010(38) (similar), ME. STAT. TIT. 28-A § 2(18) (2021) (similar).

reference to "similar fermented beverages" or malt substitutes — is used to reference all products meeting TTB's definition of "beer."[21]  For example, in 27 C.F.R. § 25.142(a), TTB dictates that "[e]ach bottle of beer shall show by label or otherwise . . . the nature of the product such as beer, ale, porter, stout, etc."  The first reference to "beer" in that regulation covers all products that meet TTB's definition of "beer," as does the shorthand phrase "beer, ale, porter, stout, etc."  This regulation is the reason every can of the CBI Products is identified as "BEER."  (SOF ¶¶ 42, 49.)

There is no indication in the Sublicense that the parties rejected prevailing regulatory and industry understandings of "beer."  To the contrary, the Sublicense unambiguously incorporates alcohol beverage regulatory terms and concepts.  "Beer" captures any "version[] or combination[]" of "beer" or "malt beverage," as understood with reference to prevailing regulations, and without limitation.  Express limitations are, in turn, drawn elsewhere in the Sublicense — such as the prohibition on using distilled spirits in "Beer" unless ABI does so first in Mexico or Canada or the requirement that new Brand Extension Beers "meet . . . applicable regulatory standards."  (*Supra* Argument I.A.)

## III.  SUMMARY JUDGMENT IS WARRANTED BECAUSE ABI HAS NOT RAISED A TRIABLE ISSUE OF FACT AS TO WHETHER THE CBI PRODUCTS MEET THE DEFINITION OF "MEXICAN-STYLE BEER."

ABI's "Mexican-style Beer" argument fails.  Because all CBI Products expressly state that the products originate in Mexico, and ABI has failed to identify trademarks, trade names, or trade dress suggesting otherwise, summary judgment is warranted.  Even assuming deeper thought were required (it is not), both parties' expert surveys indicate that the CBI Products' trademarks, trade

---

[21]     Similarly, the original language from the Internal Revenue Act of 1862, which TTB explains is where the modern federal definition of beer "originated," and which definition has "remained essentially unchanged to the present day," defined beer as "beer, ale, porter, stout, and similar fermented beverages," without express reference to malt substitutes.  (SOF ¶¶ 60-61.)  The words "beer, ale, porter, stout" combined with expansive language — be it "similar fermented beverages" (Internal Revenue Act), "etc." (TTB labelling regulations, 27 C.F.R. § 25.142(a)), or "any other versions or combinations" (Sublicense § 1.1) — is an unambiguous reference to all alcohol beverages encompassed by prevailing regulatory definitions of "beer" and "malt beverage."

names, or trade dress are not in fact implying to consumers a national origin other than Mexico.

First, the CBI Products satisfy the definition of "Mexican-style Beer" because the only indications of origin on the products' packaging unambiguously state that the products are made in Mexico. "Mexican-style beer" means "[b]eer bearing the Trademarks that does not bear any trademarks, trade names or trade dress that would reasonably be interpreted to imply to consumers in the Territory an origin *other than* Mexico." (Sublicense § 1.1.) "Origin" refers to "the source of wares," *i.e.*, where the product was produced. *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 31 (2003); *see also Idaho Potato Comm'n v. M&M Produce Farms & Sales*, 2010 WL 11712586, at *3 (S.D.N.Y. Feb. 17, 2010) (similar). Here, the only references to "origin" on the CBI Products' packaging state that the products are "IMPORTED FROM MEXICO" and "Made in Mexico by Compañía Cervecera de Coahuila S. de R.L. de C.V." (SOF ¶¶ 259-61.) In contrast, ABI cannot identify trademarks, trade names, or trade dress on the CBI Products that imply some other country's origin — such as a tradename including the phrase "*Irish* Stout," "*English* Bitter," or trade dress depictions of another country's flag — because there are none.[22]

Second, even if "Mexican-style Beer" extends beyond prohibiting designations of "origin" other than Mexico, the CBI Products' packaging otherwise evoke Mexican origin. Plaintiffs' putative survey expert, David Reibstein, explains that Corona- and Modelo-branded beers have been brewed in Mexico since 1925, and those brands have strong associations with Mexico. (SOF ¶ 256.) ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

---

[22] ABI has previously argued that "origin" in the "Mexican-style Beer" definition triggers an inquiry into the history of the beverage. But "beer" did not originate in Mexico. (SOF ¶ 255.) The test for what is "Mexican-style Beer" is not which region of the world a beer was developed or "mostly featured." (*Contra* TAC ¶ 55.) And notwithstanding ABI's allegations, hard seltzer products — including ABI's own Michelob ULTRA Hard Seltzer — are actively marketed and sold in Mexico. (SOF ¶ 257.)

████████████████████████ the CBI Products go beyond what the Sublicense requires (neutrality) and actively imply Mexican origin.

Third, while resort to consumer surveys to determine compliance with "Mexican-style Beer" is unnecessary in light of the foregoing, ABI's own purported expert survey (as well as the survey Constellation commissioned in rebuttal) confirm that the CBI Products do not in fact imply an origin other than Mexico to U.S. consumers. Reibstein conducted a survey comparing consumers' interpretations of the origin of the CBI Products as compared to Corona Extra. (SOF ¶ 263.) More than 64% of respondents in Reibstein's surveys *affirmatively* identified Mexico as the country of origin for each of the CBI Products. (SOF ¶¶ 264-65.)[23] On rebuttal, Defendants' expert, Mike Kallenberger, conducted a similar survey, though fixing various issues with Reibstein's methodology. Kallenberger's results showed that, for each product, more than 80% of consumers affirmatively identified Mexico as the country of origin. (SOF ¶ 266.) While consumer testing is not required to decipher if the CBI Products are "Mexican-style Beer," Reibstein's and Kallenberger's data confirms the products easily meet that definition.

## **CONCLUSION**

Summary judgment in Constellation's favor on each of ABI's claims is warranted.

---

[23] Defendants discuss only Reibstein's "branded" survey because, while biased and flawed for reasons that will warrant exclusion before trial, that survey is preferable to Reibstein's "unbranded" survey. In the "unbranded" survey, Reibstein attempted to remove Corona branding from product images shown to respondents purportedly in order to isolate unique trade dress on the CBI Products. (AEB Decl. Ex. 128 (Reibstein ¶ 36 & Fig. 10).) Through this exercise, Reibstein failed to survey the CBI Products, instead testing packaging that does not exist in the real world. Worse still, Reibstein failed to unbrand his "benchmark" product, Corona Extra. (*Id.* ¶ 71 (Group 6, Product #1.) Instead, the supposed "unbranded" Corona Extra retained obvious indicators that the product was Corona Extra, including trademarked gold griffins and the iconic slogan "La Cerveza Más Fina." (*Id.*) Unsurprisingly, essentially the same percentage of respondents identified Mexico as the origin of both the branded and unbranded Corona Extra stimuli. (*Id.* ¶ 77, Table 2.)

Dated: New York, New York
   August 5, 2022

         */s/ Sandra C. Goldstein*
         Sandra C. Goldstein, P.C.
         Stefan Atkinson, P.C.
         Daniel R. Cellucci
         Amal El Bakhar
         Jenny Lee
         KIRKLAND & ELLIS LLP
         601 Lexington Avenue
         New York, New York 10022
         Telephone: (212) 446-4800
         Facsimile: (212) 446-4900
         sandra.goldstein@kirkland.com
         stefan.atkinson@kirkland.com
         dan.cellucci@kirkland.com
         amal.elbakhar@kirkland.com
         jenny.lee@kirkland.com

         *Counsel for Defendants*