Mb2WcerO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

CERVECERIA MODELO de MEXICO,
S. de R.L. de C.V. and
TRADEMARKS GRUPO MODELO, S. de
R.L. de C.V.,

                    Plaintiffs,

          v.                              21 Civ. 1317 (LAK)

CB BRAND STRATEGIES, LLC,
CROWN IMPORTS LLC, and
COMPAÑIA CERVECERA de
COAHUILA, S. de R.L. de C.V.,

                    Defendants.
                                          Oral Argument
-------------------------------x
                                          New York, N.Y.
                                          November 2, 2022
                                          10:00 a.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                          District Judge


                         APPEARANCES

SULLIVAN & CROMWELL, LLP
          Attorneys for Plaintiffs
BY:  MICHAEL H. STEINBERG
          MARC DE LEEUW
          AKASH M. TOPRANI

KIRKLAND & ELLIS LLP
          Attorneys for Defendants
BY:  SANDRA C. GOLDSTEIN
          DANIEL R. CELLUCCI
          STEFAN H. ATKINSON

Mb2WcerO

1              (Case called; appearances noted)

2              THE COURT:  Good morning to all.

3              The next calendar item for this morning has

4     evaporated, so I can give you approximately 45 minutes, to a

5     side, for both motions, not for each motion.  What we'll do is

6     I'll hear the defendants' motion first, and I'll hear both

7     sides on that, and then we will go on to the plaintiffs'

8     motion.

9              Ms. Goldstein.

10             MS. GOLDSTEIN:  Thank you, your Honor.

11             Your Honor, ABI's entire case now turns on their view

12    that the only products licensed to Constellation are products

13    containing malt.  This is ABI's position even though the

14    federal government has a regulation that expressly authorizes

15    brewers across the country to make beer using sugar as a

16    substitute for malt.

17             THE COURT:  Let me give you a little help here.  I've

18    heard this regulatory argument until it's coming out of my

19    ears.  Unless you can persuade me that I'm wrong in thinking

20    that sophisticated parties, represented by some of the best

21    lawyers in the country, decided to write their own definition

22    and not to incorporate by reference the regulatory definition,

23    if there is a regulatory definition, this argument has got no

24    traction.

25             MS. GOLDSTEIN:  Your Honor, we're on the *Hugo Boss*

Mb2WcerO

1  point, which I'm going to get to later.  I'm not going to start

2  with that because I'm going to start -- I know we've talked

3  about *Hugo Boss* in the past, and so I'm going to start

4  elsewhere and actually play on plaintiffs' turf as much as

5  possible today, the dictionary definitions and all of that.

6  OK?

7            THE COURT:  OK.

8            MS. GOLDSTEIN:  But I do think it's important, your

9  Honor, to note that this case is all about malt.  Now, how do

10  we know that it's all about malt?  Because ABI said in its

11  opposition brief, "Constellation has always had an allowable

12  path under the sublicense, malt-based hard seltzers."  So

13  they're now saying, they're now saying, your Honor, that

14  Constellation is licensed to make hard seltzers.  That's not

15  the problem.  And it's also undisputed, so we're allowed to

16  make hard seltzers, period.

17            It's also undisputed, and this very important, that

18  the production process for hard seltzers results in there being

19  absolutely no difference between hard seltzers that would be

20  attributed to the base material, so meaning, your Honor,

21  whether the brewer uses malt or sugar or some other

22  fermentable, it is undisputed -- they have agreed; it is

23  undisputed -- that there won't be any difference in the

24  finished product.  And that's because, your Honor, after the

25  brewing and the fermentation, there's a filtration process that

Mb2WcerO

1    leads intentionally to a neutral base no matter what

2    fermentable is used.  And that's at counterstatement of facts,

3    ABI's counterstatement of facts 207 to 210, your Honor.  And

4    then flavoring is added.  So we can make hard seltzer, and all

5    hard seltzers, whether malt-based or sugar-based, have a

6    neutral base, and then flavor is added.  OK?

7            THE COURT:  I'm going to ask you to hold up for a

8    minute.

9            Andy, is there anything we can do to sharpen the

10   sound?  Because it's rather muddy, and I know that's not

11   Ms. Goldstein's voice.

12           OK.  Let's try again.

13           MS. GOLDSTEIN:  Should I start again, your Honor?

14           THE COURT:  No, no.

15           MS. GOLDSTEIN:  So, your Honor, this case is very

16   different than when we were here last year on our motion to

17   dismiss, because then, a key feature, your Honor will remember,

18   of ABI's argument was essentially we couldn't make Corona Hard

19   Seltzer, because the guy in the pub who ordered the beer

20   wouldn't consider hard seltzers to be a beer.  And there was

21   all this consternation about, well, if you can make hard

22   seltzer, then can you make milk, right, etc., etc., or

23   Coca-Cola?

24           That's no longer the case, your Honor.  They admit we

25   can make hard seltzer, and they admit that the hard seltzer

Mb2WcerO

that we can make would look, taste and pour the exact same way

as the Corona Hard Seltzer on the market today and, frankly,

any hard seltzer on the market today.  And, frankly, your Honor

as they admit at counterstatement of facts 198 to 201, any

flavored malt beverage on the market today.  All have neutral

base, all add the flavoring later.  OK?

So the only, as I said, this is where I started, the

only issue we're left with is whether there's some malt

requirement in the sublicense, and I'd like to go through the

sublicense briefly, your Honor, to show you that there is

literally no malt requirement anywhere in the sublicense.  The

parties, as we'll see, agreed to very specific rules around

other ingredients, like distilled spirits and yeast, but

nothing about malt.  A lot about innovation, but nothing about

malt.

Your Honor, if we can, we're going to do this the

old-fashioned way, with paper, so I'd just like to hand up to

your Honor --

THE COURT:  But if the proper definition of beer

requires malt, then your argument falls apart, right?

MS. GOLDSTEIN:  And we will get -- if beer, beer

absolutely requires malt, both beer and malt beverage

absolutely requires malt, then I guess we have a problem,

except that not really, because you have to look at it in the

course of the contract.  In other words, you look at beer, but

Mb2WcerO

you're looking in the course of the contract as well.

Your Honor, let me, if you don't mind -- of course we're going to talk about beer.  Why don't we start going through the contract, because I think it will help.  For example, beer, as we'll see, beer requires, certainly by their definitions, right, alcohol.  What we'll see in the contract that it says it includes a nonalcoholic version.  Right?  So you start with beer, but then you have to look at it in the context of the contract.  And of course -- does that -- right?

THE COURT:  I heard you.

MS. GOLDSTEIN:  Right.  If we can just hand up the contract.  Why don't we go through that, and then, of course, your Honor, we'll hit beer.  It's up there.  I'm sorry, your Honor.  Your Honor already has the contract.  OK.

And by the way, your Honor, even if lower-case b beer, right, and we'll get to beer, because I know it's in your Honor's mind, even if lower-case b beer, right, and malt beverage require malt, capital-B beer doesn't because of the versions language in the contract.

THE COURT:  Because of the what language?

MS. GOLDSTEIN:  The versions.  The definition of beer in the contract, your Honor --

THE COURT:  Believe me, I could probably recite it.

MS. GOLDSTEIN:  Right.  So any other version.  So it's beer, ale, porter, stout, malt beverage and any other versions

Mb2WcerO

1    or combinations thereof.

2              THE COURT:  I could have recited it.

3              MS. GOLDSTEIN:  But your Honor, let's just quickly go

4    through the contract, because I think it's important for the

5    context.

6              THE COURT:  And maybe if you'd talk a little slower.

7              MS. GOLDSTEIN:  I will.  Thank you, your Honor.

8              And as we go toward the contract, toward that end,

9    because I know your Honor's familiar with a bunch of things,

10   I'll take you to sub-provisions.  If you want me to slow down

11   so you could read a little more, obviously, your Honor, please

12   let me know.

13             Starting, your Honor, at tab E, which is page 23, so

14   this is section 2.15A, which governs Constellation's right to

15   innovate new Corona and Modelo-branded products -- those are

16   brand extension beers.  And you'll see there, your Honor, we

17   highlight at the end, it says, "Constellation beers shall have

18   the right to determine, in its sole discretion, the beer recipe

19   it uses for each new brand extension beer, which beer recipes

20   may be variations or derivatives of recipes of then existing

21   products or entirely new recipes, provided that such recipes

22   meet the quality standards."

23             So in light of that, your Honor, I just want to next

24   go to recipes and quality standards.

25             Recipes you'll find at tab C.  Sorry, your Honor.  I

Mb2WcerO

1    apologize, your Honor.

2              Recipes you'll find at tab D, and recipe means the

3    description and measure of ingredients, raw materials, yeast

4    cultures, formulas, brewing processes, equipment, and other

5    information that is reasonably necessary for a brewmaster to

6    produce a particular beer.  No mention of malt.  Talks about

7    yeast, a different ingredient.  No mention of malt.  And

8    obviously, your Honor, the ones I'm hitting on are the ones --

9              THE COURT:  Unless beer comprehends malt.

10             MR. STEINBERG:  Unless?

11             THE COURT:  Unless beer comprehends malt.

12             MS. GOLDSTEIN:  Right, but -- well, again, your Honor,

13   we have to look at the contract, because it's not just -- it

14   has to be beer, malt beverage or any versions of those.  So you

15   could have a version of beer that doesn't have, just like you

16   could have -- I won't bury the lead.

17             THE COURT:  I have a version of a red car that's

18   green.

19             MS. GOLDSTEIN:  But, your Honor, one, you can have a

20   version -- I don't know if a version of a red car is green,

21   your Honor, but what I'm going to show you today is even

22   operating on their turf, we have what is undeniably a version

23   of beer, even in their dictionary.  So, for example, their

24   dictionaries all talk about, it all starts with an alcoholic

25   beverage that, and goes from there.

Mb2WcerO

1          In the contract, it says you can have a nonalcoholic

2     version.  So there is -- you have to -- but, as we're going to

3     see, and that's why I wanted to go to the contract, there are

4     limiting principles, and we identified those limiting

5     principles.  One of them is yeast.  One of them is you have to

6     have a brewing process.  One of them is there has to be quality

7     standards.  So in the sort of, if you think of the world as

8     kind of beer, wine, spirits and others, right, so you can't

9     have wine.

10          THE COURT:  So if you're making chocolate egg creams,

11     that's perfectly fine, Corona chocolate egg creams, if you have

12     quality control and the manufacturing process.

13          MS. GOLDSTEIN:  No, because an egg cream is not going

14     to have yeast.  We can't put distilled spirits.  In the world

15     of beer, wine, spirits, so let's talk about wine.  Not doing

16     wine because you have to have a brewing process.  Wine's not

17     brewed.  Spirits, as you'll see in 2.15C at tab F there's a

18     very specific rule around distilled spirits.  2.15C, tab F, we

19     can't put in distilled spirits unless they do it first in

20     Mexico or Canada.  So no dispute.  If they do it, then we can

21     do it.  But if they can't do it -- if they don't do it first in

22     Mexico or Canada, no distilled spirits.

23          So it's not going to be wine, because that would be a

24     brewing process.  No distilled spirits.  Beer, beer could be

25     broad, but beer, and it's not going to be, because you need

Mb2WcerO

1    yeast, it's not going to be chocolate milk or Coca-Cola.

2    Right?

3                So, does that make beer, any version of beer, could

4    that be broad?  Sure, intentionally so.  This is a contract in

5    perpetuity, your Honor.  And what I hope to show your Honor

6    today is that there's no way around the fact that this is one

7    version of beer.  That doesn't mean, your Honor, to be clear,

8    that we know, that we can sit here, nor do I expect your Honor

9    would ask the jury to figure out what every conceivable version

10   is or isn't.  The question is, is Corona Hard Seltzer a version

11   of beer.  And they admit that we can make a hard seltzer.  They

12   admitted we can make a hard seltzer.

13                The question is only whether that hard seltzer has to

14   have malt, and I'd like to go through some points that make

15   clear it doesn't.  But it's not as though -- you know, the fact

16   that we may not be able, today, here, to decide what are the

17   limits, I can't swear to your Honor we won't be back here

18   before your Honor.  But when we have a product that clearly

19   fits within the contract, that's not a reason -- I don't think

20   your Honor's going to ask the jury to come up with what every

21   conceivable notion of what a version is.  So we may be back

22   here someday on a product that we don't know the answer to.

23   But I hope to show your Honor today, this is a version, even

24   playing in their sandbox, this is a version of beer, capital-B

25   beer.

Mb2WcerO

1          So, your Honor, obviously quality standards, which are

2     all about, which is at tab C, those are all about

3     merchantability, being free from defects, compliance with

4     applicable regulatory standards.  As I mentioned, there's a

5     provision on yeast, which, by the way, is a defined term.

6     There's no defined term malt, but there is a provision on yeast

7     at tab G that talks about the transferring of the yeast from

8     Modelo.  What happens if the yeast colony of either party dies?

9     What happens if Constellation elects to stop using the yeast?

10    So a lot about how it works with yeast.  Obviously nothing like

11    that with malt.

12         We've talked about the distilled spirits, which is at

13    tab F.  And then, your Honor, there's only one other provision

14    that specifically mentions ingredients in the sublicense, and

15    then, of course, we'll get to beer.  And that is section 3.3 at

16    tab H.  And section 3.3 applies once a recipe is created, and

17    it allows Constellation to use functional substitutes for any

18    particular ingredient so long as the switch does not change the

19    finished product.  So it's 3.3, titled importer products, and

20    by the way, importer products is defined to include brand

21    extension beers.  That's at page 6 of the agreement.

22         Again, it reads, "To the extent a recipe or technical

23    specification specifies any particular ingredients, raw

24    materials, yeast cultures, formulas, brewing processes,

25    equipment, or other items, Constellation beers and its

Mb2WcerO

suppliers may use functional substitutes or replacements for
foregoing that do not change the finished product, as will be
determined by a reasonable qualified brewmaster." And I think,
your Honor, the substitution provision in section 3.3
highlights a big problem with ABI's case, because as I said,
ABI concedes that we can make a malt-based hard seltzer, and
separately, it's undisputed that the production process for
hard seltzer is designed so that there will be no difference in
hard seltzer flavors attributable to the base material.
Finished product is the same, whether the base material is
malt, sugar, sorghum, or any other fermentable.

        And moreover -- again, the federal government, and
this has to matter, your Honor. The federal government has a
regulation titled materials for the production of beer which
expressly provide that sugar is a permitted substitute for
malt. So ABI is asking your Honor to enforce this, I have to
say meaningless, allegedly implicit malt requirement that would
only require Constellation to reformulate and re-release the
exact same product that's on the market today. And I'm really,
your Honor, not being flippant when I say meaningless. It's
literally meaningless since it's undisputed that whether or not
it's made with malt, Corona Hard Seltzer would look, taste and
pour the same.

        And it's also meaningless because, according to ABI,
Constellation could have made a Corona Hard Seltzer with a malt

1   base.  And then again, your Honor, we have to look at this in

2   concert with the contract, because we can make -- they're

3   telling us we can make a Corona Hard Seltzer with a malt base,

4   and then section 3.3 allows us to, you know, then switch over

5   to a sugar base and then that sugar-based hard seltzer would be

6   a licensed product.

7           THE COURT:  The rate of delivery is losing me.

8           MS. GOLDSTEIN:  I'm sorry.  Let me make this clear,

9   because this one's important.

10          Constellation -- the malt requirement is meaningless,

11  because, look at section 3.3, your Honor.  What they are

12  saying, what they're saying to me, what they're saying to us is

13  that we can make a Corona Hard Seltzer with malt.  Right?

14  That's a given now.  We can make a Corona Hard Seltzer with

15  malt.  Section 3.3 then says, well, if you have a functional

16  substitute that you can use for any of the ingredients in a

17  product that ends up making that product sort of, you know,

18  have the same finished product, then you can do that.  That's

19  what the contract says at 3.3.

20          So you can make entirely new recipes.  We know that.

21  But beyond, you can make entirely new recipes.  That was the

22  other provision, and you can use functional substitutes, and

23  they've admitted that Corona Hard Seltzer with malt is going to

24  look, taste, feel the exact same as Corona Hard Seltzer with

25  sugar.  They've admitted that.

Mb2WcerO

1          THE COURT:  And where is this admission?

2          MS. GOLDSTEIN:  At counterstatement of facts 207

3  through 210.

4          THE COURT:  And which document are we talking about?

5  There are so many counterstatements of fact.

6          MS. GOLDSTEIN:  Fair enough, your Honor.

7          OK.  So it's document 218, and it begins on page 116

8  of that document.

9          THE COURT:  Page 116?

10          MS. GOLDSTEIN:  116, yes, your Honor.

11          THE COURT:  And where is the admission?

12          MS. GOLDSTEIN:  So the admission, your Honor, starts

13  in paragraph 207, and it's undisputed that the brewing or

14  filtration for malt-based hard seltzers is to remove all

15  residual flavors, aromas and colors imparted by the malt with

16  the expectation of a base that is free of aroma, flavor, and

17  color.  OK?

18          And then 208 is sugar-based hard seltzers are filtered

19  to remove similar, any flavor and color, developed, imparted

20  from the base sugar.  It's similar, your Honor.

21          And then let's go to 210, which is undisputed that the

22  goal of filtration for hard seltzers is such that no difference

23  in hard seltzer flavors is attributable to the base material.

24          So no matter whether it's malt, whether it's sugar,

25  same -- it's going to look the same.  It's going to taste the

Mb2WcerO

1    same.  It's going to smell the same.  You add your additives.

2                THE COURT:  Except that they say right on the same

3    page multiple times that when you try to do it there is a

4    bitter aftertaste and it's not the same.

5                MS. GOLDSTEIN:  All that's saying, your Honor, is

6    that -- you know, you have to allow for the possibility that

7    there are production glitches or something doesn't work, but

8    that's not at all -- but at bottom, so if you make a bad batch

9    of Coca-Cola or something doesn't work, you didn't do something

10   right, that's fine.  But that is not at all saying -- you know,

11   at the end of the day, they could make a bad batch of Corona

12   Light that looks different, that tastes different than another

13   Corona Light.  If we're in a world where we can make Corona

14   Hard Seltzer, it just has to have malt, but there's no

15   difference between the look, taste, pour, smell, that they

16   admit would happen.

17               THE COURT:  OK.  You've used half your time overall.

18   You can keep going, but I'm not going to let it go on.  You

19   have 45 minutes on both motions.

20               MS. GOLDSTEIN:  Understood, your Honor.

21               One point just on the contract, your Honor, which, we

22   did cite a number of cases, your Honor, all of which plaintiffs

23   ignore, that say where a license includes express limitations

24   on a subject matter -- so the license expressly talks about a

25   limitation.  Right?  We can see a number of limitations, yeast,

Mb2WcerO

<div style="line-height:2">

1    distilled spirits, etc., but no limitations -- but omit other

2    limitations, in this case malt, then that is intentional.  And

3    we cite the *Yves Saint Laurent* case and the *Canon* case, your

4    Honor.  No response on that.

5        Your Honor, I mentioned earlier, and I mean it, I want

6    to play in their sandbox today.  Right?  So we believe the *Hugo*

7    *Boss* argument, but we can ignore that for today.  I want to

8    focus, your Honor, on they say that the dictionary is the

9    answer.  Right?  We don't look to TTB rules, even though this

10   is clearly a TTB beer.  We don't look to TTB rules; we look to

11   the dictionary to determine what is a beer and what is a malt

12   beverage.  But your Honor, first of all, their dictionary

13   definitions talk about a beer usually being made from malt.

14   Well, the unusual ones would also fall into any other version.

15   They talk about beers that can be made from sugar.  Well, your

16   Honor, and they say, oh, but those are secondary definitions.

17   When you deal with any other version, which is as broad as the

18   language gets, and we cited Second Circuit and Supreme Court

19   cases that talk about it's not just version, it's any other

20   version, any is as broad as it gets, says the Second Circuit,

21   and so says the Supreme Court.

22       And when we're saying, you know, so the fact that

23   something's a secondary definition, so what?  It could be any

24   other version.  But again, your Honor, I want to play on their

25   side, play in their box.  So let's, for the argument's sake,

</div>

Mb2WcerO

```
1    you know all the dictionary definitions that are problems for

2    them and consider only the ones that are good for them.  Even

3    assuming that, your Honor, no matter how ABI wants to define

4    lower case beer, there's no question that Corona Hard Seltzer

5    and Modelo Ranch Water have to be one possible version of beer.

6    We see that in a couple of different ways.

7            One, because it's undisputed that Corona Hard Seltzer

8    and Modelo Ranch Water are fully compliant and approved by the

9    TTB as beer, that has to be one version.  We think, you know,

10   we use dictionaries.  We think you use, that because of the

11   Hugo Boss Second Circuit law, we're not in dictionaries and

12   it's just TTB.  But we're ignoring that for now.  We're using

13   dictionaries.  Still has to be the case that when the federal

14   government and New York, which is where the contract --

15   right -- the law governing the contract and 44 states regulate

16   beer, regulate this product as, in some way as beer, malt

17   beverage or malt liquor, all of which they admit, when -- how

18   could that not be one possible version of beer as they're

19   sitting there and negotiating the contract?  We're not even

20   arguing now that, you know, the TTB has to control, but it has

21   to be one possible version of beer.

22           And your Honor, in response to that, what they say is

23   capital-B beer refers only to sort of subtypes.  Like it has to

24   be like a lager, you know, a lager or a pilsner.  Right?  But

25   your Honor, those are beer.  Right?  A version -- we actually
```

Mb2WcerO

1    agree on something.  A version has to be a particular form of

2    something differing in certain respects from the original.  And

3    your Honor, part of the disconnect is ABI saying it has to

4    retain particular defining characteristics.  But as I said,

5    your Honor, nonalcoholic, we have proof in the contract that

6    they're making that up, because nonalcoholic versions doesn't

7    retain -- if it's not alcoholic, it doesn't retain -- it

8    doesn't fit in pretty much any of their dictionary definitions.

9    And yet there's no debate nonalcoholic versions, especially in

10   the definition of beer, is allowed.

11          And then beyond that, your Honor, even if your Honor

12   doesn't look at this as a version of little-b beer, it has to

13   be also a version on or a variation on malt beverage.  And we

14   know that, your Honor, because we have ABI admitting that a

15   malt-based license, malt-based hard seltzer is licensed as a

16   malt beverage, and that's enough alone, your Honor, to conclude

17   that a gluten-free version of that same product has to be

18   licensed under any other version.  So what we have is a

19   gluten-free version of what they admit we can make.  It's a

20   gluten-free version of what they admit we can make, which

21   again, they didn't at the motion-to-dismiss stage, but they do

22   now.  They admit we can make a hard seltzer with malt.  This is

23   a gluten-free version of that.

24          But again, your Honor, we have more than that.  We

25   have them saying that actually there is no difference in the

Mb2WcerO

1  finished product.  And so obviously, your Honor, and

2  particularly when considering section 3.3, it has to be at

3  least one other version.

4           If I might, your Honor, and then I will sit down, one

5  other way to look at this is during discovery, when we said to

6  them, you know, we were talking about what little-b beer is.

7  Right?  And we said, well, of course little-b beer doesn't have

8  to have malt because there are plenty of malt-free beers on the

9  market, like, for example, Red Bridge, which is a beer that ABI

10 makes.  Doesn't have any malt in it.  OK?  So a beer that ABI

11 makes that doesn't have any malt in it.  There are lots of

12 them.  It has sorghum in it, which, like sugar, is a substitute

13 for malt, thoroughly recognized substitute for malt.  Right?

14          So there are beers out there on the market that don't

15 have malt in them.  So we said, well, of course, it doesn't

16 have to have malt.  Of course beer doesn't have to have malt.

17 Right?  So their response is yeah, true, but those beers

18 emulate the qualities of a malted beer.  And next thing you

19 know, all their witnesses, all the fact witnesses, all their

20 expert witnesses are talking about emulation, emulation of this

21 malt-free beer, your Honor.  No reasonable juror, your Honor,

22 could find that the sublicense permits malt-free beverages.

23 And by the way, when they're talking about emulation, just to

24 be clear, they're saying it emulates because it tastes like it

25 or it smells like it or it pours like it or looks like it.

Mb2WcerO

1    Right?

2            And what I'm saying, your Honor, is that no reasonable

3    juror could find that the sublicense permits malt-free

4    beverages, like Red Bridge, right, that emulate what ABI says

5    is a beer -- so because it looks like that yellow beer and

6    tastes like that yellow beer, even though it doesn't have malt

7    in it, it's fine; it's licensed, it's fine -- but prohibits a

8    malt-free beverage that emulates what ABI says, meaning the

9    malt-free beverage being Corona Hard Seltzer that emulates what

10   ABI says is an allowable malt beverage, which is hard seltzer

11   with malt.  Your Honor, I don't think any reasonable juror

12   could conclude that.

13           I will sit down and hopefully reserve some time.

14   Thank you.

15           THE COURT:  OK.  Thank you.

16           Mr. Steinberg.

17           MR. STEINBERG:  Thank you, your Honor.

18           Let me hand up some slides for the Court.  I'll put

19   them also on the monitor, and I'm going to move around a little

20   bit, because I think you've shortcut some of my argument today.

21           Thank you.

22           Your Honor, I want to start today with just the plain

23   and simple notion that plain meaning is really important for

24   clarity and predictability in contracts, and that what actually

25   Constellation is proposing as their theory of the case, they

1    claim it's unambiguous in its interpretation, is actually a way

2    of creating chaos because it takes a regulatory definition and

3    it inserts it into a contract and destroys the clarity of that

4    contract.

5           Today, we're talking about very simple -- very

6    simple -- words that are clearly defined.  They're common,

7    ordinary meanings.  They're identified in dictionaries, and

8    they're really all quite clear.  And Constellation's path, and

9    I'm not going to spend much time on their silent incorporation

10    of statutes, but that theory itself just is not only wrong, but

11    it's destructive.  And in fact, they can't even get there, as

12    I'll explain in a minute.  I think there's a Second Circuit

13    decision in the *Dish* case that I actually think is dispositive.

14           So let me go to slide two here.  I'll focus more on

15    this in our portion, but I think the plain meaning of beer is

16    quite well-known.  The plain meaning of malt is quite

17    well-known, and in both of these cases, it requires malt for

18    beer and flavored with hops.  And for a malt beverage, of

19    course, it has to have malt.  I don't agree, and I'll explain

20    why, that they get the rights to substitute, that they get the

21    right to change around and ignore malt, and that you can have a

22    malt-free version of a malt beverage.  I just think that that's

23    a logically flawed position.

24           Now, let me just go to slide three for a second.  I

25    mean they want to smuggle in, and you heard counsel for

Mb2WcerO

 1    Constellation trying to smuggle in the definition, the

 2    regulatory definitions, not only into the question of whether

 3    or not it's beer but whether or not it's a version.  And in

 4    both instances, they can't do it as a matter of law.

 5    Certainly, the *Hugo Boss* case doesn't help them.  In fact, the

 6    contract itself, the sublicense itself makes very clear that

 7    you can't incorporate by reference these types of regulatory

 8    definitions.

 9         I'll make it very clear.  There are three different

10    places in the sublicense where there are laws that are

11    discussed and that are specifically called out in the

12    sublicense by the type of law.  So, for example, confusingly

13    similar is defined in the sublicense.  Now, that's obviously a

14    trademark element, but they didn't rely on it just being

15    everybody knows it's a trademark.  The drafters wrote that you

16    have to look to the likelihood of confusion law pursuant to

17    federal trademark law as interpreted, as applied in the federal

18    courts in the state of New York.

19         Same with the abandonment of the trademark.  Could

20    have just written abandonment of trademark, but the authors

21    here, some of the marquee lawyers of the state, instead defined

22    it to be 15 U.S.C. 1127.

23         Same with intellectual property under the Bankruptcy

24    Code.  Again, quoted and defined in Section 101.  When the

25    authors of this agreement, when the parties to this agreement

Mb2WcerO

wanted to reference a federal law, they knew precisely how to

do so.  And that's why -- let me go to the next slide.  That's

why this case is actually, I think, decided it by a 2021 Second

Circuit case, *Dish v. Ace*.  And in that case, you had *Dish*, who

is the telecommunications company, claiming that they had been

sued for a function called the hopper, where you press the

button on your Dish and it skips over commercials, and there

were contract and trademark claims that Dish lost.  And so Dish

went after its insurer, and the point of this case that I want

to draw the Court's attention to is in that case the Second

Circuit said, "where the parties to this policy intended to

incorporate a legal or statutory definition of a term, the

policy says so explicitly."

That's what I just showed you in the sublicense, very

explicit references.  And in that case, if the parties had

intended the word "broadcasting," which was the undefined term,

to take on a definition assigned by the FCC or the FCA, the

regulatory agencies, they could have easily pointed to those

sources.  And as a result of that, the Second Circuit said we

reject Dish's invitation to discard the plain and ordinary

meaning of the term.  The parties here were as clear as could

be about what was going to be incorporated and what was not

going to be incorporated, and there is no evidence in the

record that there's any ambiguity about beer or malt beverage

that would allow these types of interpretations.  It's the

Mb2WcerO

 1   plain and ordinary meaning that controls.

 2           So let me go, and I would say the same thing, that the

 3   district court focused on the same very element, which we had

 4   on the bottom, which was that "where the 2011 policy intends to

 5   adopt a statutory definition of a term, it does so explicitly."

 6   That's just not the case here.  And frankly, I think that's

 7   actually the independent of their case.  I think *Dish* is the

 8   beginning and end of Constellation's case.

 9           Let me go and talk for a moment about -- actually, let

10   me talk about slide one of the rebuttal.  And this is in our

11   rebuttal deck, so I apologize.  It's going to take a moment to

12   pull it up.  But the license grant here, what allows them to

13   use the trademark is honed in on one thing and one thing only,

14   and that's beer -- beer with a capital B, as defined.  And all

15   of these, the trademark grant in 2.1 says that the grant of the

16   license is "solely in connection with importing, advertising,

17   promoting, marketing, and selling importer products and interim

18   products."

19           Importer products is beer produced in Mexico by

20   Constellation on behalf of Constellation beers.  So it's beers

21   produced under this agreement, pursuant -- or by a supplier

22   pursuant to a supply agreement.  Product, which is again part

23   of that, "means beer packaged in containers bearing one or more

24   of the trademarks."  Brand extension beer, again, is beer.  All

25   of these -- and container, this is actually my favorite.

Mb2WcerO

1   "'Container' means the bottle, can, keg or similar receptacle

2   in which the beer is directly placed."

3           Beer is a liquid.  It gets directly placed into the

4   containers.  That's what we're talking about, the plain and

5   ordinary meaning.

6           And instead, what you get from Constellation is a

7   bunch of claims that are, frankly, wildly exaggerated.  So, for

8   example, let me talk about this notion that because they

9   couldn't make a malt beverage, they get the right to make a

10  sugar beverage, sugar-based beverage and claim, well, it's

11  exactly the same.  That is just absolutely false.  We gave them

12  the right to make a malt beverage, and if they could make a

13  malt beverage, we wouldn't be bothering your Honor.  It's as

14  simple as that.

15          The problem was, and as your Honor acknowledged and is

16  aware in the record, the record shows they couldn't do it, and

17  they didn't want to do it for another reason too.  They

18  couldn't make it taste right.  OK.  But they also wanted to

19  claim gluten free.  They wanted that gluten free, and that

20  takes it out.  They're not the same.  They are not the same in

21  the marketplace, they're not the same in production, and they

22  couldn't make it taste the same.  If they could -- we say it

23  today, we've said it in the past -- if you want to make a malt

24  beverage, go for it.  We allowed Refresca, a malt beverage, to

25  go through.  That's not an issue, but they couldn't make it

Mb2WcerO

1    work.  They just couldn't make it work.

2         And so instead, they point your Honor to provisions of

3    the agreement that relate to functional substitutes.  And the

4    functional substitutes is really completely irrelevant.  It's a

5    red herring, your Honor, because for one thing, they've already

6    conceded in ECF-172 at 25 and ECF-214 at 23 that section 3.3,

7    this functional substitute language, only applies to a

8    preexisting recipe.  Only applies there.  And by the way,

9    again, it still, even with a functional substitute, has to be a

10   beer.  There's no exclusion in the beer definition for

11   functional substitutes.  The license grant is for beer, not

12   beer as modified by functional substitutes.

13        And so, for example, let's say there were a blight on

14   certain types of hops and they needed -- they come to Modelo

15   and they say, hey, we'd like to use not the very same ones that

16   you've sourced out of Mexico for generations; we'd like to use

17   a slightly different one from a different farm with slightly

18   different characteristics.  We think the taste isn't going to

19   matter.  And then we would evaluate that with a qualified

20   brewmaster -- by the way, a qualified brewmaster, not a

21   qualified seltzer judge.  But a qualified brewmaster would

22   determine whether or not this was a functional substitute.  And

23   of course, this is a trademark license, which requires Modelo

24   to have quality control.  And of course, we want quality

25   control.  The whole point, and the success of Modelo is built

1    upon the consistency of its presentation, the consistency of

2    its products, and the consistency of the taste.  Of course we

3    have an obligation to evaluate it and to make sure that they

4    meet the quality standards.

5            But the fact that they have a recipe right doesn't

6    mean that it changes it.  And they have a lot of rights to

7    innovation.  To be sure, they have rights to innovation, but

8    innovation within capital-B beer, not outside of it.  The

9    innovation isn't a trump card that they can use to play it out.

10           Again, I point to recipe.  Recipe is what you need to

11   make it reasonably necessary for a brewmaster to produce a

12   particular beer.  Whatever sole discretion they get, it's

13   constrained flatly by beer.

14           So I think that there's just really no ability for

15   Constellation to sort of suggest that plain and ordinary

16   meaning goes away here.  The plain and ordinary meaning does

17   not go away.  The plain and ordinary meaning is supplied by the

18   dictionaries.  And malt, for a malt beverage, is what creates

19   the source of alcohol.  That's for sure.

20           Now, there's been a lot of other suggestions here, and

21   let me go, I want to switch gears for a moment and switch to

22   versions. So let me go, I think slide 15 is where I want to

23   go.

24           So, actually, where I'm going to go, I think our

25   version argument, I think we all agree, everybody in the room

Mb2WcerO

agrees, what is the dictionary definition for version, your

Honor, and it's a particular form of something.  So there is a

class of a something, and version is a particular form of that

thing.  And it differs in certain respects, to be sure, but it

differs in a way that doesn't change it.  It has to be an

earlier form or other form of the same type of thing.  So

again, we sort of look at it.  Let's go to the next.  If you

actually substitute the word "beer" for the something, it makes

it all very clear:  A version of beer is a particular form of

beer differing in certain respects from an earlier form or

other forms of beer.

THE COURT:  It depends on the level of generality in

which you've defined, right?

MR. STEINBERG:  For sure it doesn't.  I'm glad your

Honor raised that, because what they actually say, and I agree

with this -- I don't agree with their position, but what they

say is, and they said it at the motion to dismiss, is that

theirs is a form of an alcoholic beverage.  To be sure, that's

correct.  And it is, for sure, it is a version of an alcoholic

beverage.  That doesn't make it a version of a beer.  And it

doesn't make it a version of a malt beverage, because, by the

way, for both beer and malt beverage, malt is the defining

feature.  You can't take the defining feature from the

definition.  I mean definition, defining feature, it's all the

same.  You can't regulate nugatory by saying it's a version and

Mb2WcerO

1    throwing it out.

2           Now, to be sure, there is a leveling issue.  Right?

3    And we talked about at the motion to dismiss whether or not a

4    car is a version of a tricycle.  You know, there are levels of

5    transportation, to be sure, but they're certainly not one.

6    Actually, I was happy you mentioned a red car, your Honor,

7    because let's take a look at an ordinary use of the word

8    "version."  So Porsche 911 Carrera coupe version, well, that's

9    a particular form of something that when you compare it against

10   the 911 convertible, it differs in certain respects from an

11   earlier form or other form of the same type of thing.

12          Now, next, a Ford Mustang -- great car, by the way,

13   love the car, but it's not a version of a 911.  OK?  It's just

14   not a version of a 911.  Now, we could level up and talk about

15   sports cars, and they would be, for sure, different versions of

16   sports cars, but that's not the level at which the beer

17   definition operates.  And so instead --

18          Let's go two more.

19          THE COURT:  Yes, but back up for a minute.

20          MR. STEINBERG:  OK.

21          THE COURT:  You can make arguments about your 911

22   comparison.  I mean one's got a roof, one doesn't have a roof.

23   If we're talking about the something being a convertible, then

24   the 911 coupe and the 911 convertible versions are not

25   different versions of the same thing.

Mb2WcerO

1    MR. STEINBERG:  In a sense -- right, we're asking, but

2    we already have this implied comparison.  We have beer.  We

3    already have this implied comparison, so now we're asking are

4    there other versions of beer, versions of the foregoing?  Is it

5    a version of beer?  Is it a version of an ale?  A stout,

6    porter?  Is it a version of a malt beverage?  We already have

7    the comparator.  Right?  We have that and it's stable.  And the

8    defining feature of beer is flavored with hops, made with malt.

9    The defining feature of malt is made with malt.  It's not a

10   version if you have to blow those two up.  It doesn't remain a

11   version.

12       And what's interesting, too, about their argument,

13   actually, they try to sneak the regulatory definitions back

14   into it, and they say in their brief, and this is actually what

15   I call *Hugo Boss* part 2, because what they really do is they

16   say -- and you heard Constellation's counsel try to do it

17   today -- well, for sure, it's a regulatory version of a beer

18   because the TTB governs it, and therefore, it must be and, you

19   know, you have this malt definition.  Of course, under the IRC,

20   malt is not required.  So it's a version, version, version.

21   And they say but there's actually a limit, and the limit is

22   because, well, again, it's based upon regulation.  So they said

23   the CBI products are at the very least one possible form of

24   beer.  Why?  Because of regulations.

25       So they're smuggling *Hugo Boss* right back in.  They're

Mb2WcerO

1    doing violence to the word "version."  Violence.  And then they

2    say, oh, but no worries because there's a limit to what we want

3    to do because Chardonnay, cola and water are not regulated as

4    beer and malt beverages.  But they are using the regulatory

5    regime to define the common and ordinary uses of the word.

6    They've smuggled it back in, and I think that's improper.

7          I want to mention one other thing, which I think is

8    just vastly wrong, but they make a lot about nonalcoholic.  We

9    heard a lot about nonalcoholic in the presentation, but your

10   Honor, in our brief, filed at document 232 -- for sure, there

11   are too many briefs, but this is Modelo's reply in support of

12   its motion for partial summary judgment, and in footnote six of

13   that, we cited a nonalcoholic definition of a version, what

14   does nonalcoholic mean?  And nonalcoholic means that it still

15   has to -- here, let me -- of or relating to or being a beverage

16   whose alcohol content is very low or negligible.

17         The fact is that to make beer, you're going to

18   ferment.  You're going to create alcohol, and what the

19   nonalcoholic, the common and ordinary use of that word, as

20   defined in the dictionary, is you then remove or limit the

21   production of alcohol.  That doesn't mean it's at a zero.  That

22   means nonalcoholic, and that's the dictionary definition, the

23   plain and ordinary meaning.  The very production of it is going

24   to create alcohol.  You can limit it, but when it says

25   nonalcoholic versions of the foregoing, that, again, is a

Mb2WcerO

1    dictionary defined term, meaning of or relating to a very low

2    amount of alcohol.

3            So I think, when I think about Constellation's case,

4    Constellation, the only way the case gets traction is by

5    incorporating things that the parties said they weren't going

6    to incorporate.  It's just as simple as that.  They claim that

7    their contract, their interpretation is an unambiguous

8    interpretation.  We say that's not true.  We say that that

9    route, that route which is legally flawed, we say instead that

10   there is a plain and ordinary path, a plain and ordinary

11   meaning path.  It's the path that reflects the intent of the

12   parties.  It's the path that the Second Circuit said was the

13   appropriate path in the *Dish* case, and it's true to the words

14   of version.  It's true to the meaning of version.

15           You cannot have a malt-free version of a malt

16   beverage.  It does violence to that word.  It does violence to

17   the malt beverage.  And the fact is, again, we would not be

18   here if they made it from malt.  The record shows, and what we

19   learned in discovery, is they tried.  The first iteration out

20   of the box for them was to create a malt beverage, and it got

21   rejected.  It got rejected for taste and, for sure, it got

22   rejected for marketing, because they wanted to make a

23   gluten-free claim.  Both.  But that's not allowed.  That's not

24   what the contract permits, and there's no basis to ignore the

25   malt requirement for purposes of this beverage.

Mb2WcerO

1          I'll be happy to sit down and reserve the rest of my

2     time.

3          THE COURT:  OK.

4          Ms. Goldstein, if you want a brief rebuttal, you can

5     have it, but I'm running the clock.

6          MS. GOLDSTEIN:  So, your Honor, I want to go back to

7     section 3.3, which is, again, the substitutes.  What we're

8     literally saying, your Honor, is we can make -- and by the way,

9     3.3 does relate to the brand extension beers.  Those are the

10    new beers that you're allowed to make.  Right?  The new, what's

11    newly allowed to innovate.  They keep on trying to say it

12    doesn't, but it does, because the title there importer

13    products.  Importer products is defined to include brand

14    extension beers.  So it absolutely does apply to us.  And what

15    they're basically saying is we can literally make one can of

16    what they admit we can make, Corona Hard Seltzer, with malt in

17    it, and then we'd be able to substitute for sugar.  Right?

18         That's commercially unreasonable.  But commercially

19    unreasonable, your Honor, so you understand, and I think we had

20    this in the papers, they're waiting in the wings to make Corona

21    Hard Seltzer with sugar.  They have an intent to use.  So what

22    they're saying is we can have, on the same shelf, right, a

23    Corona Hard Seltzer with malt that is an allowable path for us;

24    we're allowed to make Corona Hard Seltzer with malt, and

25    they're waiting to make a Corona Hard Seltzer with sugar.  The

application's out there.  I heard him talk about commercially

reasonable, my friend here.  That's commercially unreasonable.

We're going to have Corona Hard Seltzer with malt.  And

confusingly similar, I believe he used those words too.  We're

going to have Corona Hard Seltzer with malt, and their Corona

Hard Seltzer with sugar is going to be right next to it.

          Your Honor, it cannot be that we can make a Corona

Hard Seltzer with malt and can't make a Corona Hard Seltzer

with sugar when they've admitted that they are functionally the

same.  And your Honor, Mr. Steinberg said malt is the defining

feature for beer.  But Red Bridge and other beers that are out

there on the market now don't have malt.  So it can't be a

defining feature, as they're defining it, for beer.  Those

don't have malt.  That was the whole emulation.  When we made

that point, all of their witnesses started talking about, yeah,

yeah, yeah, but it emulates beer.  It emulates beer.

          OK.  Well, what we're doing emulates their definition

of a malt beverage.  By the way, there is a different real

definition of a malt beverage, but again, we're playing on

their turf today.  Their definition of a malt beverage, our

beer absolutely emulates -- Corona Hard Seltzer emulates that

version of a malt beverage, looks, tastes, smells the same,

just like Red Bridge and the other malt-free beers on the

market emulate what they call Corona Extra.

          And your Honor, we know that versions includes things

Mb2WcerO

without, as Mr. Steinberg will call it, the key ingredient,

because, again, the contract makes clear any other version is

including nonalcoholic.  There's no debate.  Right?  I'm sure

if we made an alcohol free, they'd come in and say, oh, you

can't do that either.  But the contract clearly says it can be

nonalcoholic.  They have no answer to that.

        And your Honor, they didn't answer our Tesla analogy

either when we were talking about cars.  We said the dictionary

defines an automobile to have four wheels, operating on

ordinary roads, and gasoline or diesel combustion engine.

Well, Tesla's a version of an automobile without the combustion

engine.  So your Honor, no answer to that.  And it has to be

the case, your Honor.

        THE COURT:  Wasn't a Stanley Steemer an automobile?

        MS. GOLDSTEIN:  Honestly, your Honor, I don't know.

        THE COURT:  I think it was.

        MS. GOLDSTEIN:  But again, your Honor, we know there

has to be some, it has to allow for some of what they're

calling defining characteristics.  By the way, this defining

characteristic that they're focused on mentioned nowhere --

nowhere -- in the contract, nowhere, despite the fact that many

other things are mentioned.  And your Honor, I have to say if

you're an executive negotiating this contract and you had

really intended that there has to be malt, there can't be a

malt substitute, that you as a beer executive know you can use

Mb2WcerO

```
1    every day, right, the 27 C.F.R. 2515 materials for production

2    of beer, malt is a substitute -- sugar is a substitute for

3    malt.  So you're a beer executive.  You're allowed to use a

4    substitute, use various substitutes, you use them all the time.

5    But you're intending as you're sitting in that negotiation that

6    there must be this malt requirement.  Would you have really

7    drafted a contract, your Honor, that has all the provisions

8    about entirely new recipes.  We can make entirely new recipes.

9    We can have those substitutions in 3.3 as long as it doesn't

10   change.

11           THE COURT:  I think we're just re-covering what you

12   said before.  I think you should wrap it up.

13           MS. GOLDSTEIN:  I would like, your Honor, because I

14   think there's been violence done, I think was his word, but

15   there's been violence done to *Hugo Boss*.  We are not smuggling

16   *Hugo Boss* into, his words, into the that's why this has to be

17   one possible version.  If *Hugo Boss* controls, and your Honor,

18   we do believe *Hugo Boss* controls, then we're in a world where

19   because the -- and I did give your Honor a side by side; I just

20   want to look at it very briefly.  Because the beer

21   definition -- beer, ale, porter, stout, right -- comes

22   directly, obviously, and they admit.  You remember the red line

23   that they did.  They admit that beer, ale, porter, stout starts

24   from the TTB definition.  They admit that.  So beer reads beer,

25   ale, porter, stout, and then goes on.  They admit that that
```

Mb2WcerO

| | |
|---|---|
| 1 | comes from the TTB definition of beer.  And because of that, |
| 2 | because it's rooted in this TTB definition of beer, then we say |
| 3 | the TTB definition of beer controls.  If that's the case, of |
| 4 | course we wouldn't because sugar is a substitute for malt under |
| 5 | TTB, but that's not the argument we're making. |
| 6 | THE COURT:  It doesn't, and that ship sailed months |
| 7 | ago. |
| 8 | MS. GOLDSTEIN:  But, your Honor, what I'm saying is, |
| 9 | my point is we are playing on their turf today.  So if TTB -- |
| 10 | if *Hugo Boss* controls, there would be nothing to talk about. |
| 11 | We wouldn't be talking about dictionaries. |
| 12 | I'm saying even looking at the dictionary definitions, |
| 13 | right, focusing on dictionary definitions, where our contract |
| 14 | says including any other versions, it's fair to say that a TTB |
| 15 | version is a version.  It may not be -- you know, if your Honor |
| 16 | doesn't think *Hugo Boss* controls, then that just means the |
| 17 | construct we're dealing with can include dictionaries and plain |
| 18 | meanings.  But that's not the same.  It's not the same |
| 19 | argument.  I just want to make that clear, your Honor.  It is |
| 20 | not the same argument. |
| 21 | THE COURT:  OK.  Let's wrap it up. |
| 22 | MS. GOLDSTEIN:  All right. |
| 23 | And your Honor, I don't -- I think with respect to -- |
| 24 | I don't know whether your Honor wants to hear about all the |
| 25 | record evidence that exists. |

Mb2WcerO

1          THE COURT:  Nothing else now.

2          MS. GOLDSTEIN:  OK.

3          THE COURT:  OK.  The defendants' motion for summary

4    judgment is going to be denied.

5          Let's hear from the plaintiffs on their motion for

6    partial summary judgment.

7          MR. STEINBERG:  Your Honor, with regard to the

8    plaintiffs' motion, I think it's a very simple case, and New

9    York law requires the common and ordinary use of dictionary

10   definitions.  The Second Circuit makes clear that dictionaries

11   supply the reference.  It allows the parties not to be

12   surprised, and it allows the parties to understand the

13   contracts that they enter into.

14         There is no dispute in the record about what is a

15   dictionary definition of beer.  Beer must be flavored with hops

16   and it must have malt.

17         THE COURT:  What about the word "usually"?

18         MR. STEINBERG:  So I think "usually" actually adopts

19   the New York legal standard, because that's what it is.  What's

20   the opposite of usual but unusual?  "Usually" means that it's

21   the usual, common, ordinary, everyday meaning.  I actually

22   think that that just dovetails perfectly into what is the New

23   York legal standard, because we're not talking about uncommon

24   uses here.  In unusual situations it means this.  If there were

25   an unusual situation, I think that would be one thing.  But

Mb2WcerO

1    that makes it actually, I think, not a usual and ordinary --

2            THE COURT:  But the language implies, arguably, that

3    in unusual situations, something without malt or without hops

4    is still within the definition of beer.

5            MR. STEINBERG:  Well, I would actually think that --

6            THE COURT:  Unusual, but it can be.

7            MR. STEINBERG:  But that's the point, is I think to me

8    it's the unusual question.  I'll make sure I'm speaking into

9    the mike.

10           It's the unusual point that makes it so actually

11   important, because the common and ordinary meaning of the words

12   and what we're to identify -- again, you have to go by

13   reference to a dictionary.  And again, if New York law is what

14   is the common, usual, ordinary course, then it's just the two

15   dovetail, and that's our position on it.

16           THE COURT:  I don't think the word "usually" is in the

17   New York standard.

18           MR. STEINBERG:  Well, it's common, and I've seen --

19   and I'll find it.  Also, I think it is usually, but that case

20   is not coming to mind.  And let me just sort of play it around

21   with you.

22           So there are, and I've seen those dictionary

23   definitions, your Honor.  We have ten different dictionary

24   definitions or nine that we have.

25           THE COURT:  You've got them outnumbered on

Mb2WcerO

1    dictionaries.

2          MR. STEINBERG:  Well, it's the quality, not the

3    quantity.

4          THE COURT:  That's what they say.

5          MR. STEINBERG:  And we would agree, but we think that

6    this certainly defines the parameter.  But the point would

7    be -- so, let's assume that there's a usually made with cereal,

8    malted cereal usually made with malt.  That doesn't save them

9    at all here, because to be for it to be a small-b beer, it has

10   to be flavored with hops.  Flavored with hops, and they have no

11   evidence of that.

12         In fact, their 30(b)(6) witness said that

13   Constellation agrees that the hops acid extracts it uses does

14   not have aroma-flavor functionality.  They admit that the only

15   quote/unquote hops that they add, the hops extract is made as a

16   preservative, not for flavoring.  So let's assume that you can

17   say that it usually means that malt is not always required.

18   Let's just go there.  It doesn't help them, because under beer,

19   they still have to have flavored with hops, and they don't have

20   it.  Simply put, they don't have it.

21         And so that's fine for small-b beer, and of course,

22   for malt beverage, it has to have malt.  So I think just under

23   a very plain meaning, Constellation loses.  I don't think it's

24   very tough to get to the answer of why is that true?  And if

25   it's not a beer or it's not a malt beverage, it has to be a

Mb2WcerO

1    version of the foregoing, and it's not a version of the

2    foregoing.  And again, we get back to the question of what is a

3    version, and the parties do not disagree on the dictionary

4    definition of that.  It's all quite clear.  So this is and

5    always has been a very simple case.  And I want to address one

6    item, this gluten free, because I think it's sort of a big red

7    herring.

8            First, you know, they mentioned Red Bridge.  This is

9    sort of in the unusual camp.  Red Bridge is .015 percent of

10   ABI's U.S. volume.  .015 percent.  We are talking rarest of the

11   rare.  And while there's nothing in the record suggesting the

12   existence of a malt, of an unmalted sorghum, but let's just

13   pass that for a moment, because let's assume that there's some

14   product made without malted grain, but it's not a beer under

15   the plain and ordinary meaning of the word, because it doesn't

16   have malt.  And under New York law, the plain and ordinary

17   meaning is dispositive to interpret a contract, and we look to

18   the dictionary.  And again, it's got to be made from a malted

19   grain.  So this hypothetical goes nowhere.

20           But there is a way to get around the plain and

21   ordinary meaning of a word, and that is to claim that it is

22   trade usage.  On this motion, they've been very clear that

23   they've disclaimed all trade usage.  Now, we can have that

24   debate about whether or not they meet the standard for trade

25   usage.  We cite that standard as the *Law Debenture* standard,

Mb2WcerO

1  which requires that the usage be general, uniform, and

2  unvarying.  But they have no evidence that they're going to

3  meet that standard.  They disclaimed it in opposition to this

4  motion.  They've said that trade usage on both sides is

5  irrelevant to these motions.

6       So, your Honor, I think this is really quite a simple

7  case, and they've made it very simple.  We've said it's simple

8  all along.  We do not agree that they can smuggle in the

9  portions of the regulatory world that they like and disregard

10  other regulations that they don't like.  This is a simple case.

11  The dictionary defines the case, defines malt beverage, defines

12  beer, and that's the beginning and end of it.

13       Thank you, your Honor.

14       THE COURT:  Thank you.

15       Ms. Goldstein.

16       MS. GOLDSTEIN:  Your Honor, I don't see anywhere in

17  the contract where it says that what percentage of business the

18  product is going to be helps define whether the product is in

19  or out, your Honor.  So the fact that Red Bridge is a small

20  percentage, so what?  It goes back to maybe these are unusual,

21  but as your Honor said, I think, you know, any other versions,

22  of course, includes unusual, unusual beers as well.  And your

23  Honor, of course there is, in light of your Honor's ruling, at

24  least a fact issue as to what is a beer and what is any other

25  version.  And the record is replete at this point with clarity,

Mb2WcerO

1    frankly, for our position on this, your Honor, but that's not

2    for summary judgment, your Honor.

3          But there is, between trade usage in terms of beer,

4    wine, spirits category and the course of dealing between the

5    parties and the negotiation history and everything that they

6    have said about what beer is, what they told the DOJ that beer

7    is, what they said in their press release, press releases beer

8    is, how we outright own the Modelo business now, etc., etc.,

9    your Honor, and again, literally telling the DOJ that beer is

10   defined, the beer that we have been making is, the Corona Hard

11   Seltzer is defined by the federal TTB definition and includes

12   specifically citing the malt beverage alternatives, etc.  And

13   between all the negotiations, they make clear that Corona Hard

14   Seltzer would be a product that would be included, your Honor.

15         There's just no question that the record is replete at

16   this point with fact issues, in light of your Honor's ruling,

17   on what is beer and what is versions and what is any other

18   version, your Honor.  So for all the reasons we cite in our

19   motion that we think were right, we think those oppose their

20   motion as well, and there are a lot, your Honor, of, you know,

21   of documents and testimony that make clear that we're right

22   here.

23         And I do, your Honor, just want to say, I really

24   didn't talk much about "any" and "other."  You know, "any" is

25   indiscriminately of whatever kind, any other versions.  "Any"

Mb2WcerO

1    is indiscriminately of whatever kind.  Right?  As I mentioned,

2    Supreme Court, Second Circuit have made very clear, it is very,

3    very expansive.  And "other" is distinct from those first

4    mentioned.  And your Honor, it's clear to us that in the beer,

5    ale, porter, stout malt beverage, that's saying that there are

6    five items in the definition of beer -- beer, ale, porter,

7    stout, malt beverages.  And then there's a sixth group, and

8    that sixth group of products is any other versions or

9    combinations of the preceding list of products, your Honor.

10          I think, your Honor, there's no debate that there is,

11   in light of your Honor's ruling, at least a fact question as to

12   what the intent of the parties here was in beer, and

13   unquestionably, your Honor, the summary judgment should not be

14   granted for plaintiffs here, your Honor.

15          Thank you.

16          THE COURT:  Thank you.

17          Anything else, Mr. Steinberg, in closing?

18          MR. STEINBERG:  Just one thing, your Honor.

19          I did find the case that I wanted to cite to your

20   Honor about "usual," and this comes from a case, *Ability*

21   *Insurance Company v. St. Paper LLC*, Judge Daniels, March 29,

22   2022, 2022 WL 912927 at *5.  And in that case, Judge Daniels

23   describes the New York standard as plain, ordinary, and usual

24   meaning.

25          And so, look, I think at the end of the day, we all,

Mb2WcerO

1    everybody agrees that this is sort of -- I hate to come back to

2    it, but it's the man in the pub issue.  If I order a beer, I'm

3    not going to be pleased when it comes back as a hard seltzer,

4    and it's just simply the ordinary and common usage of the word.

5    Some words are so simple and so basic, like beer, that we know

6    what they mean.  They haven't identified a factual issue that

7    requires a trial.  Of course, if you want a trial, we'll have a

8    trial, but they haven't identified a basis for one at this

9    moment.

10           With that, your Honor, thank you very much.

11           THE COURT:  Thank you.

12           If, for the sake of argument, both motions were

13    denied, how long a trial do you anticipate?

14           MR. STEINBERG:  Your Honor, do you want me to go to

15    the lectern?

16           THE COURT:  You can stay where you are as long as I

17    can hear you.

18           MR. STEINBERG:  Thank you, your Honor.

19           I think that before a trial, there needs -- I was

20    hoping that we would have a two-week trial, but I think there's

21    a lot of evidence that needs to be stripped away.  I think this

22    case is in bad need of some motions *in limine*, because there

23    are a number of different issues that need to be stripped away

24    to have us ready for trial.  And it's unfortunate, but -- I'm

25    not blaming either side; I just think that in a case like this,

1    people come up with a lot of creativity.  But I think that

2    creativity has to be stripped away.  And so my suggestion, of

3    course, not meaning to impose on your Honor, is that we have a

4    series of motions *in limine*, because I think that will change

5    the scope of this case immensely.

6         I think, for example, if motion *in limine* No. 1 were

7    the elimination of regulatory meanings, the *Hugo Boss*, that

8    would by itself cut down quite a lot.  Now, your Honor hasn't

9    decided that.  Your Honor just denied their motion, but I think

10   if we were to address those, they have a series of other claims

11   that we'd like to address.  They're going to have, of course,

12   *Daubert* motions on our experts; we're going to have *Daubert*

13   motions on theirs.  But I do think this case cries out for some

14   motions *in limine*, and it will, but with the goal of getting it

15   to a two-week trial.

16        Thank you.

17        THE COURT:  Ms. Goldstein.

18        MS. GOLDSTEIN:  Your Honor, I actually agree.  I

19   probably would reverse some of what was said, but we agree.  We

20   think there's motion practice that would be quite useful and

21   also envision a two-week trial.

22        THE COURT:  And you people -- not that I'm trying to

23   dissuade you; don't misunderstand -- have a jury demand and you

24   think you're going to try this to a jury?

25        MR. STEINBERG:  Yes, your Honor.

Mb2WcerO

1          Your Honor, with that stated, I would go back to my

2     client.  Maybe I'd have a different perspective on it.

3          THE COURT:  Well, I'm not urging you.

4          MR. STEINBERG:  I know you're not urging me.

5          THE COURT:  Because this --

6          MR. STEINBERG:  I urge clarity, so I want to have that

7     discussion with my client before we make that finding.

8          THE COURT:  I've given a lot of thought to how a jury

9     would approach this case, and -- well, OK.  I won't say any

10    more about that.

11         There's another subject I want to discuss with

12    counsel.  I don't really know, but I assume one side at least

13    is a public company.  Right?

14         MR. STEINBERG:  Both.

15         THE COURT:  Both.

16         MR. STEINBERG:  Both companies are public.  Modelo is

17    a subsidiary of AB InBev, which is a public company.  And

18    Constellation itself is a public company.

19         THE COURT:  OK.  So I think to avoid anything coming

20    on to the public record that possibly should not come on in

21    this context, I would like to see Ms. Goldstein and

22    Mr. Steinberg in the robing room with the reporter, and then we

23    can decide whether we just release the transcript or whether

24    there's some reason not to.  OK?

25         (Pages 48-51 SEALED)